**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 19-23851-Mc-UNA



IN THE MATTER OF
THE EXTRADITION OF                 **FILED UNDER SEAL**
ROBERTO GUILLERMO BRAVO

_____/

### COMPLAINT
### (18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on
information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligations to the
Argentine Republic ("Argentina").

2.      There is an extradition treaty in force between the United States and Argentina, the
Extradition Treaty Between the United States of America and the Argentine Republic, U.S.-Arg.,
June 10, 1997, S. TREATY DOC. NO. 105-18 (1997) (hereinafter, the "Treaty").  [EX-BRAVO-
0006 to EX-BRAVO-0031]

3.      Pursuant to the Treaty, the Government of Argentina has submitted a formal request
through diplomatic channels for the extradition of Roberto Guillermo Bravo ("Bravo").  [EX-
BRAVO-0005]

4.      According to the information provided by the Government of Argentina, Bravo has been
charged with sixteen counts of aggravated homicide and three counts of attempted aggravated
homicide.  [EX-BRAVO-0636 to EX-BRAVO-0653]  Aggravated homicide and attempted
aggravated homicide are proscribed by Argentina's Penal Code, including Articles 42, 44, 45,
55, and 80.  [EX-BRAVO-0630 to EX-BRAVO-0631]

1

5.     The offenses are alleged to have been committed within the jurisdiction of Argentina.  A warrant for Bravo's arrest was issued on February 1, 2008, by Judge Hugo Ricardo Sastre, Federal Judge of First Instance, City of Rawson, Province of Chubut, Republic of Argentina. [EX-BRAVO-0654 to EX-BRAVO-0657]

6.     Judge Sastre issued the warrant based on Bravo's alleged participation in the August 22, 1972, Trelew massacre, where sixteen prisoners were killed and three others were wounded at an Argentine Navy base in Trelew, Argentina, as described in more detail below:

    a.     On August 15, 1972, twenty-five prisoners affiliated with groups opposed to Argentina's *de facto* military government escaped from the Rawson Penitentiary located in Chubut Province, Argentina.  Nineteen of the prisoners were recaptured and taken to the Almirante Zar Naval Air Base in Trelew, Argentina (hereinafter, the "Base").  [EX-BRAVO-0165 to EX-BRAVO-0166]

    b.     The Base where the prisoners were held was controlled by the Argentine Navy. During the time the prisoners were detained there, Bravo was a lieutenant in Argentina's Naval Infantry Battalion No. 4 and present at the Base.  [EX-BRAVO-0167]

    c.     Bravo and other naval officers at the Base subjected the prisoners to increasingly harsh punishments during their detention.  According to a survivor of the massacre, Ricardo Rene Haidar, Bravo was the officer who treated the prisoners most aggressively.  He would make the prisoners lie on the floor completely naked for long periods of time.   Bravo also ordered one of the prisoners to sweep the corridor while naked.   In addition, Bravo commanded the prisoners to assume stress positions, including placing their fingertips against the wall, with their bodies straight and inclined, and their arms and legs outstretched.  [EX-BRAVO-0663]

    d.     A second survivor, Maria Antonia Berger, recalled Bravo holding a loaded pistol

2

to the head of one of the prisoners, Clarisa Lea Place, while threatening to kill her because she refused to lie on her back on the floor. Berger also described how the guards conducted a mock shooting one night. Like Haidar, Berger testified that the prisoners were required to follow orders while naked, and that they were commanded to assume painful stress positions. [EX-BRAVO-0668 to BRAVO-0669; EX-BRAVO-0773]

e.     The third survivor, Alberto Camps, overheard Bravo telling a subordinate that instead of feeding the prisoners, they should kill them. [EX-BRAVO-0760] Camps also identified Bravo as one of the naval officers who subjected the prisoners to harsh treatment. [EX-BRAVO-0658]

f.     The massacre of the prisoners occurred in the early morning of August 22, 1972, around 3:30 a.m., when all nineteen prisoners were sleeping in their cells. Bravo, along with four other naval officers, arrived at the cells carrying machine guns and .45 caliber pistols. The officers ordered the prisoners to stand in a line outside their cells with their heads down. Moments later, the naval officers shot at them from a close distance. Many of the prisoners were killed instantly from this initial round of gunfire. The naval officers then proceeded to discern whether there were any survivors and attempted to execute them. Bravo located several prisoners who did not die in the initial salvo and used his pistol to shoot Camps and Mario Emilio (also referred to as Alberto) Delfino, fatally wounding Delfino. [EX-BRAVO-0893 to EX-BRAVO-0894]

