**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 19-23851-MC-EGT**

IN THE MATTER OF
THE EXTRADITION OF
ROBERTO GUILLERMO BRAVO
_____/

**MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to Argentina, respectfully requests that the fugitive in this case, Roberto Guillermo Bravo ("Bravo" or "the fugitive"), be held without bond until the conclusion of the extradition process.  This memorandum summarizes the framework of extradition law in the United States, and sets forth the reasons why Bravo should be detained.  In short, Bravo should be detained because he cannot overcome the strong presumption against bail in international extradition cases.  Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community, and that special circumstances warrant his release.

## I.      BACKGROUND

Argentina seeks Bravo's extradition so that he may answer to the charges of sixteen counts of homicide and three counts of attempted aggravated homicide.  The charges are based on Bravo's alleged participation in the August 22, 1972, Trelew massacre, where sixteen political prisoners were killed and three others were wounded at an Argentine Navy base in Trelew, Argentina.

### A.      Factual Background

According to the information included in Argentina's extradition request, on August 15, 1972, twenty-five prisoners affiliated with groups opposed to Argentina's *de facto* military

government escaped from the Rawson Penitentiary located in Chubut, Argentina.  Nineteen of the prisoners were recaptured and taken to the Almirante Zar Naval Air Base in Trelew, Argentina (hereinafter, the "Base").   [EX-BRAVO-0165 to EX-BRAVO-0166]   The Base where the prisoners were held was controlled by the Argentine Navy.  During the time the prisoners were detained there, Bravo was a lieutenant in Argentina's Naval Infantry Battalion No. 4 and present at the Base.  [EX-BRAVO-0167]

Bravo and other naval officers at the Base subjected the prisoners to increasingly harsh punishments during their detention.  According to a survivor of the massacre, Ricardo Rene Haidar, Bravo was the officer who treated the prisoners most aggressively.  He would make the prisoners lie on the floor completely naked for long periods of time.   Bravo also ordered one of the prisoners to sweep the corridor while naked.   In addition, Bravo commanded the prisoners to assume stress positions, including placing their fingertips against the wall, with their bodies straight and inclined, and their arms and legs outstretched.  A second survivor, Maria Antonia Berger, recalled Bravo holding a loaded pistol to the head of one of the prisoners, Clarisa Lea Place, while threatening to kill her because she refused to lie on her back on the floor.  Berger also described how the guards conducted a mock shooting one night.  The third survivor, Alberto Camps, overheard Bravo telling a subordinate that instead of feeding the prisoners, they should kill them.  [EX-BRAVO-0663; EX-BRAVO-0668 to BRAVO-0669; EX-BRAVO-0773; EX-BRAVO-0760; EX-BRAVO-0658]

The massacre of the prisoners occurred in the early morning of August 22, 1972, around 3:30 a.m., when all nineteen prisoners were sleeping in their cells.  Bravo, along with four other naval officers, arrived at the cells carrying machine guns and .45 caliber pistols.  The officers

ordered the prisoners to stand in a line outside their cells with their heads down.  Moments later, the naval officers shot at them from a close distance.  Many of the prisoners were killed instantly from this initial round of gunfire.  The naval officers then proceeded to execute all remaining prisoners.  Only six individuals lived long enough for other Base personnel to transfer them to the infirmary, and only three—Haidar, Camps, and Berger—ultimately survived.  [EX-BRAVO-0893 to EX-BRAVO-0894]

The three survivors of the massacre (now deceased) and other witnesses recounted the events of August 22, 1972.  Camps recalls being awoken around 3:00 a.m. by Bravo and another naval officer, Lieutenant Commander Luis Emilio Sosa.  Sosa and Bravo were shouting insults at them and threatening that the prisoners would now "know what the anti-terror repression is." Contrary to prior practice, all of the prisoners' cell doors were opened at the same time rather than their being taken out one at a time.  The prisoners were then ordered to line up in the hallway. Moments later, there was a burst of gunfire.  Camps' initial thought was that this was a mock shooting with the officers using blank cartridges.  But then he saw a fellow prisoner fall to the ground and he realized the officers were using live ammunition.  Camps hurled himself back into his cell, as did his cellmate, Alberto Delfino.  Camps then heard more gunfire.  A few moments later, Bravo approached Camps' cell, holding a pistol in his right hand, and ordered Camps and Delfino to stand up.  Bravo then demanded to know whether Camps was going to answer all the questions that were posed to him in an earlier interrogation.  When Camps refused, Bravo shot him in the stomach.  Bravo then trained his gun on Delfino and shot him at close range.  [EX-BRAVO-0756; EX-BRAVO-0660 to BRAVO-0661]

