**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.  19-mc-23851-EGT**

**IN THE MATTER OF**
**THE EXTRADITION  OF**
**ROBERTO GUILLERMO BRAVO**
_____/

## MOTION FOR BAIL PENDING EXTRADITION HEARING

**I.**
**INTRODUCTION**

On October 25, 2019, Roberto Bravo ("Mr. Bravo")was arrested on a Complaint for Extradition to Argentina which had been filed under seal on September 16, 2019.[1]

This is the <u>second</u> time the government of Argentina has sought the extradition of Mr. Bravo. More than nine (9) years earlier, on February 25, 2010, Mr. Bravo was arrested on a similar Complaint.[2] Both extradition attempts relate to an incident that occurred forty-seven (47) years ago, and which we demonstrated in Bravo I were false and inaccurate.

_____

[1]  The extradition request had actually been in the works for some time. The Embassy of Argentina initially submitted a Diplomatic Note which was certified by the United States Embassy on September 15, 2014. Thereafter, supplemental documents were submitted and certified on May 7, 2018. *See* Declaration of Katherine C. Fennell, Attorney-Advisor for the Department of State, EX-Bravo-0001-0003.

[2]  *See United States v. Bravo*, Case No. 10-20559 MC/DUBÉ. To avoid confusion, we shall refer to this case as "Bravo I."

In *Bravo I*, after a hearing on our *Motion For Bail Pending Extradition Hearing*, United States Magistrate Judge Robert L. Dubé granted bail. Mr. Bravo was released on a $1,000,000 Personal Surety Bond, co-signed by Ana Bravo (his Wife), Pablo Bravo (his Son), and Martin Galarce (his Nephew) and a separate $250,000 bond with 10% deposited in the registry of the Court.[3]

Throughout the pendency of that case, Mr. Bravo remained at liberty and fully honored all the conditions of his bond. After a full hearing and briefing by both parties, Judge Dubé issued a thorough, strong, and erudite Order Denying Certification Of Extradition.[4] He found that evidence we had presented "obliterated" probably cause:

> This Court concludes that the evidence of the full military investigation and acquittal, Presidential Decree No. 425, and the evidence and testimony regarding the application of Amnesty Law 20.508 are all relevant and admissible on the issue of probable cause. Furthermore, the Court finds that the relevant evidence does obliterate the showing of probable cause in this case. Therefore, based on that finding, the Government of Argentina has failed to carry its burden of showing probable cause to justify extradition.

*See Order Denying Certification Of Extradition*, Bravo I, DE 62, p. 17.

Although the Court found that the Government failed to establish probable cause for extradition, it nevertheless decided to address the "political offense" exception. After a careful analysis of the evidence, Magistrate Judge Dubé

---

[3]   *See* **Bravo I, DE 14 and DE 15.**

[4]   *See* **Bravo I, DE 62.**

2

concluded:

> Based on the documents and the expert testimonies, this Court finds that Bravo satisfied his burden of showing that the charges against him constituted a political offense.

*See Bravo I*, DE 62, p. 20. Judge Dube′ also determined that the Government had not refuted or contradicted our evidence and thus failed to satisfy their shifting burden of proof.

This motion will set forth the law relating to bail in extradition cases, Mr. Bravo's personal history, the facts of this case from the defense perspective, and the "special circumstances" which justify his release on bail, including the fact that he was exonerated and acquitted of these charges by a full military investigation in 1973, that he is protected from prosecution by an Amnesty law which has never been repealed or vacated, that the charges are political in nature and thus not extraditable, and other factors which courts have considered to be "special circumstances" justifying bail.

## II.
## THE LEGAL STANDARD FOR BAIL IN EXTRADITION CASES

The Supreme Court in *Wright v. Henkel*, 190 U.S. 40, 63, 23 S.Ct. 781 (1903) established that, while there is a presumption against bail in extradition cases, district courts may release relators when "special circumstances" are present. Thus, courts have granted bail pending extradition proceedings if the defendant demonstrates: that he is not a flight risk. *United States v. Leitner*, 784 F.2d 159 (2d. Cir. 1986); *In the Matter of the Extradition of Gonzalez*, 52 F.Supp.2d 725, 735 (W.D.