7.     Following the shooting, other Base personnel arrived on the scene and transferred six individuals to the infirmary. Of those individuals, only three—Haidar, Camps, and Berger—survived. [EX-BRAVO-0894]

8.     The three survivors of the massacre (now deceased) and other witnesses recounted the

3

events of August 22, 1972:

    a.    Camps recalls being woken up around 3:00 a.m. by Bravo and another naval officer, Lieutenant Commander Luis Emilio Sosa.  Sosa and Bravo were shouting insults at them and threatening that the prisoners would now "know what the anti-terror repression is."  Contrary to prior practice, all of the prisoners' cell doors were opened at the same time rather than their being taken out one at a time.  The prisoners were then ordered to line up in the hallway. Moments later, there was a burst of gunfire.  Camps' initial thought was that this was a mock shooting with the officers using blank cartridges.  But then he saw a fellow prisoner fall to the ground and he realized the officers were using live ammunition.  Camps hurled himself back into his cell, as did his cellmate, Delfino.  Camps then heard more gunfire.  A few moments later, Bravo approached Camps' cell, holding a pistol in his right hand, and ordered Camps and Delfino to stand up.  Bravo then demanded to know whether Camps was going to answer all the questions that were posed to him in an earlier interrogation.  When Camps refused, Bravo shot him in the stomach.  Bravo then trained his gun on Delfino and fatally shot him at close range. [EX-BRAVO-0756; EX-BRAVO-0660 to BRAVO-0661]

    b.    Haidar similarly recalled being awoken by the shouts of Bravo and Sosa at approximately 3:30 a.m. on the morning of the massacre.  Bravo and Sosa ordered the prisoners to fold their mattresses and blankets, line up in the hallway, and look down.  At the end of the corridor, Haidar could see two or three other officers with machine guns.  Bravo and Sosa walked up and down the line of prisoners while threatening them with comments like, "the worst thing you could have done was to meddle with the Navy" and, "now you'll see how we terrorize guerrilla members."  The prisoners remained silent and did not move.  Then, all of a sudden, there was a burst of machinegun fire.  Haidar retreated into his cell with another prisoner,

Alfredo Kohon, and crouched below a slab of concrete that functioned as a bed. After the initial gunfire subsided he heard Bravo call out, "this one is still alive," and then an isolated shot. This repeated several times. Bravo then entered Haidar's cell with a gun in his hand and demanded to know whether Haidar and Kohon were going to provide information. When the prisoners answered affirmatively, Bravo left. But another naval officer then appeared and shot Haidar, wounding him, before proceeding to fatally shoot Kohon. The shooting was followed by a period of silence, punctuated by Bravo saying in a loud voice, "They tried to escape! Pujadas tried to grab the Captain's gun, he tried to fight back!" Haidar testified that Bravo's statement was completely false. The prisoners did not attack the officers and they had not attempted to escape. [EX-BRAVO-0769; EX-BRAVO-0664 to EX-BRAVO-0666]

      c.      Berger also recalled being awoken by the shouts of Bravo and other naval officers at 3:30 a.m. on the morning of the massacre. The officers threatened the prisoners, warning that they "were going to be taught a lesson about meddling with the Navy," and that the prisoners would "provide information that night, whether [they] liked it or not." The prisoners were ordered to form a line outside their cells and look down at the floor. Like Camps, Berger reported that this was the first time the prisoners were given such an order. Suddenly, the officers began firing their weapons at the prisoners. Berger herself was struck multiple times. She saw a fellow female prisoner, Maria Angelica Sabelli, whose breathing first became more labored before she stopped moving. Berger also saw another female prisoner, Ana Maria Villareal de Santucho, lie motionless. Berger heard Bravo screaming at Camps and Delfino to provide information and, when they refused, she heard more gunfire. Later, Berger overheard the officers beginning to invent a story to justify the assassinations. [EX-BRAVO-0773; EX-BRAVO-0669 to EX-BRAVO-0670]