Haidar similarly recalled being awoken by the shouts of Bravo and Sosa at approximately 3:30 a.m. on the morning of the massacre.  Bravo and Sosa ordered the prisoners to fold their mattresses and blankets, line up in the hallway, and look down.  At the end of the corridor, Haidar could see two or three other officers with machine guns.  Bravo and Sosa walked up and down the line of prisoners while threatening them with comments like, "the worst thing you could have done was to meddle with the Navy" and, "now you'll see how we terrorize guerrilla members."  The prisoners remained silent and did not move.  Then, all of a sudden, there was a burst of machinegun fire.  Haidar retreated into his cell with another prisoner, Alfredo Kohon, and crouched below a slab of concrete that functioned as a bed.  After the initial gunfire subsided he heard Bravo call out, "this one is still alive," and then an isolated shot.  This repeated several times.  Bravo then entered Haidar's cell with a gun in his hand and demanded to know whether Haidar and Kohon were going to provide information. When the prisoners answered affirmatively, Bravo left.  But another naval officer then appeared and shot Haidar, wounding him, before proceeding to shoot Kohon.  The shooting was followed by a period of silence, punctuated by Bravo saying in a loud voice, "They tried to escape!  Pujadas tried to grab the Captain's gun, he tried to fight back!" Haidar testified that Bravo's statement was completely false.  The prisoners did not attack the officers and they had not attempted to escape.  [EX-BRAVO-0769; EX-BRAVO-0664 to EX-BRAVO-0666]

Berger also recalled being awoken by the shouts of Bravo and other naval officers at 3:30 a.m. on the morning of the massacre.  The officers threatened the prisoners, warning that they "were going to be taught a lesson about meddling with the Navy," and that the prisoners would "provide information that night, whether [they] liked it or not."  The prisoners were ordered to

form a line outside their cells and look down at the floor.  Like Camps, Berger reported that this was the first time the prisoners were given such an order.  Suddenly, the officers began firing their weapons at the prisoners.  Berger herself was struck several times.  She looked around and saw a fellow female prisoner, Maria Angelica Sabelli, whose breathing became more labored before she stopped moving entirely.   Berger also saw another female prisoner, Ana Maria Villareal de Santucho, lie motionless.   Berger heard Bravo screaming at Camps and Delfino to provide information and, when they refused, she heard more gunfire.  Later, Berger overheard the officers beginning to invent a story to justify the assassinations.  [EX-BRAVO-0773; EX-BRAVO-0669 to EX-BRAVO-0670]

Navy corporal Carlos Amadeo Marandino was the officer on guard duty at the time of the massacre.  Marandino testified that everything was normal during the first three hours and fifteen minutes of his shift, which ran from 12:00 a.m. to 4:00 a.m.  The prisoners were asleep and had not caused any trouble.  However, at 3:15 a.m., Bravo, Sosa, Lieutenant Emilio Jorge Del Real, Captain Juan Carlos Antonio Herrera, and a fifth person he could not identify, arrived at the prison cells smelling of alcohol and carrying pistols and machine guns.  They ordered Marandino to open the cell doors and disarm.  Once Marandino fulfilled that order, Marandino claimed that he was instructed to leave.  Marandino testified that he retreated behind a screen that separated the guard area from the cells.  From behind the screen, Marandino recalled hearing a lot of shouting, the singing of the national anthem, someone shouting "they're trying to escape," a burst of gunfire followed by a pause, and then more shooting.  Marandino went to see what was happening.  The naval officers gave him a pistol and told him to check the bodies.  When Marandino entered the corridor outside the cells he saw lots of blood and many bodies, piled one on top of the other.