La. 1999); that he is not a danger to the community; and that there are "special circumstances" warranting his bail pending an extradition hearing. *Wright v. Henkel*, **supra.**[5]

The determination of what constitutes "special circumstances" is left to the sound discretion of the trial judge. *Beaulieu v. Hartigan,* **554 F.2d 1 (1st Cir. 1977).** However, courts can focus on whether a defendant's circumstances collectively establish special circumstances. *United States v Molnar*, **182 F.Supp. 2d 684 (N.D.**

---

[5]   Courts have found 'special circumstances' in the following situations: The deteriorating health of the petitioner. *United States v. Huerta,* Slip Copy 2008 WL 2557514 (S.D. Tex. 2008) (deteriorating heart condition); where petitioner faced prospect of losing "all his fortune" if not permitted to complete his participation in a civil proceeding underway at the time of his arrest. *In Re Mitchell,* 171 F.289 (S.D.N.Y. 1909); the substantial likelihood of success on the merits. *United States v. Nacif-Borge,* 829 F.Supp. 1210 (D. Nev. 1993) (availability of bail likely under law of requesting nation); *United States v. Ramnath,* 533 F.Supp.2d 662 (E.D. Tex. 2008) (Court found that the crime for which extradition was requested probably did not constitute a crime under law of the requesting Nation); *In the Matter of the Extradition of Gonzalez,* 52 F.Supp.2d 725 (W.D. La. 1999) (government failed to establish the reliability of eyewitness identifications inculpating the detainees);*United States v Santos,* 473 F.Supp.2d 1030 (C.D. Cal. 2006)("not only did a Mexican court invalidate the first arrest warrant, but the second warrant, which was obtained after Mexican prosecutors had notice of deficiencies in the first warrant, also was invalidated."); *United States v. Bogey,* 147 F.Supp.2d 1365 (N.D. Ga. 2001)( Court found that the criminal case against [Defendant] in France may have "little prosecutorial merit, despite the technical merit the criminal charges may have.");  inability to practice religious rituals as an Orthodox Jew. *United States v. Taitz,* 130 F.R.D. 442 (S.D. Cal. 1990); lengthy delay in the proceedings. *Taitz,* 130 F.R.D. 442; *Santos,* 473 F.Supp. 2d 1030; the issuance of a foreign arrest warrant without a finding of probable cause consistent with the Fourth Amendment. *Paretti v. United States,* 122 F.3d 758 (9th Cir. 1997)( Court granted bail even if the even if defendant failed to make a showing a "special circumstances" to the satisfaction of the district court because the foreign warrant violated the defendants' due process rights).

Ill. 2002). (Court was "compelled  to view his 'circumstances' collectively rather than singularly")

Courts have held that a special circumstance arises when – as we maintain is the case here – an extraditee is charged with  "political offense" as defined by the applicable extradition treaty. *In Re La Salvia,* – F.Supp. — 1986 WL 1436 (S.D.N.Y. 1986), quoting *In Re Castioni,* [1891] 1 Q.B. 149, 156 (1890). There are two types of political offenses: pure and relative. *Marzook v. Christopher,* —F.Supp. 1996 WL 583378 (S.D.N.Y. 1996)." ('Pure' political offense are crimes directed at the state that lack the elements of ordinary crimes; they include such crimes as treason, sedition, and espionage).