      d.     Navy corporal Carlos Amadeo Marandino was the officer on guard duty at the time of the massacre.  Marandino testified that everything was normal during the first three hours and fifteen minutes of his shift, which ran from 12:00 a.m. to 4:00 a.m.  The prisoners were asleep and had not caused any trouble.  However, at 3:15 a.m., Bravo, Sosa, Lieutenant Emilio Jorge Del Real, Captain Juan Carlos Antonio Herrera, and a fifth person he could not identify, arrived at the prison cells smelling of alcohol and carrying pistols and machine guns.  They ordered Marandino to open the cell doors and disarm.  Once Marandino fulfilled that order, Marandino claimed that he was instructed to leave.  Marandino testified that he retreated behind a screen that separated the guard area from the cells.  From behind the screen, Marandino recalled hearing a lot of shouting, the singing of the national anthem, someone shouting "they are trying to escape," a burst of gunfire followed by a pause, and then more shooting.  Marandino went to see what was happening.  The naval officers gave him a pistol and told him to check the bodies.  When Marandino entered the corridor outside the cells he saw lots of blood and many bodies piled one on top of the other.  Marandino further testified that the claim the prisoners were trying to escape was not credible.  Marandino explained that in connection with a prior military investigation conducted just after the massacre, a ranking officer instructed him to support the official account of events, including the false allegation that the prisoners attempted to escape the Base, which prompted the shooting.  The Argentine courts similarly found that the military investigation was fatally flawed and further concluded that Marandino minimized his culpability and was a participant in the shooting.  [EX-BRAVO-0684 to EX-BRAVO-0692; EX-BRAVO-0733 to EX-BRAVO-734; EX-BRAVO-0194]

      e.     Miguel Fernando Marileo, an employee at a funeral home in Trelew, Argentina, testified about his observations of the deceased prisoners on the night of August 22, 1972.

Marileo saw that one of the victims, Santucho, was pregnant and had been shot multiple times in the abdomen.  Marileo also saw that another female victim, Sabelli, had been shot in the back of the neck.  A third victim, Mariano Pujadas, appeared to have been shot ten or eleven times.  [EX-BRAVO-0828 to EX-BRAVO-0830]

9.      Several of the other participants in the Trelew massacre were tried for their roles in the massacre, including Sosa, Emilio Jorge Del Real (a lieutenant in the Naval Air Force), and Marandino.  On October 15, 2012, the Federal Oral Criminal Court of Comodoro Rivadavia (the "Trial Court") issued a written decision finding Sosa, Del Real, and Marandino guilty of sixteen counts of aggravated murder and three counts of aggravated attempted murder, declaring that their offenses qualified as "crimes against humanity," and sentenced the defendants to life imprisonment.  [EX-BRAVO-1005 to EX-BRAVO-1009]  The Trial Court made several relevant factual findings, including the following:

a.      Bravo was among the naval officers who, carrying weapons, arrived at the prisoners' cells at approximately 3:30 a.m. on August 22, 1972, abruptly woke the prisoners, and forced them to stand in line in the corridor with their heads down.  A few minutes later, the naval officers used machineguns and .45 caliber pistols to shoot indiscriminately at the prisoners from close range, immediately killing several of them.  Bravo then forced Delfino and Camps, two of the prisoners who had survived the initial round of gunfire, to stand up in their cell and declare whether they would cooperate in an interrogation.  Upon their refusal, Bravo shot and wounded Camps, and killed Delfino.  [EX-BRAVO-0893 to EX-BRAVO-0894]

b.      The Trial Court rejected the defendants' argument that they had acted in self-defense and in order to repel a prison break.  The Trial Court reasoned that the prisoners were defenseless and unarmed, isolated from the outside world, and surrounded by hundreds of

trained soldiers who were heavily armed.  Thus, any attempt at fleeing would have been

suicidal.  Further, the Trial Court found that the gunshot wounds of the prisoners who were

killed was not consistent with the defendants' version of events.  The Trial Court noted, for

example, that Sabelli had been fatally shot in the back of her neck and that Pujadas had been

shot numerous times.  [EX-BRAVO-0898 to EX-BRAVO-0900]

10.    On March 19, 2014, the Federal Court of Cassation in Criminal Matters (the "Appellate

Court") affirmed the convictions of Sosa, Del Real, and Marandino, and also reversed the Trial