Marandino further testified that the claim the prisoners were trying to escape was not credible. Marandino explained that in connection with a prior military investigation conducted just after the massacre, a ranking officer instructed him to support the official account of events, including the false allegation that the prisoners attempted to escape the Base, which prompted the shooting.  The Argentine courts found that the military investigation was fatally flawed and further concluded that Marandino minimized his culpability and was a participant in the shooting.  [EX-BRAVO-0684 to EX-BRAVO-0692; EX-BRAVO-0733 to EX-BRAVO-734; EX-BRAVO-0194]

Miguel Fernando Marileo, an employee at a funeral services company in Trelew, Argentina, testified about his observations of the deceased prisoners on the night of August 22, 1972.  Marileo observed that one of the female victims, Ana Maria Villareal de Santucho, was pregnant and had been shot multiple times in the abdomen.  Marileo also saw that another female victim, Maria Angelica Sabelli, had been shot in the back of the neck.  A third victim, Mariano Pujadas, appeared to have been shot ten or eleven times.  [EX-BRAVO-0828 to EX-BRAVO-0830]

**B.    Procedural History**

**1.    Argentina's Initial Request For Bravo's Extradition And The Subsequent Trial Of His Accomplices**

A warrant for the arrest of Bravo and several of his alleged accomplices was issued on February 1, 2008, by Judge Hugo Ricardo Sastre, Federal Judge of First Instance, City of Rawson, Province of Chubut, Republic of Argentina.  As Bravo was living in the United States at that time, the Argentine government submitted a request for his extradition.  But on November 1, 2010, the presiding U.S. magistrate judge (Dubé, M.J.) declined to certify to the Secretary of State that Bravo was extraditable.

Following that decision, however, there were significant factual developments in Argentina bearing directly on Bravo's extraditability.   Specifically, on October 15, 2012, the Federal Oral Criminal Court of Comodoro Rivadavia (the "Trial Court") issued a written decision finding Sosa, Del Real, and Marandino guilty of sixteen counts of aggravated murder and three counts of aggravated attempted murder and sentencing the defendants to life imprisonment.  [EX-BRAVO-1005 to EX-BRAVO-1007]  The Trial Court made several relevant findings, including that:

- Bravo was among the naval officers who, carrying weapons, arrived at the prisoners' cells at approximately 3:30 a.m. on August 22, 1972, abruptly woke the prisoners, and forced them to stand in line in the corridor with their heads down.  [EX-BRAVO-0893 to EX-BRAVO-0894]

- The naval officers used machineguns and .45 caliber pistols to shoot indiscriminately at the prisoners from close range, immediately killing several of them.  [EX-BRAVO-0893 to EX-BRAVO-0894]

- Bravo forced Delfino and Camps, two of the prisoners who had survived the initial round of gunfire, to stand up in their cell and declare whether they would cooperate in an interrogation.  Upon their refusal, Bravo shot and wounded Camps, and killed Delfino.  [EX-BRAVO-0893 to EX-BRAVO-0894]

- The defendants had not acted in self-defense and in order to repel a prison break, as they contended at their trial.  [EX-BRAVO-0898 to EX-BRAVO-0900]

On March 19, 2014, the Federal Court of Cassation in Criminal Matters (the "Appellate Court") affirmed the convictions of Sosa, Del Real, and Marandino, and also reversed the Trial Court's decision to acquit two other defendants, Jorge Enrique Bautista and Norberto Ruben

Paccagnini. [EX-BRAVO-0232]

The Appellate Court considered claims interposed by Bravo's former confederates, Sosa, Del Real, and Marandino, that were substantially similar to those that Bravo asserted in opposition to his extradition in 2010, including his claim of statutory amnesty, prior acquittal in a military inquiry, and the purported lack of credibility of the survivors' statements.