The test for finding a 'relative' political offense is two-fold: (1) there must be "a political matter, a political rising, or a dispute between two parties in the State, as to which is to have the government in its hands " and (2) the act for which extradition is requested must be "incident to" or "in furtherance of assisting a political rising" such as war, revolution, and rebellion.  *La Salvia,* – F.Supp. — 1986 WL 1436 at p.2*, citing *Sidona v. Grant,* 619 F.2d 167, 173 (2d. Cir. 1980)*; see also *Barapind v. Enomoto,* 400 F.3d 744, 753 (9th Cir. 2005), quoting *Ornelas v. Ruiz,* 161 US 502 (1896) (Arguing that courts should define whether something is "political" by focusing on "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed").

To establish the political offense exception, the extraditee must establish "a

rational nexus between the alleged crimes and the prevailing turmoil." *Extradition of Artukovic,* 628 F.Supp. 1370, 1376 (C.D. Cal. 1986). "The focus of the inquiry is on the circumstances, and on the status of those harmed, and not on whether the acts merely were committed during the disorder." *Artukovic,* 628 F.Supp at 1376.[6]

## III
## FACTUAL STATEMENT

### A.   Mr. Bravo's Personal History

We shall discuss the allegations against Mr. Bravo below, but we first want to inform the Court about Roberto Bravo, the upstanding and respected citizen of this community.

Roberto Bravo was born and raised in Argentina, where he attended college and the Argentinian Naval Academy. He was commissioned a Lieutenant and was serving in that capacity when the uprising at Trelew, which is the subject of the extradition request, took place.

In 1973, still in the service of the Argentine military, Mr. Bravo came to the

---

[6] *See also In re McMullen,* No.3-78-1099 MG (N.D. Cal. May 11, 1979)(Court denied UK's extradition request for former PIRA member accused of bombing a military barracks reasoning that defendants acts took place during a state of uprising throughout the UK and were incidental to the political disturbance; *see also McMullen v. INS,* 658 F.2d 1312 (9th Cir. 1981) (finding that McMullen's life would be threatened if he were returned to UK) ; *Quinn,* 783 F.2d at 810 ("It is clear that various "non-military" offenses, including acts as disparate as stealing food to sustain the combatants, killing to avoid disclosure of strategies, or killing simply to avoid capture, may be incidental to or in furtherance of an uprising.") *But compare Eain v. Wilkes,* 641 F.2d 504, 520 (7th Cir. 1981) (US granted Israel's extradition request for PLO member accused of bombing and maiming 30 Israeli civilians because isolated acts of violence do not satisfy the political offense exception "absent a direct link between the perpetrator, an organization's political goals, and a specific act.")

United States, where he was attached to the Argentine Embassy and also trained with the United States Military, completing courses in Army Advanced Infantry Training, Airborne, Pathfinder, as well as an Amphibious Reconnaissance course with the United States Marine Corps.

In late 1979, Mr. Bravo retired from the Argentine military. He received a permanent employment offer from a U.S. electronics company and received his permanent residence status on March 24, 1980. Mr. Bravo became a naturalized United States Citizen on September 1, 1987.

Roberto Bravo has been married to his wife, Ana Maria Bravo, for 52 years, and they have three sons, all of whom served in the United States Army or Navy: Fernando G. Bravo, age 50 (who holds a Masters degree in Business Administration); Pablo A. Bravo, age 49 (who holds a B.S. in Information Technology); and Andres E. Bravo, age 48 (who holds B.A. degree in Business). Mr. Bravo also has two nephews in the Miami area, Martin Galarce (who holds a Masters degree in sociology and in political science) and Ignacio Bravo, who has a B.A. in international business.

Mr. Bravo and his family moved to Miami in 1982. He owns his own home, and each of his family members mentioned above own property which they will gladly pledge as collateral for his bond.[7]

---

[7] We have not detailed that information in this Motion to avoid running afoul of ECF redaction rules.

Since 1979, Mr. Bravo has performed in several managerial positions in the Consumer Electronics and Industrial Electronics fields, gaining a solid background of practical experience in sales, distribution, design, programming, purchasing, and marketing. He has also worked as a business consultant in the  import-export business.