Court's decision to acquit two other defendants, Jorge Enrique Bautista and Norberto Ruben

Paccagnini.  [EX-BRAVO-0232]

11.    In 2009, prior to the trial of his co-defendants, the Government of Argentina made an

initial request for Bravo's extradition.  On November 1, 2010, the presiding U.S. magistrate

judge (Dubé, M.J.) declined to certify Bravo's extradition for the Secretary of State's surrender

decision.  Since that time, however, there have been significant factual developments in

Argentina bearing directly on Bravo's extradition, including the decision by the Trial Court to

convict Bravo's accomplices and the Appellate Court opinion affirming those convictions.

Notably, the Trial Court and Appellate Court's findings rejected several legal and factual

defenses raised by Bravo during his prior extradition proceeding, including his claim of statutory

amnesty, prior acquittal in a military inquiry, and the purported lack of credibility of the

survivors' statements.

12.    The Appellate Court opinion considered identical claims interposed by Bravo's former

confederates, Sosa, Del Real, and Marandino:

a.  The Appellate Court found that the defense of statutory amnesty was invalid

under Argentine law because the offenses in question constituted crimes against

8

humanity, for which amnesty cannot be granted; [EX-BRAVO-0184 to EX-BRAVO-0188]

b.  The Appellate Court concluded that the prior military proceeding did not comport with basic requirements of impartiality and due process and, therefore, did not vitiate the legal and factual basis for the Defendants' convictions; [EX-BRAVO-0188 to EX-BRAVO-0191]

c.  The Appellate Court affirmed that the evidence established that the Defendants carried out the Trelew Massacre and found credible the survivors' account rather than the incredible claim that the prisoners attempted to escape; [EX-BRAVO-0192 to EX-BRAVO-0202]; *see* [EX-BRAVO-0195 to EX-BRAVO-0197] ("[T]he statements made by Alberto Miguel Camps, Ricardo Rene Haidar and Maria Antonia Berger are compatible with the evidence gathered . . . . Thus, the evidence produced contradicts the account of the events given by the *de facto* government in office at the time, and rules out the flight attempt attributed to the detainees at the Almirante Zar Base.")]

d.  The Appellate Court identified physical evidence consistent with the survivors' accounts, including the fact that some of the bodies bore "tattooing" from gunpowder that could only be the product of shots fired "at close range," i.e., within 35 centimeters or approximately 14 inches. [EX-BRAVO-0198]

13.    Bravo may be found within the jurisdiction of this Court.  Upon information and belief, he resides at 1907 118th Road, North Miami, Florida, 33181, and operates a business located at 4141 North Miami Avenue, Suite 210, Miami, Florida, 33127.

14.    Katherine Fennell, an Attorney-Adviser in the Office of the Legal Adviser of the U.S.

Department of State, has provided the U.S. Department of Justice with a declaration

authenticating a copy of the diplomatic notes by which the request for extradition was made and

a copy of the Treaty, stating that the aggravated murder and aggravated attempted murder

charges for which extradition is demanded are provided for by the Treaty, and confirming that

the documents supporting the request for extradition are properly certified by the principal U.S.

diplomatic or consular officer in Argentina, in accordance with 18 U.S.C. § 3190, so as to enable

them to be received into evidence.  [EX-BRAVO-0001 to EX-BRAVO-0003]

15.     The declaration from the U.S. Department of State with its attachments, including a copy

of the diplomatic notes from Argentina, a copy of the Treaty, and the certified documents

submitted in support of the request, marked collectively as Government's Exhibit #1, are filed

with this complaint and incorporated by reference herein.

16.     Bravo potentially may flee if he learns of the existence of a warrant for his arrest.


        WHEREFORE, the undersigned requests that a warrant for Bravo's arrest be issued in

accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and

Argentina, so that the fugitive may be arrested and brought before this Court to the end that the

evidence of criminality may be heard and considered.  The undersigned further requests that this

complaint and the warrant be placed under the seal of the Court, except as disclosure is needed

for the warrant's execution, until such time as the warrant is executed.

                                        _____
                                        Assistant United States Attorney


Sworn to before me and subscribed in my presence this ___ day of September, 2019, at

_____.

10

_____
United States Magistrate Judge