First, the Appellate Court found that the defense of statutory amnesty and the related defense of the statute of limitations were invalid under Argentine law because the offenses in question constituted crimes against humanity, for which amnesty cannot be granted and which are subject to no statute of limitations.  [EX-BRAVO-0184 to EX-BRAVO-0188]

Second, the Appellate Court concluded that the prior military proceeding did not comport with basic requirements of impartiality and due process and, therefore, did not vitiate the legal and factual basis for the defendants' convictions.  [EX-BRAVO-0188 to EX-BRAVO-0191]

Third, the Appellate Court affirmed that the evidence established that the defendants carried out the Trelew Massacre and found credible the survivors' account rather than the incredible claim that the prisoners attempted to escape.  [EX-BRAVO-0192 to EX-BRAVO-0202] In fact, the Appellate Court rejected as non-credible the defendants' account of events and concluded that "the statements made by Alberto Miguel Camps, Ricardo Rene Haidar and Maria Antonia Berger are compatible with the evidence gathered" [EX-BRAVO-0195] while "the evidence produced contradicts the account of the events given by the *de facto* government in office at the time, and rules out the flight attempt attributed to the detainees at the Almirante Zar Base." [EX-BRAVO-0197]   The Appellate Court identified physical evidence consistent with the survivors' accounts, including the fact that some of the bodies bore "tattooing" from gunpowder

8

that could only be the product of shots fired "at close range," i.e., within 35 centimeters or approximately 14 inches.  [EX-BRAVO-0198]

### 2. Argentina's Second Request For Bravo's Extradition

After Bravo's accomplices were convicted, and those convictions were upheld on appeal, the Argentine government submitted a second request for Bravo's extradition, pursuant to its extradition treaty with the United States (the "Treaty").[1]  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. § 3184, filed a complaint in this District seeking a warrant for Bravo's arrest.  This Court issued the arrest warrant, and Bravo was arrested on October 25, 2019.  Bravo is currently in the custody of the United States Marshals Service.

---

[1] *See* The Extradition Treaty Between the United States of America and the Argentine Republic, U.S.-Arg., June 10, 1997, S. TREATY DOC. NO. 105-18 (1997).

## II.     ARGUMENT

### A.     Legal Framework Of Extradition Proceedings

#### 1.     The limited role of the court in extradition proceedings

The extradition process is *sui generis*.  Extradition is primarily an executive function with a specially defined role for the court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also, e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 984 n.5, 986 (11th Cir. 2004).  The Secretary of State, and not the court, then decides whether the fugitive should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established.  *See Martin*, 993 F.2d at 828-29  If the court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the United States Marshals Service to await the Secretary's final determination regarding surrender.  *See* 18 U.S.C.

§ 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see also, e.g.*, *Martin*, 993 F.2d at 828.

## 2.   The requirements for certification

The court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to the charges.  *See, e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015).  The following sections briefly discuss each of those requirements.

### a.   Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather is acting in a "non-institutional capacity by virtue of a special authority."  *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (citation and quotation marks omitted).  Both magistrate judges and district judges may render a certification under Section 3184.  *See, e.g.*, *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir.

11

1993).   This District's local rules also expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

> b.      Jurisdiction over the fugitive

The court has jurisdiction over a fugitive, such as Bravo, who is found within its jurisdictional boundaries.   18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

> c.      Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*   At the extradition hearing the government will offer into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting to the fact that there is a treaty in full force and effect between the United States and Argentina.   The Court must defer to the Department of State's determination in that regard.   *See, e.g.*, *Arias v. Warden*, 928 F.3d 1281, 1288 (11th Cir. 2019) ("courts *must* defer to the determination of the executive branch in deciding whether an extradition treaty remains in force") (emphasis in original, internal quotation marks and citation omitted); *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force) (citing *Kastnerova*, 365 F.3d at 986).