Since he moved to Miami, Mr. Bravo has been active in business and in the community. He created and served as President of his own company, RGB Group, Inc., and has also served as President and CEO of RLM Services, Inc, President and CEO of One Fountainhead Center, LLC., Managing Member of Miami Alliance, Inc, and President and CEO of Stafford Bookbinding, Inc.

B.      The Argentina Charges

We acknowledge the charges brought against Mr. Bravo in Argentina and the first extradition request made by Argentina in 2010. However, those charges were soundly rejected by Magistrate Judge Dube′ in his [8]

The government's new request – an effort to overcome the 2010 outcome – is insufficient to change the result. While we want to concentrate on our request for bail in this Motion, the operative facts were discussed in several pleadings in Bravo I.[9]

---

[8]   *See* Order Denying Certification Of Extradition, Bravo I, DE 62, filed on November 2, 2010.

[9]   See, e.g., DE 57_Post-Hearing Memorandum In Opposition To Extradition, 09-29-2010; DE 62_Order Denying Certification Of Extradition, 11-02-2010.

## IV
## MR. BRAVO SHOULD BE GRANTED BAIL PENDING EXTRADITION

Because Mr. Bravo is not a flight risk or a danger to the community, and can demonstrate multiple "special circumstance," he should be granted bail in this case.

A.    <u>Mr. Bravo is not a flight risk</u>

As we noted above, Mr Bravo had been aware of these charges since they were filed in Argentina in 2008. He publicly vowed to fight them,[10] and he remained in Miami, living openly and taking no actions that would indicate he was a risk of flight, despite his knowledge that he would likely be held to answer these extradition charges. Mr. Bravo has extensive family and business ties to South Florida, has been a respected business man, and has been active in the community.

Even after he prevailed in Bravo I, he took no action to flee the jurisdiction, hide his whereabouts, or disguise himself or his family in any way.[11]

In determining whether a potential extraditee seeking release on bail will intentionally fail to appear for further extradition proceedings, courts generally look

---

[10]  *See, e.g.*, "Argentina Seeks Ex-Navy Officer in USA" Associated Press, March 7, 2008 ("a lawyer for Roberto Guillermo Bravo, 65, said Thursday his client denies the massacre charges and will fight extradition. 'Anything that he did while he was in the Argentinean military was done in a legal manner, and he was not involved in any execution-style killings," said attorney Neal Sonnett."). <u>http://seattletimes.nwsource.com/html/nationworld/2004265249_apargentin</u> edirtywar.html (last accessed February 28, 2010).

[11] Mr. Bravo did purchase a new home in the intervening years, about a mile from where he had previously lived.

to 18 U.S.C. § 3142(g), which prescribes the factors to be considered "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community...." *See In the Matter of the Extradition of Jose Luis Munoz Santos*, 473 F.Supp.2d 1030, 1040-1041 (C.D. Cal 2006);  *In re Extradition of Campillo Valles*, 36 F.Supp.2d 1228, 1231 (S.D.Cal.1998)(considering "the standards governing the release or detention of a defendant in the United States" in determining the risk of non-appearance); *In re Extradition of Nacif-Borge*, 829 F.Supp. 1210, 1221-22 (D.Nev.1993) (noting that 18 U.S.C. § 3142(g) is not directly applicable to extradition cases but using its "detailed outline of traditional factors" in evaluating the risk of non-appearance in an extradition case).

First, Mr. Bravo poses absolutely no flight risk. *United States v. Messina,* 566 F. Supp. 740, 742 (D.C.N.Y. 1983), (citing Digest of the States Practice in International Law 157) ("it is the practice of United States Courts to allow persons provisionally arrested to remain at large on bond if there is no evidence that the person is about to flee."); *United States v. Taitz,* 130 F.R.D. 442, 446 (S.D. Cal. 1990) ("The State Department has recognized that in general, the practice of the district courts is to release persons provisionally arrested and facing extradition on bail in the absence of risk of flight."); *In the Matter of Kirby,* 106 F.3d 855 (9th Cir. 1997) (finding that defendants pose no risk of flight because "[a]ll three men have strong ties of family and friendship in [community]"); *See also United States v. Nacif-Borge,* 829 F.Supp. 1210 (D. Nev. 1993).