12

d.   Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article 1 of the Treaty in this case provides for the return of fugitives charged with, or found guilty of, an extraditable offense, as that term is defined under the Treaty.  Article 2 of the Treaty defines offenses as extraditable if they are punishable under the laws of both the United States and Argentina by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

In assessing whether the crimes for which extradition is requested are covered by the Treaty, the court should examine the description of criminal conduct provided by Argentina in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See, e.g.*, *Arias*, 928 F.3d at 1293 ("courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo–Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel*, 190 U.S. 40, 61 (1903)).  A requesting country need not establish that its crimes are identical to ours.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

13

e.    <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the court must conclude there is probable cause to believe that the crimes charged by Argentina were committed by the person before the court. *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).

**3.    An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of the charges for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *see also, e.g.*, *Arias*, 928 F.3d at 1286 ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused.") (internal quotation marks and citation omitted). An extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017); and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Criminal Procedure do not apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include

. . . the extradition and rendition of a fugitive."). Moreover, many constitutional protections applicable in criminal cases do not apply to extradition hearings. Notably, the Supreme Court has held that the "constitutional provision against double jeopardy" has "no application" in an extradition proceeding because the fugitive has not been tried. *Collins v. Loisel* (*Collins* II), 262 U.S. 426, 429 (1923). Thus, "a fugitive from justice may be arrested in extradition proceedings a second time upon a new complaint charging the same crime, where he was discharged by the magistrate on the first complaint or the complaint was withdrawn." *Id.* In addition, a fugitive has no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Martin* 993 F.2d at 829; the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."). Hearsay evidence is admissible at an extradition hearing and "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *Shaw*, 2015 WL 3442022, at *4; *see also, e.g.*, *Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993)

15

(police detective's statement summarizing results of investigation established probable cause); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive has no right to discovery, *see, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), and his right to challenge the evidence against him at an extradition hearing is severely constrained, *see, e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d at 1281.  A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913).  A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do.").

Courts routinely reject technical and affirmative defenses in extradition proceedings.  *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (collecting cases).  These issues, which

require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### 4.    The inapplicability of the doctrine of res judicata

Although a magistrate judge of this Court denied extradition in response to an earlier request from Argentina, that decision does not bar the government from seeking extradition on this renewed request.

As noted above, there is no Double Jeopardy or claim preclusion bar to a second extradition request. *See Collins* II, 262 U.S. at 429. Similarly, it is well-established that the doctrine of issue preclusion does not apply to successive extradition requests. *See Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (sound policy reasons, "together with the patent inapplicability of the requirements of res judicata to extradition orders, compel the Court to conclude that it is wholly inappropriate to apply res judicata concepts to the findings resulting from extradition proceedings"); *McMullen v. I.N.S.*, 788 F.2d 591, 597 (9th Cir. 1986) ("That a magistrate earlier found McMullen's acts to be political offenses for purposes of denying extradition does not affect the BIA's contrary finding under section 243(h)(2)(C) because *extradition determinations have no res judicata effect in subsequent judicial proceedings*.") (citations omitted) (emphasis added); *United States v. Doherty*, 786 F.2d 491, 501 (2d Cir. 1986) (suggesting that each "new extradition magistrate" should "give the opinion of the previous magistrate only such weight as he would give to an opinion of a respected judge in an unrelated case"); *Reed v. Colpoys*, 99 F.2d 396, 398 (D.C. Cir. 1938) ("[I]t is too well settled to require citation of authority that the doctrine of res judicata applies only to judicial or at best quasi-judicial proceedings," that judges "act[] in extradition matters in an executive capacity," and that appellant "cite[d] no authority . . . that the doctrine of

res judicata applies to extradition proceedings"); *Ahmad v. Wigen*, 726 F. Supp. 389, 397 (E.D.N.Y. 1989) (same, in case where first magistrate concluded that fugitive's offenses fell within political offense exception, but district judge rejected that position in response to renewed request); *In re Extradition of Tafoya*, 572 F. Supp. 95, 97-98 (W.D. Tex. 1983) (res judicata is "inapplicable to extradition proceedings," and "[t]he question of how many times the government may reinstitute extradition proceedings after unfavorable attempts to extradite is a decision left largely to the discretion of the executive branch"); *In re Extradition of Gonzalez*, 217 F. Supp. 717, 720 (S.D.N.Y. 1963) (concluding that prior decision denying extradition based on the political offense exception was "not finally binding in later, renewed proceedings" and granting extradition after rejecting that defense).