10

**B.**   <u>Mr. Bravo is not a danger to the community</u>

There is absolutely no evidence that Mr. Bravo is a danger to the community. The charges against him date back to 1972, and he first came to the United States within months of being acquitted of any wrongdoing. In the almost 50 years he has been in this country, he has been a law abiding, contributing member of society, and an outstanding citizen since he was naturalized in 1987.  *See Nacif-Borge,* 829 F.Supp. at 1215-1216.  Mr. Bravo has no criminal history, no criminal record, and nothing indicates that he has ever been involved in any criminal legal proceedings in the United States. *In Re Extradition of Campillo Valles,* 36 F.Supp. 2d 1228, 1231 (S.D. Cal. 1998)(In deciding whether to grant a motion to bail "court may consider evidence concerning an extraditee's past conduct, including any prior criminal convictions and association with known criminals and/or evidence of attempts to avoid arrest.")

Far from posing a danger to the community, Mr. Bravo is revered in the community and has positively affected the community with his entrepreneurial ventures. *Campillo Valles,* 36 F.Supp. 2d at 1231 (In deciding whether to grant a motion to bail "court may also consider ties to the community and possibility of posting security for an appropriate bond.") Mr. Bravo's accomplishments range from seeking to help foreign enterprises conduct business in America and attempting to restore a book-binding shop to its original condition, to helping place individuals in private sectors ranging from the health industry to the securities industry.  Mr Bravo is not a danger to anyone in the community.

11

C.     **There are Special Circumstances in this Case that Justify Bail**

Mr. Bravo can demonstrate clear and convincing evidence of "special circumstances" warranting his bail pending an extradition hearing.

1.     **The Denial of the First Extradition Request in 2010 Presents Special Circumstances Which Justify a Bond.**

The denial of the 2010 extradition request from Argentina presents special circumstances which not only justify release on bond, but also should be considered by this Honorable Court in analyzing the strength of the government's case for extradition.

Either before or after Magistrate Judge Dube′ denied certification of extradition on November 2, 2011, the governments of Argentina and the United States took absolutely no action to try to reopen and supplement or correct the record or buttress their arguments for extradition, nor was there any attempt to appeal the Magistrate Judge's decision to the United States District Court, and no attempt to provide additional documents or testimony to support the extradition of Mr. Bravo.

It should be noted that the Argentina Judge, Hugo Sastre, was well aware of the status of the hearing in Miami, and was obviously in contact with the AUSA. For example, in one attempt to bolster its case, (evidently at the request of the AUSA), Judge Sastre wrote a letter, dated March 2010, that attempted to respond to several arguments we had made. While the contents of the letter were rejected by

Magistrate Judge Dube,[12] it is clear that the Argentina courts were paying close attention, yet did nothing to try to rescue a failing extradition request.

Clearly, these are "special circumstances" which favor bond in this case. Moreover, those same circumstances should be taken into consideration by this Honorable Court in determining whether extradition should be granted.

### 2.   The Military "Acquittal" Presents an Issue of Double Jeopardy Which Could Bar Extradition

The prior formal military investigation clearing Mr. Bravo of the alleged offenses for which Argentina now seeks his extradition demonstrates Mr. Bravo's "special circumstances." The court in *United States v. Zarate,* 492 F.Supp. 2d 514 (D. Md. 2007) addressed a very similar issue: whether bail is available to a defendant pending an extradition hearing when documentary evidence purports to establish that the requesting nation (Mexico) had officially exonerated the defendant of the crime underlying the charges?