*Hooker*, the opinion containing the most extensive discussion of this issue, concluded that three independent reasons rendered res judicata doctrine inapplicable to extradition proceedings. Res judicata requires "(1) a valid, final judgment, (2) rendered on the merits, (3) a subsequent action involving the same parties . . . [and] (4) that is based on the same cause of action or claim." 573 F.2d at 1367. First, an order concerning extraditability does not constitute a final judgment because it "signals the start, rather than the conclusion, of litigation of the fugitive's guilt or innocence." *Id.* Such an decision "is truly an interlocutory order, more akin to a preliminary hearing on criminal charges. And . . . it is well settled that a finding of lack of probable cause does not bar the state from rearresting the suspect on the same charges." *Id.* Second, an extradition decision does not constitute a decision "on the merits" because "the merits of the fugitive's guilt or innocence are not explored. . . . Because of the limited function of an extradition proceeding

and the limited participation of the fugitive, the order of the court does not reflect a consideration of all the merits of the case." *Id.* at 1368.

Finally, "res judicata is a judicially created rule," and "there is ample reason in judicial policy to refrain from applying it to matters of extradition." Most importantly, "there is *no appeal* from an extradition decision by either the accused or the government." *Id.* (emphasis added). Thus, although the government at the time disputed the propriety of Judge Dubé's ruling, its only remedy was "re-institution of [the] extradition request." *Id.* "[T]he Government has never been thought to be able to obtain 'review' when the certificate has been denied. Its sole recourse . . . has been to file another request—a request that must be considered *de novo* by the new extradition magistrate, who will give the opinion of the previous magistrate only such weight as he would give to an opinion of a respected judge in an unrelated case." *Doherty*, 786 F.2d at 501; *see also Collins v. Miller*, 252 U.S. 364, 369 (1920) (Brandeis, J.) (extradition proceedings are "not subject to correction by appeal"); *In re Extradition of Macklin*, 668 F.2d 122, 128-30 (2d Cir. 1981) (same).

### 5.    Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the court. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the

Department of State.") (internal citation omitted).  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *In re Kaine*, 55 U.S. 103, 110 (1852).

### B.      Bravo Should Be Detained

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[2]  *See, e.g.*, *In re Extradition of Shaw*, No. 14–mc–81475, 2015 WL 521183, at *4-5 (S.D. Fla. Feb. 6, 2015).  Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

#### 1.      Applicable law

#####     a.      <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process.").  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a

---

[2] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, Bravo is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Argentina.

proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the

person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases

are clear and compelling.  When, as here, a requesting country meets the conditions of the Treaty,

the United States has an "overriding interest in complying with its treaty obligations" to deliver

the fugitive.  *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also*

*Wright*, 190 U.S. at 62.  It is important that the United States be regarded in the international

community as a country that honors its agreements in order to be in a position to demand that other

nations meet their reciprocal obligations to the United States.  Such reciprocity would be defeated

if a fugitive flees after being released on bond.  *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306

("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that

other treaty partners will refrain from doing so in the future.  And a difficult but necessary measure

in carrying out that responsibility is to secure a wanted individual and surrender him or her to the

foreign jurisdiction.").

        b.    <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *Shaw*, 2015 WL 521183, at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special circumstances" test has been applied by circuit and district courts for bail determinations in extradition cases). This standard is "much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

Crucially, the special circumstances inquiry is separate from, and additional to, considerations of the fugitive's flight risk and danger to the community. *See, e.g.*, *Martin*, 993 F.2d at 828 ("[The fugitive] complains only that the district court erred in determining that he was a flight risk. Absent proof of special circumstances, however, Martin is not entitled to bail."); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (low flight risk alone "is not the criteria for release in an extradition case"); *Leitner*, 784 F.2d at 161 ("[e]ven a low risk of flight" is not a circumstance sufficiently "unique" to "be dispositive"). Accordingly, a fugitive who fails to establish special circumstances should be detained even if he is deemed not to be a flight risk or danger to the community.