The court held that special circumstances warranted defendant's bail pending an extradition hearing reasoning that "[c]onfinement for a crime of which the defendant had been acquitted would work a "manifest substantial injustice." *Zarate,* 492 F. Supp. 2d at 515. While the "acquittal" in this case may be different in form, *Zarate's* holding weighs heavily in favor of finding special circumstances here, and the fact that the Magistrate Judge in Bravo I gave great weight to this issue makes

---

[12]   *See* DE 62_Order Denying Certification Of Extradition, p. 16.

### 3.      Mr. Bravo is Protected from Extradition by an Amnesty Law Which has Never Been Abrogated, a Special Circumstance

On May 27, 1973, soon after Mr. Bravo was exonerated by the military decision, Argentina passed Amnesty Law 20.508 which applied to events prior to May 25, 1973, including the events at Trelew. We had been advised that Amnesty Law 20.508 had never been repealed, abrogated, or found to be unconstitutional[13].

### 4       The Political Offense Exception Constitutes a "Special Circumstance"

The Extradition Treaty between the United States and Argentina specifically carves out a provision in Article 4, Section 1 exempting any individual "if the offense for which extradition is requested is a political offense."

Magistrate Judge Dube′ found that the political offense exception applied to Mr. Bravo and his extradition was therefore barred by Article 4 of the Treaty. That finding should be considered a "special circumstance" which supports release on bail in this case.

### C.      THE BAIL PACKAGE WE PROPOSE IS MORE THAN ADEQUATE TO JUSTIFY MR. BRAVO'S RELEASE ON BOND.

We propose a bail package far more extensive than that upon which Mr. Bravo was released in 2010.

1.      A Personal Surety Bond in the amount of Four Million Dollars, ($4,000,000) signed by Mr. Bravo's wife, three Sons, a Nephews, and two friends, all of whom are

---

[13]  Magistrate Judge Dube′ discussed this issue in his Order in Bravo I. *See* DE 62 at p.16.

prepared to pledge their equity in their residences in support of a bond for Mr. Bravo

The signatories have the following equity in real property which they will pledge:[14]

| | | |
|---|---|---|
| Roberto Bravo and Ana Bravo | Miami, FL | $ 1,600,000 |
| Fernando Bravo (Son) | Cooper City, FL | $   527,000 |
| Pablo Bravo (Son) | Tallahassee, FL | $   297,000 |
| Andres Bravo (Son) - | Frederick, CO | $   503,000 |
| Martin Galarce (Nephew) | Coconut Grove, FL | $ 1,000,000 |
| Armando Valladares (Friend) | Miami, FL | $   400,000 |
| Maria Werlau (Friend) | North Miami, FL | $   142,000 |
| TOTAL VALUE OF PROPERTIES PLEDGED: | | $ 4,327,000 |

2.     A separate Appearance Bond in the amount of $1,000,000, with 10% of the face amount deposited in the Registry of the Court.

3.     Any other non-monetary conditions which the Court wishes to impose, including electronic monitoring, house arrest, or similar conditions.

IV
CONCLUSION

It is abundantly clear that Mr. Bravo deserves to be released on bail, and the generous bail package we have proposed will more than guarantee that he will abide

---

[14]  We have not included specific addresses or other personal information which might be subject to redaction rules, but we will provide the court with that information at the bail hearing.

by the conditions of his release. We therefore respectfully request that this Honorable Court grant him bail.

WHEREFORE, Mr. Bravo respectfully requests this Court to grant him bail pending an extradition hearing.

Respectfully submitted,

**NEAL R. SONNETT, P.A**.
Attorneys for Roberto Guillermo Bravo
Two South Biscayne Boulevard, Suite 2600
Miami, Florida  33131-1804
Telephone:     305-358-2000
Fax:              305-358-1233
Email:           nrs@sonnett.com

By   s/  Neal R. Sonnett
  **NEAL R. SONNETT**
  Florida Bar No. 105986

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2019,  I electronically filed the foregoing document with the Clerk of the Court and all counsel of record using CM/ECF.

By:  s/ Neal R. Sonnett
  **NEAL R. SONNETT**

16