"[C]ourts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extradites." *Shaw*, 2015 WL 521183, at *5 (citation and quotation marks omitted). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with counsel, *see, e.g.*, *Matter of Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992);

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305; *In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fugitive's advanced age, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02, 1305 (66-year-old defendant); *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *2-4 (S.D. Fla. Nov. 16, 2009) (detaining 71-year-old fugitive despite his claims of "advanced age" and poor health);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61;

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *Noeller*, 2017 WL 6462358, at *8-9; *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Shaw*, 2015 WL 521183, at *8;

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1070 (C.D. Cal. 2017); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070-71.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### 2.   Analysis

The Court should detain Bravo without bond. As an initial matter, Bravo is a flight risk—indeed, arguably more of a flight risk than he was during his prior extradition proceedings. Three of his co-conspirators now have been convicted and sentenced in the Argentine courts. An Argentine Appellate Court upheld those convictions and even overturned acquittals for defendants whose involvement was more indirect than Bravo, one of the officers identified as a shooter and executioner in the survivors' accounts. The Appellate Court rejected numerous legal challenges interposed by those defendants, which Bravo has asserted in the past.

Bravo also has long been aware that there is a warrant outstanding for his arrest in Argentina, but yet he has refused to return to his home country to answer the charges. Thus, Bravo is already by definition in flight or deliberately absent from Argentina. The fact that he has evaded prosecution in his home country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1034 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)); *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (fugitive found to be a flight

risk because, among other things, he could have "return[ed] to Mexico and voluntarily surrender[ed], [but] he has not done so.").

Bravo's offense was undeniably serious, and he faces the prospect of correspondingly severe punishment. His confederates have received sentences of life imprisonment. [EX-BRAVO-0215] Bravo is similarly situated to, if not more culpable than, the other officers involved in the massacre. Bravo therefore has a significant incentive to flee because he faces the prospect of life imprisonment if extradited from the United States and convicted in Argentina. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305 (finding fugitive was a flight risk because, among other things, he faced prospect of a 21-year prison term if convicted in the demanding country). In addition, upon information and belief, Bravo is a businessman in the United States with the means to flee. Hence, further flight from the United States to yet another country (or to an underground location in the United States) is a reasonable possibility.

Bravo's risk of flight and the seriousness of his crimes are each sufficient reasons for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Bravo is not a flight risk and poses no danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. The fact that a different magistrate judge denied extradition in 2010 does not constitute such a special circumstance. As discussed above, that decision is not binding on this Court under the doctrine of res judicata. *See* Part II.A.4, *supra*. Nor is it persuasive. Both its factual findings and the legal conclusions that stemmed from them are inconsistent with the thorough and careful opinions of the Argentinian trial and appellate courts. In particular, the finding of the Argentine courts that Bravo and his accomplices engaged in the cold-blooded execution of unarmed prisoners in the middle of the night supports a probable

25

cause finding and is fatal to Bravo's political offense defense.  Moreover, the Argentine courts expressly rejected the argument that the perpetrators of the massacre were shielded by amnesty laws or their prior military acquittal.

In sum, there are no special circumstances and allowance of bail in any amount would not guarantee Bravo's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.  *See, e.g., Martinelli*, 263 F. Supp. 3d at 1306 ("We have no intention of allowing our nation's treaty obligations to suffer from an errant bail determination.").  Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order in order to protect the ability of the United States to meet its treaty obligations to the Government of Argentina.

## III.      CONCLUSION

For the foregoing reasons, the United States requests that Bravo be detained until the conclusion of the extradition process and that the Court schedule an extradition hearing forthwith.

Dated: October 28, 2019

Respectfully submitted,

Ariana Fajardo Orshan
United States Attorney

By:    /s Jason Wu
Jason Wu
Assistant United States Attorney
Court ID No. A5502299
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was uploaded onto

the Court's CM/ECF system and sent via CM/ECF to all counsel of record.

<u>/s *Jason Wu*</u>
Jason Wu
Assistant United States Attorney

28