```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO. 1:19-MC-23851-EGT
3

4    IN RE
     IN THE MATTER OF:              Miami, Florida
5
     83579-004                      March 9, 2020
6                                   Monday
     EXTRADITION OF ROBERTO
7    GUILLERMO BRAVO              Scheduled for 9:00 a.m.
                                    9:12 a.m. to 11:38 a.m.
8    _____

     UNITED STATES OF AMERICA       Pages 1 - 109
9                PLAINTIFF

10        -v-

11   ROBERTO GUILLERMO BRAVO
                     DEFENDANT
12   ------------------------------------------------------------

13

14                     FINAL EXTRADITION HEARING

15           BEFORE THE HONORABLE EDWIN G. TORRES
                UNITED STATES MAGISTRATE JUDGE
16
     APPEARANCES:
17
     ON BEHALF OF GOVERNMENT:       JASON WU, ESQ.
18                                  United States Attorney's Office
                                    99 Northeast 4th Street
19                                  Miami, Florida  33132

20                                  CHRISTOPHER J. SMITH, ESQ.
                                    United States Department Justice
21                                  1301 New York Avenue, NW
                                    Washington, D.C.  20001
22
                                    PHILIP MIRRER-SINGER, ESQ.
23                                  United States Department Justice
                                    Office of International Affairs
24                                  Criminal Division
                                    1301 New York Avenue, NW
25                                  Washington, D.C.  20530
```

```
 1    APPEARANCES (CONTINUED):

 2
      ON BEHALF OF DEFENDANT:        NEAL RUSSELL SONNETT, ESQ.
 3                                   Neal R. Sonnett, P.A.
                                     2 South Biscayne Boulevard
 4                                   Suite 2600
                                     Miami, Florida  33131
 5

 6
                      ALSO PRESENT:  Roberto Bravo, Defendant
 7

 8
      STENOGRAPHICALLY
 9    REPORTED BY:
                                     GLENDA M. POWERS, RPR, CRR, FPR
10                                   Official Court Reporter
                                     United States District Court
11                                   400 North Miami Avenue, Room 08S33
                                     Miami, Florida  33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the order of the Court:)

 2         COURTROOM DEPUTY:  All rise.

 3         United States District Court for the Southern District

 4    of Florida; the Honorable Judge Edwin G. Torres presiding.

 5         THE COURT:  Good morning, everyone.

 6         MR. SONNETT:  Good morning, Your Honor.

 7         COURTROOM DEPUTY:  Calling the case in the matter of

 8    the Extradition of Roberto Guillermo Bravo, Case Number

 9    19-23851, Judge Torres.

10         Counsel, please state your appearances for the record.

11         MR. WU:  Good morning, Your Honor.

12         Jason Wu on behalf of the United States.

13         With me at counsel table is Christopher Smith, the

14    Associate Director of the Department of Justice, Offices of

15    International Affairs, and Philip Mirer-Singer, also with the

16    Office of International Affairs.

17         THE COURT:  Good morning.

18         MR. SONNETT:  Good morning, Your Honor.

19         Neal Sonnett on behalf of Roberto Bravo, who's present

20    in court.

21         THE COURT:  Good morning, everybody.

22         This is the extradition hearing we set for Mr. Bravo's

23    case.  The parties have filed their respective papers, which we

24    reviewed.

25         And so, with that, let me turn to counsel, the
```

```
 1   petitioner, asking you, are there any witnesses you wish to

 2   introduce?

 3        MR. WU:  There are not, Your Honor.

 4        THE COURT:  And you're going to be relying on the paper

 5   records submitted?

 6        MR. WU:  That's correct.  And in that regard, may I

 7   move, under Section 3190, to formally admit the extradition

 8   request from the Republic of Argentina that was filed with our

 9   complaint under seal?  I just want to make sure formally that

10   we move that into evidence.

11        THE COURT:  Right.  We will mark that then as

12   Government's Exhibit 1, Composite, and put it in evidence.

13        MR. WU:  Thank you, Your Honor.

14        THE COURT:  Okay.  Other than that, every document that

15   you're referring to was attached to the complaint?

16        MR. WU:  That's correct, yes.  And we also provided an

17   electronic copy for Your Honor to more conveniently consider.

18        THE COURT:  Okay.  So, turning to counsel for the

19   defendant -- respondent, rather, are there going to be any

20   witnesses you wish to call in this hearing here?

21        MR. SONNETT:  No, Your Honor.  We called two expert

22   witnesses at the last hearing and we had filed their testimony,

23   and the documents, and the exhibits that we used, and we ask

24   the Court to consider those as our witnesses and our experts

25   for this hearing as well.
```

```
1              THE COURT:  Okay.  Any objection from the Government to
2    that?
3              MR. WU:  Your Honor, we don't have any legal objection
4    to you considering them.  We're happy to elaborate in more
5    detail, as I'm sure we will later in the hearing, but, of
6    course, we have arguments for why you should not find certain
7    portions of those witnesses' testimony persuasive and why they
8    are insufficient to meet the defendant's burden under the
9    political offense exception.  So, I'm happy to say that now or
10   we can cover that later.
11             THE COURT:  Okay.  Well, just for purposes of the
12   record then, Mr. Sonnett, who are the people, I guess, what we
13   have is their trial testimony or hearing testimony; is that it?
14             MR. SONNETT:  Their trial testimony, Your Honor, and we
15   submitted a copy of that transcript as an exhibit in this case,
16   so that their testimony is on record in this case.
17             THE COURT:  And the names of the witnesses are?
18             MS. SONNETT:  Professor Solari, S-O-L-A-R-I, and Jon,
19   J-O-N, Perdue, P-E-R-D-U-E.
20             THE COURT:  Okay.  So then they testified at the
21   preceding hearing; without objection, then I will treat those
22   as that it is their testimony as an affidavit in support of
23   their position and consider that; okay?
24             MR. SONNETT:  Thank you, Judge.
25             THE COURT:  All right.  So then, there being no live
```

6

1    witnesses either party wishes to introduce, at this point, then

2    let me turn to counsel for the Government on your initial

3    presentation on your petition.

4         MR. WU:  Thank you, Your Honor.

5         Your Honor, Argentina has presented an extraordinarily

6    substantial extradition request in this case.  And unlike the

7    run-of-the-mill case, Argentina has already held a trial to

8    determine the truth of what happened in the early morning hours

9    of August 22nd, 1972.

10        The Argentinian Trial Court concluded beyond a

11   reasonable doubt that a group of military officers, including

12   Mr. Bravo, massacred unarmed and defenseless prisoners in the

13   dead of night, and those findings provide more than enough

14   probable cause to certify this request.

15        So I think what would be most useful for Your Honor, at

16   the outset, is I'd like to narrow the scope of the issues that

17   this Court would have to consider, because it does appear on

18   the papers that we have some significant points of agreement.

19   And let me go through some of those.

20        So, looking at the opposition, particularly, at

21   page 11, Mr. Bravo admits many of the facts as they occurred

22   and as are alleged in the Argentinian papers.

23        So he admits that -- and I think we agree -- that 19 of

24   these escapees from the Rawson Prison became military prisoners

25   at the Almirante Zar Naval Air Base.

1          Mr. Bravo admits that he was present, that he was

2     guarding these prisoners, and that, on August 22nd, 1972, he

3     was one of the shooters who killed these victims and injured

4     others, along with other military officers.

5          He also lists in his opposition accurate statistics,

6     that 13 of those victims died on the spot, three died in

7     medical care, and three survived, who are the three who

8     provided the affidavits that you can consider today.

9          And I also believe that he implicitly concedes what I

10    call the sort of procedural requirements of extradition, so

11    he's not debating whether this Court has jurisdiction or

12    authority to certify, and he seems to agree that there is a

13    valid treaty enforced between the United States and Argentina

14    and that it covers the charged offenses of murder and attempted

15    murder.

16         I think this is maybe where we start getting into where

17    we disagree and where there are issues that Your Honor should

18    resolve today.

19         Essentially, I think he's even conceding -- although,

20    it would be worth asking for their clarification of their

21    position -- I think they're conceding that if the request facts

22    are true, in other words, if they woke these prisoners up in

23    the middle of the night, the prisoners had not done anything to

24    provoke them, and that they then gunned these people down for

25    no reason and without any justification, I think he's conceding

1   that that would be an extraditable offense and that it would

2   not be a political offense.

3          Because in his papers he never says, even if the facts

4   are true, as alleged in the Argentinian request, I still should

5   not be extradited.

6          I did not see that argument in his opposition.

7          So the real core of his argument is found on page 10,

8   and, of course, elsewhere throughout his papers, but what he

9   says on page 10 is:

10          The charges brought against Mr. Bravo in Argentina and

11   the documents submitted with his current extradition request do

12   not tell a true or accurate story of what actually occurred.

13   End quote.

14          And what that boils down to, Your Honor, is that he

15   wants to have a trial on the merits of his case here, and he

16   wants to contest the underlying facts alleged in Argentina's

17   extradition request.

18          But the problem with that -- as Your Honor well knows

19   and stated yourself in the Martinelli decision -- is that

20   Mr. Bravo cannot defeat probable cause by introducing evidence

21   that merely controverts the existence of probable cause found

22   in Argentina's documents, and he cannot introduce testimony

23   that merely gives the opposite version of the facts, because

24   that would never destroy the probability of guilt.

25          That would only present a defense.  It would only

1    present evidence that weighs against guilt or was required to

2    define -- make adverse credibility findings against the account

3    presented in Argentina's request.

4          And I think, based on that Black Letter Law, that

5    already -- that's really the core issue that Your Honor has to

6    decide, is whether to go with a century of Black Letter Law

7    saying that the extraditee, the fugitive, is not entitled to

8    contradict the facts in the Government's request, and that's

9    exactly what he's trying to do here, Your Honor.

10          And so, we would submit, really, primarily, that's the

11   reason why the Government's request should be certified and why

12   you should reject the arguments presented by Mr. Bravo today.

13          Turning to the issue of probable cause, I do want to

14   highlight for Your Honor, this is a somewhat unusual case, and

15   it's unusual in favor of the Government's request.

16          In most of these cases, the Government relies on a

17   portion of the evidence that the requesting nation has, and

18   normally, the case has not yet been tried or there haven't been

19   factual determinations in the foreign country about the guilt

20   of the extraditee or, in this case, his codefendants.

21          Here, we have an unusual case, because there has been a

22   full adversarial trial.  There are multiple codefendants.

23          They presented, in fact, many of the arguments that

24   Mr. Bravo claims will exonerate him under Argentinian law, and

25   they lost.  They lost on the facts, because the Argentinian

1    courts found beyond a reasonable doubt that these murders

2    occurred and that the official 1970's Government account of an

3    escape attempt by terrorist prisoners was a lie.

4         And moreover, they lost on the law.  They lost on these

5    issues, such as, the amnesty and certain other things that

6    Mr. Bravo has raised, which the Argentinian courts found, under

7    their own law, was inapplicable.

8         And so, based on those requests and the opinions that

9    are included in the Argentinian documents, we would ask that

10   Your Honor conclude that there is probable cause.

11        The next primary issue that I see in this case,

12   Your Honor, is the issue of the political offense exception,

13   and I know you've asked about that in the past, so I would like

14   to briefly discuss that.

15        The key fault line that I see in the case law -- the

16   case law is crystal clear, even if killings occur in a time of

17   conflict, even a large-scale war, like World War II, for

18   example, you cannot kill unarmed and defenseless prisoners and

19   call it a political offense.

20        The killing of unarmed and defenseless prisoners is

21   never incidental to a conflict, because it does not serve the

22   political aims of that conflict and it isn't sufficiently

23   proximately connected to the conflicts.  And those are -- we've

24   cited multiple cases for that proposition.

25        So, I think, right away, based on those cases, we see

1    that -- looking at Argentina's request -- it falls squarely

2    into that category of offense.  The allegations and -- more

3    than allegations -- the proof is that Mr. Bravo and his fellow

4    military officers roused these prisoners in the middle of the

5    night, pulled them out of their cells, grouped them together,

6    and then gunned them down with machine guns.

7         And that's never going to be a political offense.

8    It cannot be incidental to the larger conflict that was

9    happening in Argentina at the time, because these people had

10   been disarmed and were merely being held in custody.

11        The second point I want to make, which I think is

12   important, is that Mr. Bravo has failed --

13        THE COURT:  Let me ask this question of you.

14        If the facts are as the defendant purports them to

15   be -- and I accept that in terms it supports this issue -- then

16   what?

17        MR. WU:  In other words, if it occurred during an

18   escape attempt?

19        THE COURT:  Right.

20        MR. WU:  So I think that presents a closer question,

21   Your Honor.  Even then, I think -- first of all, it's not clear

22   that the political offense exception would cover him, because

23   if it's -- you know, again, these prisoners, even if they were

24   attempting to escape and they were ultimately unarmed, it was

25   not proportional to killing all of them.  So let me point that

1    out right off the bat.

2           But secondly, Your Honor, even if you accepted his

3    account of the facts, his account of the facts is that a single

4    prisoner -- a man named Pujadas -- attempted to disarm his

5    fellow Officer Sosa.

6           So even in that case, I would say there are multiple

7    offenses listed in the extradition request, which you can still

8    certify, because they concern killings that were not

9    proximately connected or not sufficiently connected to the

10   hostages' escape attempt.

11          And just as a few examples of those, the affidavits of

12   Mr. Camps and Mr. Haidar establish that they actually hid after

13   this initial fusillade or this initial salvo.  They hid in

14   their cell.  They cowered in their cell.

15          And Mr. Bravo and his fellow officers found them

16   afterwards and, essentially, killed them execution-style

17   after -- even accepting his account of the facts -- there was a

18   brief escape attempt by one prisoner.

19          So I would say you certify the counts of murder of

20   Mr. Kohon and Mr. Delfino, who were two killed, and along with

21   the attempted murders of Mr. Camps and Haidar, which, again,

22   occurred after that initial supposed escape attempt.

23          And, moreover, looking at the record of the trial in

24   Argentina, there are a number of victims who, demonstrated with

25   the forensic evidence, were killed execution-style, meaning

1    they weren't killed by initial salvo of bullets from far away.

2         There was a man named Mr. Bonnet, who, the forensic

3    evidence would show, was shot through the occipital region --

4    in other words, his head -- while he was on the ground, so that

5    was not an escape attempt; that was an execution-style killing.

6         Mr. Ohla, another of the victims, was killed by a

7    gunshot within 14 inches, or 35 centimeters, that was execution

8    style.  That was not during any purported escape attempt.

9         And there is a witness -- I'm sorry -- a victim named

10   Ms. Sabelli, who was shot through the back of the neck, again,

11   within 10 centimeters, and that doesn't -- is utterly

12   inconsistent with any escape attempt.

13        At a minimum, those are seven victims, and the related

14   counts could be certified as non-political offenses, even

15   accepting that one of the prisoners attempted to escape or

16   attack one of the officers.

17        But, Your Honor, I would like to stress, we think it's

18   inappropriate for this Court to consider Mr. Bravo's evidence

19   and reach the conclusion that there was an escape attempt, for

20   a few reasons:

21        The first is that this overarching Rule of

22   Non-Contradiction, which I've described, it applies to

23   political offenses as well.

24        And, for this example, the Eain -v- Wilkes case from

25   the Seventh Circuit, at 641 F2.d 504 is the main cite, and then

1   the pin cite, 516, the Court there said that:

2           In considering the presence of a political offense, the

3   Court determines whether the crime charged stems from political

4   violence.

5           THE COURT:  You need to slow down for the court

6   reporter, she can't keep up.

7           COURT REPORTER:  Thank you, Judge.

8           MR. WU:  Thank you, Your Honor.

9           THE COURT:  So you need to read that again.

10          MR. WU:  516.  In considering the presence of a

11  political offense, the Court determines whether the crime

12  charged stems from political violence.

13          To make that determination the magistrate need look

14  only to the facts supporting the extradition request for

15  evidence as to whether or not violent political activity was

16  unfolding at the time to which the facts relate and of the

17  individuals' recognizable connection to that violence.

18          So that suggests to me that the Court still has to

19  accept the core factual allegations of the Argentinian request

20  as true and then consider whether that qualifies as a political

21  offense.

22          To the same effect is Ahmad -v- Wigen, that's 726

23  F.Supp, 389, that's an Eastern District of New York decision

24  from 1989, at page 409, that Court stated:

25          Petitioner's alleged attack, if it took place in the

1    manner charged, must be characterized as a random act of

2    murderous terrorism, rather than a protected political offense.

3         So again, the same Rule of Non-Contradiction applies

4    here.  He cannot contest the facts in Argentina's request.

5    He can only attempt to explain them, and there's good reason

6    why, Your Honor:

7         Because if the case were that he could bring up his

8    defensive evidence in this proceeding, that would effectively

9    mean that we find Mr. Bravo's guilt here simply to determine

10   whether he gets a trial in Argentina, which would actually

11   determine the final punishment and guilt, and that doesn't make

12   any sense.

13        The Court's case law and centuries of extradition case

14   law makes clear that this tribunal's responsibility is not to

15   determine the guilt or innocence of Mr. Bravo.

16        And I know Your Honor cited a number of those

17   decisions, searching back to the turn of the century, searching

18   back to Justice Oliver Wendell Holmes, saying that:

19        While we may be tempted to bring all the niceties of

20   the criminal trial into this courtroom today, that's not what

21   we're here to do.  We're here for this narrow purpose of

22   certifying an extradition request.

23        THE COURT:  Now, on the point that you're raising now,

24   can you find contrary authority that did look beyond the

25   primary fact that set forth the position on the question of the

1    political offense?

2         MR. WU:  Right, but I want to be clear about what he's

3    allowed to do, because I don't think I found contrary

4    authorities, specifically, in this area of political offenses.

5         But I want to make a caveat to that, which is, he is

6    allowed to introduce explanatory evidence, that's also Black

7    Letter Law, so we do not dispute that fact.

8         The way to bring those two lines of cases into harmony,

9    in my mind, Your Honor, is that he is entitled to present

10   evidence to explain the larger historical context in which this

11   crime took place.

12        And that's why I say, to some extent, the affidavits of

13   his experts who describe Argentinian history and political --

14   different context of who these people were, what was going on

15   in Argentina at the time.  That explains, in some sense, like

16   what he did.

17        But what he cannot do -- and this is the key here --

18   is, in this particular case, under these particular

19   circumstances, his political offense argument rests on there

20   being an escape attempt by violent, armed prisoners, and that's

21   not what the Argentinian request alleges, and that's not what

22   the Argentinian Trial Courts found.

23        So, in the ordinary mind-run (phonetic) case, if we

24   could just take a step back and consider a hypothetical, there

25   might be a charge of murder; and in order to explain it, the

1    person might introduce evidence.

2         For instance, that there was an IRA-related killing in

3    Ireland during the 1980's.  He might introduce evidence, it's

4    explanatory for him to introduce evidence that proves he was a

5    member of the IRA, that there was an ongoing conflict between

6    the IRA and the British Government, or British-controlled

7    Government, at the time.

8         So, in other words, all those explanatory facts -- and

9    he might explain the identity of the victim, if the victim was

10   a Government official or military officer -- that he was

11   engaged in a struggle and -- those explanatory facts would not

12   contradict an extradition request that simply said the fugitive

13   killed Victim X.  In this case, we have more than that.

14        This extradition request not only establishes that

15   Mr. Bravo killed these people, but it establishes that the

16   manner in which he killed these people was that -- again, I

17   hate to repeat myself -- but they roused these people in the

18   middle of the night, gathered them in the center of the

19   cellblock and then gunned them all down; and that there was no

20   escape attempt.

21        The Argentinian -- both Trial and Appellate -- Courts

22   are crystal clear on this, and they've described at length the

23   evidence that led them to conclude that the so-called "the

24   story of the escape" was a fictitious account invented by the

25   then empowered military government, military dictatorship of

```
 1   Argentina in 1972.

 2          And so, unlike that case that I've described, the

 3   hypothetical of the IRA, here, Mr. Bravo has to squarely

 4   contradict the facts as alleged and have proven in Argentina's

 5   court -- not proven, but as alleged in Argentina's extradition

 6   request to take benefit of the political offense exception.

 7          THE COURT:  And didn't Judge Dube, in part, rely,

 8   though, on the rebellion -- ongoing rebellion part, aspect of

 9   all that was going on at the time, as support for his

10   conclusion that it was a political offense?

11          In other words, he didn't -- didn't he -- wasn't there

12   really two parts to his finding?

13          One, that he was in the middle of a rebellious time

14   period; two, that within the context of that there was

15   prisoners being held, an escape attempt, and then what happened

16   after that.

17          MR. WU:  That's correct.  And so I think it's important

18   to parse those two apart 'cause those are two separate

19   requirements.

20          Both of them have to be established by Mr. Bravo.

21          The first is that this occurred at a time when there

22   was an uprising, a rebellion, or insurrection within the

23   country.  That hasn't been primarily what I've been discussing

24   this morning or disputing.

25          I'm talking about the second requirement, which is that
```

1    the actions have to be incident to the uprising or rebellion,

2    and that has a fairly specific meaning in the case law and a

3    legal meaning.

4        THE COURT:  You can see then, for my purposes, that I

5    can assume that the first part of his analysis is right, that

6    for purposes of extradition law, there was, in fact, a

7    rebellion on law.

8        MR. WU:  So our position is that we are -- we have not

9    contested that in the papers to date.  I think if Your Honor

10   wants us to further discuss that, we would ask for supplemental

11   briefing on that matter.

12       But at least today, for the purposes of --

13       THE COURT:  If you were going to challenge that, what

14   would you introduce -- wouldn't there -- wouldn't you have to

15   have evidence to do that; and if you're relying on the evidence

16   you submitted, which is largely what Judge Dube considered,

17   there's some supplemental information, right, 'cause there was,

18   in fact, a trial in the interim period.

19       But to some extent, in terms of what evidence is relied

20   upon against the respondent, the evidence is still, arguably,

21   the same, right, the affidavits that were of the three

22   individuals that you identified that were actually signed and

23   prepared many years ago.  So am I wrong on that?

24       MR. WU:  So I would disagree to some extent,

25   Your Honor.  Of course, the part of our probable cause showing

1    is those three affidavits.

2         But I think the fairest way to read these court

3    opinions that we've appended is they are effectively

4    compilations of the evidence against the defendant, so they're

5    analogous in the -- I'm going to brutalize the name of this

6    case -- Afanajev -- there was an unsworn bill of indictment,

7    but it was actually a quite lengthy recitation of the facts

8    against the defendant, and that was considered evidence.

9         I think, in the same vein, the Argentinian court

10   opinions point to additional evidence and describe additional

11   evidence that was not before Judge Dube.

12        And I think we've discussed this at earlier hearings,

13   but there was forensic evidence that is inconsistent with this

14   count of escape and, in fact, strongly corroborates the

15   victims' accounts that Judge Dube did not have before him.

16        And that evidence includes, as I mentioned, there are a

17   number of gunshot wounds where the forensics are analyzed and

18   they demonstrate execution-style killings, and those are of the

19   victims, including Mr. Ohla, Mr. Bonnet, Ms. Sabelli.

20        There is also --

21        THE COURT:  As to those three -- let me stop you to

22   make sure I get everything straight.

23        So let's start with those three individuals.

24        What you're saying is that beyond the affidavit that

25   was prepared 30 years ago, they've been able to supplement that

1    into the issue of modern forensic analysis?

2           MR. WU:  It's not necessarily modern forensic analysis.

3    It's actually finding the people at the time, including some of

4    them were made by the relatives of the victims.  One was made

5    by, I believe, a funeral home director, who examined the bodies

6    afterwards in preparation for burial.

7           But the point is, these opinions compiled that evidence

8    together in a format that Judge Dube did not have -- did not

9    have those facts.

10          THE COURT:  Well, wouldn't, though -- just so I

11   understand, I'm trying to --

12          MR. WU:  Sure.

13          THE COURT:  -- if that is the case, that --

14   quote/unquote -- forensic evidence that you were talking about,

15   why wouldn't it have been something he considered.  That would

16   have been preexisting -- I don't have it in front of me right

17   now -- was it 2008 was Judge Dube's opinion?

18          MR. WU:  It was 2010, Your Honor.

19          THE COURT:  2010.  So that would have been evidence

20   preexisting 2010, because if that's what you're talking about?

21          MR. WU:  Yeah.  So some of this evidence preexisted

22   2010, but, of course, it wasn't all necessarily submitted to

23   Judge Dube at that time.  We were relying largely on the

24   affidavits and, moreover, the Court opinions certainly did not

25   exist in 2010.

1          So they are, like I said, they are, effectively, a

2    compilation or a summary of the evidence and, of course,

3    Your Honor is entitled to consider that, because in an

4    extradition hearing the Rules of Evidence don't apply and

5    unsworn affidavits, or hearsay, or compilations of material,

6    are available for you to consider.

7          And the simple fact is Judge Dube did not have these

8    very persuasive opinions from the Argentinian Trial Court in

9    2012, or the Appeals Court in 2014, that explain the numerous

10   inconsistencies between the official 1970's Government account

11   and all of the evidence that they had before them, which does,

12   admittedly, include a lot of evidence that existed as of 2010,

13   but which Judge Dube never had a chance to see.

14          THE COURT:  Okay.

15          Now, with respect to the -- going back a step to the

16   individuals that you're relying, what evidence is there in the

17   record as to the defendant's specific involvement with those

18   three individuals?

19          MR. WU:  So there are a number of facts -- well, you

20   mean, taking into account their own statements?  I mean, their

21   own statements identify Mr. Bravo as one of the perpetrators

22   and, in fact, Mr. Camps states that when he and -- I believe he

23   and Mr. Kohon were hiding in their cell together, Mr. Bravo was

24   the one who personally came into the cell -- this is after the

25   initial fusillade ceases -- and he demands them, something to

1   the effect of, Are you going to talk now or are you going to

2   collaborate?

3           When they refuse -- or when they try to make a

4   response, he shoots both victims; one of them survives, that's

5   the person who provides the affidavit.  One of them is killed

6   by that shot, and this is after --

7           THE COURT:  Mr. Campos -- Mr. Campos survived?

8           MR. WU:  Mr. Camps.  Camps.

9           THE COURT:  Camps?

10          MR. WU:  Yes.  And then, similarly, the account from

11  Ms. Berger also describes Mr. Bravo's involvement, how he was

12  one of the shooters, and states that he was one of the ones who

13  seemed to be talking afterwards to try to concoct this

14  fictitious attempt story -- escape story.  So, again, that

15  verifies his central role in these events.

16          Mr. Haidar also describes Mr. Bravo as one of the

17  individuals who committed the shooting.

18          But in terms of -- there's also additional evidence

19  that supports that, including the fact that Mr. Bravo's

20  weapon -- as discussed in our papers -- was a 45-caliber

21  handgun, that was actually shown to be a handgun -- or there

22  was evidence in support of the notion that bullets from his gun

23  had been some of the bullets used in the shooting and which had

24  hit some of the victims.

25          I'd also note, to the extent -- he has not made any

1    kind of argument to limit himself to sort of his own principal

2    liability.   To the extent that Your Honor is concerned about

3    him being held liable for killings that were directly

4    perpetrated by his fellow officers, I think it's understood

5    that this was a conspiracy or, at least, at the very minimum,

6    in our law, I think we would call this aiding and abetting

7    liability, where they all accomplished this crime together.

8            So we're not alleging that Mr. Bravo's bullets

9    personally killed these 16 people and wounded the three others.

10   But under Argentinian law he has been charged with all of them,

11   based on this aiding and abetting or conspiratorial liability.

12           And to my understanding, I don't think he's contesting

13   that aspect of this.   I didn't see anything in his papers

14   discussing that.

15           But taking a step back, Your Honor, you asked to what

16   extent the evidence demonstrated a political offense, and I

17   want to turn back to the importance of distinguishing those two

18   prongs, because this is the key part.

19           90 percent, if not more, of the witnesses' testimony at

20   the prior hearing went to the first prong, went to the history

21   of Argentina.   It was explanatory evidence, in fact, and so I

22   can concede that Your Honor can consider it, but --

23           THE COURT:  The first prong being the rebellion element

24   of the conflict that was going on?

25           MR. WU:  Precisely.

1              THE COURT:  Okay.

2              MR. WU:  But I would like to focus Your Honor, in

3       particular, on page 37 of the cross-examination of Mr. Perdue,

4       one of the experts, because I think this goes to show why these

5       experts do not help you at all on the second prong.

6              So Mr. Perdue is being asked in cross-examination about

7       whether he can describe the events that happened on the morning

8       of August 22nd, in other words, whether there was an escape

9       attempt.

10             And he replies:  It depends on whether you believe that

11      somebody tried to disarm one of the guards or not.

12             And later on in the page, he describes that:

13             The only differences that I can discern -- meaning

14      between the Government account and the victims' account -- is

15      whether there was a -- whether there was a fusillado -- as they

16      call it -- where you line them up against the wall and open

17      fire, or a response to a disarming one of the guards and trying

18      to foster another escape.

19             The Government attorney asks:

20             So you're inclined to accept the statement that one of

21      the individuals had attempted to grab a weapon and that

22      resulted in the shooting of 19 people?

23             Answer:  I have no way to know whether that's the truth

24      or not, whatsoever.

25             And that's what I want to emphasize here today, is that

1    he has to establish both prongs, and his own experts are saying

2    that they have no insight.  And I think, candidly, they have to

3    say that because they're historians, they were not firsthand

4    witnesses.  They have no insight as to whether there was an

5    escape attempt or whether there was an execution-style killing

6    of 19 people.

7         And Mr. Solari, I believe, makes a similar comment.

8    It's a little less specific.

9         Let me find the page number for Your Honor.

10        But at one point he's asked a similar question, and he

11   says something like, If you're asking me whether there was a

12   murder or not, I cannot speak to that.

13        And I think that's important because it reveals to

14   Your Honor that the experts, at most, get you part of the way

15   there or can help you as to the first prong of the political

16   offense exception.

17        But to accept the second prong -- in other words, that

18   it's incident to -- you have to conclude, contrary to the

19   extradition request -- or the escape attempt -- and again, you

20   have to conclude that based on no evidence, because there's no

21   evidence of that.

22        The witnesses themselves, the expert witnesses, would

23   not say it, and the only sources that we have for that are news

24   articles which are, essentially, reproducing the official

25   Government account, which, as the Argentinian Court found in

1    2012, was a false account, was one produced by the military

2    Government -- as proved -- urging its witnesses to testify

3    falsely.

4            The quotation that I would think as to Professor Solari

5    is on page 64, where the question was, just simply -- there was

6    an incident that occurred in Trelew, (inaudible), in which many

7    of those terrorists were killed.

8            And Professor Solari:

9            To say whether or not they were murdered, that's a

10   fact-finding investigation, I cannot say.

11           So I want to emphasize, both experts are actually

12   disclaiming the ability (inaudible) to get to prong two, and

13   that's clear as to prong two.

14           So, for those reasons, Your Honor, I would urge you to

15   conclude that Mr. Bravo failed to satisfy the political offense

16   exception and has failed to meet his burden there, and that we

17   have otherwise shown probable cause through, again, this very

18   substantial, hefty, weighty extradition request from the

19   Republic of Argentina.

20           THE COURT:  Let me ask you this question.

21           Based upon your research, whether there's conflicting

22   evidence on the political exception issue, did you find any

23   authority where a Court resolved that in the defendant's -- in

24   the respondent's favor where there was conflicting evidence?

25           MR. WU:  Off the top of my head, Your Honor, I cannot

1    think of a case and, of course, I was -- we were primarily

2    searching for a very narrow, specific universe of cases, which

3    are these cases that present a good analogy 'cause they discuss

4    the killing of prisoners.  So I can say, in that universe of

5    cases, it's not like we were being selective in only finding

6    the good ones for us.  I think we had tried to cite all of the

7    ones that were relevant from the modern era.

8                THE COURT:  And what about in terms of broader context

9    of what you were searching for, where you have Government -- in

10   other words, as opposed to your IRA example --

11               MR. WU:  Yes.

12               THE COURT:  -- for example, where you have the

13   terrorist issue --

14               MR. WU:  Yes.

15               THE COURT:  -- where you have a Government official at

16   issue.  What we have here is a Government account with

17   contemporaneous events saying that there was nothing unlawful.

18               You have a Government account subsequent to that

19   finding that those -- that the earlier version was a cover-up,

20   in fact.

21               Have you seen any authority where you had that

22   situation, where you had Government official at issue and you

23   had a conflict in evidence stemming, in part, from conflicting

24   Governmental positions?

25               MR. WU:  I've not seen anything exactly analogous.

1    What I will say -- so there's two types of evidence that you

2    can introduce.  There's explanatory evidence, I think we have

3    already covered that today.

4         There is, of course, this narrow exception, which may

5    be what you're suggesting.  There's this narrow suggestion, if

6    you can produce evidence that obliterates probable cause.

7         And I just want to emphasize, here, we're falling far

8    short of that, right, at most, we have two contradictory

9    accounts.

10        One is produced by a modern court proceeding that's

11   resulted in opinions that are hundreds of pages in length that

12   discuss their findings in detail.

13        The other is a document that Mr. Sonnett attached to

14   the pleadings, it is a seven-page summary, a military

15   investigation, what he refers to as an "acquittal," but it's,

16   essentially, a decision by the military that these people will

17   not be prosecuted and that they are going to support this

18   official 1970's era Government account.

19        So, at most, you have -- what I think you termed in

20   Martinelli -- "two opposite versions of the fact," and they

21   don't -- neither destroys or obliterates the other.

22        If anything, I would say our version, which is backed

23   by far more evidence, and there's much more work showing those

24   opinions of why the evidence supports this view that there was

25   no escape attempt, that would come far closer to obliterating

1   the other one.  But, ultimately, I think it boils down to we

2   have two contradictory versions of the facts.

3        And the thing you do when you have two contradictory

4   versions of the facts, you go to trial; and if it's a foreign

5   proceeding, you extradite Mr. Bravo and he gets to try those

6   defenses in the Argentinian Court, he gets to convince those

7   judges the rightness of his view that there was an escape

8   attempt.

9        That's what he is going to have if he goes back to

10  Argentina, a full adversarial trial on this issue.

11       THE COURT:  And -- well, is that really true, though?

12  Is there any -- it would be an adversarial trial, in our terms,

13  it would be an adversarial trial in these papers submitted into

14  evidence --

15       MR. WU:  Exactly.

16       THE COURT:  -- because there's no evidence -- there's

17  no witnesses against him today; right?  Everything is paper

18  evidence.

19       MR. WU:  Certainly, a lot of the evidence because of

20  the passage of time would be paper evidence.  I don't know.

21  It's not entirely clear to me.  There are survivors -- or there

22  are people who were living in that era that could speak to more

23  ancillary matters.

24       I do think it's correct that, in terms of the witnesses

25  who were there -- the victims are deceased -- and I just, you

1    know, I cannot speak to how Argentina is going to try their

2    case.  At this point, they have people convicted of the

3    charges, you know.

4         And the Government here, we would potentially try to

5    cooperate people.  You might have live witnesses, as you might

6    expect, but I just don't want to make predictions about that.

7         THE COURT:  Well, as -- on the other hand, you do have,

8    though, the trial evidence of people who were there?

9         MR. WU:  Correct, exactly.

10        THE COURT:  And part of that is relied on that

11   additional evidence that will be marshalled against the

12   defendant.

13        MR. WU:  Yes, of course, exactly.

14        THE COURT:  And the trial proceedings that have

15   occurred to date -- and I assume these were the other members

16   of the military force that was in place at the time?

17        MR. WU:  Exactly.  It was Mr. Sosa, who was the one

18   allegedly attacked by Pujadas, it was some of the other people

19   that committed the shooting.

20        THE COURT:  And the evidence that was introduced at

21   trial, was there any contemporaneous evidence from a witness,

22   or was it all affidavits?

23        MR. WU:  Again, I do believe there were witnesses who

24   presented evidence in that trial, but it related to the larger

25   historical context, kind of analogous to the experts submitted

1    here, within a very limited fashion in the extradition request.

2         Again, the victims are long deceased, even the

3    survivors, I believe, passed away decades ago.

4         THE COURT:  So their testimony was based upon the

5    affidavits that were submitted a long time ago?

6         MR. WU:  Correct.  And based on what you would call

7    multiple contemporaneous accounts, so more even than what was

8    presented in the written affidavits that you saw.

9         As the Argentinian Court explained, these witnesses

10   gave not just one statement or two statements.  They gave -- I

11   think, Mr. Camps and Mr. Haidar, they gave four to six

12   statements apiece.

13        And particularly significant, both Mr. Camps and

14   Mr. Haidar gave statements while in the hospital while

15   segregated from each other, separated:

16        One on August 22nd and one on August 23rd, so the day

17   of the shooting and the day after the shooting, and those

18   substantially corroborated each other and gave an account

19   related to the submissions.

20        THE COURT:  Now, there is plenty of authority that says

21   that we're not supposed to -- we would never allow anybody

22   tried for murder on paper, that would just not exist.

23        And it didn't rise to the level of concocted evidence,

24   right, the trial transcript, not an affidavit.  So our

25   procedure would not allow for a condition in that circumstance.

1          But just because -- I believe the law is clear, just

2     because our procedure would have a certain protection does not

3     mean that for purposes of extradition I have to impose the same

4     standard on a foreign country's trial.

5          MR. WU:  Precisely, Your Honor.

6          And again, in Martinelli, I think you put this well,

7     you said that we are bound to assume that the trial in the home

8     country will be fair.

9          And the reason for that is, what I think they often

10    call in the case law the Rule of Non-Inquiry, which effectively

11    said, we are not supposed to sit here in judgment of whatever

12    different Rules of Evidence and what procedure may apply in

13    foreign courts' proceedings.

14         That's more equitable consideration that may be

15    appropriate for the Secretary of State at stage two of this

16    process, right, being his discretionary determination whether

17    to actually extradite the defendant.

18         Right now this Court only has to decide, is there

19    fraudulent concealment?

20         And if the answer is yes, then all this Court has to do

21    is certify it, meaning that he could be extradited.

22         THE COURT:  And this then leads to a question I have,

23    which, I think, in part, was driving, potentially, Judge Dube;

24    although, you can read Judge Dube's opinion, and he lays out

25    rationale, some of which, arguably, is now more susceptible to

```
 1    attack, I think he did rely a fair amount on that whole
 2    immunity process.
 3              MR. WU:  Yes.
 4              THE COURT:  And the Government over in Argentina
 5    discounted that in their --
 6              MR. WU:  Correct.
 7              THE COURT:  So let's assume you take that at face
 8    value, and put that aside for a moment.  And I guess one of the
 9    things I see running through it is that because -- again, I'm
10    inferring here is that because the evidence -- we're not going
11    to learn anything more in the trial in Argentina than we know
12    now, that's what I think he was thinking, so, therefore, when
13    he was considering the probable cause standard, as well as the
14    political offense issue, I get a sense that he was considering
15    the paper record that was going to be available, to either
16    release him now or acquit him later.
17              There's nothing else going to be introduced, we now
18    know the introduction of evidence.  And if you assume that it's
19    going to come in, I guess part of the concern was that -- on
20    the question of obliteration -- the findings of the Government
21    investigation back in the '70s, this, I recognize, the present
22    Government needs to be tainted.
23              But nevertheless, those findings are a matter of
24    record, and so, just -- you know, just like the affidavit of
25    Mr. Camps in the record, there's nothing new that he's going to
```

1    add to it now.

2         And so, I guess, from where he sat, when you juxtapose

3    the findings of the Government back in the contemporaneous

4    period to the change of the position of the Government now,

5    relying on the same accusations and evidence, I guess one way

6    to read his opinion is that he did find that it was

7    ineffective, at least as it relates to the political offense

8    issue, on the question of, for example, A, was there a

9    rebellion; and B, was this incident to the rebellion; right?

10        MR. WU:  Correct.

11        THE COURT:  And, I guess, from his point of view, given

12   that conflict between findings then, evidence then, that

13   conflict remains today; doesn't it?

14        In other words, to the extent that that's relevant --

15   and I guess one of your arguments is it's completely

16   irrelevant -- that his position was beyond -- he undertook an

17   analysis that was under the scope of what extradition should

18   have been.

19        MR. WU:  Yes.

20        THE COURT:  That's your first argument.

21        MR. WU:  Correct.

22        THE COURT:  But on the other hand, assuming that you

23   get past that point, what's wrong with his analysis, if that,

24   in fact, was what was driving him --

25        MR. WU:  Yes.

1          THE COURT:  -- where you have a finding -- he's looking

2     at a finding -- I know there's a legal issue on immunity, but

3     there also is a factual question as to what was the cause of

4     the initial confrontation.

5          And given the findings at the time, he found that

6     probably was sufficient to dispel the normal presumption that

7     you rely upon the petition now.  That's my reading of it.

8          MR. WU:  Sure.

9          THE COURT:  Is that fair?

10          MR. WU:  I think that is fair.  I do think he exceeded

11     the bounds of what an extradition hearing should be, by drawing

12     factual conclusions; to that extent, you're totally right, that

13     that's our first argument.

14          THE COURT:  Well --

15          MR. WU:  But let me address what sounds like your core

16     concern, which is that merely because there was a military

17     acquittal that obliterates the evidence that was presented.

18          Now, this is where the two proceedings stand on very

19     different footings.  And to rely on a metaphor from childhood,

20     it was a lot easier for the wolf to blow down the straw house

21     than the brick house in The Three Little Pigs.

22          In that original proceeding, you have those three

23     affidavits, they were, as you point out, from people who are

24     now deceased, who cannot be cross-examined, and that was what

25     stood against what appeared to be at the time a full

1    proceeding, a fact-finding investigation.

2         What we subsequently learned from this case was quite

3    different.  First of all, we now have a lot more on this side

4    of the equation than just three affidavits.

5         We have the forensic evidence that I've referred to.

6         We have facts, notably, that actually one of the

7    military investigators -- I believe his name is Mr. Bautista --

8    is actually charged and discussed in these papers with

9    conducting what's, effectively -- for lack of a better term --

10   white-washing that investigation.

11        And, moreover, we have their own discussion of the fact

12   that the military investigation was not partial -- was not

13   impartial -- was not conducted in a sufficiently proper

14   manner -- sufficiently thorough manner to warrant deference.

15        I also will note, in this regard, to Corporal

16   Marandino -- who was one of the people who gave a witness

17   statement that he later recanted, in part -- he said that a

18   ranking officer told him to say there was an escape attempt;

19   again, demonstrating that the military investigation and its

20   conclusion were a product of a flawed procedure.

21        So I think the balance has completely shifted.

22        So when you talk about obliteration, arguably,

23   Judge Dube thought -- I think, you do have a plausible, perhaps

24   even a likely reading of that decision, which is that he saw

25   the extradition request resting solely on the three affidavits

1  and then he saw all this new information that he hadn't heard

2  until the defense brought it up -- such as the amnesty law or

3  the purported military acquittal -- and that led him to

4  conclude that that was sufficient to deny the request.

5       But here, you know, we don't just have those three

6  affidavits.  We have hundreds of pages of analysis and

7  discussion and summaries of witnesses from those Argentinian

8  Court proceedings.

9       And those, I think, put us on far firmer footing.

10       So, again, I don't think you end up with an

11  obliteration.  I think -- I was trying to be very fair, even

12  generous, to Mr. Bravo earlier, when I said that you,

13  essentially, have two contradictory opposite accounts of the

14  facts and you need a trial to figure out which one is true,

15  because there's a lot of evidence weighing on this side of the

16  Government's -- of Argentina's request.

17       THE COURT:  The problem is, of course -- I guess I'm

18  trying to infer what his concern was -- when you had one side

19  of the evidence that was based upon a Government's acquittal,

20  it wasn't just, you know, a civil proceeding.  It was,

21  technically, the Government -- it would be akin to a

22  court-martial proceeding in our country.

23       Whether it was a court-martial proceeding, somebody is

24  charged with murder, as they were committed within a military

25  environment, and the court-martial hearing acquits him.

1           And so, I understand your point, which is, number one,

2    it is tainted as to who is conducting the proceeding.

3           And two, there is all this new evidence now that we now

4    have that undermines the reliability of that proceeding.

5           That's what you're saying?

6           MR. WU:  Yes.  And if I can make --

7           THE COURT:  The problem is, do we, in fact, have any

8    new evidence?  In other words, a Court's summation of evidence

9    is not new evidence; right?

10          Do we, in fact, have any new evidence that you're

11   relying upon, other than the fact that we have convictions, for

12   example, we have findings by an Argentinian Judge, but is

13   that -- for purposes of this issue, what he was dealing with,

14   is it really new evidence, or is it just somebody -- it's a new

15   interpretation of it that has now been recognized in Argentina,

16   but is it really new evidence?

17          MR. WU:  It is new, Your Honor, in this sense.

18          So I think we're starting to sort of conflate what we

19   mean by "evidence."  Of course, not all of this is admissible

20   evidence, the way we would discuss it as U.S. law, right,

21   because it's a summary.

22          But summaries are permissible in an extradition

23   proceeding, and that's clear from Afanajev, from the Bovio case

24   that Your Honor cited in Martinelli, where the evidence was a

25   compilation of hearsay statements and witness testimony -- or

1    witness accounts by an investigator from Sweden.

2          So I would analogize it to let's imagine there's a

3    first request from Sweden, and the investigator recounts a

4    single witness' statement, and then somehow the fugitive

5    manages to obliterate that or, otherwise, so strongly

6    contradicts it that the Court denies extradition.

7          So Sweden comes back and he says, Actually, our

8    investigator had 10 witness statements and forensic evidence,

9    we just didn't realize we had to describe it all to you.

10   So, again, he compiles it into a much longer summary, right.

11         It is not new in the sense that it postdates the first

12   extradition proceeding.  But it is new in the sense that the

13   extradition magistrate from the first proceeding had not seen

14   that material, had not had the opportunity to consider it.  And

15   that's -- in one sense, we're saying that this material is new.

16   It's not that it dates from post-2010.

17         It's that Judge Dube did not have all the summaries of

18   the forensic evidence, all of the additional witness

19   statements, all of the -- the material that, basically, the

20   Courts in Argentina found is squarely contradictory or

21   inconsistent with that official 1970's Government account.

22         THE COURT:  All right.  On that point, let me ask you,

23   give me an example of what you're talking about that he didn't

24   have the benefit of.

25         MR. WU:  Sure.  So the forensic evidence that I've been

describing -- let me give you the specific page numbers, I

think that would be helpful -- of the -- so there's a summary.

So, in the Appellate Court summary, it's at pages 192

to 199.  In the Trial Court summary, it's at 891 to 902.  And

those passages, in particular, lay out the evidence that

disproves this escape attempt lie, the story that was

promulgated by the official Government.

And so some of those facts include -- this was a

notable point -- but Lieutenant Sosa, who was the alleged

victim of Pujadas' escape attempt, actually, did not recall the

first escape attempt when he was first asked about it, and the

Court describes this:

He only recalled it when the Government conducted

what's called a "reconstruction of the events," and they, more

or less, impressed upon him that there had been an escape

attempt; and so then, he went along with that story.

That was -- I think none of that discussion was before

Judge Dube.  There is the analysis of forensics, which they

discuss in detail in those passages that I've cited, including

one of the victims, the one that I named before, Mr. Bonnet,

was shot on the ground through the occipital region, in other

words, his head.

That's squarely contradictory with the idea that these

people were violent, they were engaged in an escape attempt.

That's much more consistent with it being an execution-style

1    killing, where someone is --

2         THE COURT:  And that wasn't available -- well, A, was

3    it available at the time of the Navy tribunal issue; and B, was

4    it available at the time of Judge Dube's hearing?

5         MR. WU:  And again, this is -- so I'm not sure about

6    whether it was available at the time of the Navy tribunal.

7    I imagine that was known by the time of 2010.

8         But again, I want to stress there's a distinction

9    between everything that Argentina could have brought in that

10   proceeding and what it actually did present to the Court.

11        And maybe that was Argentina's mistake in 2010, it did

12   not present all of this material because, I think,

13   understandably, it didn't feel the need to conduct the full

14   trial on the merits, here, in U.S. Court.

15        But to the extent that that was the error made by

16   Argentina before, it's rectified that error by presenting, in

17   this digestible form, the Court opinions that you lay out on

18   that.

19        THE COURT:  And just so I understand, what you're

20   saying is that evidence relating to how Mr. Bonnet was shot was

21   not available in the extradition record available to Judge

22   Dube; is that what you're saying?

23        MR. WU:  It's that, I don't think there were these

24   summaries of forensic reports, because at the time there would

25   not have been such a natural, digestible format in which to

1    present all this.

2        I think that's the key, is that the Argentinian Courts

3    have done, you know, a good service to us by summarizing and,

4    therefore, presenting in a readable format what are really

5    voluminous, it sounds like, thousands of pages, if not tens of

6    thousands of pages of historical documents, and records, and

7    testimony, you know.

8        If we had tried to present that in 2010, we would have

9    filled this courtroom with boxes, it sounds like, and basically

10   done what the Argentinian Court had to do in 2012 in resolving

11   that criminal case.

12       So there's a few more forensic points, if you would

13   like to hear them, Your Honor.

14       THE COURT:  Sure.

15       MR. WU:  One is that a victim named Ms. Sabelli was

16   shot.  The shot came through the back of the neck, and it was

17   assessed to have been made within a distance of 10 centimeters.

18       So, again, the notion that someone was repelling an

19   active escape attempt -- meaning a moving target from far away

20   with a machine gun -- that they could have hit her through the

21   back of the neck with a bullet from 10 centimeters away, I

22   think, is absurd.

23       THE COURT:  And the evidence pointing to that is?

24       MR. WU:  It's summarized in the documents, but I think

25   it was -- it was either the funeral director or some of the

1    other people who examined the bodies afterwards.

2           So, again, I want to stress, that's not post-2010

3    evidence, but we did --

4           THE COURT:  Was it available in the Naval proceeding?

5    Was it introduced in the Naval proceeding?

6           MR. WU:  So we're not sure about that, and the reason

7    we're not sure, Your Honor, is -- my understanding is -- the

8    only thing that survives in that Naval proceeding is that

9    seven-page summary of findings.

10          Actually, the underlying record, I believe, has been

11   destroyed, or lost, or is otherwise unavailable.  But they

12   don't really know what the military investigators considered.

13          THE COURT:  Is there any discussion of that, though, in

14   the seven-page finding?

15          MR. WU:  No.

16          THE COURT:  Okay.

17          MR. WU:  No, I don't believe.  I think it's relatively

18   cursory, Your Honor, that seven-page finding.

19          THE COURT:  And with respect to what was available for

20   Judge Dube, was it in the extradition record?

21          MR. WU:  No, we did not present all of that material

22   before.  Again, we didn't have it in this digestible form.

23          In addition to that, I think it's significant that

24   Ms. Santucho -- who is the pregnant victim that's discussed in

25   the papers -- she was shot several times through the abdomen,

1  in other words, her pregnant stomach, which I think displays a

2  sort of a degree of cruelty and animus that should inform this

3  Court's consideration.  I mean, that's again, not something

4  that would happen if you were repelling an escaping attempt;

5  that's something you're doing, I think, when you're killing

6  people in a more execution-style approach.

7          And then, the victim named Ohla, again, there was

8  tattooing, so the testimony is that his brother, I believe, was

9  some sort of physician or had a medical background, and he

10 re-counted that he saw tattooing from gunpowder by the gunshot

11 wounds in his brother's body, and that suggests that those

12 shots had to be made within a range of about 35 centimeters or

13 14 inches.  I'd also note and --

14         THE COURT:  Was that not presented to Judge Dube?

15         MR. WU:  Again, I don't think any of this forensic

16 summary was presented to Judge Dube.

17         MR. SONNETT:  You're wrong.

18         MR. WU:  So, my understanding, at least the -- look,

19 it's in the court opinions, and the discussion in the court

20 opinions was not available at the time.  It dates to 2012 and

21 2014.  Again, we didn't have a way to transmit all of these

22 records to the Court at that time.  There might have been some

23 assertion of them, but there aren't findings, and there's

24 discussion of that evidence.

25         THE COURT:  Okay.

1          MR. WU:  All right.  Your Honor, if you have no further

2     questions, we would, respectfully, ask that you certify

3     Mr. Bravo's request -- or Argentina's request to extradite

4     Mr. Bravo.

5          THE COURT:  Okay.  Does the court reporter want a

6     break?

7          COURT REPORTER:  Yes, please, Judge.

8          THE COURT:  We'll take 10 minutes, and then we'll start

9     with Mr. Sonnett.

10          MR. SONNETT:  Thank you, Judge.

11          COURTROOM DEPUTY:  All rise.

12          (Recess taken from 10:07 a.m. to 10:27 a.m.)

13          COURTROOM DEPUTY:  All rise.  Court is back in session.

14          MR. WU:  Your Honor, could I briefly clarify a point

15     before we turn to Mr. Bravo.

16          So, looking both at the original denial order and the

17     papers that we have, I just wanted to make clear, there is a

18     reference to Mr. Marileo's existence and sort of a very cursory

19     summary of what he states at Exhibit Bravo, page 645, that was

20     the 2008 summary by the Argentinian Judge Sastre.  So, in other

21     words, he mentions that this witness is out there.

22          THE COURT:  And remind me who the Mastroleo {sic}

23     witness is.

24          MR. WU:  Marileo is one of the ones who saw some of the

25     bodies and made some of the observations that I alluded to.

1          However, I want to --

2          THE COURT:  Is that the funeral director or somebody

3    else?

4          MR. WU:  Exactly, the funeral director.

5          However, if you look at page two and three of

6    Judge Dube's order, he lists all of the material he considered

7    and the statements that he had.  And again, he primarily

8    relies -- he says there's a statement of Berger, Haidar, Camps

9    and Marandino -- a different person, to be clear.

10         There's no summary of a statement by Marileo, and I

11   think what we have in this record, at page 828 to 830, is a

12   longer statement by Marandino -- or Marileo that made these

13   observations.

14         And then, at 894 to 895, there's a summary including --

15   of other experts -- other evidence considered that lays out the

16   forensics that I described.

17         So, you know, I think it's a little tricky, because we

18   don't have the full paper request from 2010 with us.  But

19   trying to reconstruct it, based on what Judge Dube describes as

20   being in the request, that there's a lot of additional

21   material.

22         And I think -- even on page 14 of his order, he says,

23   the extradition documents do not reveal any independent

24   evidence that would support their version.

25         In other words, it was pretty much just these few eye

```
 1    witnesses, and the Argentinian Trial and the Appellate Court

 2    documents are alluding to a lot of facts that I think never

 3    show up in Judge Dube's order, and thus, how we would urge you

 4    to consider that as sort of new material for purposes of this

 5    proceeding.  Thank you.

 6             THE COURT:  Let me ask you a follow-up on that.

 7             Looking back at Judge Dube's order, one of the things

 8    that he found is that, on the political character issue, that

 9    he found that the respondent had met his burden of showing that

10    there was evidence tending to show that the political character

11    exception applied.

12             And then he concluded that that shifted the burden to

13    the Government to disprove that and that the Government had

14    failed to do that.

15             MR. WU:  Yes.

16             THE COURT:  The first question on that is, do you agree

17    that that legal framework is the correct legal framework to

18    continue to apply?

19             MR. WU:  No, Your Honor.  Although, I'll caveat it by

20    saying, it's not really clear what the original SDFL Court

21    meant in Ramos -v- Diaz, so he takes the burden from a 1950's

22    case called Ramos -v- Diaz that says that the burden is on the

23    fugitive to produce evidence tending to show the nature of his

24    offense.

25             Arguably, we could read that to mean a preponderance of
```

1    the evidence, because that's evidence that's sufficient to show

2    or tends to show the truth of the statement.

3          To the extent that he reads it as anything lower than

4    that, as if it's just a prima facia showing, or something like

5    that, that's not consistent with more modern case law, and it

6    doesn't really accord with reason and logic, because the

7    political offense exception is an affirmative defense.

8          That means it's something that he has to prove, and

9    there's no burden of proof lower than a preponderance.

10   Everything else is, sort of, for instance, a prima facia

11   showing is just more of a pleading burden in civil law, you

12   know, in areas like discrimination law, so it doesn't really

13   make any sense to apply those kind of pleading burdens to

14   something that's an actual affirmative defense that is the

15   fugitive's burden to prove.

16         And in our brief, on page 35, we cite a number of

17   cases, including Vo -v- Benov from the Ninth Circuit, and

18   again, Ahmad -v- Wigen, which I cited earlier today, which

19   states that this is an affirmative defense and the burden is on

20   the fugitive.

21         And Ahmad, specifically, discusses this issue and says,

22   at a minimum, it should be a preponderance of the evidence.

23         So that would be what we would ask Your Honor to apply.

24         THE COURT:  But do you think that Judge Dube was doing

25   anything different when he says "tending to show," do you think

1   that signifies lesser than a probable cause standard?

2          MR. WU:  It reads to me, in Judge Dube's order, that he

3   thought it was a lower standard, and I think that does not make

4   much sense.  I don't even think that's what Ramos -v- Diaz is

5   trying to say, but I do think that's how Judge Dube applied it.

6          THE COURT:  So you would argue that if he didn't apply

7   a lesser than probable cause standard that was error?

8          MR. WU:  Lesser than a preponderance standard, that was

9   error, correct.

10         THE COURT:  And what you would say is that the correct

11  framework would at least require a preponderance showing?

12         MR. WU:  Yes.

13         THE COURT:  And that if a preponderance showing is

14  made, does that then shift to the Government to show that it is

15  not a political character?

16         MR. WU:  Yeah -- well, for purposes of this proceeding,

17  yes.  Ahmad -v- Wigen suggested it had to be at least a

18  preponderance, then the burden shifts, yes.

19         And we would argue, even in that case that the burden

20  shifts, we've met it, because these documents lay out

21  voluminous evidence --

22         THE COURT:  And your burden --

23         MR. WU:  -- (inaudible) that apply.

24         THE COURT:  -- once shifted, your burden would be what,

25  in terms of an evidentiary standard?

1        MR. WU:  The case law had not reached that question.

2   To that extent, Your Honor, I would assume it would just be a

3   preponderance again.  It's certainly not going to be beyond a

4   reasonable doubt, since this isn't a criminal case.

5        THE COURT:  Right.

6        MR. WU:  Yes.

7        THE COURT:  So then, with that clarification, what

8   you're saying is I could follow that framework, but what your

9   ultimate conclusion is, that to the extent the burden ever

10  shifted, we have met that burden now based upon the evidence

11  that we've submitted in this application that some of which

12  Judge Dube did not have?

13       MR. WU:  Exactly.  And especially on that second prong,

14  where he has a preponderance burden, his own witnesses say

15  things like, I cannot speak to that, I don't know that, that's

16  a fact-finding investigation.  That's almost, you know,

17  abdicating any responsibility for attempting to even meet that

18  threshold burden of preponderance to show that there was an

19  escape attempt.

20       THE COURT:  Okay.  All right.

21       Now I will turn to counsel for the respondent.

22       MR. SONNETT:  When we broke, Your Honor, I went over to

23  Mr. Wu and told him that I remembered the evidence concerning

24  the funeral director, so it had to be in the 2010 documents,

25  and I appreciate him taking another look and finding that.

1          Let me start with a summary of what evidence there was

2     at the military proceeding, because Your Honor had asked

3     questions about that.

4          And contrary to what the Government says, the

5     Exhibit 12 of the filing that we did -- this was Exhibit 12

6     introduced into evidence at the 2010 proceeding -- has a

7     substantial narrative of what occurred; and then has a

8     discussion of the evidence, and it talks about photographs --

9     on page 322 to 325 -- illustrate the way in which the

10    previously stated events took place; and the floor plan --

11    appearing on page 29 -- shows the positions occupied by all the

12    protagonists; and then it goes into death certificates for the

13    deceased appear.

14         There is also certification that the cadavers, as well

15    as any personal effects, were delivered to the family members,

16    and then the report says:

17         As far as analyzing the conduct of the military

18    personnel that intervened in the events, I should stress that

19    after a thorough analysis of the exhaustive investigation that

20    was carried out, the sworn witness statements -- and I won't

21    repeat all of the numbers, but it's followed by four lines of

22    numbers of the witness statements -- medical reports, expert

23    testimony on ballistics, expert testimony on the wounds, I draw

24    the conclusion that there is no convincing evidence, not even

25    circumstantial evidence, which would allow criminal charges to

1   be brought against the personnel who intervened in the

2   suppression in order to prevent the escape and Pujadas' rash

3   behavior.  And then it says:

4        Aside from this, as far as Haidar and Camps'

5   affirmations are concerned -- pages 193, 226, 253, 259, 200,

6   233, 249, 257 -- the charges that they made in their statements

7   against the military personnel, that they had tried to kill

8   them after the shootout had ended, the medical and ballistics

9   expert testimonies completely disproved them and demonstrate

10  their falseness.

11       I'm not going to read the whole thing -- I hope

12  Your Honor will as you get into this -- but this clearly

13  indicates that there was a great deal of evidence that was

14  turned over to the military for the military's investigation

15  and trial.

16       And then, Exhibit 13 is the executive order, and it

17  says:  The exhaustive investigation completed, testimonial

18  statements, medical reports, ballistics reports, expert

19  testimony regarding wounds, et cetera, are insufficient to

20  warrant judgment for reproach of any kind against the

21  intervening military personnel due to the fact that such

22  examination allowed for the conclusion beyond doubt that they

23  acted - facing an extremely dangerous group - in strict

24  compliance with their orders and their legitimate exercise of

25  their authority.

1          Both the military report and the national executive

2     power that follows make it clear that there was a great deal of

3     detail that was present for the military report.

4          And I know Your Honor asked a question of Mr. Wu about

5     that, and I think it's important to clarify that there was,

6     indeed, a great deal of evidence, probably more evidence than

7     Judge Sastre included in his certification back in 2010.

8          But I remember from the documents that there was,

9     indeed, testimony from the funeral director.  And I'm

10    underwhelmed by Mr. Wu's discussion of what other evidence

11    there was, particularly, when he talks about the bullets and

12    the fact that there were shots fired at close range, I think

13    you have to remember the facts here.

14         These people were Montoneros, they were guerillas.

15    They were very tough, illegal people.  They had escaped from a

16    maximum security prison six days earlier.  They had shot a

17    guard in the course of their escape.

18         And their expert testimony from Mr. Perdue -- and I

19    think Solari as well -- made it clear that part of their

20    responsibility as members of the Montoneros group was to escape

21    any time they were in custody and do as much damage as they

22    could, including killing people, because that brought attention

23    to them among the civilian population.

24         Now you have them confined to very small quarters, this

25    is a narrow hallway with cells where they are confined.  And

1    the report makes it clear that Pujadas attempted to take away

2    the weapon of one of the guards, and that's when the shooting

3    started.  So this is not a situation that Judge Sastre and the

4    Government would have you believe, that they just lined these

5    people up and shot them indiscriminately.

6         Common sense would tell you that if the intent here was

7    to kill them all -- if this was to be a mass killing of these

8    people, that they would not have taken the survivors -- there

9    were six of them originally -- to the hospital for treatment.

10        Now, three of them died at the hospital, but three

11   survived, and those are the three that submitted several of the

12   statements that are now being relied on by the Argentine Judge

13   and by the Government in this case.

14        It seems to me that there is no way to speculate that

15   you had a bunch of killers that wanted to get revenge on the

16   Montoneros, when the reports were just the opposite.

17        And we have activities by these folks six days earlier,

18   escaping from a maximum security prison, going to the airport,

19   highjacking a plane, they were not nice people.

20        And the notion that they would try to overpower the

21   guard and take away the guard's weapon and create a situation

22   where shots fired at close range -- sure, there were shots that

23   were fired at close range -- this was a very confined quarters.

24        And there is -- the military investigation was

25   thorough, and the conclusions are listed in the evidence that

1    we have submitted and that were testified to by Professor

2    Solari and Jon Perdue.

3         And it seems to me that it creates a very strong basis

4    for believing that what occurred here is exactly the way the

5    military report found it to be and exactly the reason why the

6    military report -- and then the president of the country --

7    cleared Roberto Bravo.  Now, let me --

8         THE COURT:  Let me ask you this question:

9         With respect to -- getting back to the detail of the

10   event, why would it be more than a common sense analysis to

11   find -- as the Government is arguing now -- that even assuming

12   that there was an initial confrontation that resulted from the

13   attempt to disarm a guard and a shooting that incurred in

14   relation to that, the fact that then results in 16 people

15   getting shot indicates that more probably than not that initial

16   confrontation, or escalation, or incident, that took place

17   because of the prisoners then resulted in an angry reaction

18   against everybody else, and so, therefore, maybe not as it

19   relates to the initial person who tried to takeover the guard,

20   but as to everybody else, it went from responding to that

21   initial confrontation to murder; that, basically, at some point

22   along that line the guards -- and specifically, obviously, in

23   this case, your client crossed the line.

24        MR. SONNETT:  Well, that assumes, Your Honor, that all

25   of these other Montoneros were locked in their cells.  They

1   weren't.  They had been taken out of their cells because of

2   noises and conversations back and forth, so I --

3        THE COURT:  Doesn't that contradict what one of the

4   affidavits said?

5        MR. SONNETT:  No.  I think I'm correct on this.  I'll

6   double-check it, but I think that, if not all, most had been

7   taken out of their cells when Pujadas attacked, and then the

8   others tried to join in, and it turned into a group escape.

9        Now, if -- my memory is 10 years old on this, so if I'm

10  incorrect, I'll let the Court know.  But I believe that the

11  evidence shows that this was not a massacre by people that were

12  outraged, that it was an initial self-defense that turned into

13  a melee.

14       And when those things happen, bullets start flying in

15  close quarters, you have close shots, which is one of the

16  things that Mr. Wu was talking about.

17       So, it seems to me that not only was that not a

18  massacre and, therefore, fully qualifies as a political

19  offense, but that the military investigation went into detail

20  to clear Mr. Bravo and make sure that the record reflected that

21  he was not guilty of any kind of an offense.

22       THE COURT:  Now, part of the -- again, reading between

23  the lines of what bothered Judge Dube to deny the position, is

24  we do have this question of -- there's an element of fairness,

25  I think, involved where you have a military tribunal imposing

1    discipline on a military soldier, finding that there was no

2    violation, and then years later somebody trying to come back

3    and undermine that.

4         And Judge Dube found that the evidence -- that the

5    Government had not met its burden of showing a political

6    character, that it was not a political character under those

7    circumstances.

8         Mr. Wu is arguing that even if that was right or wrong,

9    but taking it at face value, they have now done that by

10   introducing additional evidence in this petition that goes

11   beyond what Judge Dube had.  What's wrong with that argument?

12        MR. SONNETT:  Because the so-called "additional

13   evidence" doesn't really create any new conclusions.  This was

14   not what the Government claims it was.  And to have a few more

15   witnesses or the funeral director, who actually was present on

16   the 2010 papers, and a judge make some additional findings with

17   regard to ballistics, all of which was before the military when

18   they did their investigation, doesn't make this a whole new set

19   of facts that Judge Dube didn't have.

20        My guess is that if Judge Dube had everything that

21   Mr. Wu is talking about, he would have reached the same

22   conclusion.  Nothing that I read in these new papers changed my

23   mind -- I may be bias -- but changed my mind with regard to

24   what occurred at the prison -- or the military barracks on the

25   night of the events.

1          So I don't think these new pieces of evidence that

2    Mr. Wu is talking about change the outcome.  I think you still

3    can and should find that this was a political uprising and that

4    the additional evidence that the Government now claims has been

5    presented doesn't change that ultimate objective.

6          THE COURT:  Now, to be more specific now, with respect

7    to the testimony that Mr. Wu is highlighting from the experts

8    back in 2010, what I hear the Government saying is, at best,

9    that testimony only relates to the rebellion, that there was an

10   existence of a rebellion, conflict -- civil conflict going on

11   in Argentina at that time, but that would not -- that doesn't

12   answer the next part of the equation, which is, did that act --

13   was it incidental to that rebellion.

14         Because you would concede -- the Government said you

15   would concede that if, in fact, as the Government of Argentina

16   is alleging, these people were rounded up from their cells,

17   placed against the wall and shot.

18         Then notwithstanding the political rebellion character

19   of the day, that would not be non-extraditable under the

20   political offense exception; you would agree with that?

21         MR. SONNETT:  I'm not sure I'm following you, Judge.

22         THE COURT:  In other words, if we found that it

23   established, as a matter of fact, right, that what the

24   Government is alleging is true, that these people were taken

25   out of their cells, put up against the wall and shot at close

1    range, after, after the escape was over, all right, an hour

2    later, two hours later, if that happened, would the political

3    character exception and political offense exception apply?

4         MR. SONNETT:  It would make it a closer question, but I

5    don't think it would require a different result.

6         THE COURT:  Why?

7         MR. SONNETT:  Because there's still an uprising, the

8    Montoneros are still a terrorist group, and all the testimony

9    that Solari and Jon Perdue gave demonstrates that and leads up

10   to the conclusion that this should still be a political offense

11   exception.  What Mr. Wu did was point to two answers.

12        THE COURT:  Do you have any authority that so long as

13   an act arises in an environment of political uprising, that

14   completely insulates any type of conduct like that?

15        MR. SONNETT:  No.

16        THE COURT:  In other words, do you have any law that

17   supports that?

18        MR. SONNETT:  No, I don't.  What I'm saying is, it

19   doesn't completely -- to use another word that's been bandied

20   about in those papers -- it doesn't "obliterate" the political

21   offense exception.

22        Mr. Perdue and Professor Solari did -- or did not

23   answer the ultimate question on examination, which I think

24   makes them good expert witnesses.

25        If they had answered questions that required a bias,

1    rather than an expert opinion, their expertise, I think, would

2    have been called into question.

3         But their testimony makes it clear that this was

4    incident to an uprising and that the political exception

5    applied.

6         THE COURT:  But don't you think -- but in order to make

7    that finding the case law does appear to be contrary to that,

8    though, doesn't it?

9         In other words, I haven't seen anything that would

10   rise -- make the political character issue that sweeping.

11        Because my hypothetical to you is, assume three hours

12   of delay, right -- in other words, your argument, well, this is

13   incidental to the uprising.

14        I'm asking you, well, say, the shooting that resulted

15   in these people's death occurred hours after the attempted

16   escape; right?

17        MR. SONNETT:  Well, that's slightly different facts.

18        THE COURT:  Right.

19        MR. SONNETT:  On those facts, we'd have a problem.

20        THE COURT:  Right.  You would concede that the

21   political question {sic} defense {sic} would not apply in that

22   situation?

23        MR. SONNETT:  It certainly would be a whole lot more

24   difficult to prevail on.

25        THE COURT:  Right, okay.

```
 1           MR. SONNETT:  But that's not what we think happened.

 2           THE COURT:  Right.  So then here, isn't there an

 3   overlap between the Government's evidence on the initial

 4   shooting on the reason for the charge and your defense?

 5           In other words, isn't there a factual dispute that

 6   ultimately underlies both the probable cause to charge, as well

 7   as the political offense question?

 8           And if there is that conflict in evidence, why

 9   shouldn't -- for purposes of extradition, why shouldn't we

10   defer to the charging country to prove it?

11           I guess, that's my question.  Let me just explain my

12   question.

13           You're saying it was incident to the offense because

14   the persons were trying to flee; in the course of trying to

15   flee, they engaged in the confrontation with the guards; the

16   guards proceeded to defend themselves and a shooting occurred;

17   and by the end of that shooting, 16 people were shot; right?

18           What you're saying is all of that was incidental to the

19   original escalation caused by fleeing political prisoners or

20   fleeing terrorists; right?

21           MR. SONNETT:  Well, I --

22           THE COURT:  If, in fact, you're right, right, let's

23   assume the facts in the light most favorable to you -- and yes,

24   that is what occurred -- there would be two parts, two

25   conclusions could be reached.
```

1          Number one is that you can't call this murder, so

2     there's no probable cause, I mean, murder.

3          But number two, putting that issue aside, there's

4     certainly probable cause that what the conduct at issue was of

5     a political character, was of an armed rebellion and a response

6     to that; right?

7          The facts overlap in some respects; don't they?

8          MR. SONNETT:  Well, I think it's a continuum.  I mean,

9     you started Rawson six days earlier, and the escape from Rawson

10    Prison, the highjacking of the aircraft, the battle until they

11    finally surrendered, and then taking them over to Trelew.

12         That's a continuum, and I don't think anything stops;

13    that's still an uprising, it's still all incident to the

14    uprising, even though there may be six days, I think, between

15    the original activity and the shootings.

16         And I don't believe that the -- that it stops, or that

17    you can say that when there was the shootout, it was no longer

18    incident to a political uprising.

19         THE COURT:  But I thought you just told me that, well,

20    if the facts were different, it would be.

21         How is that not contradictory of the point you just

22    made a few minutes ago?

23         MR. SONNETT:  No, because I'm saying it's a continuum,

24    and the facts are not different.  I mean, if --

25         THE COURT:  Because the Government would concede that

1    this confrontation did not begin at Trelew.  It began -- as you

2    indicate -- several days earlier; if not even earlier than

3    that, but at the very least, six days earlier.

4         There's no debate about that; right?

5         MR. SONNETT:  That's correct.

6         THE COURT:  If that was sufficient, right, if that in

7    and of itself is sufficient, then it doesn't matter whether or

8    not they were lined up against the wall and shot point-blank

9    behind their heads, because it's all related to that rebellion.

10        But I thought what you said was, well, that would be a

11   different case.

12        And my point to you is, well, it would be a different

13   case because it's kind of like an intervening cause.

14        At some point, yes, you might be protected by that, but

15   once that's over, right, once that insurrection has been

16   quashed, that doesn't necessarily give you license to just

17   murder them, right, and you are conceding that.

18        So the issue isn't what happened six days earlier.

19        The issue is what happened in the hour that led up to

20   these people's death; right?

21        MR. SONNETT:  Yes, I think you're right about that,

22   Judge.

23        THE COURT:  Okay.  So that's what I'm focussing on.

24        Isn't there an overlap between what the Government is

25   alleging your defense, that that overlap has to be resolved

1    somehow; right?

2          If you are correct, then the way it would be resolved

3    is he would be acquitted.

4          If you're incorrect, then not only would the political

5    offense issue not be relevant, but he should be convicted.

6          If that's the case, if we do have that kind of overlap,

7    why don't we let the charging country make the final

8    conclusion?

9          MR. SONNETT:  Well, because, in point of fact, there is

10   no real overlap.  The activities and events took place as the

11   defense portrays them, as the military justice tribunal

12   portrayed them, as the president of the country portrays them.

13         And this is not a situation where they were simply

14   massacred.  Argentina would like you to believe that now, but

15   that's not what occurred, and it's not what the evidence shows.

16         And the discussion by Judge Sastre and then by an

17   Appellate Court -- which is not really a trial, I mean, I know

18   you've read these papers -- these are not trials.

19         These are commentary by judges that do not show what

20   kind of evidence was introduced, what kind of testimony was

21   introduced.

22         They're summaries of testimony from witnesses, and then

23   the judge makes a decision.  In one case, he reversed an

24   acquittal, and I don't think he reversed the acquittal of

25   Captain Bautista, but there were two acquittals, one of which

1    was reversed, and he found him guilty.

2         So there's no way to say this was a clear case of

3    massacre or a simple murder, because that's not what went on

4    there, and that's not what the evidence shows.

5         THE COURT:  But if that's the case, and I guess let me

6    ask this question:

7         One of the things is that we now know is different is

8    you have these intervening convictions of other people since

9    2010, where they've been adjudicated and they've been

10   sentenced.

11        What effect, if any, do you think that should have on

12   the outcome here?

13        MR. SONNETT:  None.

14        THE COURT:  Why?

15        MR. SONNETT:  Well, because if Mr. Bravo were facing a

16   trial and had three or four or five codefendants that had

17   already been tried, some convicted, some acquitted, you

18   wouldn't say that there's proof that Mr. Bravo committed the

19   offense.

20        And in this case, there is certainly a lot of narrative

21   about what went on, or the witness statements with regard to

22   these individuals, but there was an acquittal, reversed on

23   appeal -- I don't know how you do that, but that's Argentina --

24   an acquittal that stood.

25        And Mr. Bravo has never been tried, and we don't know

1    what kind of evidence was introduced, if there were, in fact,

2    trials of these other individuals.

3         THE COURT:  But isn't there some of that in the record?

4         MR. SONNETT:  Not what I'm thinking about.  I'm

5    wondering whether or not there was evidence produced of the

6    military investigation, for example.

7         As far as I know, Mr. Bravo is the only one that had

8    that.  That military investigation was for him.  If there was a

9    military investigation of the others, there was little or no

10   comment -- and Mr. Wu can correct me if I'm wrong -- there was

11   little or no comment by Judge Sastre regarding what the

12   military court found -- or the military tribunal found.

13        THE COURT:  But why does that help you?

14        In other words, why does that -- if we don't know of

15   any military tribunal and these people were tried, basically,

16   fresh, in the last 10 years and convicted -- certainly, we may

17   question other countries' systems, although, nowadays, maybe

18   they can question ours -- but the law is very clear that for

19   purposes of extradition, my criticism of another country's

20   processes cannot be used to deny extradition; right.

21        The fact that Argentina doesn't have a Fifth Amendment,

22   for example, right, that has no bearing on my decision.

23        The one fact that I can consider is that people have

24   been tried who were similarly situated and convicted under the

25   laws that apply in Argentina after a trial, whatever that

1    entails; and so, therefore, the Government is saying that

2    Argentina should be able to do the same thing with this

3    additional defendant.  Why isn't it as simple as that?

4         MR. SONNETT:  Because Mr. Bravo has not been tried, and

5    because Mr. Bravo has his own defenses that he would be

6    entitled to put forward; and those defenses include things that

7    I didn't read about on any of the other defendants, including

8    the clearance by the military, including amnesty.

9         You know, there's discussion about the amnesty being

10   revoked.  Different amnesty.

11        The amnesty that applied to Mr. Bravo was an amnesty

12   that was passed in 1973.

13        In 1976, there were two other amnesty laws that were

14   passed.  They call them "obedience" and due -- I'll figure it

15   out in a minute -- but those two amnesty laws were later

16   appealed.

17        And when the Appellate Court is talking about those

18   issues, they're talking about those issues specifically with

19   regard to the full-stop and due obedience.

20        For example, on page 0928, it says:

21        In addition, our Supreme Court has talked that certain

22   behaviors which are described as "common offenses" may be at

23   the same time crimes against humanity and, therefore, they are

24   not subject to any statutory limitations or amnesty.

25        In other cases, it's been decided on the rights to the

1    truth --

2        I think I need my glasses again.

3        -- on the rights of the truth regarding events which

4    involve serious human rights violations, such as the Artiaga

5    case:  The recognition that crimes against humanity are not

6    subject to any statutory limitations.

7        And then it says:  The unconstitutionality of certain

8    laws -- parenthesis -- due obedience and full-stop -- end

9    parenthesis.

10        And then it quotes the Simone case and several other

11    cases that hold that principle of law.

12        But the 1973 amnesty law has never been repealed.

13        And when we were sitting down to answer these charges,

14    we double-checked and found out that that law still is in full

15    force and effect.

16        THE COURT:  Is that particular law discussed in any way

17    in any of the Government's papers or the --

18        MR. SONNETT:  There is some references to it by

19    numbers.  It's 20.850, is that --

20        MR. WU:  508.

21        MR. SONNETT:  -- 850.  And there are some references to

22    20.850, but there is nothing that I found that showed that that

23    law had been declared as unconstitutional.

24        THE COURT:  And I guess then the next question is:

25        Well, why wouldn't the defendant present that in his

1     defense at the trial that you say he's never had?

2          In other words, that would be one of the defenses that

3     this defendant could raise if he was extradited.

4          MR. SONNETT:  The best answer I can give, Your Honor,

5     is -- having read the papers, I know you have as well -- what's

6     going on in the courts down there is kangaroo on steroids.

7          And the exhibits to our own memorandum in opposition to

8     extradition, I think, point that out.  The column by Anastasia

9     O'Grady -- who's a distinguished and highly rewarded columnist

10    for the Wall Street Journal -- shows what's going on in the

11    courts in Argentina, and there just isn't any justice down

12    there.

13         There has been an effort to convict and get revenge on

14    the people who were members of the military, going back,

15    primarily, to the dirty war, but even before the dirty war

16    'cause they now have all of the people that were involved in

17    Trelew.

18         And they are metting out -- and the papers show -- life

19    sentences to all of these people, and they waited 50 years to

20    bring them to so-called "justice," and to then give them life

21    imprisonment.

22         There is nothing that I can see that remotely resembles

23    the kind of justice system we have here; and that's the reason

24    why we -- our last point in our memorandum, which goes to due

25    process issues, was put in there -- and those are two exhibits

1     to that point.

2             And while I couldn't find a case that refused

3     extradition on that ground, the law is clear that you can take

4     into account the due process and human rights issues in

5     deciding extradition cases.

6             And given all of the -- even if you call it a close

7     question on the issue of the due process and on the issue of

8     political offense, and on the obliteration of probable cause,

9     even if those are all close questions, or even if you find what

10    the Government on the question of probable cause, and find with

11    us on the question of political offense, or find that to be a

12    close question, I think you still can take into consideration

13    the impact that extradition would have on an American citizen,

14    who's been an American citizen in this country for more than

15    30 years, who was involved in a full investigation 50 years

16    ago, and who Argentina did not try to bring to trial or bring

17    to justice until 2009, and it just doesn't make any sense to

18    me, to put this man in prison for the rest of his life, as

19    they've done with the others.

20            They're all in their '70s now, and they've done that

21    with all of the others, and I just -- I think that's a

22    travesty.

23            THE COURT:  But isn't that -- I understand where you're

24    coming from, but isn't that a product of you have a different

25    Government in place now in Argentina, different perspective,

1    and ultimately, is that a matter that I can really rely upon

2    for purpose of deciding extradition?

3           Because that happens all the time.  And, frankly, I

4    don't think we're in a position to criticize other countries,

5    in light of some of the things we're seeing here, right, so

6    we're not perfect, by any means.

7           And, frankly, even before this era, right, we just

8    convicted 10 years ago two people of murder, based upon -- on

9    federal charges, based upon murder of citizens that occurred in

10   Mississippi when they were acquitted; right?

11          They were acquitted in Mississippi, and we, ultimately,

12   40 years later, convicted them on federal civil rights charges,

13   because over time evidence developed, and then the probable

14   cause was asserted, and the jury convicted.

15          So how is that really -- and so, to some extent, you

16   have a different -- what's the difference between 1964 and

17   1994, or 2004?

18          The difference is the political branches were occupied

19   by different people and they asserted different positions;

20   isn't that really what's going on in Argentina now?

21          MR. SONNETT:  No.

22          THE COURT:  How is it different?

23          MR. SONNETT:  I have some familiarity with the case

24   you're referring to, 'cause the prosecutor in that case is a

25   friend of mine.

1          THE COURT:  How is that different?

2          MR. SONNETT:  Doug Jones, by the way, who's now a

3   United States Senator.

4          THE COURT:  That's right, now he's a United States

5   Senator.

6          MR. SONNETT:  And I hope he's going to be re-elected.

7          But no, it's different because that's a question of

8   developing evidence that justified a second prosecution, a

9   federal prosecution, when the State prosecution resulted in an

10  acquittal.

11         And that's not a fatal flaw in the justice system, and

12  it's not a railroaded.  It was a hard-fought case by Doug with

13  evidence developed by our law enforcement agencies who sought

14  to -- right or wrong -- in the acquittal on the State charges.

15         THE COURT:  Well, the people in Argentina wouldn't say

16  now that the acquittal that you're relying upon was by a

17  military Government that was going to white-wash anything that

18  occurred in their control, and 40 years later, you have a

19  civilian Government that has a different view, and they've

20  decided that what occurred in 1972 was a crime against

21  humanity, and so they're going to prosecute now, even though

22  it's 40 years old, the evidence is largely the same.

23         And more importantly, one Government has a right to do

24  that, and so then the issue for an extraditing entity is, do we

25  intervene in that process; and isn't that really what it comes

```
 1    down to?

 2         MR. SONNETT:  Well, it's -- I would disagree with one

 3    point you make, Judge.  If you are looking at this as a strict

 4    analogy to the Alabama case, then I have to disagree, because

 5    that's not what occurred.

 6         This was a situation in which there was a full

 7    investigation by a military tribunal at the time that these

 8    issues took place, and Mr. Bravo was cleared.

 9         There was a question of whether or not Mr. Bravo had

10    amnesty, and we think he did, and we think he did with an

11    amnesty law that has never been overturned or reversed.

12         So I don't see -- I mean, I think the Alabama case is

13    meritable, you know, I think the Alabama case has lots to

14    commend it.  I don't see anything in this case in Argentina

15    that is commendable.

16         THE COURT:  But don't you say that simply because of

17    your perspective?  In other words, your perspective may be very

18    different than a prosecutor in Argentina or a family member in

19    Argentina who believes that their family member was murdered.

20         In other words, their perspective is going to be

21    different.

22         MR. SONNETT:  Well, I'm trying to compare the two, and

23    I think my background enables me to be able to look at both

24    cases and compare them.

25         THE COURT:  Because the more --
```

1           MR. SONNETT:  I agree with you.

2           THE COURT:  The more analogous situation would be, had

3     those people who were acquitted in 1964 or '65, been hiding out

4     in, say, Bermuda, right, and the Government of the United

5     States goes and says we want those people back now because

6     we're going to press federal charges against them, and then

7     they would say, Well, what are you talking about, we were

8     acquitted by a jury; should they be extradited or not?

9           Isn't that the case you have here, 'cause it's not my

10    determination to say what happened in 1972.

11          The only question is -- for my determination and for

12    the State Department to decide is, do we extradite and allow

13    the Government to proceed with what it believes to be a

14    meritorious, legally justified case?

15          MR. SONNETT:  Well, that's one of the decisions that

16    you have to make, and you really don't have to get there if you

17    decide that there was a political offense exception and that

18    Mr. Bravo should not be extradited because of that.

19          Or if you find -- and it's a little longer haul -- if

20    you find that probable cause was obliterated, as Judge Dube

21    found, and that it hasn't been unobliterated -- if you'll

22    forgive me -- by the evidence brought to the courtroom today,

23    you know, in the 2014 cases.

24          So I'm not sure you ever have to get there.

25          I can look at Alabama and Argentina and use my

1   experience as a prosecutor and as a defense lawyer, and I think

2   I can look at them fairly, but that's not what you have to do.

3           It's an interesting analogy.  But you have to take a

4   look at what Judge Dube found, and I hope that you will give

5   his findings great weight.

6           It's not res judicata, we all understand that, but it

7   certainly is an area -- that opinion, I looked at it again

8   several times in preparing our memorandum, and I am even more

9   impressed now with the reasoning that Judge Dube used and with

10  the results that he reached.

11          And I think you can reach the same results without ever

12  worrying about an analogy between Alabama and Argentina.

13          THE COURT:  Okay.

14          Do you want to reply?

15          MR. WU:  Yes, briefly, Your Honor, and I'll try to keep

16  this short because I appreciate all the time that you've given

17  us.

18          THE COURT:  Does the court reporter want a break?

19          COURT REPORTER:  No, thank you, Judge, we can keep

20  going.

21          THE COURT:  Keep going.

22          MR. WU:  Thank you.  So, just right off the bat, I

23  think we should be -- I wanted to clarify, I believe Mr. Bravo

24  just suggested that there wasn't exactly a trial, that there

25  was this summary by Judge Sastre and then there's an Appellate

1    Court opinion in 2014, and I wanted to clarify.

2          There's a big event in the middle there, which is,

3    there was a trial, and it's encapsulated in the 2012 order that

4    begins at page 718 of the request.  That's actually the longest

5    piece of writing in the request.

6          So there was a trial of these defendants in 2012.

7          So what that resulted in is convictions of a number of

8    people, the direct perpetrators of the shooting; and then, as

9    has been alluded to, there were two people initially acquitted

10   in the trial in 2012.

11         What then happens, they go up to appeal in 2014, and

12   the Appellate Court affirms the conviction of the shooters and

13   then it actually reverses the acquittals of the other two

14   people, one of whom was the superior officer and one of whom

15   was this person that we've discussed named Judge Bautista, who

16   is the military investigator who conducted that proceeding.

17         And that bears on your consideration, because I think

18   Mr. Bravo has emphasized -- or tried to cast that military

19   proceeding as a very sound, thorough investigation.

20         In fact, it was so deficient that Mr. Bautista's

21   acquittal was reversed by the Appellate Court.  And I would

22   refer you to page 211 to 214, which discusses all his failings,

23   as well as the final result, is at 232, his acquittal was

24   unanimously reversed.

25         And that goes to show, you know, as the cliche goes,

1    "sometimes it's not the crime, but the cover-up."

2         Judge Bautista was implicated in the cover-up of these

3    offenses in Argentina -- of course, not the original crime --

4    and nonetheless, that was the result of that proceeding.

5         The other two points in the record -- there are a few

6    other points in the record that I would like to note.

7         Mr. Bravo has asserted that there was no discussion of

8    his specific amnesty law, which is 20508, that's cited in his

9    brief at page 14, that was the 1973 amnesty law.

10        If you look at the page 184, this is in the Appellate

11   Court opinion, it specifically addresses the issue.  The

12   heading title is "Extinction of the Criminal Action By

13   Application of the Statute of Limitations and By Amnesty As

14   Provided For By Law Number 20508."

15        And the conclusion of the Court reflected, on page

16   185 -- I apologize -- it's page 187 -- is there is a clear

17   imcompatability between the amnesty law -- in other words,

18   20508 -- and the American Convention on Human Rights, and it

19   concludes that:

20        Therefore, it is no formal impediment to the

21   investigation -- or in the conviction.

22        So, there was discussion.  These other defendants in

23   Argentina interposed the same defense.  They failed.

24        For this Court to conclude that the amnesty protects

25   Mr. Bravo would be to contradict the Argentinian Court in the

1     application and interpretation of their own law, which is

2     something that -- it's Black Letter Law that extradition courts

3     should not get themselves into that kind of trouble.

4          Let me point to the very next few pages which are also

5     significant, from page 188 to 191 of the Appellate Court

6     opinion, the other defendants asserted the exact same

7     double-jeopardy defense, based on the same military

8     investigation.

9          That's discussed starting at 188, and is under the

10    heading "Prohibition Against Double-Jeopardy."  And again, the

11    courts in Argentina found that that posed no barrier to their

12    prosecution, because that investigation was deficient.  It was

13    so deficient that the person who conducted it -- Bautista --

14    was prosecuted for his cover-up of these crimes.

15         The final point I would like to make is -- and I think

16    Your Honor already -- there are two final points I'll make very

17    quickly.

18         One is that it's crystal clear based on the case law

19    that it's not okay to massacre unarmed, defenseless prisoners,

20    so the line Your Honor identified is exactly right:

21         If there was no escape attempt, if they were killed

22    just in the middle of the night, that's not a political

23    offense, and it's not an excuse to say there was an uprising,

24    there was conflict.

25         These people were just bad people.  They had been armed

1    at one point -- or they were opposing us in armed conflict, and

2    that's consistent with the Nezirovic decision we cite.

3         Many of these decisions arise from the conflicts in the

4    Balkans in the early 1990s, and virtually all of those

5    defendants had some claim that the people that were their

6    prisoners had just weeks earlier -- or months earlier had been

7    soldiers committing ethnic cleansing or massacring their own

8    people.  So that was the case in Nezirovic, that was the case

9    in Arambasic, and in Mujagic.

10        And in all those cases the courts found that that fell

11   outside of the political offense exception at the point where

12   they were not killing people in the midst of armed hostilities

13   with those people, but rather, those people had been

14   imprisoned, they were neutralized.

15        As the Court put it in Suarez-Mason, which is actually

16   a case related to the "Dirty War in Argentina," even if there

17   were evidence that these persons had been involved in an

18   uprising, they had been arrested or gathered and, therefore,

19   were not a military threat.  That's at 694 F.Supp. 676,

20   page 707.

21        And the final point I would like to make, Your Honor,

22   is this discussion of the justness of the process in Argentina

23   is not for this Court's consideration, that belongs to the

24   Secretary of State.

25        Very recently, the Eleventh Circuit held that, in the

1    Leiva case, in 2019, that's at 928 F.3d 1281, and on page 1295,

2    the Court explained that:

3           The Rule of Non-Inquiry precludes courts from assessing

4    the investigative, judicial and penal systems of foreign

5    nations when reviewing an extradition request.  We have neither

6    the power, nor competence, to consider a foreign fugitive's

7    concerns about the fairness of his country's criminal justice

8    system, let alone, halt his extradition on that basis.  That

9    kind of consideration is properly addressed to the executive

10   branch.

11          And so, therefore, Your Honor, we, again, would

12   respectfully request that you certify this request for

13   extradition.

14          Mr. Bravo will have additional opportunities of --

15   presumably, on habeas review, and at the discretionary stage of

16   the Secretary of State's determination, to assert all his

17   equitable and legal defenses.

18          And we think that really the right place for those,

19   ultimately, to be resolved is at a trial in Argentina, where

20   finally his guilt or innocence can be determined.

21          Thank you, Your Honor.

22          THE COURT:  Well, the problem with that is, of course,

23   we know what his -- we know the outcome in this case of the

24   trial, because we know that Argentina's -- that the judges are

25   finding that Mr. Camps' affidavits are established fact.

1          In other words, they've relied upon those same

2     affidavits.  There's no new evidence.

3          They're relying on the same affidavits to convict the

4     other people; right?

5          MR. WU:  That is true.  But as I hear Mr. Bravo's own

6     arguments in court today, he seems to be asserting that he can

7     present a better defense, he can present more thorough

8     evidence, either related to the amnesty, his own military

9     acquittal, that he has other facts that he believes

10    distinguish him from his compatriots; to the extent that's

11    true, that has to be decided by the courts in Argentina.

12         MR. SONNETT:  Judge, that's not what I'm saying.

13         THE COURT:  But -- but as a practical matter, though,

14    we've -- given the record that you submitted, we know that if

15    he's extradited, he's more likely than not going to be

16    convicted, just as these other people were, right.

17         I mean, as a practical matter, there's no -- there's

18    not going to be much of a mystery surrounding it, because it's

19    not like he's entitled to a fresh trial, where people are going

20    to have to come in and testify and there's going to be a new

21    trier of fact.

22         Everything here is going to be in front of same

23    tribunal, based not on live testimony, but instead, on paper

24    record; right?

25         MR. WU:  Of course, a lot of the evidence is paper

```
1   evidence.  But I do think he would -- I don't know enough about

2   the Argentinian system to say exactly what proceeding he would

3   get.  Presumably, it would be an adversarial proceeding, he

4   would have representation.

5        So there would be -- there would need to be, just as

6   these defendants received a thorough opinion by the trial

7   judges, there would need to be such a document relating to

8   Mr. Bravo.  They wouldn't simply convict him because Lieutenant

9   Sosa has been convicted.

10       And again, ultimately, those larger concerns are

11  allayed, because in this extradition proceeding, it's limited

12  enough that we presume that his trial and the extraditing

13  country -- or the requesting State will be fair.

14       THE COURT:  Let me ask this question:

15       With respect to following up on my earlier questions to

16  defense counsel, how do you address the question of the point

17  that was made, in terms of you had one Government proceeding

18  back then, which resulted in a certain outcome and a certain

19  treatment, legislation, right.

20       You now have different Government, 40 years later,

21  different approach, different perspective, that Government has

22  taken a very different view.

23       Why doesn't that circumstance support in an argument

24  that the prosecution is of a political nature, such that the

25  political offense exception would apply?
```

1          In other words, don't we now have evidence that

2     actually supports that theory, based upon what has transpired

3     and the different approaches that the Government has taken.

4          And to the extent here where you're saying that what

5     the Government did in 1970 is itself being prosecuted as, in

6     effect, a white-washed investigation; right?

7          The investigator was convicted, I guess -- what was the

8     conviction of Mr. Bautista?

9          What's the actual charge he was convicted of?

10         MR. WU:  I would have to look in the documents to get

11    that, Your Honor, I apologize.  I don't know off the top of my

12    head.  It's, obviously, not the original murders it relates to.

13         THE COURT:  How about obstruction of justice or

14    something?

15         MR. WU:  I believe so, Your Honor.

16         THE COURT:  So -- but going on that, why doesn't that

17    circumstance, that type of environment, support an argument

18    that this prosecution is of political character and, therefore,

19    subject to that exception?

20         MR. WU:  So, Your Honor, my response would be, now we

21    seem to be conflating two very different inquiries.

22         One inquiry is, were the acts that he committed in 1972

23    of a political character incident to the suppression or

24    support -- in the opposite side -- of a political uprising.

25    That is the relevant inquiry for the political offense

1    exception.

2         The other -- the sort of -- part that is being

3    conflated a little bit is, is the requesting State motivated by

4    political reasons, and that is no defense to extradition.

5         And in the Martinelli, in the District Court opinion,

6    it states that -- 263 F.Supp. 1280, page 1302:

7         Even if the charges against him were politically

8    motivated, they may still be based on facts and supported by

9    evidence.

10        Panama's motive for charging President Martinelli and

11   requesting his extradition from the United States is not a

12   special circumstance in this case.

13        And, moreover, in the Ordinola case that we've cited in

14   our briefs, 478 F3.d 588, Judge Traxler, who wrote the opinion,

15   also appended a concurring opinion, and at page 607, he noted,

16   specifically:

17        It is a question for the executive branch, not the

18   courts, whether the requesting nation is sincere in its demand

19   for extradition or is merely using the process as a subterfuge

20   to exact revenge against an opponent of the Government.

21        And so, even taking the most generous view, what

22   Mr. Bravo is suggesting is that this is now his old political

23   enemies are in power and are exacting revenge against him;

24   that's a part that equitable consideration belongs before the

25   Secretary of State, can be considered by the Secretary of

1      State, and is an appropriate consideration for this proceeding,

2      and it does not bear, certainly, on what his political --

3      purportedly, political motivations were in 1972.

4             MR. SONNETT:  Wasn't your Martinelli courtroom

5      available in the bail hearing?

6             MR. WU:  Yes.  To be clear, it's from the bail hearing.

7      But the point is that all these considerations related to

8      political motivation.  They play no part at any stage of this

9      extradition hearing.  And so, you know, quite frankly, we have

10     additional citations if Your Honor wants them.

11            But the overall point of this Rule of Non-Inquiry --

12     which I already cited from Leiva -- is that, as they've stated

13     in that opinion:

14            We have neither the power, nor confidence, to consider

15     a foreign fugitive's concerns about the fairness of his

16     country's justice system.

17            And so that -- to the extent that his claim is one of

18     motivated -- politically motivated prosecution, that is a

19     concern that belongs to the Secretary of State.

20            That is not the definition of a political offense for

21     purposes of that affirmative defense.

22            MR. SONNETT:  Not if it buttresses the finding that

23     it's a political offense exception to the treaty, you know,

24     they are kind of two different things.

25            But Your Honor can still find that there's a political

1   offense exception and that the treaty will not allow his

2   extradition because of that.

3          I was pretty sure that the Martinelli -- I think that

4   was your decision -- the Martinelli decision was, on bail, on

5   whether or not it was a special circumstance.

6          But a judge may still take into account whether or not

7   there is a political offense exception.  And if you find it is,

8   as Judge Dube did, then extradition must be denied under the

9   treaty.

10          THE COURT:  Anything you want to add?

11          MR. WU:  Yes.

12          THE COURT:  Either party.

13          MR. WU:  My co-counsel helpfully points out that

14   there's actually a separate provision in the treaty related to

15   political motivation.

16          So, Article 4, paragraph three, states -- regarding

17   some of the exceptions:

18          Notwithstanding the terms of paragraph two of this

19   article, extradition shall --

20          THE COURT:  You need to slow down.

21          MR. WU:  Oh, sorry.

22          Notwithstanding the terms of paragraph two of this

23   article, extradition shall not be granted if the competent

24   authority of the requested State determines that the request

25   was politically motivated.

1            However, for the United States of America -- this is

2    Article 20 now -- the term "competent authority" as used in

3    this treaty means the appropriate authorities of its executive

4    branch.

5            In other words, the Secretary of State, per the treaty,

6    is told to consider whether this request is politically

7    motivated, and that is a basis to deny extradition at the

8    Secretary of State level.

9            And that's why it's reserved for that executive branch

10   determination.

11           MR. SONNETT:  Yeah, but there's also --

12           THE COURT:  And what you're saying is that that's

13   different from -- that's different than the political offense

14   exception that I'm dealing with?

15           MR. WU:  Exactly.  Exactly.  And it is the exact same

16   Your Honor stated in Martinelli when the president -- President

17   Martinelli alleged that there was widespread corruption in

18   Panama that had been the origin of these charges against him.

19           And at pages 28 and 29 of that decision, which is 2017,

20   Westlaw 3776953, Your Honor stated:

21           We are bound by the existence of an extradition treaty

22   to assume that the trial will be fair.  This means that a claim

23   of corruption in a foreign proceeding is not a valid defense to

24   a finding of extraditability.

25           And so I don't think they get to smuggle in or

1    back-door that sort of claim of corruption or political

2    motivation just by saying that you can find a political offense

3    based on their now 2018/2020 era political motivation.

4              THE COURT:  Now, is there anything in the language of

5    this particular treaty that may make a difference from any of

6    the prior case law?

7              Is there anything unique about the language of the

8    treaty itself that I need to pay attention to?

9              MR. WU:  I don't believe so, Your Honor.

10             The treaty does not specifically define the term

11   "political offense," so I think you apply this body of case law

12   that's developed over of time.

13             And as my co-counsel just pointed out -- and I cited --

14   in fact, the language of the treaty expressly reserves the

15   charge of political motivation to the care of the Secretary of

16   State.

17             THE COURT:  You said that was in Article 4, paragraph

18   three?

19             MR. WU:  Correct, Your Honor.

20             THE COURT:  Whereas, the political offense exception is

21   found where again?

22             MR. WU:  It is the first paragraph of Article 4.

23             THE COURT:  Article 4.  Okay.

24             MR. WU:  Thank you.

25             THE COURT:  Mr. Sonnett, anything you want to add?

```
1          MR. SONNETT:  Your Honor, what I'd like to do is ask

2     that we have an opportunity to file a short memorandum

3     post-hearing to address some of these issues.  Some of them are

4     interesting.  I'd like to order the transcript.  I know

5     Your Honor will want to review the transcript, in any event.

6          THE COURT:  You think you're going to be able to come

7     up with something you haven't already done in your memorandum?

8          In other words, didn't you already kind of cover

9     everything?  My recollection of it, it was pretty thorough --

10     as was the Government -- but do you think there's anything

11     different than what you've already said?

12          MR. SONNETT:  I'd like to address a couple of the

13     questions that you asked that I was unable to handily answer.

14          THE COURT:  I thought you answered them fine, but I

15     suppose -- I have no objection if you want to review the

16     transcript to supplement, I suppose.  I'm not going to issue a

17     ruling tomorrow, so, as practical matter, if you would like to

18     do that -- the Government, I guess, would, obviously, have the

19     same opportunity.

20          MR. SONNETT:  Yes, we talked about that earlier.

21     I think we both wanted to ask for time to file a post-hearing

22     memo.

23          MR. WU:  Your Honor, we don't object to Mr. Sonnett

24     filing.  At this point, I think we have thoroughly aired out

25     these matters, we've been here for two-and-a-half hours, so it
```

 1    would be my personal preference -- I don't think there's any

 2    unaddressed questions that remain from our side.

 3            But to the extent that Mr. Sonnett files, if we could

 4    have a few days to respond to specific points in his memo, I'd

 5    appreciate that, rather than doing -- I don't think, in other

 6    words, simultaneous submissions would be helpful, because right

 7    now I can't think of anything extra to say.

 8            THE COURT:  That's fine.  Do you want to have 10 days

 9    from when the transcript is filed?

10            MR. SONNETT:  Yes, I can do that.

11            THE COURT:  And then you can reply seven days

12    thereafter?

13            MR. SONNETT:  If you could give us 15, that would --

14            THE COURT:  Sure.

15            MR. SONNETT:  -- that would be a little more

16    comfortable.

17            THE COURT:  We'll make it 14.  The Court now operates

18    on a 7-14-21 schedule.

19            MR. SONNETT:  Fourteen.  But from the date that we

20    receive the transcript.

21            THE COURT:  Right, when the transcript is -- it will be

22    filed on the docket, so then that will trigger your 14-day

23    period.

24            MR. SONNETT:  That's fine, Judge.

25            THE COURT:  And then seven days for the reply.

1          MR. WU:  Understood.  Thank you very much.

2          MR. SONNETT:  Thank you, Your Honor.

3          THE COURT:  Okay.  I will wait to see that, and then

4    consider the record and issue an opinion when I feel I'm

5    satisfied with the work that we've undertaken.

6          So, like I said, it's not going to be tomorrow, so I do

7    want to make sure I'm careful about it.  So since defendant is

8    currently on bail, I'm going to take as much time as I need to

9    appropriately apply the treaty.  Okay.  Thank you.

10          MR. SONNETT:  I read the Martinelli pleading, so I know

11   you're going to be careful about it.

12          THE COURT:  So, thank you, everybody, for your

13   presentations.

14          MR. SONNETT:  Thank you, Your Honor.

15          THE COURT:  Have a good day.

16          COURTROOM DEPUTY:  All rise.

17          Court is now adjourned.

18          MR. WU:  Thank you, Your Honor.

19          (Proceedings concluded at 11:38 a.m.)

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

        I hereby certify that the foregoing is an
4

     accurate transcription of the proceedings in the
5

     above-entitled matter.
6

7        April 2, 2020          Glenda M. Powers
                                GLENDA M. POWERS, RPR, CRR, FPR
8                               United States District Court
                                400 North Miami Avenue, 08S33
9                               Miami, Florida  33128

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'65** [1] - 75:3
**'70s** [2] - 34:21, 71:20

# 0

**08S33** [2] - 2:11, 93:8
**0928** [1] - 68:20

# 1

**1** [2] - 1:8, 4:12
**10** [11] - 8:7, 8:9,
  13:11, 40:8, 43:17,
  43:21, 46:8, 57:9,
  67:16, 72:8, 91:8
**109** [1] - 1:8
**10:07** [1] - 46:12
**10:27** [1] - 46:12
**11** [1] - 6:21
**11:38** [2] - 1:7, 92:19
**12** [2] - 52:5
**1280** [1] - 85:6
**1281** [1] - 81:1
**1295** [1] - 81:1
**13** [2] - 7:6, 53:16
**1301** [2] - 1:21, 1:24
**1302** [1] - 85:6
**14** [5] - 13:7, 45:13,
  47:22, 78:9, 91:17
**14-day** [1] - 91:22
**15** [1] - 91:13
**16** [3] - 24:9, 56:14,
  62:17
**184** [1] - 78:10
**185** [1] - 78:16
**187** [1] - 78:16
**188** [2] - 79:5, 79:9
**19** [3] - 6:23, 25:22,
  26:6
**19-23851** [1] - 3:9
**191** [1] - 79:5
**192** [1] - 41:3
**193** [1] - 53:5
**1950's** [1] - 48:21
**1964** [2] - 72:16, 75:3
**1970** [1] - 84:5
**1970's** [4] - 10:2,
  22:10, 29:18, 40:21
**1972** [7] - 6:9, 7:2,
  18:1, 73:20, 75:10,
  84:22, 86:3
**1973** [3] - 68:12,
  69:12, 78:9
**1976** [1] - 68:13
**1980's** [1] - 17:3
**1989** [1] - 14:24
**199** [1] - 41:4
**1990s** [1] - 80:4

**1994** [1] - 72:17
**1:19-MC-23851-EGT**
  [1] - 1:2

# 2

**2** [2] - 2:3, 93:7
**20** [1] - 88:2
**20.850** [2] - 69:19,
  69:22
**200** [1] - 53:5
**20001** [1] - 1:21
**2004** [1] - 72:17
**2008** [2] - 21:17, 46:20
**2009** [1] - 71:17
**2010** [16] - 21:18,
  21:19, 21:20, 21:22,
  21:25, 22:12, 42:7,
  42:11, 43:8, 47:18,
  51:24, 52:6, 54:7,
  58:16, 59:8, 66:9
**2012** [7] - 22:9, 27:1,
  43:10, 45:20, 77:3,
  77:6, 77:10
**2014** [5] - 22:9, 45:21,
  75:23, 77:1, 77:11
**2017** [1] - 88:19
**2018/2020** [1] - 89:3
**2019** [1] - 81:1
**2020** [2] - 1:5, 93:7
**20508** [3] - 78:8,
  78:14, 78:18
**20530** [1] - 1:25
**211** [1] - 77:22
**214** [1] - 77:22
**226** [1] - 53:5
**22nd** [4] - 6:9, 7:2,
  25:8, 32:16
**232** [1] - 77:23
**233** [1] - 53:6
**23rd** [1] - 32:16
**249** [1] - 53:6
**253** [1] - 53:5
**257** [1] - 53:6
**259** [1] - 53:5
**2600** [1] - 2:4
**263** [1] - 85:6
**28** [1] - 88:19
**29** [2] - 52:11, 88:19

# 3

**30** [2] - 20:25, 71:15
**3190** [1] - 4:7
**322** [1] - 52:9
**325** [1] - 52:9
**33128** [2] - 2:11, 93:9
**33131** [1] - 2:4
**33132** [1] - 1:19
**35** [3] - 13:7, 45:12,

49:16
**37** [1] - 25:3
**3776953** [1] - 88:20
**389** [1] - 14:23

# 4

**4** [4] - 87:16, 89:17,
  89:22, 89:23
**40** [4] - 72:12, 73:18,
  73:22, 83:20
**400** [2] - 2:11, 93:8
**409** [1] - 14:24
**45-caliber** [1] - 23:20
**478** [1] - 85:14
**4th** [1] - 1:18

# 5

**50** [2] - 70:19, 71:15
**504** [1] - 33:5
**508** [1] - 69:20
**516** [2] - 14:1, 14:10
**588** [1] - 85:14

# 6

**607** [1] - 85:15
**64** [1] - 27:5
**641** [1] - 13:25
**645** [1] - 46:19
**676** [1] - 80:19
**694** [1] - 80:19

# 7

**7-14-21** [1] - 91:18
**707** [1] - 80:20
**718** [1] - 77:4
**726** [1] - 14:22

# 8

**828** [1] - 47:11
**830** [1] - 47:11
**83579-004** [1] - 1:5
**850** [1] - 69:21
**891** [1] - 41:4
**894** [1] - 47:14
**895** [1] - 47:14

# 9

**9** [1] - 1:5
**90** [1] - 24:19
**902** [1] - 41:4
**928** [1] - 81:1
**99** [1] - 1:18
**9:00** [1] - 1:7
**9:12** [1] - 1:7

# A

**a.m** [6] - 1:7, 1:7,
  46:12, 92:19
**abdicating** [1] - 51:17
**abdomen** [1] - 44:25
**abetting** [2] - 24:6,
  24:11
**ability** [1] - 27:12
**able** [4] - 20:25, 68:2,
  74:23, 90:6
**above-entitled** [1] -
  93:5
**absurd** [1] - 43:22
**accept** [4] - 11:15,
  14:19, 25:20, 26:17
**accepted** [1] - 12:2
**accepting** [2] - 12:17,
  13:15
**accomplished** [1] -
  24:7
**accord** [1] - 49:6
**account** [20] - 9:2,
  10:2, 12:3, 12:17,
  17:24, 22:10, 22:20,
  23:10, 25:14, 26:25,
  27:1, 28:16, 28:18,
  29:18, 32:18, 40:21,
  71:4, 87:6
**accounts** [5] - 20:15,
  29:9, 32:7, 38:13,
  40:1
**accurate** [3] - 7:5,
  8:12, 93:4
**accusations** [1] - 35:5
**acquit** [1] - 34:16
**acquits** [1] - 38:25
**acquittal** [14] - 29:15,
  36:17, 38:3, 38:19,
  65:24, 66:22, 66:24,
  73:10, 73:14, 73:16,
  77:21, 77:23, 82:9
**acquittals** [2] - 65:25,
  77:13
**acquitted** [7] - 65:3,
  66:17, 72:10, 72:11,
  75:3, 75:8, 77:9
**act** [3] - 15:1, 59:12,
  60:13
**acted** [1] - 53:23
**Action** [1] - 78:12
**actions** [1] - 19:1
**active** [1] - 43:19
**activities** [2] - 55:17,
  65:10
**activity** [2] - 14:15,
  63:15
**acts** [1] - 84:22
**actual** [2] - 49:14, 84:9
**add** [3] - 35:1, 87:10,

89:25
**addition** [2] - 44:23,
  68:21
**additional** [13] -
  20:10, 23:18, 31:11,
  40:18, 47:20, 58:10,
  58:12, 58:16, 59:4,
  68:3, 81:14, 86:10
**address** [4] - 36:15,
  83:16, 90:3, 90:12
**addressed** [1] - 81:9
**addresses** [1] - 78:11
**adjourned** [1] - 92:17
**adjudicated** [1] - 66:9
**admissible** [1] - 39:19
**admit** [1] - 4:7
**admits** [3] - 6:21,
  6:23, 7:1
**admittedly** [1] - 22:12
**adversarial** [5] - 9:22,
  30:10, 30:12, 30:13,
  83:3
**adverse** [1] - 9:2
**Afanajev** [2] - 20:6,
  39:23
**Affairs** [3] - 1:23, 3:15,
  3:16
**affidavit** [5] - 5:22,
  20:24, 23:5, 32:24,
  34:24
**affidavits** [18] - 7:8,
  12:11, 16:12, 19:21,
  20:1, 21:24, 22:5,
  31:22, 32:5, 32:8,
  36:23, 37:4, 37:25,
  38:6, 57:4, 81:25,
  82:2, 82:3
**affirmations** [1] - 53:5
**affirms** [1] - 77:12
**afterwards** [4] - 12:16,
  21:6, 23:13, 44:1
**agencies** [1] - 73:13
**ago** [7] - 19:23, 20:25,
  32:3, 32:5, 63:22,
  71:16, 72:8
**agree** [5] - 6:23, 7:12,
  48:16, 59:20, 75:1
**agreement** [1] - 6:18
**Ahmad** [4] - 14:22,
  49:18, 49:21, 50:17
**aiding** [2] - 24:6,
  24:11
**aims** [1] - 10:22
**Air** [1] - 6:25
**aircraft** [1] - 63:10
**aired** [1] - 90:24
**airport** [1] - 55:18
**akin** [1] - 38:21
**Alabama** [5] - 74:4,
  74:12, 74:13, 75:25,

76:12
**allayed** [1] - 83:11
**allegations** [3] - 11:2, 11:3, 14:19
**alleged** [8] - 6:22, 8:4, 8:16, 14:25, 18:4, 18:5, 41:9, 88:17
**allegedly** [1] - 31:18
**alleges** [1] - 16:21
**alleging** [4] - 24:8, 59:16, 59:24, 64:25
**allow** [5] - 32:21, 32:25, 52:25, 75:12, 87:1
**allowed** [3] - 16:3, 16:6, 53:22
**alluded** [2] - 46:25, 77:9
**alluding** [1] - 48:2
**Almirante** [1] - 6:25
**almost** [1] - 51:16
**alone** [1] - 81:8
**ALSO** [1] - 2:6
**Amendment** [1] - 67:21
**AMERICA** [1] - 1:8
**America** [1] - 88:1
**American** [3] - 71:13, 71:14, 78:18
**Amnesty** [1] - 78:13
**amnesty** [18] - 10:5, 38:2, 68:8, 68:9, 68:10, 68:11, 68:13, 68:15, 68:24, 69:12, 74:10, 74:11, 78:8, 78:9, 78:17, 78:24, 82:8
**amount** [1] - 34:1
**analogize** [1] - 40:2
**analogous** [4] - 20:5, 28:25, 31:25, 75:2
**analogy** [4] - 28:3, 74:4, 76:3, 76:12
**analysis** [9] - 19:5, 21:1, 21:2, 35:17, 35:23, 38:6, 41:18, 52:19, 56:10
**analyzed** [1] - 20:17
**analyzing** [1] - 52:17
**Anastasia** [1] - 70:8
**ancillary** [1] - 30:23
**angry** [1] - 56:17
**animus** [1] - 45:2
**answer** [7] - 25:23, 33:20, 59:12, 60:23, 69:13, 70:4, 90:13
**answered** [2] - 60:25, 90:14
**answers** [1] - 60:11
**apart** [1] - 18:18

**apiece** [1] - 32:12
**apologize** [2] - 78:16, 84:11
**appeal** [2] - 66:23, 77:11
**appealed** [1] - 68:16
**Appeals** [1] - 22:9
**appear** [3] - 6:17, 52:13, 61:7
**appearances** [1] - 3:10
**APPEARANCES** [2] - 1:16, 2:1
**appeared** [1] - 36:25
**appearing** [1] - 52:11
**Appellate** [10] - 17:21, 41:3, 48:1, 65:17, 68:17, 76:25, 77:12, 77:21, 78:10, 79:5
**appended** [2] - 20:3, 85:15
**Application** [1] - 78:13
**application** [2] - 51:11, 79:1
**applied** [4] - 48:11, 50:5, 61:5, 68:11
**applies** [2] - 13:22, 15:3
**apply** [13] - 22:4, 33:12, 48:18, 49:13, 49:23, 50:6, 50:23, 60:3, 61:21, 67:25, 83:25, 89:11, 92:9
**appreciate** [3] - 51:25, 76:16, 91:5
**approach** [2] - 45:6, 83:21
**approaches** [1] - 84:3
**appropriate** [3] - 33:15, 86:1, 88:3
**appropriately** [1] - 92:9
**April** [1] - 93:7
**Arambasic** [1] - 80:9
**area** [2] - 16:4, 76:7
**areas** [1] - 49:12
**Argentina** [44] - 4:8, 6:5, 6:7, 7:13, 8:10, 11:9, 12:24, 15:10, 16:15, 18:1, 24:21, 27:19, 30:10, 31:1, 34:4, 34:11, 39:15, 40:20, 42:9, 42:16, 59:11, 59:15, 65:14, 66:23, 67:21, 67:25, 68:2, 70:11, 71:16, 71:25, 72:20, 73:15, 74:14, 74:18, 74:19, 75:25, 76:12, 78:3,

78:23, 79:11, 80:16, 80:22, 81:19, 82:11
**Argentina's** [11] - 8:16, 8:22, 9:3, 11:1, 15:4, 18:4, 18:5, 38:16, 42:11, 46:3, 81:24
**Argentine** [1] - 55:12
**Argentinian** [26] - 6:10, 6:22, 8:4, 9:24, 9:25, 10:6, 10:9, 14:19, 16:13, 16:21, 16:22, 17:21, 20:9, 22:8, 24:10, 26:25, 30:6, 32:9, 38:7, 39:12, 43:2, 43:10, 46:20, 48:1, 78:25, 83:2
**arguably** [4] - 19:20, 33:25, 37:22, 48:25
**argue** [2] - 46:6, 50:19
**arguing** [2] - 56:11, 58:8
**argument** [10] - 8:6, 8:7, 16:19, 24:1, 35:20, 36:13, 58:11, 61:12, 83:23, 84:17
**arguments** [5] - 5:6, 9:12, 9:23, 35:15, 82:6
**arise** [1] - 80:3
**arises** [1] - 60:13
**armed** [5] - 16:20, 63:5, 79:25, 80:1, 80:12
**arrested** [1] - 80:18
**Artiaga** [1] - 69:4
**Article** [5] - 87:16, 88:2, 89:17, 89:22, 89:23
**article** [2] - 87:19, 87:23
**articles** [1] - 26:24
**aside** [3] - 34:8, 53:4, 63:3
**aspect** [2] - 18:8, 24:13
**assert** [1] - 81:16
**asserted** [4] - 72:14, 72:19, 78:7, 79:6
**asserting** [1] - 82:6
**assertion** [1] - 45:23
**assessed** [1] - 43:17
**assessing** [1] - 81:3
**Associate** [1] - 3:14
**assume** [9] - 19:5, 31:15, 33:7, 34:7, 34:18, 51:2, 61:11, 62:23, 88:22
**assumes** [1] - 56:24

**assuming** [2] - 35:22, 56:11
**attached** [2] - 4:15, 29:13
**attack** [3] - 13:16, 14:25, 34:1
**attacked** [2] - 31:18, 57:7
**attempt** [30] - 10:3, 11:18, 12:10, 12:18, 12:22, 13:5, 13:8, 13:12, 13:19, 15:5, 16:20, 17:20, 18:15, 23:14, 25:9, 26:5, 26:19, 29:25, 30:8, 37:18, 41:6, 41:10, 41:11, 41:16, 41:24, 43:19, 45:4, 51:19, 56:13, 79:21
**attempted** [7] - 7:14, 12:4, 12:21, 13:15, 25:21, 55:1, 61:15
**attempting** [2] - 11:24, 51:17
**attention** [2] - 54:22, 89:8
**attorney** [1] - 25:19
**Attorney's** [1] - 1:18
**August** [5] - 6:9, 7:2, 25:8, 32:16
**authorities** [2] - 16:4, 88:3
**authority** [7] - 7:12, 15:24, 27:23, 28:21, 32:20, 53:25, 60:12, 87:24, 88:2
**available** [12] - 22:6, 34:15, 42:2, 42:3, 42:4, 42:6, 42:21, 44:4, 44:19, 45:20, 86:5
**Avenue** [4] - 1:21, 1:24, 2:11, 93:8

---

## B

**back-door** [1] - 89:1
**backed** [1] - 29:22
**background** [2] - 45:9, 74:23
**bad** [1] - 79:25
**bail** [4] - 86:5, 86:6, 87:4, 92:8
**balance** [1] - 37:21
**Balkans** [1] - 80:4
**ballistics** [4] - 52:23, 53:8, 53:18, 58:17
**bandied** [1] - 60:19
**barracks** [1] - 58:24
**barrier** [1] - 79:11

**Base** [1] - 6:25
**based** [19] - 9:4, 10:8, 10:25, 24:11, 26:20, 27:21, 32:4, 32:6, 38:19, 47:19, 51:10, 72:8, 72:9, 79:7, 79:18, 82:23, 84:2, 85:8, 89:3
**basis** [3] - 56:3, 81:8, 88:7
**bat** [2] - 12:1, 76:22
**battle** [1] - 63:10
**Bautista** [6] - 37:7, 65:25, 77:15, 78:2, 79:13, 84:8
**Bautista's** [1] - 77:20
**bear** [1] - 86:2
**bearing** [1] - 67:22
**bears** [1] - 77:17
**became** [1] - 6:24
**BEFORE** [1] - 1:15
**began** [1] - 64:1
**begin** [1] - 64:1
**begins** [1] - 77:4
**behalf** [2] - 3:12, 3:19
**BEHALF** [2] - 1:17, 2:2
**behavior** [1] - 53:3
**behaviors** [1] - 68:22
**behind** [1] - 64:9
**believes** [3] - 74:19, 75:13, 82:9
**belongs** [3] - 80:23, 85:24, 86:19
**benefit** [2] - 18:6, 40:24
**Benov** [1] - 49:17
**Berger** [2] - 23:11, 47:8
**Bermuda** [1] - 75:4
**best** [2] - 59:8, 70:4
**better** [2] - 37:9, 82:7
**between** [13] - 7:13, 17:5, 22:10, 25:14, 35:12, 42:9, 57:22, 62:3, 63:14, 64:24, 72:16, 76:12, 78:17
**beyond** [8] - 6:10, 10:1, 15:24, 20:24, 35:16, 51:3, 53:22, 58:11
**bias** [2] - 58:23, 60:25
**big** [1] - 77:2
**bill** [1] - 20:6
**Biscayne** [1] - 2:3
**bit** [1] - 85:3
**Black** [4] - 9:4, 9:6, 16:6, 79:2
**blank** [1] - 64:8
**blow** [1] - 36:20
**bodies** [3] - 21:5,

44:1, 46:25
**body** [2] - 45:11, 89:11
**boils** [2] - 8:14, 30:1
**Bonnet** [4] - 13:2,
20:19, 41:20, 42:20
**bothered** [1] - 57:23
**Boulevard** [1] - 2:3
**bound** [2] - 33:7,
88:21
**bounds** [1] - 36:11
**Bovio** [1] - 39:23
**boxes** [1] - 43:9
**branch** [4] - 81:10,
85:17, 88:4, 88:9
**branches** [1] - 72:18
**BRAVO** [2] - 1:7, 1:11
**Bravo** [46] - 2:6, 3:8,
3:19, 6:12, 6:21, 7:1,
8:10, 8:20, 9:12,
9:24, 10:6, 11:3,
11:12, 12:15, 15:15,
17:15, 18:3, 18:20,
22:21, 22:23, 23:16,
27:15, 30:5, 38:12,
46:4, 46:15, 46:19,
56:7, 57:20, 66:15,
66:18, 66:25, 67:7,
68:4, 68:5, 68:11,
74:8, 74:9, 75:18,
76:23, 77:18, 78:7,
78:25, 81:14, 83:8,
85:22
**Bravo's** [8] - 3:22,
13:18, 15:9, 23:11,
23:19, 24:8, 46:3,
82:5
**break** [2] - 46:6, 76:18
**brick** [1] - 36:21
**brief** [3] - 12:18,
49:16, 78:9
**briefing** [1] - 19:11
**briefly** [3] - 10:14,
46:14, 76:15
**briefs** [1] - 85:14
**bring** [6] - 15:7, 15:19,
16:8, 70:20, 71:16
**British** [2] - 17:6
**British-controlled** [1]
- 17:6
**broader** [1] - 28:8
**broke** [1] - 51:22
**brother** [1] - 45:8
**brother's** [1] - 45:11
**brought** [6] - 8:10,
38:2, 42:9, 53:1,
54:22, 75:22
**brutalize** [1] - 20:5
**bullet** [1] - 43:21
**bullets** [6] - 13:1,
23:22, 23:23, 24:8,

54:11, 57:14
**bunch** [1] - 55:15
**burden** [19] - 5:8,
27:16, 48:9, 48:12,
48:21, 48:22, 49:9,
49:11, 49:15, 49:19,
50:18, 50:19, 50:22,
50:24, 51:9, 51:10,
51:14, 51:18, 58:5
**burdens** [1] - 49:13
**burial** [1] - 21:6
**buttresses** [1] - 86:22
**BY** [1] - 2:9

## C

**cadavers** [1] - 52:14
**Campos** [1] - 23:7
**Camps** [9] - 12:12,
12:21, 22:22, 23:8,
23:9, 32:11, 32:13,
34:25, 47:8
**camps** [1] - 23:8
**Camps'** [2] - 53:4,
81:25
**candidly** [1] - 26:2
**cannot** [13] - 8:20,
8:22, 10:18, 11:8,
15:4, 16:17, 26:12,
27:10, 27:25, 31:1,
36:24, 51:15, 67:20
**Captain** [1] - 65:25
**care** [2] - 7:7, 89:15
**careful** [2] - 92:7,
92:11
**carried** [1] - 52:20
**case** [69] - 3:7, 3:23,
5:15, 5:16, 6:6, 6:7,
8:15, 9:14, 9:18,
9:20, 9:21, 10:11,
10:15, 10:16, 12:6,
13:24, 15:7, 15:13,
16:18, 16:23, 17:13,
18:2, 19:2, 20:6,
21:13, 28:1, 31:2,
33:10, 37:2, 39:23,
43:11, 48:22, 49:5,
50:19, 51:1, 51:4,
55:13, 56:23, 61:7,
64:11, 64:13, 65:6,
65:23, 66:2, 66:5,
66:20, 69:5, 69:10,
71:2, 72:23, 72:24,
73:12, 74:4, 74:12,
74:13, 74:14, 75:9,
75:14, 79:18, 80:8,
80:16, 81:1, 81:23,
85:12, 85:13, 89:6,
89:11
**CASE** [1] - 1:2

**Case** [1] - 3:8
**cases** [14] - 9:16,
10:24, 10:25, 16:8,
28:2, 28:3, 28:5,
49:17, 68:25, 69:11,
71:5, 74:24, 75:23,
80:10
**cast** [1] - 77:18
**category** [1] - 11:2
**caused** [1] - 62:19
**caveat** [2] - 16:5,
48:19
**ceases** [1] - 22:25
**cell** [4] - 12:14, 22:23,
22:24
**cellblock** [1] - 17:19
**cells** [7] - 11:5, 54:25,
56:25, 57:1, 57:7,
59:16, 59:25
**center** [1] - 17:18
**centimeters** [1] - 13:7,
13:11, 43:17, 43:21,
45:12
**central** [1] - 23:15
**centuries** [1] - 15:13
**century** [2] - 9:6,
15:17
**certain** [7] - 5:6, 10:5,
33:2, 68:21, 69:7,
83:18
**certainly** [9] - 21:24,
30:19, 51:3, 61:23,
63:4, 66:20, 67:16,
76:7, 86:2
**certificates** [1] - 52:12
**certification** [2] -
52:14, 54:7
**certified** [2] - 9:11,
13:14
**certify** [8] - 6:14, 7:12,
12:8, 12:19, 33:21,
46:2, 81:12, 93:3
**certifying** [1] - 15:22
**cetera** [1] - 53:19
**challenge** [1] - 19:13
**chance** [1] - 22:13
**change** [3] - 35:4,
59:2, 59:5
**changed** [2] - 58:22,
58:23
**character** [11] - 48:8,
48:10, 50:15, 58:6,
59:18, 60:3, 61:10,
63:5, 84:18, 84:23
**characterized** [1] -
15:1
**charge** [5] - 16:25,
62:4, 62:6, 84:9,
89:15
**charged** [7] - 7:14,

14:3, 14:12, 15:1,
24:10, 37:8, 38:24
**charges** [11] - 8:10,
31:3, 52:25, 53:6,
69:13, 72:9, 72:12,
73:14, 75:6, 85:7,
88:18
**charging** [3] - 62:10,
65:7, 85:10
**check** [1] - 57:6
**checked** [1] - 69:14
**childhood** [1] - 36:19
**Christopher** [1] - 3:13
**CHRISTOPHER** [1] -
1:20
**Circuit** [2] - 13:25,
49:17, 80:25
**circumstance** [5] -
32:25, 83:23, 84:17,
85:12, 87:5
**circumstances** [2] -
16:19, 58:7
**circumstantial** [1] -
52:25
**citations** [1] - 86:10
**cite** [5] - 13:25, 14:1,
28:6, 49:16, 80:2
**cited** [9] - 10:24,
15:16, 39:24, 41:19,
49:18, 78:8, 85:13,
86:12, 89:13
**citizen** [2] - 71:13,
71:14
**citizens** [1] - 72:9
**civil** [4] - 38:20, 49:11,
59:10, 72:12
**civilian** [2] - 54:23,
73:19
**claim** [4] - 80:5, 86:17,
88:22, 89:1
**claims** [3] - 9:24,
58:14, 59:4
**clarification** [2] - 7:20,
51:7
**clarify** [4] - 46:14,
54:5, 76:23, 77:1
**cleansing** [1] - 80:7
**clear** [23] - 10:16,
11:21, 15:14, 16:2,
17:22, 27:13, 30:21,
33:1, 39:23, 46:17,
47:9, 48:20, 54:2,
54:19, 55:1, 57:20,
61:3, 66:2, 67:18,
71:3, 78:16, 79:18,
86:6
**clearance** [1] - 68:8
**cleared** [2] - 56:7,
74:8
**clearly** [1] - 53:12

**cliche** [1] - 77:25
**client** [1] - 56:23
**close** [9] - 54:12,
55:22, 55:23, 57:15,
59:25, 71:6, 71:9,
71:12
**closer** [3] - 11:20,
29:25, 60:4
**co** [2] - 87:13, 89:13
**co-counsel** [2] -
87:13, 89:13
**codefendants** [3] -
9:20, 9:22, 66:16
**collaborate** [1] - 23:2
**column** [1] - 70:8
**columnist** [1] - 70:9
**comfortable** [1] -
91:16
**coming** [1] - 71:24
**commend** [1] - 74:14
**commendable** [1] -
74:15
**comment** [3] - 26:7,
67:10, 67:11
**commentary** [1] -
65:19
**committed** [5] - 23:17,
31:19, 38:24, 66:18,
84:22
**committing** [1] - 80:7
**common** [3] - 55:6,
56:10, 68:22
**compare** [2] - 74:22,
74:24
**compatriots** [1] -
82:10
**competence** [1] - 81:6
**competent** [2] - 87:23,
88:2
**compilation** [2] - 22:2,
39:25
**compilations** [2] -
20:4, 22:5
**compiled** [1] - 21:7
**compiles** [1] - 40:10
**complaint** [2] - 4:9,
4:15
**completed** [1] - 53:17
**completely** [5] -
35:15, 37:21, 53:9,
60:14, 60:19
**compliance** [1] -
53:24
**Composite** [1] - 4:12
**concealment** [1] -
33:19
**concede** [5] - 24:22,
59:14, 59:15, 61:20,
63:25
**concedes** [1] - 7:9

conceding [4] - 7:19, 7:21, 7:25, 64:17
concern [5] - 12:8, 34:19, 36:16, 38:18, 86:19
concerned [2] - 24:2, 53:5
concerning [1] - 51:23
concerns [3] - 81:7, 83:10, 86:15
conclude [7] - 10:10, 17:23, 26:18, 26:20, 27:15, 38:4, 78:24
concluded [3] - 6:10, 48:12, 92:19
concludes [1] - 78:19
conclusion [10] - 13:19, 18:10, 37:20, 51:9, 52:24, 53:22, 58:22, 60:10, 65:8, 78:15
conclusions [4] - 36:12, 55:25, 58:13, 62:25
concoct [1] - 23:13
concocted [1] - 32:23
concurring [1] - 85:15
condition [1] - 32:25
conduct [4] - 42:13, 52:17, 60:14, 63:4
conducted [4] - 37:13, 41:13, 77:16, 79:13
conducting [2] - 37:9, 39:2
confidence [1] - 86:14
confined [3] - 54:24, 54:25, 55:23
conflate [1] - 39:18
conflated [1] - 85:3
conflating [1] - 84:21
conflict [14] - 10:17, 10:21, 10:22, 11:8, 17:5, 24:24, 28:23, 35:12, 35:13, 59:10, 62:8, 79:24, 80:1
conflicting [3] - 27:21, 27:24, 28:23
conflicts [2] - 10:23, 80:3
confrontation [6] - 36:4, 56:12, 56:16, 56:21, 62:15, 64:1
connected [3] - 10:23, 12:9
connection [1] - 14:17
consider [18] - 4:17, 4:24, 5:23, 6:17, 7:8, 13:18, 14:20, 16:24, 22:3, 22:6, 24:22, 40:14, 48:4, 67:23,

81:6, 86:14, 88:6, 92:4
consideration [8] - 33:14, 45:3, 71:12, 77:17, 80:23, 81:9, 85:24, 86:1
considerations [1] - 86:7
considered [7] - 19:16, 20:8, 21:15, 44:12, 47:6, 47:15, 85:25
considering [5] - 5:4, 14:2, 14:10, 34:13, 34:14
consistent [3] - 41:25, 49:5, 80:2
conspiracy [1] - 24:5
conspiratorial [1] - 24:11
contemporaneous [4] - 28:17, 31:21, 32:7, 35:3
contest [2] - 8:16, 15:4
contested [1] - 19:9
contesting [1] - 24:12
context [5] - 16:10, 16:14, 18:14, 28:8, 31:25
continue [1] - 48:18
CONTINUED [1] - 2:1
continuum [3] - 63:8, 63:12, 63:23
contradict [5] - 9:8, 17:12, 18:4, 57:3, 78:25
Contradiction [2] - 13:22, 15:3
contradictory [7] - 29:8, 30:2, 30:3, 38:13, 40:20, 41:23, 63:21
contradicts [1] - 40:6
contrary [5] - 15:24, 16:3, 26:18, 52:4, 61:7
control [1] - 73:18
controlled [1] - 17:6
controverts [1] - 8:21
conveniently [1] - 4:17
Convention [1] - 78:18
conversations [1] - 57:2
convict [3] - 70:13, 82:3, 83:8
convicted [12] - 31:2, 65:5, 66:17, 67:16,

67:24, 72:8, 72:12, 72:14, 82:16, 83:9, 84:7, 84:9
conviction [3] - 77:12, 78:21, 84:8
convictions [3] - 39:11, 66:8, 77:7
convince [1] - 30:6
convincing [1] - 52:24
cooperate [1] - 31:5
copy [2] - 4:17, 5:15
core [4] - 8:7, 9:5, 14:19, 36:15
Corporal [1] - 37:15
correct [17] - 4:6, 4:16, 18:17, 30:24, 31:9, 32:6, 34:6, 35:10, 35:21, 48:17, 50:9, 50:10, 57:5, 64:5, 65:2, 67:10, 89:19
corroborated [1] - 32:18
corroborates [1] - 20:14
corruption [3] - 88:17, 88:23, 89:1
counsel [9] - 3:10, 3:13, 3:25, 4:18, 6:2, 51:21, 83:16, 87:13, 89:13
count [1] - 20:14
counted [1] - 45:10
countries [1] - 72:4
countries' [1] - 67:17
country [10] - 9:19, 18:23, 33:8, 38:22, 56:6, 62:10, 65:7, 65:12, 71:14, 83:13
country's [4] - 33:4, 67:19, 81:7, 86:16
counts [2] - 12:19, 13:14
couple [1] - 90:12
course [15] - 5:6, 8:8, 19:25, 21:22, 22:2, 28:1, 29:4, 31:13, 38:17, 39:19, 54:17, 62:14, 78:3, 81:22, 82:25
COURT [142] - 1:1, 3:5, 3:17, 3:21, 4:4, 4:11, 4:14, 4:18, 5:1, 5:11, 5:17, 5:20, 5:25, 11:13, 11:19, 14:5, 14:7, 14:9, 15:23, 18:7, 19:4, 19:13, 20:21, 21:10, 21:13, 21:19, 22:14, 23:7, 23:9, 24:23,

25:1, 27:20, 28:8, 28:12, 28:15, 30:11, 30:16, 31:7, 31:10, 31:14, 31:20, 32:4, 32:20, 33:22, 34:4, 34:7, 35:11, 35:20, 35:22, 36:1, 36:9, 36:14, 38:17, 39:7, 40:22, 42:2, 42:19, 43:14, 43:23, 44:4, 44:13, 44:16, 44:19, 45:14, 45:25, 46:5, 46:7, 46:8, 46:22, 47:2, 48:6, 48:16, 49:24, 50:6, 50:10, 50:13, 50:22, 50:24, 51:5, 51:7, 51:20, 56:8, 57:3, 57:22, 59:6, 59:22, 60:6, 60:12, 60:16, 61:6, 61:18, 61:20, 61:25, 62:2, 62:22, 63:19, 63:25, 64:6, 64:23, 66:5, 66:14, 67:3, 67:13, 69:16, 69:24, 71:23, 72:22, 73:1, 73:4, 73:15, 74:16, 74:25, 75:2, 76:13, 76:18, 76:19, 76:21, 81:22, 82:13, 83:14, 84:13, 84:16, 87:10, 87:12, 87:20, 88:12, 89:4, 89:17, 89:20, 89:23, 89:25, 90:6, 90:14, 91:8, 91:11, 91:14, 91:17, 91:21, 91:25, 92:3, 92:12, 92:15
court [17] - 3:20, 14:5, 18:5, 20:2, 20:9, 29:10, 38:22, 38:23, 38:25, 45:19, 46:5, 46:13, 67:12, 76:18, 82:6, 92:17
Court [52] - 2:10, 2:10, 3:1, 3:3, 4:24, 6:10, 6:17, 7:11, 13:18, 14:1, 14:3, 14:11, 14:18, 14:24, 21:24, 22:8, 22:9, 26:25, 27:23, 30:6, 32:9, 33:18, 33:20, 38:8, 40:6, 41:3, 41:4, 41:12, 42:10, 42:14, 42:17, 43:10, 45:22, 48:1, 48:20, 57:10, 65:17, 68:17, 68:21, 77:1, 77:12, 77:21, 78:11, 78:15, 78:24, 78:25, 79:5, 80:15, 81:2, 85:5, 91:17,

93:8
Court's [4] - 15:13, 39:8, 45:3, 80:23
court-martial [3] - 38:22, 38:23, 38:25
courtroom [4] - 15:20, 43:9, 75:22, 86:4
COURTROOM [5] - 3:2, 3:7, 46:11, 46:13, 92:16
Courts [4] - 16:22, 17:21, 40:20, 43:2
courts [10] - 10:1, 10:6, 70:6, 70:11, 79:2, 79:11, 80:10, 81:3, 82:11, 85:18
courts' [1] - 33:13
cover [7] - 5:10, 11:22, 28:19, 78:1, 78:2, 79:14, 90:8
cover-up [4] - 28:19, 78:1, 78:2, 79:14
covered [1] - 29:3
covers [1] - 7:14
cowered [1] - 12:14
create [2] - 55:21, 58:13
creates [1] - 56:3
credibility [1] - 9:2
crime [7] - 14:3, 14:11, 16:11, 24:7, 73:20, 78:1, 78:3
crimes [3] - 68:23, 69:5, 79:14
Criminal [2] - 1:24, 78:12
criminal [5] - 15:20, 43:11, 51:4, 52:25, 81:7
criticism [1] - 67:19
criticize [1] - 72:4
cross [3] - 25:3, 25:6, 36:24
cross-examination [2] - 25:3, 25:6
cross-examined [1] - 36:24
crossed [1] - 56:23
CRR [2] - 2:9, 93:7
cruelty [1] - 45:2
crystal [3] - 10:16, 17:22, 79:18
current [1] - 8:11
cursory [2] - 44:18, 46:18
custody [2] - 11:10, 54:21

# D

**D.C** [2] - 1:21, 1:25
**damage** [1] - 54:21
**dangerous** [1] - 53:23
**date** [3] - 19:9, 31:15, 91:19
**dates** [2] - 40:16, 45:20
**days** [11] - 54:16, 55:17, 63:9, 63:14, 64:2, 64:3, 64:18, 91:4, 91:8, 91:11, 91:25
**dead** [1] - 6:13
**deal** [3] - 53:13, 54:2, 54:6
**dealing** [2] - 39:13, 88:14
**death** [3] - 52:12, 61:15, 64:20
**debate** [1] - 64:4
**debating** [1] - 7:11
**decades** [1] - 32:3
**deceased** [4] - 30:25, 32:2, 36:24, 52:13
**decide** [4] - 9:6, 33:18, 75:12, 75:17
**decided** [3] - 68:25, 73:20, 82:11
**deciding** [2] - 71:5, 72:2
**decision** [10] - 8:19, 14:23, 29:16, 37:24, 65:23, 67:22, 80:2, 87:4, 88:19
**decisions** [3] - 15:17, 75:15, 80:3
**declared** [1] - 69:23
**defeat** [1] - 8:20
**defend** [1] - 62:16
**Defendant** [1] - 2:6
**DEFENDANT** [2] - 1:11, 2:2
**defendant** [10] - 4:19, 11:14, 20:4, 20:8, 31:12, 33:17, 68:3, 69:25, 70:3, 92:7
**defendant's** [3] - 5:8, 22:17, 27:23
**defendants** [6] - 68:7, 77:6, 78:22, 79:6, 80:5, 83:6
**defense** [19] - 8:25, 38:2, 49:7, 49:14, 49:19, 57:12, 61:21, 62:4, 64:25, 65:11, 70:1, 76:1, 78:23, 79:7, 82:7, 83:16, 85:4, 86:21, 88:23

**defenseless** [4] - 6:12, 10:18, 10:20, 79:19
**developed** [3] - 72:13, 73:13, 89:12
**developing** [1] - 73:8
**Diaz** [3] - 48:21, 48:22, 50:4
**dictatorship** [1] - 17:25
**died** [3] - 7:6, 55:10
**difference** [3] - 72:16, 72:18, 89:5
**differences** [1] - 25:13
**different** [15] - 16:14, 33:12, 36:19, 37:3, 47:9, 49:25, 60:5, 61:17, 63:20, 63:24, 64:11, 64:12, 66:7, 68:10, 71:24, 71:25, 72:16, 72:19, 72:22, 73:1, 73:7, 73:19, 74:18, 74:21, 83:20, 83:21, 83:22, 84:3, 84:21, 86:24, 88:13, 90:11
**difficult** [1] - 61:24
**digestible** [3] - 42:17, 42:25, 44:22
**direct** [1] - 77:8
**directly** [1] - 24:3
**Director** [1] - 3:14
**director** [7] - 21:5, 43:25, 47:2, 47:4, 51:24, 54:9, 58:15
**dirty** [1] - 70:15
**Dirty** [1] - 80:16
**disagree** [4] - 7:17, 19:24, 74:2, 74:4
**disarm** [2] - 12:4, 25:11, 56:13
**disarmed** [1] - 11:10
**disarming** [1] - 25:17
**discern** [1] - 25:13
**discipline** [1] - 58:1
**disclaiming** [1] - 27:12
**discounted** [1] - 34:5
**discretionary** [2] - 33:16, 81:15
**discrimination** [1] - 49:12
**discuss** [6] - 10:14, 19:10, 28:3, 29:12, 39:20, 41:19
**discussed** [7] - 20:12, 23:20, 37:8, 44:24, 69:16, 77:15, 79:9
**discusses** [2] - 49:21, 77:22
**discussing** [2] - 18:23, 24:14

14:11, 87:24
**discussion** [13] - 37:11, 38:7, 41:17, 44:13, 45:19, 45:24, 52:8, 54:10, 65:16, 68:9, 78:7, 78:22, 80:22
**dispel** [1] - 36:6
**displays** [1] - 45:1
**disprove** [1] - 48:13
**disproved** [1] - 53:9
**disproves** [1] - 41:6
**dispute** [2] - 16:7, 62:5
**disputing** [1] - 18:24
**distance** [1] - 43:17
**distinction** [1] - 42:8
**distinguish** [1] - 82:10
**distinguished** [1] - 70:9
**distinguishing** [1] - 24:17
**District** [6] - 2:10, 3:3, 14:23, 85:5, 93:8
**DISTRICT** [2] - 1:1, 1:1
**Division** [1] - 1:24
**DIVISION** [1] - 1:2
**docket** [1] - 91:22
**document** [3] - 4:14, 29:13, 83:7
**documents** [12] - 4:23, 8:11, 8:22, 10:9, 43:6, 43:24, 47:23, 48:2, 50:20, 51:24, 54:8, 84:10
**done** [7] - 7:23, 43:3, 43:10, 58:9, 71:19, 71:20, 90:7
**door** [1] - 89:1
**double** [3] - 57:6, 69:14, 79:7
**Double** [1] - 79:10
**double-check** [1] - 57:6
**double-checked** [1] - 69:14
**double-jeopardy** [1] - 79:7
**Double-Jeopardy** [1] - 79:10
**doubt** [4] - 6:11, 10:1, 51:4, 53:22
**Doug** [2] - 73:2, 73:12
**down** [12] - 7:24, 8:14, 11:6, 14:5, 17:19, 30:1, 36:20, 69:13, 70:6, 70:11, 74:1, 87:20
**draw** [1] - 52:23
**drawing** [1] - 36:11
**driving** [2] - 33:23,

35:24
**Dube** [29] - 18:7, 19:16, 20:11, 20:15, 21:8, 21:23, 22:7, 22:13, 33:23, 37:23, 40:17, 41:18, 42:22, 44:20, 45:14, 45:16, 47:19, 49:24, 50:5, 51:12, 57:23, 58:4, 58:11, 58:19, 58:20, 75:20, 76:4, 76:9, 87:8
**Dube's** [7] - 21:17, 33:24, 42:4, 47:6, 48:3, 48:7, 50:2
**due** [7] - 53:21, 68:14, 68:19, 69:8, 70:24, 71:4, 71:7
**during** [3] - 11:17, 13:8, 17:3

# E

**Eain** [1] - 13:24
**early** [2] - 6:8, 80:4
**easier** [1] - 36:20
**Eastern** [1] - 14:23
**Edwin** [1] - 3:4
**EDWIN** [1] - 1:15
**effect** [5] - 14:22, 23:1, 66:11, 69:15, 84:6
**effectively** [5] - 15:8, 20:3, 22:1, 33:10, 37:9
**effects** [1] - 52:15
**effort** [1] - 70:13
**either** [5] - 6:1, 34:15, 43:25, 82:8, 87:12
**elaborate** [1] - 5:4
**elected** [1] - 73:6
**electronic** [1] - 4:17
**element** [2] - 24:23, 57:24
**Eleventh** [1] - 80:25
**elsewhere** [1] - 8:8
**emphasize** [3] - 25:25, 27:11, 29:7
**emphasized** [1] - 77:18
**empowered** [1] - 17:25
**enables** [1] - 74:23
**encapsulated** [1] - 77:3
**end** [4] - 8:13, 38:10, 62:17, 69:8
**ended** [1] - 53:8
**enemies** [1] - 85:23
**enforced** [1] - 7:13

**enforcement** [1] - 73:13
**engaged** [3] - 17:11, 41:24, 62:15
**entails** [1] - 68:1
**entirely** [1] - 30:21
**entitled** [6] - 9:7, 16:9, 22:3, 68:6, 82:19, 93:5
**entity** [1] - 73:24
**environment** [3] - 38:25, 60:13, 84:17
**equation** [2] - 37:4, 59:12
**equitable** [3] - 33:14, 81:17, 85:24
**era** [5] - 28:7, 29:18, 30:22, 72:7, 89:3
**error** [4] - 42:15, 42:16, 50:7, 50:9
**escalation** [2] - 56:16, 62:19
**escape** [39] - 10:3, 11:18, 11:24, 12:10, 12:18, 12:22, 13:5, 13:8, 13:12, 13:15, 13:19, 16:20, 17:20, 17:24, 18:15, 20:14, 23:14, 25:8, 25:18, 26:5, 26:19, 29:25, 30:7, 37:18, 41:6, 41:10, 41:11, 41:15, 41:24, 43:19, 51:19, 53:2, 54:17, 54:20, 57:8, 60:1, 61:16, 63:9, 79:21
**escaped** [1] - 54:15
**escapees** [1] - 6:24
**escaping** [2] - 45:4, 55:18
**especially** [1] - 51:13
**ESQ** [4] - 1:17, 1:20, 1:22, 2:2
**essentially** [5] - 7:19, 12:16, 26:24, 29:16, 38:13
**establish** [2] - 12:12, 26:1
**established** [3] - 18:20, 59:23, 81:25
**establishes** [2] - 17:14, 17:15
**et** [1] - 53:19
**ethnic** [1] - 80:7
**event** [3] - 56:10, 77:2, 90:5
**events** [9] - 23:15, 25:7, 28:17, 41:14, 52:10, 52:18, 58:25, 65:10, 69:3

**Evidence** [2] - 22:4, 33:12
**evidence** [130] - 4:10, 4:12, 8:20, 9:1, 9:17, 12:25, 13:3, 13:18, 14:15, 15:8, 16:6, 16:10, 17:1, 17:3, 17:4, 17:23, 19:15, 19:19, 19:20, 20:4, 20:8, 20:10, 20:11, 20:13, 20:16, 21:7, 21:14, 21:19, 21:21, 22:2, 22:11, 22:12, 22:16, 23:18, 23:22, 24:16, 24:21, 26:20, 26:21, 27:22, 27:24, 28:23, 29:1, 29:2, 29:6, 29:23, 29:24, 30:14, 30:16, 30:18, 30:19, 30:20, 31:8, 31:11, 31:20, 31:21, 31:24, 32:23, 34:10, 34:18, 35:4, 35:12, 36:17, 37:5, 38:15, 38:19, 39:3, 39:8, 39:9, 39:10, 39:14, 39:16, 39:19, 39:20, 39:24, 40:8, 40:18, 40:25, 41:5, 42:20, 43:23, 44:3, 45:24, 47:15, 47:24, 48:10, 48:23, 49:1, 49:22, 50:21, 51:10, 51:23, 52:1, 52:6, 52:8, 52:24, 52:25, 53:13, 54:6, 54:10, 55:25, 57:11, 58:4, 58:10, 58:13, 59:1, 59:4, 62:3, 62:8, 65:15, 65:20, 66:4, 67:1, 67:5, 72:13, 73:8, 73:13, 73:22, 75:22, 80:17, 82:2, 82:8, 82:25, 83:1, 84:1, 85:9
**evidentiary** [1] - 50:25
**exact** [3] - 79:6, 85:20, 88:15
**exacting** [1] - 85:23
**exactly** [15] - 9:9, 28:25, 30:15, 31:9, 31:13, 31:17, 47:4, 51:13, 56:4, 56:5, 76:24, 79:20, 83:2, 88:15
**examination** [4] - 25:3, 25:6, 53:22, 60:23
**examined** [3] - 21:5, 36:24, 44:1

**example** [10] - 10:18, 13:24, 28:10, 28:12, 35:8, 39:12, 40:23, 67:6, 67:22, 68:20
**examples** [1] - 12:11
**exceeded** [1] - 36:10
**exception** [26] - 5:9, 10:12, 11:22, 18:6, 26:16, 27:16, 27:22, 29:4, 48:11, 49:7, 59:20, 60:3, 60:11, 60:21, 61:4, 75:17, 80:11, 83:25, 84:19, 85:1, 86:23, 87:1, 87:7, 88:14, 89:20
**exceptions** [1] - 87:17
**excuse** [1] - 79:23
**execution** [8] - 12:16, 12:25, 13:5, 13:7, 20:18, 26:5, 41:25, 45:6
**execution-style** [7] - 12:16, 12:25, 13:5, 13:7, 20:18, 26:5, 41:25, 45:6
**executive** [6] - 53:16, 54:1, 81:9, 85:17, 88:3, 88:9
**exercise** [1] - 53:24
**exhaustive** [2] - 52:19, 53:17
**Exhibit** [5] - 4:12, 46:19, 52:5, 53:16
**exhibit** [1] - 5:15
**exhibits** [3] - 4:23, 70:7, 70:25
**exist** [2] - 21:25, 32:22
**existed** [1] - 22:12
**existence** [4] - 8:21, 46:18, 59:10, 88:21
**exonerate** [1] - 9:24
**expect** [1] - 31:6
**experience** [1] - 76:1
**expert** [9] - 4:21, 26:22, 52:22, 52:23, 53:9, 53:18, 54:18, 60:24, 61:1
**expertise** [1] - 61:1
**experts** [10] - 4:24, 16:13, 25:4, 25:5, 26:1, 26:14, 27:11, 31:25, 47:15, 59:7
**explain** [6] - 15:5, 16:10, 16:25, 17:9, 22:9, 62:11
**explained** [2] - 32:9, 81:2
**explains** [1] - 16:15
**explanatory** [6] - 16:6, 17:4, 17:8, 17:11,

24:21, 29:2
**expressly** [1] - 89:14
**extent** [17] - 16:12, 19:19, 19:24, 23:25, 24:2, 24:16, 35:14, 36:12, 42:15, 49:3, 51:2, 51:9, 72:15, 82:10, 84:4, 86:17, 91:3
**Extinction** [1] - 78:12
**extra** [1] - 91:7
**extraditability** [1] - 88:24
**extraditable** [2] - 8:1, 59:19
**extradite** [4] - 30:5, 33:17, 46:3, 75:12
**extradited** [6] - 8:5, 33:21, 70:3, 75:8, 75:18, 82:15
**extraditee** [2] - 9:7, 9:20
**extraditing** [2] - 73:24, 83:12
**EXTRADITION** [2] - 1:6, 1:13
**Extradition** [1] - 3:8
**extradition** [52] - 3:22, 4:7, 6:6, 7:10, 8:11, 8:17, 12:7, 14:14, 15:13, 15:22, 17:12, 17:14, 18:5, 19:6, 22:4, 26:19, 27:18, 32:1, 33:3, 35:17, 36:11, 37:25, 39:22, 40:6, 40:12, 40:13, 42:21, 44:20, 47:23, 62:9, 67:19, 67:20, 70:8, 71:3, 71:5, 71:13, 72:2, 79:2, 81:5, 81:8, 81:13, 83:11, 85:4, 85:11, 85:19, 86:9, 87:2, 87:8, 87:19, 87:23, 88:7, 88:21
**extraordinarily** [1] - 6:5
**extremely** [1] - 53:23
**eye** [1] - 47:25

**F**

**F.3d** [1] - 81:1
**F.Supp** [3] - 14:23, 80:19, 85:6
**F2.d** [1] - 13:25
**F3.d** [1] - 85:14
**face** [2] - 34:7, 58:9
**facia** [2] - 49:4, 49:10
**facing** [2] - 53:23,

66:15
**fact** [34] - 9:23, 15:25, 16:7, 19:6, 19:18, 20:14, 22:7, 22:22, 23:19, 24:21, 27:10, 28:20, 29:20, 35:24, 37:1, 37:11, 39:7, 39:10, 39:11, 51:16, 53:21, 54:12, 56:14, 59:15, 59:23, 62:22, 65:9, 67:1, 67:21, 67:23, 77:20, 81:25, 82:21, 89:14
**fact-finding** [3] - 27:10, 37:1, 51:16
**facts** [36] - 6:21, 7:21, 8:3, 8:16, 8:23, 9:8, 9:25, 11:14, 12:3, 12:17, 14:14, 14:16, 15:4, 17:8, 17:11, 18:4, 20:7, 21:9, 22:19, 30:2, 30:4, 37:6, 38:14, 41:8, 48:2, 54:13, 58:19, 61:17, 61:19, 62:23, 63:7, 63:20, 63:24, 82:9, 85:8
**factual** [5] - 9:19, 14:19, 36:3, 36:12, 62:5
**failed** [5] - 11:12, 27:15, 27:16, 48:14, 78:23
**failings** [1] - 77:22
**fair** [7] - 33:8, 34:1, 36:9, 36:10, 38:11, 83:13, 88:22
**fairest** [1] - 20:2
**fairly** [2] - 19:2, 76:2
**fairness** [3] - 57:24, 81:7, 86:15
**falling** [1] - 29:7
**falls** [1] - 11:1
**false** [1] - 27:1
**falsely** [1] - 27:3
**falseness** [1] - 53:10
**familiarity** [1] - 72:23
**family** [3] - 52:15, 74:18, 74:19
**far** [9] - 13:1, 29:7, 29:23, 29:25, 38:9, 43:19, 52:17, 53:4, 67:7
**fashion** [1] - 32:1
**fatal** [1] - 73:11
**fault** [1] - 10:15
**favor** [2] - 9:15, 27:24
**favorable** [1] - 62:23
**federal** [4] - 72:9, 72:12, 73:9, 75:6

fell [1] - 80:10
fellow [4] - 11:3, 12:5, 12:15, 24:4
few [9] - 12:11, 13:20, 43:12, 47:25, 58:14, 63:22, 78:5, 79:4, 91:4
fictitious [2] - 17:24, 23:14
Fifth [1] - 67:21
figure [2] - 38:14, 68:14
file [2] - 90:2, 90:21
filed [5] - 3:23, 4:8, 4:22, 91:9, 91:22
files [1] - 91:3
filing [2] - 52:5, 90:24
filled [1] - 43:9
final [6] - 15:11, 65:7, 77:23, 79:15, 79:16, 80:21
FINAL [1] - 1:13
finally [2] - 63:11, 81:20
findings [13] - 6:13, 9:2, 29:12, 34:20, 34:23, 35:3, 35:12, 36:5, 39:12, 44:9, 45:23, 58:16, 76:5
fine [3] - 90:14, 91:8, 91:24
fire [1] - 25:17
fired [3] - 54:12, 55:22, 55:23
firmer [1] - 38:9
first [17] - 11:21, 13:21, 18:21, 19:5, 24:20, 24:23, 26:15, 35:20, 36:13, 37:3, 40:3, 40:11, 40:13, 41:11, 48:16, 89:22
firsthand [1] - 26:3
five [1] - 66:16
flaw [1] - 73:11
flawed [1] - 37:20
flee [2] - 62:14, 62:15
fleeing [2] - 62:19, 62:20
floor [1] - 52:10
FLORIDA [1] - 1:1
Florida [6] - 1:4, 1:19, 2:4, 2:11, 3:4, 93:9
flying [1] - 57:14
focus [1] - 25:2
focussing [1] - 64:23
folks [1] - 55:17
follow [2] - 48:6, 51:8
follow-up [1] - 48:6
followed [1] - 52:21
following [2] - 59:21,

83:15
follows [1] - 54:2
footing [1] - 38:9
footings [1] - 36:19
force [2] - 31:16, 69:15
foregoing [1] - 93:3
foreign [8] - 9:19, 30:4, 33:4, 33:13, 81:4, 81:6, 86:15, 88:23
forensic [13] - 12:25, 13:2, 20:13, 21:1, 21:2, 21:14, 37:5, 40:8, 40:18, 40:25, 42:24, 43:12, 45:15
forensics [3] - 20:17, 41:18, 47:16
forgive [1] - 75:22
form [2] - 42:17, 44:22
formal [1] - 78:20
formally [2] - 4:7, 4:9
format [3] - 21:8, 42:25, 43:4
forth [2] - 15:25, 57:2
forward [1] - 68:6
foster [1] - 25:18
fought [1] - 73:12
four [3] - 32:11, 52:21, 66:16
fourteen [1] - 91:19
FPR [2] - 2:9, 93:7
framework [4] - 48:17, 50:11, 51:8
frankly [3] - 72:3, 72:7, 86:9
fraudulent [1] - 33:19
fresh [2] - 67:16, 82:19
friend [1] - 72:25
front [2] - 21:16, 82:22
fugitive [3] - 9:7, 17:12, 40:4, 48:23, 49:20
fugitive's [3] - 49:15, 81:6, 86:15
full [10] - 9:22, 30:10, 36:25, 42:13, 47:18, 68:19, 69:8, 69:14, 71:15, 74:6
full-stop [2] - 68:19, 69:8
fully [1] - 57:18
funeral [7] - 21:5, 43:25, 47:2, 47:4, 51:24, 54:9, 58:15
fusillade [2] - 12:13, 22:25
fusillado [1] - 25:15

G

gathered [2] - 17:18, 80:18
generous [2] - 38:12, 85:21
given [5] - 35:11, 36:5, 71:6, 76:16, 82:14
glasses [1] - 69:2
GLENDA [2] - 2:9, 93:7
Glenda [1] - 93:7
Government [60] - 5:1, 6:2, 9:16, 10:2, 17:6, 17:7, 17:10, 22:10, 25:14, 25:19, 26:25, 27:2, 28:9, 28:15, 28:16, 28:18, 28:22, 29:18, 31:4, 34:4, 34:20, 34:22, 35:3, 35:4, 38:21, 40:21, 41:7, 41:13, 48:13, 50:14, 52:4, 55:4, 55:13, 56:11, 58:5, 58:14, 59:4, 59:8, 59:14, 59:15, 59:24, 63:25, 64:24, 68:1, 71:10, 71:25, 73:17, 73:19, 73:23, 75:4, 75:13, 83:17, 83:20, 83:21, 84:3, 84:5, 85:20, 90:10, 90:18
government [1] - 17:25
GOVERNMENT [1] - 1:17
Government's [8] - 4:12, 9:8, 9:11, 9:15, 38:16, 38:19, 62:3, 69:17
Governmental [1] - 28:24
grab [1] - 25:21
granted [1] - 87:23
great [4] - 53:13, 54:2, 54:6, 76:5
ground [2] - 13:4, 41:21, 71:3
group [5] - 6:11, 53:23, 54:20, 57:8, 60:8
grouped [1] - 11:5
guard [4] - 54:17, 55:21, 56:13, 56:19
guard's [1] - 55:21
guarding [1] - 7:2
guards [6] - 25:11, 25:17, 55:2, 56:22, 62:15, 62:16

guerillas [1] - 54:14
guess [14] - 5:12, 34:8, 34:19, 35:2, 35:5, 35:11, 35:15, 38:17, 58:20, 62:11, 66:5, 69:24, 84:7, 90:18
GUILLERMO [2] - 1:7, 1:11
Guillermo [1] - 3:8
guilt [7] - 8:24, 9:1, 9:19, 15:9, 15:11, 15:15, 81:20
guilty [2] - 57:21, 66:1
gun [2] - 23:22, 43:20
gunned [3] - 7:24, 11:6, 17:19
gunpowder [1] - 45:10
guns [1] - 11:6
gunshot [3] - 13:7, 20:17, 45:10

H

habeas [1] - 81:15
Haidar [7] - 12:12, 12:21, 23:16, 32:11, 32:14, 47:8, 53:4
half [1] - 90:25
hallway [1] - 54:25
halt [1] - 81:8
hand [2] - 31:7, 35:22
handgun [2] - 23:21
handily [1] - 90:13
happy [2] - 5:4, 5:9
hard [1] - 73:12
hard-fought [1] - 73:12
harmony [1] - 16:8
hate [1] - 17:17
haul [1] - 75:19
head [4] - 13:4, 27:25, 41:22, 84:12
heading [2] - 78:12, 79:10
heads [1] - 64:9
hear [3] - 43:13, 59:8, 82:5
heard [1] - 38:1
hearing [17] - 3:22, 4:20, 4:22, 4:25, 5:5, 5:13, 5:21, 22:4, 24:20, 36:11, 38:25, 42:4, 86:5, 86:6, 86:9, 90:3, 90:21
HEARING [1] - 1:13
hearings [1] - 20:12
hearsay [2] - 22:5, 39:25
hefty [1] - 27:18

held [5] - 6:7, 11:10, 18:15, 24:3, 80:25
help [3] - 25:5, 26:15, 67:13
helpful [2] - 41:2, 91:6
helpfully [1] - 87:13
hereby [1] - 93:3
hid [2] - 12:12, 12:13
hiding [2] - 22:23, 75:3
highjacking [2] - 55:19, 63:10
highlight [1] - 9:14
highlighting [1] - 59:7
highly [1] - 70:9
himself [1] - 24:1
historians [1] - 26:3
historical [3] - 16:10, 31:25, 43:6
history [2] - 16:13, 14:20
hit [2] - 23:24, 43:20
hold [1] - 69:11
Holmes [1] - 15:18
home [2] - 21:5, 33:7
Honor [77] - 3:6, 3:11, 3:18, 4:3, 4:13, 4:17, 4:21, 5:3, 5:14, 6:4, 6:5, 6:15, 7:17, 8:14, 8:18, 9:5, 9:9, 9:14, 10:10, 10:12, 11:21, 12:2, 13:17, 14:8, 15:6, 15:16, 16:9, 19:9, 19:25, 21:18, 22:3, 24:2, 24:15, 24:22, 25:2, 26:9, 26:14, 27:14, 27:25, 33:5, 39:17, 39:24, 43:13, 44:7, 44:18, 46:1, 46:14, 48:19, 49:23, 51:2, 51:22, 52:2, 53:12, 54:4, 56:24, 70:4, 76:15, 79:16, 79:20, 80:21, 81:11, 81:21, 84:11, 84:15, 84:20, 86:10, 86:25, 88:16, 88:20, 89:9, 89:19, 90:1, 90:5, 90:23, 92:2, 92:14, 92:18
HONORABLE [1] - 1:15
Honorable [1] - 3:4
hope [3] - 53:11, 73:6, 76:4
hospital [3] - 32:14, 55:9, 55:10
hostages' [1] - 12:10
hostilities [1] - 80:12
hour [2] - 60:1, 64:19

**hours** [5] - 6:8, 60:2, 61:11, 61:15, 90:25
**house** [2] - 36:20, 36:21
**Human** [1] - 78:18
**human** [2] - 69:4, 71:4
**humanity** [3] - 68:23, 69:5, 73:21
**hundreds** [2] - 29:11, 38:6
**hypothetical** [3] - 16:24, 18:3, 61:11

# I

**idea** [1] - 41:23
**identified** [2] - 19:22, 79:20
**identify** [1] - 22:21
**identity** [1] - 17:9
**II** [1] - 10:17
**illegal** [1] - 54:15
**illustrate** [1] - 52:9
**imagine** [2] - 40:2, 42:7
**imcompatability** [1] - 78:17
**immunity** [2] - 34:2, 36:2
**impact** [1] - 71:13
**impartial** [1] - 37:13
**impediment** [1] - 78:20
**implicated** [1] - 78:2
**implicitly** [1] - 7:9
**importance** [1] - 24:17
**important** [4] - 11:12, 18:17, 26:13, 54:5
**importantly** [1] - 73:23
**impose** [1] - 33:3
**imposing** [1] - 57:25
**impressed** [2] - 41:15, 76:9
**imprisoned** [1] - 80:14
**imprisonment** [1] - 70:21
**IN** [2] - 1:4, 1:4
**inapplicable** [1] - 10:7
**inappropriate** [1] - 13:18
**inaudible** [3] - 27:6, 27:12, 50:23
**inches** [2] - 13:7, 45:13
**incident** [10] - 19:1, 26:18, 27:6, 35:9, 56:16, 61:4, 62:13, 63:13, 63:18, 84:23
**incidental** [5] - 10:21, 11:8, 59:13, 61:13,

62:18
**inclined** [1] - 25:20
**include** [3] - 22:12, 41:8, 68:6
**included** [2] - 10:9, 54:7
**includes** [1] - 20:16
**including** [10] - 6:11, 20:19, 21:3, 23:19, 41:19, 47:14, 49:17, 54:22, 68:7, 68:8
**inconsistencies** [1] - 22:10
**inconsistent** [3] - 13:12, 20:13, 40:21
**incorrect** [2] - 57:10, 65:4
**incurred** [1] - 56:13
**indeed** [2] - 54:6, 54:9
**independent** [1] - 47:23
**indicate** [1] - 64:2
**indicates** [2] - 53:13, 56:15
**indictment** [1] - 20:6
**indiscriminately** [1] - 55:5
**individuals** [8] - 19:22, 20:23, 22:16, 22:18, 23:17, 25:21, 66:22, 67:2
**individuals'** [1] - 14:17
**ineffective** [1] - 35:7
**infer** [1] - 38:18
**inferring** [1] - 34:10
**inform** [1] - 45:2
**information** [2] - 19:17, 38:1
**initial** [13] - 6:2, 12:13, 12:22, 13:1, 22:25, 36:4, 56:12, 56:15, 56:19, 56:21, 57:12, 62:3
**injured** [1] - 7:3
**innocence** [2] - 15:15, 81:20
**inquiries** [1] - 84:21
**Inquiry** [1] - 33:10, 81:3, 86:11
**inquiry** [2] - 84:22, 84:25
**insight** [2] - 26:2, 26:4
**instance** [2] - 17:2, 49:10
**instead** [1] - 82:23
**insufficient** [2] - 5:8, 53:19
**insulates** [1] - 60:14
**insurrection** [2] -

18:22, 64:15
**intent** [1] - 55:6
**interesting** [2] - 76:3, 90:4
**interim** [1] - 19:18
**International** [3] - 1:23, 3:15, 3:16
**interposed** [1] - 78:23
**interpretation** [2] - 39:15, 79:1
**intervene** [1] - 73:25
**intervened** [2] - 52:18, 53:1
**intervening** [3] - 53:21, 64:13, 66:8
**introduce** [9] - 4:2, 6:1, 8:22, 16:6, 17:1, 17:3, 17:4, 19:14, 29:2
**introduced** [7] - 31:20, 34:17, 44:5, 52:6, 65:20, 65:21, 67:1
**introducing** [2] - 8:20, 58:10
**introduction** [1] - 34:18
**invented** [1] - 17:24
**investigation** [24] - 27:10, 29:15, 34:21, 37:1, 37:10, 37:12, 37:19, 51:16, 52:19, 53:14, 53:17, 55:24, 57:19, 58:18, 67:6, 67:8, 67:9, 71:15, 74:7, 77:19, 78:21, 79:8, 79:12, 84:6
**investigative** [1] - 81:4
**investigator** [5] - 40:1, 40:3, 40:8, 77:16, 84:7
**investigators** [2] - 37:7, 44:12
**involve** [1] - 69:4
**involved** [4] - 57:25, 70:16, 71:15, 80:17
**involvement** [2] - 22:17, 23:11
**IRA** [5] - 17:2, 17:5, 17:6, 18:3, 28:10
**IRA-related** [1] - 17:2
**Ireland** [1] - 17:3
**irrelevant** [1] - 35:16
**issue** [30] - 9:5, 9:13, 10:11, 10:12, 11:15, 21:1, 27:22, 28:13, 28:16, 28:22, 30:10, 34:14, 35:8, 36:2, 39:13, 42:3, 48:8,

49:21, 61:10, 63:3, 63:4, 64:18, 64:19, 65:5, 71:7, 73:24, 78:11, 90:16, 92:4
**issues** [9] - 6:16, 7:17, 10:5, 68:18, 70:25, 71:4, 74:8, 90:3
**itself** [3] - 64:7, 84:5, 89:8

# J

**Jason** [1] - 3:12
**JASON** [1] - 1:17
**jeopardy** [1] - 79:7
**Jeopardy** [1] - 79:10
**join** [1] - 57:8
**Jon** [3] - 5:18, 56:2, 60:9
**JON** [1] - 5:19
**Jones** [1] - 73:2
**Journal** [1] - 70:10
**Judge** [58] - 3:4, 3:9, 5:24, 14:7, 18:7, 19:16, 20:11, 20:15, 21:8, 21:17, 21:23, 22:7, 22:13, 33:23, 33:24, 37:23, 39:12, 40:17, 41:18, 42:4, 42:21, 44:20, 45:14, 45:16, 46:7, 46:10, 46:20, 47:6, 47:19, 48:3, 48:7, 49:24, 50:2, 50:5, 51:12, 54:7, 55:3, 55:12, 57:23, 58:4, 58:11, 58:19, 58:20, 59:21, 64:22, 65:16, 67:11, 74:3, 75:20, 76:4, 76:9, 76:19, 76:25, 77:15, 78:2, 85:14, 87:8, 91:24
**judge** [4] - 58:16, 65:23, 82:12, 87:6
**JUDGE** [1] - 1:15
**judges** [4] - 30:7, 65:19, 81:24, 83:7
**judgment** [2] - 33:11, 53:20
**judicata** [1] - 76:6
**judicial** [1] - 81:4
**jurisdiction** [1] - 7:11
**jury** [2] - 72:14, 75:8
**justice** [9] - 65:11, 70:11, 70:20, 70:23, 71:17, 73:11, 81:7, 84:13, 86:16
**Justice** [4] - 1:20, 1:23, 3:14, 15:18
**justification** [1] - 7:25

**justified** [2] - 73:8, 75:14
**justness** [1] - 80:22
**juxtapose** [1] - 35:2

# K

**kangaroo** [1] - 70:6
**keep** [4] - 14:6, 76:15, 76:19, 76:21
**key** [4] - 10:15, 16:17, 24:18, 43:2
**kill** [3] - 10:18, 53:7, 55:7
**killed** [13] - 7:3, 12:16, 12:20, 12:25, 13:1, 13:6, 17:13, 17:15, 17:16, 23:5, 24:9, 27:7, 79:21
**killers** [1] - 55:15
**killing** [11] - 10:20, 11:25, 13:5, 17:2, 26:5, 28:4, 42:1, 45:5, 54:22, 55:7, 80:12
**killings** [4] - 10:16, 12:8, 20:18, 24:3
**kind** [15] - 24:1, 31:25, 49:13, 53:20, 57:21, 64:13, 65:6, 65:20, 67:1, 70:23, 79:3, 81:9, 86:24, 90:8
**known** [1] - 42:7
**knows** [1] - 8:18
**Kohon** [2] - 12:20, 22:23

# L

**lack** [1] - 37:9
**language** [3] - 89:4, 89:7, 89:14
**large** [1] - 10:17
**large-scale** [1] - 10:17
**largely** [3] - 19:16, 21:23, 73:22
**larger** [4] - 11:8, 16:10, 31:24, 83:10
**last** [3] - 4:22, 67:16, 70:24
**law** [38] - 9:24, 10:4, 10:7, 10:15, 10:16, 15:13, 15:14, 19:2, 19:6, 19:7, 24:6, 24:10, 33:1, 33:10, 38:2, 39:20, 49:5, 49:11, 49:12, 51:1, 60:16, 61:7, 67:18, 69:11, 69:12, 69:14, 69:16, 69:23, 71:3,

73:13, 74:11, 78:8, 78:9, 78:17, 79:1, 79:18, 89:6, 89:11
**Law** [5] - 9:4, 9:6, 16:7, 78:14, 79:2
**laws** [4] - 67:25, 68:13, 68:15, 69:8
**lawyer** [1] - 76:1
**lay** [3] - 41:5, 42:17, 50:20
**lays** [2] - 33:24, 47:15
**leads** [2] - 33:22, 60:9
**learn** [1] - 34:11
**learned** [1] - 37:2
**least** [7] - 19:12, 24:5, 35:7, 45:18, 50:11, 50:17, 64:3
**led** [3] - 17:23, 38:3, 64:19
**legal** [6] - 5:3, 19:3, 36:2, 48:17, 81:17
**legally** [1] - 75:14
**legislation** [1] - 83:19
**legitimate** [1] - 53:24
**Leiva** [2] - 81:1, 86:12
**length** [2] - 17:22, 29:11
**lengthy** [1] - 20:7
**less** [2] - 26:8, 41:15
**lesser** [3] - 50:1, 50:7, 50:8
**Letter** [4] - 9:4, 9:6, 16:7, 79:2
**level** [2] - 32:23, 88:8
**liability** [3] - 24:2, 24:7, 24:11
**liable** [1] - 24:3
**license** [1] - 64:16
**lie** [2] - 10:3, 41:6
**Lieutenant** [2] - 41:9, 83:8
**life** [3] - 70:18, 70:20, 71:18
**light** [2] - 62:23, 72:5
**likely** [2] - 37:24, 82:15
**limit** [1] - 24:1
**Limitations** [1] - 78:13
**limitations** [2] - 68:24, 69:6
**limited** [2] - 32:1, 83:11
**line** [5] - 10:15, 25:16, 56:22, 56:23, 79:20
**lined** [2] - 55:4, 64:8
**lines** [3] - 16:8, 52:21, 57:23
**listed** [2] - 12:7, 55:25
**lists** [2] - 7:5, 47:6
**live** [3] - 5:25, 31:5,

82:23
**living** [1] - 30:22
**locked** [1] - 56:25
**logic** [1] - 49:6
**longest** [1] - 77:4
**look** [11] - 14:13, 15:24, 45:18, 47:5, 51:25, 74:23, 75:25, 76:2, 76:4, 78:10, 84:10
**looked** [1] - 76:7
**looking** [7] - 6:20, 11:1, 12:23, 36:1, 46:16, 48:7, 74:3
**lost** [5] - 9:25, 10:4, 44:11
**lower** [3] - 49:3, 49:9, 50:3

## M

**machine** [2] - 11:6, 43:20
**magistrate** [2] - 14:13, 40:13
**MAGISTRATE** [1] - 1:15
**main** [1] - 13:25
**man** [3] - 12:4, 13:2, 71:18
**manages** [1] - 40:5
**manner** [4] - 15:1, 17:16, 37:14
**Marandino** [3] - 37:16, 47:9, 47:12
**March** [1] - 1:5
**Marileo** [3] - 46:24, 47:10, 47:12
**Marileo's** [1] - 46:18
**mark** [1] - 4:11
**marshalled** [1] - 31:11
**martial** [3] - 38:22, 38:23, 38:25
**Martinelli** [12] - 8:19, 29:20, 33:6, 39:24, 85:5, 85:10, 86:4, 87:3, 87:4, 88:16, 88:17, 92:10
**Mason** [1] - 80:15
**mass** [1] - 55:7
**massacre** [4] - 57:11, 57:18, 66:3, 79:19
**massacred** [2] - 6:12, 65:14
**massacring** [1] - 80:7
**Mastroleo** [1] - 46:22
**material** [9] - 22:5, 40:14, 40:15, 40:19, 42:12, 44:21, 47:6, 47:21, 48:4

**matter** [10] - 3:7, 19:11, 34:23, 59:23, 64:7, 72:1, 82:13, 82:17, 90:17, 93:5
**MATTER** [1] - 1:4
**matters** [2] - 30:23, 90:25
**maximum** [2] - 54:16, 55:18
**mean** [13] - 15:9, 22:20, 33:3, 39:19, 45:3, 48:25, 63:2, 63:8, 63:24, 65:17, 74:12, 82:17
**meaning** [6] - 12:25, 19:2, 19:3, 25:13, 33:21, 43:19
**means** [4] - 49:8, 72:6, 88:3, 88:22
**meant** [1] - 48:21
**medical** [5] - 7:7, 45:9, 52:22, 53:8, 53:18
**meet** [3] - 5:8, 27:16, 51:17
**melee** [1] - 57:13
**member** [3] - 17:5, 74:18, 74:19
**members** [4] - 31:15, 52:15, 54:20, 70:14
**memo** [2] - 90:22, 91:4
**memorandum** [5] - 70:7, 70:24, 76:8, 90:2, 90:7
**memory** [1] - 57:9
**mentioned** [1] - 20:16
**mentions** [1] - 46:21
**merely** [5] - 8:21, 8:23, 11:10, 36:16, 85:19
**meritable** [1] - 74:13
**meritorious** [1] - 75:14
**merits** [2] - 8:15, 42:14
**met** [4] - 48:9, 50:20, 51:10, 58:5
**metaphor** [1] - 36:19
**metting** [1] - 70:18
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 1:19, 2:4, 2:11, 2:11, 93:8, 93:9
**middle** [6] - 7:23, 11:4, 17:18, 18:13, 77:2, 79:22
**midst** [1] - 80:12
**might** [8] - 16:25, 17:1, 17:3, 17:9, 31:5, 45:22, 64:14
**military** [49] - 6:11,

6:24, 7:4, 11:4, 17:10, 17:25, 27:1, 29:14, 29:16, 31:16, 36:16, 37:7, 37:12, 37:19, 38:3, 38:24, 44:12, 52:2, 52:17, 53:7, 53:14, 53:21, 54:1, 54:3, 55:24, 56:5, 56:6, 57:19, 57:25, 58:1, 58:17, 58:24, 65:11, 67:6, 67:8, 67:9, 67:12, 67:15, 68:8, 70:14, 73:17, 74:7, 77:16, 77:18, 79:7, 80:19, 82:8
**military's** [1] - 53:14
**mill** [1] - 6:7
**mind** [4] - 16:9, 16:23, 58:23
**mind-run** [1] - 16:23
**mine** [1] - 72:25
**minimum** [3] - 13:13, 24:5, 49:22
**minute** [1] - 68:15
**minutes** [2] - 46:8, 63:22
**Mirer** [1] - 3:15
**Mirer-Singer** [1] - 3:15
**MIRRER** [1] - 1:22
**MIRRER-SINGER** [1] - 1:22
**Mississippi** [2] - 72:10, 72:11
**mistake** [1] - 42:11
**modern** [5] - 21:1, 21:2, 28:7, 29:10, 49:5
**moment** [1] - 34:8
**Monday** [1] - 1:6
**months** [1] - 80:6
**Montoneros** [5] - 54:14, 54:20, 55:16, 56:25, 60:8
**moreover** [5] - 10:4, 12:23, 21:24, 37:11, 85:13
**morning** [9] - 3:5, 3:6, 3:11, 3:17, 3:18, 3:21, 6:8, 18:24, 25:7
**most** [8] - 6:15, 9:16, 26:14, 29:8, 29:19, 57:6, 62:23, 85:21
**motivated** [6] - 85:3, 85:8, 86:18, 87:25, 88:7
**motivation** [5] - 86:8, 87:15, 89:2, 89:3, 89:15

**motivations** [1] - 86:3
**motive** [1] - 85:10
**move** [2] - 4:7, 4:10
**moving** [1] - 43:19
**MR** [148] - 3:6, 3:11, 3:18, 4:3, 4:6, 4:13, 4:16, 4:21, 5:3, 5:14, 5:24, 6:4, 11:17, 11:20, 14:8, 14:10, 16:2, 18:17, 19:8, 19:24, 21:2, 21:12, 21:18, 21:21, 22:19, 23:8, 23:10, 24:25, 25:2, 27:25, 28:11, 28:14, 28:25, 30:15, 30:19, 31:9, 31:13, 31:17, 31:23, 32:6, 33:5, 34:3, 34:6, 35:10, 35:19, 35:21, 35:25, 36:8, 36:10, 36:15, 39:6, 39:17, 40:25, 42:5, 42:23, 43:15, 43:24, 44:6, 44:15, 44:17, 44:21, 45:15, 45:17, 45:18, 46:1, 46:10, 46:14, 46:24, 47:4, 48:15, 48:19, 50:2, 50:8, 50:12, 50:16, 50:23, 51:1, 51:6, 51:13, 51:22, 56:24, 57:5, 58:12, 59:21, 60:4, 60:7, 60:15, 60:18, 61:17, 61:19, 61:23, 62:1, 62:21, 63:8, 63:23, 64:5, 64:21, 65:9, 66:13, 66:15, 67:4, 68:4, 69:18, 69:20, 69:21, 70:4, 72:21, 72:23, 73:2, 73:6, 74:2, 74:22, 75:1, 75:15, 76:15, 76:22, 82:5, 82:12, 82:25, 84:10, 84:15, 84:20, 86:4, 86:6, 86:22, 87:11, 87:13, 87:21, 88:11, 88:15, 89:9, 89:19, 89:22, 89:24, 90:1, 90:12, 90:20, 90:23, 91:10, 91:13, 91:15, 91:19, 91:24, 92:1, 92:2, 92:10, 92:14, 92:18
**MS** [1] - 5:18
**Mujagic** [1] - 80:9
**multiple** [4] - 9:22, 10:24, 12:6, 32:7
**murder** [14] - 7:14, 7:15, 12:19, 16:25, 26:12, 32:22, 38:24,

56:21, 63:1, 63:2,
64:17, 66:3, 72:8,
72:9
**murdered** [2] - 27:9,
74:19
**murderous** [1] - 15:2
**murders** [3] - 10:1,
12:21, 84:12
**must** [2] - 15:1, 87:8
**mystery** [1] - 82:18

## N

**name** [2] - 20:5, 37:7
**named** [7] - 12:4,
13:2, 13:9, 41:20,
43:15, 45:7, 77:15
**names** [1] - 5:17
**narrative** [2] - 52:7,
66:20
**narrow** [6] - 6:16,
15:21, 28:2, 29:4,
29:5, 54:25
**nation** [2] - 9:17,
85:18
**national** [1] - 54:1
**nations** [1] - 81:5
**natural** [1] - 42:25
**nature** [2] - 48:23,
83:24
**Naval** [4] - 6:25, 44:4,
44:5, 44:8
**Navy** [2] - 42:3, 42:6
**NEAL** [1] - 2:2
**Neal** [2] - 2:3, 3:19
**necessarily** [3] - 21:2,
21:22, 64:16
**neck** [3] - 13:10,
43:16, 43:21
**need** [11] - 14:5, 14:9,
14:13, 38:14, 42:13,
69:2, 83:5, 83:7,
87:20, 89:8, 92:8
**needs** [1] - 34:22
**neutralized** [1] - 80:14
**never** [11] - 8:3, 8:24,
10:21, 11:7, 22:13,
32:21, 48:2, 66:25,
69:12, 70:1, 74:11
**nevertheless** [1] -
34:23
**New** [3] - 1:21, 1:24,
14:23
**new** [20] - 34:25, 38:1,
39:3, 39:8, 39:9,
39:10, 39:14, 39:16,
39:17, 40:11, 40:12,
40:15, 48:4, 58:13,
58:18, 58:22, 59:1,
82:2, 82:20

**news** [1] - 26:23
**next** [4] - 10:11, 59:12,
69:24, 79:4
**Nezirovic** [2] - 80:2,
80:8
**nice** [1] - 55:19
**niceties** [1] - 15:19
**night** [6] - 6:13, 7:23,
11:5, 17:18, 58:25,
79:22
**Ninth** [1] - 49:17
**NO** [1] - 1:2
**noises** [1] - 57:2
**non** [2] - 13:14, 59:19
**Non** [5] - 13:22, 15:3,
33:10, 81:3, 86:11
**Non-Contradiction** [2]
- 13:22, 15:3
**non-extraditable** [1] -
59:19
**Non-Inquiry** [3] -
33:10, 81:3, 86:11
**non-political** [1] -
13:14
**none** [2] - 41:17,
66:13
**nonetheless** [1] - 78:4
**normal** [1] - 36:6
**normally** [1] - 9:18
**North** [2] - 2:11, 93:8
**Northeast** [1] - 1:18
**notable** [1] - 41:9
**notably** [1] - 37:6
**note** [4] - 23:25,
37:15, 45:13, 78:6
**noted** [1] - 85:15
**nothing** [6] - 28:17,
34:17, 34:25, 58:22,
69:22, 70:22
**notion** [3] - 23:22,
43:18, 55:20
**notwithstanding** [3] -
59:18, 87:18, 87:22
**nowadays** [1] - 67:17
**Number** [2] - 3:8,
78:14
**number** [10] - 12:24,
15:16, 20:17, 22:19,
26:9, 39:1, 49:16,
63:1, 63:3, 77:7
**numbers** [4] - 41:1,
52:21, 52:22, 69:19
**numerous** [1] - 22:9
**NW** [2] - 1:21, 1:24

## O

**O'Grady** [1] - 70:9
**obedience** [3] - 68:14,
68:19, 69:8

**object** [1] - 90:23
**objection** [4] - 5:1,
5:3, 5:21, 90:15
**objective** [1] - 59:5
**obliterate** [2] - 40:5,
60:20
**obliterated** [1] - 75:20
**obliterates** [3] - 29:6,
29:21, 36:17
**obliterating** [1] -
29:25
**obliteration** [4] -
34:20, 37:22, 38:11,
71:8
**observations** [2] -
46:25, 47:13
**obstruction** [1] -
84:13
**obviously** [3] - 56:22,
84:12, 90:18
**occipital** [2] - 13:3,
41:21
**occupied** [2] - 52:11,
72:18
**occur** [1] - 10:16
**occurred** [19] - 6:21,
8:12, 10:2, 11:17,
12:22, 18:21, 27:6,
31:15, 52:7, 56:4,
58:24, 61:15, 62:16,
62:24, 65:15, 72:9,
73:18, 73:20, 74:5
**OF** [6] - 1:1, 1:4, 1:6,
1:8, 1:17, 2:2
**offense** [48] - 5:9, 8:1,
8:2, 10:12, 10:19,
11:2, 11:7, 11:22,
14:2, 14:11, 14:21,
15:2, 16:1, 16:19,
18:6, 18:10, 24:16,
26:16, 27:15, 34:14,
35:7, 48:24, 49:7,
57:19, 57:21, 59:20,
60:3, 60:10, 60:21,
62:7, 62:13, 65:5,
66:19, 71:8, 71:11,
75:17, 79:23, 80:11,
83:25, 84:25, 86:20,
86:23, 87:1, 87:7,
88:13, 89:2, 89:11,
89:20
**offenses** [7] - 7:14,
12:7, 13:14, 13:23,
16:4, 68:22, 78:3
**office** [1] - 1:23
**Office** [2] - 1:18, 3:16
**Officer** [1] - 12:5
**officer** [3] - 17:10,
37:18, 77:14
**officers** [6] - 6:11, 7:4,

11:4, 12:15, 13:16,
24:4
**Offices** [1] - 3:14
**official** [9] - 10:2,
17:10, 22:10, 26:24,
28:15, 28:22, 29:18,
40:21, 41:7
**Official** [1] - 2:10
**often** [1] - 33:9
**Ohla** [3] - 13:6, 20:19,
45:7
**old** [3] - 57:9, 73:22,
85:22
**Oliver** [1] - 15:18
**ON** [2] - 1:17, 2:2
**once** [3] - 50:24, 64:15
**one** [58] - 7:3, 12:18,
13:15, 13:16, 18:13,
21:4, 22:21, 22:24,
23:4, 23:5, 23:12,
23:16, 25:4, 25:11,
25:17, 25:20, 26:10,
27:1, 29:10, 30:1,
31:17, 32:10, 32:16,
34:8, 35:5, 35:15,
37:6, 37:16, 38:14,
38:18, 39:1, 40:15,
41:20, 43:15, 46:24,
48:7, 55:2, 57:3,
57:15, 63:1, 65:23,
65:25, 66:7, 67:7,
67:23, 70:2, 73:23,
74:2, 75:15, 77:14,
80:1, 83:17, 84:22,
86:17
**One** [1] - 79:18
**ones** [4] - 23:12, 28:6,
28:7, 46:24
**ongoing** [2] - 17:5,
18:8
**open** [1] - 25:16
**operates** [1] - 91:17
**opinion** [14] - 21:17,
33:24, 35:6, 61:1,
76:7, 77:1, 78:11,
79:6, 83:6, 85:5,
85:14, 85:15, 86:13,
92:4
**opinions** [11] - 10:8,
20:3, 20:10, 21:7,
21:24, 22:8, 29:11,
29:24, 42:17, 45:19,
45:20
**opponent** [1] - 85:20
**opportunities** [1] -
81:14
**opportunity** [3] -
40:14, 90:2, 90:19
**opposed** [1] - 28:10
**opposing** [1] - 80:1

**opposite** [5] - 8:23,
29:20, 38:13, 55:16,
84:24
**opposition** [4] - 6:20,
7:5, 8:6, 70:7
**order** [13] - 3:1, 16:25,
46:16, 47:6, 47:22,
48:3, 48:7, 50:2,
53:2, 53:16, 61:6,
77:3, 90:4
**orders** [1] - 53:24
**ordinary** [1] - 16:23
**Ordinola** [1] - 85:13
**origin** [1] - 88:18
**original** [7] - 36:22,
46:16, 48:20, 62:19,
63:15, 78:3, 84:12
**originally** [1] - 55:9
**otherwise** [3] - 27:17,
40:5, 44:11
**outcome** [4] - 59:2,
66:12, 81:23, 83:18
**outraged** [1] - 57:12
**outset** [1] - 6:16
**outside** [1] - 80:11
**overall** [1] - 86:11
**overarching** [1] -
13:21
**overlap** [6] - 62:3,
63:7, 64:24, 64:25,
65:6, 65:10
**overpower** [1] - 55:20
**overturned** [1] - 74:11
**own** [13] - 10:7, 22:20,
22:21, 24:1, 26:1,
37:11, 51:14, 68:5,
70:7, 79:1, 80:7,
82:5, 82:8

## P

**P-E-R-D-U-E** [1] - 5:19
**P.A** [1] - 2:3
**page** [32] - 6:21, 8:7,
8:9, 14:24, 25:3,
25:12, 26:9, 27:5,
29:14, 41:1, 44:9,
44:14, 44:18, 46:19,
47:5, 47:11, 47:22,
49:16, 52:9, 52:11,
68:20, 77:4, 77:22,
78:9, 78:10, 78:15,
78:16, 79:5, 80:20,
81:1, 85:6, 85:15
**pages** [8] - 29:11,
38:6, 41:3, 43:5,
43:6, 53:5, 79:4,
88:19
**Pages** [1] - 1:8
**Panama** [1] - 88:18

**Panama's** [1] - 85:10
**paper** [8] - 4:4, 30:17, 30:20, 32:22, 34:15, 47:18, 82:23, 82:25
**papers** [19] - 3:23, 6:18, 6:22, 8:3, 8:8, 19:9, 23:20, 24:13, 30:13, 37:8, 44:25, 46:17, 58:16, 58:22, 60:20, 65:18, 69:17, 70:5, 70:18
**paragraph** [5] - 87:16, 87:18, 87:22, 89:17, 89:22
**parenthesis** [2] - 69:8, 69:9
**parse** [1] - 18:18
**part** [17] - 18:7, 18:8, 19:5, 19:25, 24:18, 26:14, 28:23, 31:10, 33:23, 34:19, 37:17, 54:19, 57:22, 59:12, 85:2, 85:24, 86:8
**partial** [1] - 37:12
**particular** [6] - 16:18, 25:3, 41:5, 69:16, 89:5
**particularly** [3] - 6:20, 32:13, 54:11
**parties** [1] - 3:23
**parts** [2] - 18:12, 62:24
**party** [2] - 6:1, 87:12
**passage** [1] - 30:20
**passages** [2] - 41:5, 41:19
**passed** [3] - 32:3, 68:12, 68:14
**past** [2] - 10:13, 35:23
**pay** [1] - 89:8
**penal** [1] - 81:4
**people** [57] - 5:12, 7:24, 11:9, 16:14, 17:15, 17:16, 17:17, 21:3, 24:9, 25:22, 26:6, 29:16, 30:22, 31:2, 31:5, 31:8, 31:18, 36:23, 37:16, 41:24, 44:1, 45:6, 54:14, 54:15, 54:22, 55:5, 55:8, 55:19, 56:14, 57:11, 59:16, 59:24, 62:17, 66:8, 67:15, 67:23, 70:14, 70:16, 70:19, 72:8, 72:19, 73:15, 75:3, 75:5, 77:8, 77:9, 77:14, 79:25, 80:5, 80:8, 80:12, 80:13, 82:4, 82:16, 82:19

**people's** [2] - 61:15, 64:20
**per** [1] - 88:5
**percent** [1] - 24:19
**Perdue** [7] - 5:19, 25:3, 25:6, 54:18, 56:2, 60:9, 60:22
**perfect** [1] - 72:6
**perhaps** [1] - 37:23
**period** [4] - 18:14, 19:18, 35:4, 91:23
**permissible** [1] - 39:22
**perpetrated** [1] - 24:4
**perpetrators** [2] - 22:21, 77:8
**person** [6] - 17:1, 23:5, 47:9, 56:19, 77:15, 79:13
**personal** [2] - 52:15, 91:1
**personally** [2] - 22:24, 24:9
**personnel** [4] - 52:18, 53:1, 53:7, 53:21
**persons** [2] - 62:14, 80:17
**perspective** [5] - 71:25, 74:17, 74:20, 83:21
**persuasive** [2] - 5:7, 22:8
**petition** [3] - 6:3, 36:7, 58:10
**petitioner** [1] - 4:1
**petitioner's** [1] - 14:25
**PHILIP** [1] - 1:22
**Philip** [1] - 3:15
**phonetic** [1] - 16:23
**photographs** [1] - 52:8
**physician** [1] - 45:9
**piece** [1] - 77:5
**pieces** [1] - 59:1
**Pigs** [1] - 36:21
**pin** [1] - 14:1
**place** [9] - 14:25, 16:11, 31:16, 52:10, 56:16, 65:10, 71:25, 74:8, 81:18
**placed** [1] - 59:17
**PLAINTIFF** [1] - 1:9
**plan** [1] - 52:10
**plane** [1] - 55:19
**plausible** [1] - 37:23
**play** [1] - 86:8
**pleading** [3] - 49:11, 49:13, 92:10
**pleadings** [1] - 29:14
**plenty** [1] - 32:20

**point** [35] - 6:1, 11:11, 11:25, 15:23, 20:10, 21:7, 26:10, 31:2, 35:11, 35:23, 36:23, 39:1, 40:22, 41:9, 46:14, 56:21, 60:11, 63:21, 64:8, 64:12, 64:14, 65:9, 70:8, 70:24, 71:1, 74:3, 79:4, 79:15, 80:1, 80:11, 80:21, 83:16, 86:7, 86:11, 90:24
**point-blank** [1] - 64:8
**pointed** [1] - 89:13
**pointing** [1] - 43:23
**points** [7] - 6:18, 43:12, 78:5, 78:6, 79:16, 87:13, 91:4
**political** [80] - 5:9, 8:2, 10:12, 10:19, 10:22, 11:7, 11:22, 13:14, 13:23, 14:2, 14:3, 14:11, 14:12, 14:15, 14:20, 15:2, 16:1, 16:4, 16:13, 16:19, 18:6, 18:10, 24:16, 26:15, 27:15, 27:22, 34:14, 35:7, 48:8, 48:10, 49:7, 50:15, 57:18, 58:5, 58:6, 59:3, 59:18, 59:20, 60:2, 60:3, 60:10, 60:13, 60:20, 61:4, 61:10, 61:21, 62:7, 62:19, 63:5, 63:18, 65:4, 71:8, 71:11, 72:18, 75:17, 79:22, 80:11, 83:24, 83:25, 84:18, 84:23, 84:24, 84:25, 85:4, 85:22, 86:2, 86:3, 86:8, 86:20, 86:23, 86:25, 87:7, 87:15, 88:13, 89:1, 89:2, 89:3, 89:11, 89:15, 89:20
**politically** [4] - 85:7, 86:18, 87:25, 88:6
**population** [1] - 54:23
**portion** [1] - 9:17
**portions** [1] - 5:7
**portrayed** [1] - 65:12
**portrays** [2] - 65:11, 65:12
**posed** [1] - 79:11
**position** [8] - 5:23, 7:21, 15:25, 19:8, 35:4, 35:16, 57:23, 72:4
**positions** [3] - 28:24, 52:11, 72:19

**post** [2] - 90:3, 90:21
**post-2010** [2] - 40:16, 44:2
**post-hearing** [2] - 90:3, 90:21
**postdates** [1] - 40:11
**potentially** [2] - 31:4, 33:23
**power** [4] - 54:2, 81:6, 85:23, 86:14
**Powers** [1] - 93:7
**POWERS** [2] - 2:9, 93:7
**practical** [3] - 82:13, 82:17, 90:17
**preceding** [1] - 5:21
**precisely** [2] - 24:25, 33:5
**precludes** [1] - 81:3
**predictions** [1] - 31:6
**preexisted** [1] - 21:21
**preexisting** [2] - 21:16, 21:20
**preference** [1] - 91:1
**pregnant** [2] - 44:24, 45:1
**preparation** [1] - 21:6
**prepared** [2] - 19:23, 20:25
**preparing** [1] - 76:8
**preponderance** [10] - 48:25, 49:9, 49:22, 50:8, 50:11, 50:13, 50:18, 51:3, 51:14, 51:18
**presence** [2] - 14:2, 14:10
**present** [17] - 3:19, 7:1, 8:25, 9:1, 16:9, 28:3, 34:21, 42:10, 42:12, 43:1, 43:8, 44:21, 54:3, 58:15, 69:25, 82:7
**PRESENT** [1] - 2:6
**presentation** [1] - 6:3
**presentations** [1] - 92:13
**presented** [10] - 6:5, 9:3, 9:12, 9:23, 31:24, 32:8, 36:17, 45:14, 45:16, 59:5
**presenting** [2] - 42:16, 43:4
**presents** [1] - 11:20
**president** [3] - 56:6, 65:12, 88:16
**President** [2] - 85:10, 88:16
**presiding** [1] - 3:4
**press** [1] - 75:6

**presumably** [2] - 81:15, 83:3
**presume** [1] - 83:12
**presumption** [1] - 36:6
**pretty** [3] - 47:25, 87:3, 90:9
**prevail** [1] - 61:24
**prevent** [1] - 53:2
**previously** [1] - 52:10
**prima** [2] - 49:4, 49:10
**primarily** [5] - 9:10, 18:23, 28:1, 47:7, 70:15
**primary** [2] - 10:11, 15:25
**principal** [1] - 24:1
**principle** [1] - 69:11
**prison** [4] - 54:16, 55:18, 58:24, 71:18
**Prison** [2] - 6:24, 63:10
**prisoner** [2] - 12:4, 12:18
**prisoners** [18] - 6:12, 6:24, 7:2, 7:22, 7:23, 10:3, 10:18, 10:20, 11:4, 11:23, 13:15, 16:20, 18:15, 28:4, 56:17, 62:19, 79:19, 80:6
**probability** [1] - 8:24
**probable** [18] - 6:14, 8:20, 8:21, 9:13, 10:10, 19:25, 27:17, 29:6, 34:13, 50:1, 50:7, 62:6, 63:2, 63:4, 71:8, 71:10, 72:13, 75:20
**problem** [5] - 8:18, 38:17, 39:7, 61:19, 81:22
**procedural** [1] - 7:10
**procedure** [4] - 32:25, 33:2, 33:12, 37:20
**proceed** [1] - 75:13
**proceeded** [1] - 62:16
**proceeding** [30] - 15:8, 29:10, 30:5, 36:22, 37:1, 38:20, 38:22, 38:23, 39:2, 39:4, 39:23, 40:12, 40:13, 42:10, 44:4, 44:5, 44:8, 48:5, 50:16, 52:2, 52:6, 77:16, 77:19, 78:4, 83:2, 83:3, 83:11, 83:17, 86:1, 88:23
**proceedings** [6] - 31:14, 33:13, 36:18,

38:8, 92:19, 93:4
**process** [8] - 33:16,
34:2, 70:25, 71:4,
71:7, 73:25, 80:22,
85:19
**processes** [1] - 67:20
**produce** [2] - 29:6,
48:23
**produced** [3] - 27:1,
29:10, 67:5
**product** [2] - 37:20,
71:24
**professor** [1] - 5:18
**Professor** [4] - 27:4,
27:8, 56:1, 60:22
**Prohibition** [1] - 79:10
**promulgated** [1] -
41:7
**prong** [8] - 24:20,
24:23, 25:5, 26:15,
26:17, 27:12, 27:13,
51:13
**prongs** [2] - 24:18,
26:1
**proof** [3] - 11:3, 49:9,
66:18
**proper** [1] - 37:13
**properly** [1] - 81:9
**proportional** [1] -
11:25
**proposition** [1] -
10:24
**prosecute** [1] - 73:21
**prosecuted** [3] -
29:17, 79:14, 84:5
**prosecution** [7] -
73:8, 73:9, 79:12,
83:24, 84:18, 86:18
**prosecutor** [3] -
72:24, 74:18, 76:1
**protagonists** [1] -
52:12
**protected** [2] - 15:2,
64:14
**protection** [1] - 33:2
**protects** [1] - 78:24
**prove** [3] - 49:8,
49:15, 62:10
**proved** [1] - 27:2
**proven** [2] - 18:4, 18:5
**proves** [1] - 17:4
**provide** [1] - 6:13
**Provided** [1] - 78:14
**provided** [2] - 4:16,
7:8
**provides** [1] - 23:5
**provision** [1] - 87:14
**provoke** [1] - 7:24
**proximately** [2] -
10:23, 12:9

**Pujadas** [4] - 12:4,
31:18, 55:1, 57:7
**Pujadas'** [2] - 41:10,
53:2
**pulled** [1] - 11:5
**punishment** [1] -
15:11
**purported** [2] - 13:8,
38:3
**purportedly** [1] - 86:3
**purports** [1] - 11:14
**purpose** [2] - 15:21,
72:2
**purposes** [11] - 5:11,
19:4, 19:6, 19:12,
32:3, 39:13, 48:4,
50:16, 62:9, 67:19,
86:21
**put** [9] - 4:12, 33:6,
34:8, 38:9, 59:25,
68:6, 70:25, 71:18,
80:15
**putting** [1] - 63:3

## Q

**qualifies** [2] - 14:20,
57:18
**quarters** [3] - 54:24,
55:23, 57:15
**quashed** [1] - 64:16
**questions** [7] - 46:2,
52:3, 60:25, 71:9,
83:15, 90:13, 91:2
**quickly** [1] - 79:17
**quite** [3] - 20:7, 37:2,
86:9
**quotation** [1] - 27:4
**quote** [1] - 8:13
**quote/unquote** [1] -
21:14
**quotes** [1] - 69:10

## R

**railroaded** [1] - 73:12
**raise** [1] - 70:3
**raised** [1] - 10:6
**raising** [1] - 15:23
**Ramos** [3] - 48:21,
48:22, 50:4
**random** [1] - 15:1
**range** [5] - 45:12,
54:12, 55:22, 55:23,
60:1
**ranking** [1] - 37:18
**rash** [1] - 53:2
**rather** [5] - 4:19, 15:2,
61:1, 80:13, 91:5
**rationale** [1] - 33:25

**Rawson** [2] - 6:24,
63:9
**RE** [1] - 1:4
**re** [2] - 45:10, 73:6
**re-counted** [1] - 45:10
**re-elected** [1] - 73:6
**reach** [2] - 13:19,
76:11
**reached** [4] - 51:1,
58:21, 62:25, 76:10
**reaction** [1] - 56:17
**read** [11] - 14:9, 20:2,
33:24, 35:6, 48:25,
53:11, 58:22, 65:18,
68:7, 70:5, 92:10
**readable** [1] - 43:4
**reading** [3] - 36:7,
37:24, 57:22
**reads** [2] - 49:3, 50:2
**real** [2] - 8:7, 65:10
**realize** [1] - 40:9
**really** [19] - 9:5, 9:10,
18:12, 30:11, 39:14,
39:16, 43:4, 44:12,
48:20, 49:6, 49:12,
58:13, 65:17, 72:1,
72:15, 72:20, 73:25,
75:16, 81:18
**reason** [9] - 7:25,
9:11, 15:5, 33:9,
44:6, 49:6, 56:5,
62:4, 70:23
**reasonable** [3] - 6:11,
10:1, 51:4
**reasoning** [1] - 76:9
**reasons** [3] - 13:20,
27:14, 85:4
**rebellion** [14] - 18:8,
18:22, 19:1, 19:7,
24:23, 35:9, 59:9,
59:10, 59:13, 59:18,
63:5, 64:9
**rebellious** [1] - 18:13
**recalled** [1] - 41:13
**recanted** [1] - 37:17
**receive** [1] - 91:20
**received** [1] - 83:6
**recently** [1] - 80:25
**recess** [1] - 46:12
**recitation** [1] - 20:7
**recognition** [1] - 69:5
**recognizable** [1] -
14:17
**recognize** [1] - 34:21
**recognized** [1] - 39:15
**recollection** [1] - 90:9
**reconstruct** [1] -
47:19
**reconstruction** [1] -
41:14

**record** [19] - 3:10,
5:12, 5:16, 12:23,
22:17, 34:15, 34:24,
34:25, 42:21, 44:10,
44:20, 47:11, 57:20,
67:3, 78:5, 78:6,
82:14, 82:24, 92:4
**records** [3] - 4:5, 43:6,
45:22
**recounts** [1] - 40:3
**rectified** [1] - 42:16
**refer** [1] - 77:22
**reference** [1] - 46:18
**references** [2] - 69:18,
69:21
**referred** [1] - 37:5
**referring** [2] - 4:15,
72:24
**refers** [1] - 29:15
**reflected** [2] - 57:20,
78:15
**refuse** [1] - 23:3
**refused** [1] - 71:2
**regard** [6] - 4:6, 37:15,
58:17, 58:23, 66:21,
68:19
**regarding** [4] - 53:19,
67:11, 69:3, 87:16
**region** [2] - 13:3,
41:21
**reject** [1] - 9:12
**relate** [1] - 14:16
**related** [9] - 13:13,
17:2, 31:24, 32:19,
64:9, 80:16, 82:8,
86:7, 87:14
**relates** [4] - 35:7,
56:19, 59:9, 84:12
**relating** [2] - 42:20,
83:7
**relation** [1] - 56:14
**relatively** [1] - 44:17
**relatives** [1] - 21:4
**release** [1] - 34:16
**relevant** [4] - 28:7,
35:14, 65:5, 84:25
**reliability** [1] - 39:4
**relied** [4] - 19:19,
31:10, 55:12, 82:1
**relies** [2] - 9:16, 47:8
**rely** [5] - 18:7, 34:1,
36:7, 36:19, 72:1
**relying** [8] - 4:4,
19:15, 21:23, 22:16,
35:5, 39:11, 73:16,
82:3
**remain** [1] - 91:2
**remains** [1] - 35:13
**remember** [2] - 54:8,
54:13

**remembered** [1] -
51:23
**remind** [1] - 46:22
**remotely** [1] - 70:22
**repealed** [1] - 69:12
**repeat** [2] - 17:17,
52:21
**repelling** [2] - 43:18,
45:4
**replies** [1] - 25:10
**reply** [5] - 76:14,
91:11, 91:25
**report** [6] - 52:16,
54:1, 54:3, 55:1,
56:5, 56:6
**REPORTED** [1] - 2:9
**reporter** [3] - 14:6,
46:5, 76:18
**Reporter** [1] - 2:10
**REPORTER** [3] - 14:7,
46:7, 76:19
**reports** [5] - 42:24,
52:22, 53:18, 55:16
**representation** [1] -
83:4
**reproach** [1] - 53:20
**reproducing** [1] -
26:24
**Republic** [2] - 4:8,
27:19
**request** [39] - 4:8, 6:6,
6:14, 7:21, 8:4, 8:11,
8:17, 9:3, 9:8, 9:11,
9:15, 11:1, 12:7,
14:14, 14:19, 15:4,
15:22, 16:21, 17:12,
17:14, 18:6, 26:19,
27:18, 32:1, 37:25,
38:4, 38:16, 40:3,
46:3, 47:18, 47:20,
77:4, 77:5, 81:5,
81:12, 87:24, 88:6
**requested** [1] - 87:24
**requesting** [5] - 9:17,
83:13, 85:3, 85:11,
85:18
**requests** [1] - 10:8
**require** [2] - 50:11,
60:5
**required** [2] - 9:1,
60:25
**requirement** [1] -
18:25
**requirements** [2] -
7:10, 18:19
**res** [1] - 76:6
**research** [1] - 27:21
**resembles** [1] - 70:22
**reserved** [1] - 88:9
**reserves** [1] - 89:14

**resolve** [1] - 7:18
**resolved** [4] - 27:23, 64:25, 65:2, 81:19
**resolving** [1] - 43:10
**respect** [5] - 22:15, 44:19, 56:9, 59:6, 83:15
**respectfully** [2] - 46:2, 81:12
**respective** [1] - 3:23
**respects** [1] - 63:7
**respond** [1] - 91:4
**respondent** [4] - 4:19, 19:20, 48:9, 51:21
**respondent's** [1] - 27:24
**responding** [1] - 56:20
**response** [4] - 23:4, 25:17, 63:5, 84:20
**responsibility** [3] - 15:14, 51:17, 54:20
**rest** [1] - 71:18
**resting** [1] - 37:25
**rests** [1] - 16:19
**result** [3] - 60:5, 77:23, 78:4
**resulted** [8] - 25:22, 29:11, 56:12, 56:17, 61:14, 73:9, 77:7, 83:18
**results** [3] - 56:14, 76:10, 76:11
**reveal** [1] - 47:23
**reveals** [1] - 26:13
**revenge** [4] - 55:15, 70:13, 85:20, 85:23
**reversed** [7] - 65:23, 65:24, 66:1, 66:22, 74:11, 77:21, 77:24
**reverses** [1] - 77:13
**review** [3] - 81:15, 90:5, 90:15
**reviewed** [1] - 3:24
**reviewing** [1] - 81:5
**revoked** [1] - 68:10
**rewarded** [1] - 70:9
**rightness** [1] - 30:7
**rights** [5] - 68:25, 69:3, 69:4, 71:4, 72:12
**Rights** [1] - 78:18
**rise** [6] - 3:2, 32:23, 46:11, 46:13, 61:10, 92:16
**ROBERTO** [2] - 1:6, 1:11
**Roberto** [4] - 2:6, 3:8, 3:19, 56:7
**role** [1] - 23:15

**Room** [1] - 2:11
**rounded** [1] - 59:16
**roused** [2] - 11:4, 17:17
**RPR** [2] - 2:9, 93:7
**Rule** [5] - 13:21, 15:3, 33:10, 81:3, 86:11
**Rules** [2] - 22:4, 33:12
**ruling** [1] - 90:17
**run** [2] - 6:7, 16:23
**run-of-the-mill** [1] - 6:7
**running** [1] - 34:9
**RUSSELL** [1] - 2:2

**S**

**Sabelli** [3] - 13:10, 20:19, 43:15
**salvo** [2] - 12:13, 13:1
**Santucho** [1] - 44:24
**Sastre** [6] - 46:20, 54:7, 55:3, 65:16, 67:11, 76:25
**sat** [1] - 35:2
**satisfied** [1] - 92:5
**satisfy** [1] - 27:15
**saw** [5] - 32:8, 37:24, 38:1, 45:10, 46:24
**scale** [1] - 10:17
**schedule** [1] - 91:18
**Scheduled** [1] - 1:7
**scope** [2] - 6:16, 35:17
**SDFL** [1] - 48:20
**seal** [1] - 4:9
**searching** [4] - 15:17, 28:2, 28:9
**second** [6] - 11:11, 18:25, 25:5, 26:17, 51:13, 73:8
**secondly** [1] - 12:2
**Secretary** [9] - 33:15, 80:24, 81:16, 85:25, 86:19, 88:5, 88:8, 89:15
**Section** [1] - 4:7
**security** [2] - 54:16, 55:18
**see** [12] - 8:6, 10:11, 10:15, 10:25, 19:4, 22:13, 24:13, 34:9, 70:22, 74:12, 74:14, 92:3
**seeing** [1] - 72:5
**seem** [1] - 84:21
**segregated** [1] - 32:15
**selective** [1] - 28:5
**self** [1] - 57:12
**self-defense** [1] - 57:12

**Senator** [2] - 73:3, 73:5
**sense** [12] - 15:12, 16:15, 34:14, 39:17, 40:11, 40:12, 40:15, 49:13, 50:4, 55:6, 56:10, 71:17
**sentenced** [1] - 66:10
**sentences** [1] - 70:19
**separate** [2] - 18:18, 87:14
**separated** [1] - 32:15
**serious** [1] - 69:4
**serve** [1] - 10:21
**service** [1] - 43:3
**session** [1] - 46:13
**set** [3] - 3:22, 15:25, 58:18
**seven** [7] - 13:13, 29:14, 44:9, 44:14, 44:18, 91:11, 91:25
**seven-page** [4] - 29:14, 44:9, 44:14, 44:18
**Seventh** [1] - 13:25
**several** [5] - 44:25, 55:11, 64:2, 69:10, 76:8
**shall** [2] - 87:19, 87:23
**shift** [1] - 50:14
**shifted** [4] - 37:21, 48:12, 50:24, 51:10
**shifts** [2] - 50:18, 50:20
**shooters** [3] - 7:3, 23:12, 77:12
**shooting** [13] - 23:17, 23:23, 25:22, 31:19, 32:17, 55:2, 56:13, 61:14, 62:4, 62:16, 62:17, 77:8
**shootings** [1] - 63:15
**shootout** [2] - 53:8, 63:17
**shoots** [1] - 23:4
**short** [3] - 29:8, 76:16, 90:2
**shot** [15] - 13:3, 13:10, 23:6, 41:21, 42:20, 43:16, 44:25, 54:16, 55:5, 56:15, 59:17, 59:25, 62:17, 64:8
**shots** [5] - 45:12, 54:12, 55:22, 57:15
**show** [13] - 13:3, 25:4, 48:3, 48:10, 48:23, 49:1, 49:2, 49:25, 50:14, 51:18, 65:19, 70:18, 77:25
**showed** [1] - 69:22

**showing** [8] - 19:25, 29:23, 48:9, 49:4, 49:11, 50:11, 50:13, 58:5
**shown** [2] - 23:21, 27:17
**shows** [5] - 52:11, 57:11, 65:15, 66:4, 70:10
**sic** [2] - 46:22, 61:21
**side** [5] - 37:3, 38:15, 38:18, 84:24, 91:2
**signed** [1] - 19:22
**significant** [4] - 6:18, 32:13, 44:23, 79:5
**signifies** [1] - 50:1
**similar** [2] - 26:7, 26:10
**similarly** [2] - 23:10, 67:24
**Simone** [1] - 69:10
**simple** [3] - 22:7, 66:3, 68:3
**simply** [6] - 15:9, 17:12, 27:5, 65:13, 74:16, 83:8
**simultaneous** [1] - 91:6
**sincere** [1] - 85:18
**Singer** [1] - 3:15
**SINGER** [1] - 1:22
**single** [2] - 12:3, 40:4
**sit** [1] - 33:11
**sitting** [1] - 69:13
**situated** [1] - 67:24
**situation** [7] - 28:22, 55:3, 55:21, 61:22, 65:13, 74:6, 75:2
**six** [8] - 32:11, 54:16, 55:9, 55:17, 63:9, 63:14, 64:3, 64:18
**slightly** [1] - 61:17
**slow** [2] - 14:5, 87:20
**small** [1] - 54:24
**Smith** [1] - 3:13
**SMITH** [1] - 1:20
**smuggle** [1] - 88:25
**so-called** [3] - 17:23, 58:12, 70:20
**Solari** [8] - 5:18, 26:7, 27:4, 27:8, 54:19, 56:2, 60:9, 60:22
**SOLARI** [1] - 5:18
**soldier** [1] - 58:1
**soldiers** [1] - 80:7
**solely** [1] - 37:25
**someone** [2] - 42:1, 43:18
**sometimes** [1] - 78:1
**somewhat** [1] - 9:14

**SONNETT** [58] - 2:2, 3:6, 3:18, 4:21, 5:14, 5:18, 5:24, 45:17, 46:10, 51:22, 56:24, 57:5, 58:12, 59:21, 60:4, 60:7, 60:15, 60:18, 61:17, 61:19, 61:23, 62:1, 62:21, 63:8, 63:23, 64:5, 64:21, 65:9, 66:13, 66:15, 67:4, 68:4, 69:18, 69:21, 70:4, 72:21, 72:23, 73:2, 73:6, 74:2, 74:22, 75:1, 75:15, 82:12, 86:4, 86:22, 88:11, 90:1, 90:12, 90:20, 91:10, 91:13, 91:15, 91:19, 91:24, 92:2, 92:10, 92:14
**Sonnett** [8] - 2:3, 3:19, 5:12, 29:13, 46:9, 89:25, 90:23, 91:3
**sorry** [2] - 13:9, 87:21
**sort** [10] - 7:10, 24:1, 39:18, 45:2, 45:9, 46:18, 48:4, 49:10, 85:2, 89:1
**Sosa** [4] - 12:5, 31:17, 41:9, 83:9
**sought** [1] - 73:13
**sound** [1] - 77:19
**sounds** [3] - 36:15, 43:5, 43:9
**sources** [1] - 26:23
**South** [1] - 2:3
**SOUTHERN** [1] - 1:1
**Southern** [1] - 3:3
**special** [2] - 85:12, 87:5
**specific** [8] - 19:2, 22:17, 26:8, 28:2, 41:1, 59:6, 78:8, 91:4
**specifically** [7] - 16:4, 49:21, 56:22, 68:18, 78:11, 85:16, 89:10
**speculate** [1] - 55:14
**spot** [1] - 7:6
**squarely** [4] - 11:1, 18:3, 40:20, 41:23
**stage** [3] - 33:15, 81:15, 86:8
**stand** [1] - 36:18
**standard** [7] - 33:4, 34:13, 50:1, 50:3, 50:7, 50:8, 50:25
**start** [5] - 7:16, 20:23, 46:8, 52:1, 57:14
**started** [2] - 55:3, 63:9

**starting** [2] - 39:18, 79:9
**state** [1] - 3:10
**State** [14] - 33:15, 73:9, 73:14, 75:12, 80:24, 83:13, 85:3, 85:25, 86:1, 86:19, 87:24, 88:5, 88:8, 89:16
**State's** [1] - 81:16
**statement** [8] - 25:20, 32:10, 37:17, 40:4, 47:8, 47:10, 47:12, 49:2
**statements** [15] - 22:20, 22:21, 32:10, 32:12, 32:14, 39:25, 40:8, 40:19, 47:7, 52:20, 52:22, 53:6, 53:18, 55:12, 66:21
**STATES** [3] - 1:1, 1:8, 1:15
**states** [6] - 22:22, 23:12, 46:19, 49:19, 85:6, 87:16
**States** [13] - 1:18, 1:20, 1:23, 2:10, 3:3, 3:12, 7:13, 73:3, 73:4, 75:5, 85:11, 88:1, 93:8
**statistics** [1] - 7:5
**Statute** [1] - 78:13
**statutory** [2] - 68:24, 69:6
**stemming** [1] - 28:23
**stems** [2] - 14:3, 14:12
**STENOGRAPHICALLY** [1] - 2:9
**step** [3] - 16:24, 22:15, 24:15
**steroids** [1] - 70:6
**still** [15] - 8:4, 12:7, 14:18, 19:20, 59:2, 60:7, 60:8, 60:10, 63:13, 69:14, 71:12, 85:8, 86:25, 87:6
**stomach** [1] - 45:1
**stood** [2] - 36:25, 66:24
**stop** [3] - 20:21, 68:19, 69:8
**stops** [2] - 63:12, 63:16
**story** [6] - 8:12, 17:24, 23:14, 41:6, 41:16
**straight** [1] - 20:22
**straw** [1] - 36:20
**Street** [2] - 1:18, 70:10
**stress** [4] - 13:17, 42:8, 44:2, 52:18

**strict** [2] - 53:23, 74:3
**strong** [1] - 56:3
**strongly** [2] - 20:14, 40:5
**struggle** [1] - 17:11
**style** [8] - 12:16, 12:25, 13:5, 13:8, 20:18, 26:5, 41:25, 45:6
**Suarez** [1] - 80:15
**Suarez-Mason** [1] - 80:15
**subject** [3] - 68:24, 69:6, 84:19
**submissions** [2] - 32:19, 91:6
**submit** [1] - 9:10
**submitted** [12] - 4:5, 5:15, 8:11, 19:16, 21:22, 30:13, 31:25, 32:5, 51:11, 55:11, 56:1, 82:14
**subsequent** [1] - 28:18
**subsequently** [1] - 37:2
**substantial** [3] - 6:6, 27:18, 52:7
**substantially** [1] - 32:18
**subterfuge** [1] - 85:19
**sufficient** [5] - 36:6, 38:4, 49:1, 64:6, 64:7
**sufficiently** [4] - 10:22, 12:9, 37:13, 37:14
**suggested** [2] - 50:17, 76:24
**suggesting** [2] - 29:5, 85:22
**suggestion** [1] - 29:5
**suggests** [2] - 14:18, 45:11
**Suite** [1] - 2:4
**summaries** [5] - 38:7, 39:22, 40:17, 42:24, 65:22
**summarized** [1] - 43:24
**summarizing** [1] - 43:3
**summary** [15] - 22:2, 29:14, 39:21, 40:10, 41:2, 41:3, 41:4, 44:9, 45:16, 46:19, 46:20, 47:10, 47:14, 52:1, 76:25
**summation** [1] - 39:8
**superior** [1] - 77:14

**supplement** [2] - 20:25, 90:16
**supplemental** [2] - 19:10, 19:17
**support** [8] - 5:22, 18:9, 23:22, 29:17, 47:24, 83:23, 84:17, 84:24
**supported** [1] - 85:8
**supporting** [1] - 14:14
**supports** [5] - 11:15, 23:19, 29:24, 60:17, 84:2
**suppose** [2] - 90:15, 90:16
**supposed** [3] - 12:22, 32:21, 33:11
**suppression** [2] - 53:2, 84:23
**Supreme** [1] - 68:21
**surrendered** [1] - 63:11
**surrounding** [1] - 82:18
**survived** [3] - 7:7, 23:7, 55:11
**survives** [2] - 23:4, 44:8
**survivors** [3] - 30:21, 32:3, 55:8
**susceptible** [1] - 33:25
**Sweden** [3] - 40:1, 40:3, 40:7
**sweeping** [1] - 61:10
**sworn** [1] - 52:20
**system** [5] - 70:23, 73:11, 81:8, 83:2, 86:16
**systems** [2] - 67:17, 81:4

## T

**table** [1] - 3:13
**tainted** [2] - 34:22, 39:2
**takeover** [1] - 56:19
**talks** [2] - 52:8, 54:11
**target** [1] - 43:19
**tattooing** [2] - 45:8, 45:10
**technically** [1] - 38:21
**tempted** [1] - 15:19
**tending** [3] - 48:10, 48:23, 49:25
**tends** [1] - 49:2
**tens** [1] - 43:5
**term** [3] - 37:9, 88:2, 89:10

**termed** [1] - 29:19
**terms** [10] - 11:15, 19:19, 23:18, 28:8, 30:12, 30:24, 50:25, 83:17, 87:18, 87:22
**terrorism** [1] - 15:2
**terrorist** [3] - 10:3, 28:13, 60:8
**terrorists** [2] - 27:7, 62:20
**testified** [2] - 5:20, 56:1
**testify** [2] - 27:2, 82:20
**testimonial** [1] - 53:17
**testimonies** [1] - 53:9
**testimony** [25] - 4:22, 5:7, 5:13, 5:14, 5:16, 5:22, 8:22, 24:19, 32:4, 39:25, 43:7, 45:8, 52:23, 53:19, 54:9, 54:18, 59:7, 59:9, 60:8, 61:3, 65:20, 65:22, 82:23
**THE** [140] - 1:4, 1:15, 3:5, 3:17, 3:21, 4:4, 4:11, 4:14, 4:18, 5:1, 5:11, 5:17, 5:20, 5:25, 11:13, 11:19, 14:5, 14:9, 15:23, 18:7, 19:4, 19:13, 20:21, 21:10, 21:13, 21:19, 22:14, 23:7, 23:9, 24:23, 25:1, 27:20, 28:8, 28:12, 28:15, 30:11, 30:16, 31:7, 31:10, 31:14, 31:20, 32:4, 32:20, 33:22, 34:4, 34:7, 35:11, 35:20, 35:22, 36:1, 36:9, 36:14, 38:17, 39:7, 40:22, 42:2, 42:19, 43:14, 43:23, 44:4, 44:13, 44:16, 44:19, 45:14, 45:25, 46:5, 46:8, 46:22, 47:2, 48:6, 48:16, 49:24, 50:6, 50:10, 50:13, 50:22, 50:24, 51:5, 51:7, 51:20, 56:8, 57:3, 57:22, 59:6, 59:22, 60:6, 60:12, 60:16, 61:6, 61:18, 61:20, 61:25, 62:2, 62:22, 63:19, 63:25, 64:6, 64:23, 65:5, 66:14, 67:3, 67:13, 69:16, 69:24, 71:23, 72:22, 73:1, 73:4, 73:15, 74:16, 74:25, 75:2,

76:13, 76:18, 76:21, 81:22, 82:13, 83:14, 84:13, 84:16, 87:10, 87:12, 87:20, 88:12, 89:4, 89:17, 89:20, 89:23, 89:25, 90:6, 90:14, 91:8, 91:11, 91:14, 91:17, 91:21, 91:25, 92:3, 92:12, 92:15
**themselves** [3] - 26:22, 62:16, 79:3
**theory** [1] - 84:2
**thereafter** [1] - 91:12
**therefore** [10] - 34:12, 43:4, 56:18, 57:18, 68:1, 68:23, 78:20, 80:18, 81:11, 84:18
**they've** [9] - 17:22, 20:25, 66:9, 71:19, 71:20, 73:19, 82:1, 86:12
**thinking** [2] - 34:12, 67:4
**thorough** [7] - 37:14, 52:19, 55:25, 77:19, 82:7, 83:6, 90:9
**thoroughly** [1] - 90:24
**thousands** [2] - 43:5, 43:6
**threat** [1] - 80:19
**Three** [1] - 36:21
**three** [21] - 7:6, 7:7, 19:21, 20:1, 20:21, 20:23, 22:18, 24:9, 36:22, 37:4, 37:25, 38:5, 47:5, 55:10, 55:11, 61:11, 66:16, 87:16, 89:18
**threshold** [1] - 51:18
**throughout** [1] - 8:8
**title** [1] - 78:12
**today** [12] - 7:8, 7:18, 9:12, 15:20, 19:12, 25:25, 29:3, 30:17, 35:13, 49:18, 75:22, 82:6
**together** [4] - 11:5, 21:8, 22:23, 24:7
**tomorrow** [2] - 90:17, 92:6
**took** [6] - 14:25, 16:11, 52:10, 56:16, 65:10, 74:8
**top** [2] - 27:25, 84:11
**TORRES** [1] - 1:15
**Torres** [2] - 3:4, 3:9
**totally** [1] - 36:12
**tough** [1] - 54:15
**transcript** [8] - 5:15,

32:24, 90:4, 90:5, 90:16, 91:9, 91:20, 91:21
**transcription** [1] - 93:4
**transmit** [1] - 45:21
**transpired** [1] - 84:2
**travesty** [1] - 71:22
**Traxler** [1] - 85:14
**treat** [1] - 5:21
**treatment** [2] - 55:9, 83:19
**treaty** [13] - 7:13, 86:23, 87:1, 87:9, 87:14, 88:3, 88:5, 88:21, 89:5, 89:8, 89:10, 89:14, 92:9
**Trelew** [4] - 27:6, 63:11, 64:1, 70:17
**trial** [39] - 5:13, 5:14, 6:7, 8:15, 9:22, 12:23, 15:10, 15:20, 19:18, 30:4, 30:10, 30:12, 30:13, 31:8, 31:14, 31:21, 31:24, 32:24, 33:4, 33:7, 34:11, 38:14, 42:14, 53:15, 65:17, 66:16, 67:25, 70:1, 71:16, 76:24, 77:3, 77:6, 77:10, 81:19, 82:14, 82:19, 83:6, 83:12, 88:22
**Trial** [6] - 6:10, 16:22, 17:21, 22:8, 41:4, 48:1
**trials** [2] - 65:18, 67:2
**tribunal** [8] - 42:3, 42:6, 57:25, 65:11, 67:12, 67:15, 74:7, 82:23
**tribunal's** [1] - 15:14
**tricky** [1] - 47:17
**tried** [14] - 9:18, 25:11, 28:6, 32:22, 43:8, 53:7, 56:19, 57:8, 66:17, 66:25, 67:15, 67:24, 68:4, 77:18
**trier** [1] - 82:21
**trigger** [1] - 91:22
**trouble** [1] - 79:3
**true** [9] - 7:22, 8:4, 8:12, 14:20, 30:11, 38:14, 59:24, 82:5, 82:11
**truth** [5] - 6:8, 25:23, 49:2, 69:1, 69:3
**try** [8] - 23:3, 23:13, 30:5, 31:1, 31:4, 55:20, 71:16, 76:15

**trying** [11] - 9:9, 21:11, 25:17, 38:11, 38:18, 47:19, 50:5, 58:2, 62:14, 74:22
**turn** [6] - 3:25, 6:2, 15:17, 24:17, 46:15, 51:21
**turned** [3] - 53:14, 57:8, 57:12
**turning** [2] - 4:18, 9:13
**two** [41] - 4:21, 12:20, 16:8, 18:12, 18:14, 18:18, 24:17, 27:12, 27:13, 29:1, 29:8, 29:20, 30:2, 30:3, 32:10, 33:15, 36:18, 38:13, 39:3, 47:5, 60:2, 60:11, 62:24, 63:3, 65:25, 68:13, 68:15, 70:25, 72:8, 74:22, 77:9, 77:13, 78:5, 79:16, 84:21, 86:24, 87:18, 87:22, 90:25
**two-and-a-half** [1] - 90:25
**type** [2] - 60:14, 84:17
**types** [1] - 29:1

## U

**U.S** [2] - 39:20, 42:14
**ultimate** [3] - 51:9, 59:5, 60:23
**ultimately** [7] - 11:24, 30:1, 62:6, 72:1, 72:11, 81:19, 83:10
**unable** [1] - 90:13
**unaddressed** [1] - 91:2
**unanimously** [1] - 77:24
**unarmed** [5] - 6:12, 10:18, 10:20, 11:24, 79:19
**unavailable** [1] - 44:11
**unconstitutional** [1] - 69:23
**unconstitutionality** [1] - 69:7
**under** [13] - 4:7, 4:9, 5:8, 9:24, 10:6, 16:18, 24:10, 35:17, 58:6, 59:19, 67:24, 79:9, 87:8
**underlies** [1] - 62:6
**underlying** [2] - 8:16, 44:10
**undermine** [1] - 58:3

**undermines** [1] - 39:4
**understandably** [1] - 42:13
**understood** [2] - 24:4, 92:1
**undertaken** [1] - 92:5
**undertook** [1] - 35:16
**underwhelmed** [1] - 54:10
**unfolding** [1] - 14:16
**unique** [1] - 89:7
**UNITED** [3] - 1:1, 1:8, 1:15
**united** [1] - 2:10
**United** [12] - 1:18, 1:20, 1:23, 3:3, 3:12, 7:13, 73:3, 73:4, 75:4, 85:11, 88:1, 93:8
**universe** [2] - 28:2, 28:4
**unlawful** [1] - 28:17
**unlike** [2] - 6:6, 18:2
**unobliterated** [1] - 75:21
**unsworn** [2] - 20:6, 22:5
**unusual** [3] - 9:14, 9:15, 9:21
**up** [21] - 7:22, 14:6, 15:7, 25:16, 28:19, 38:2, 38:10, 48:3, 48:6, 55:5, 59:16, 59:25, 60:9, 64:8, 64:19, 77:11, 78:1, 78:2, 79:14, 83:15, 90:7
**uprising** [13] - 18:22, 19:1, 59:3, 60:7, 60:13, 61:4, 61:13, 63:13, 63:14, 63:18, 79:23, 80:18, 84:24
**urge** [2] - 27:14, 48:3
**urging** [1] - 27:2
**useful** [1] - 6:15
**utterly** [1] - 13:11

## V

**valid** [2] - 7:13, 88:23
**value** [2] - 34:8, 58:9
**vein** [1] - 20:9
**verifies** [1] - 23:15
**version** [4] - 8:23, 28:19, 29:22, 47:24
**versions** [3] - 29:20, 30:2, 30:4
**victim** [7] - 13:9, 17:9, 41:10, 43:15, 44:24, 45:7

**Victim** [1] - 17:13
**victims** [12] - 7:3, 7:6, 12:24, 13:6, 13:13, 20:19, 21:4, 23:4, 23:24, 30:25, 32:2, 41:20
**victims'** [2] - 20:15, 25:14
**view** [6] - 29:24, 30:7, 35:11, 73:19, 83:22, 85:21
**violation** [1] - 58:2
**violations** [1] - 69:4
**violence** [3] - 14:4, 14:12, 14:17
**violent** [3] - 14:15, 16:20, 41:24
**virtually** [1] - 80:4
**Vo** [1] - 49:17
**voluminous** [2] - 43:5, 50:21

## W

**wait** [1] - 92:3
**waited** [1] - 70:19
**wall** [4] - 25:16, 59:17, 59:25, 64:8
**Wall** [1] - 70:10
**wants** [4] - 8:15, 8:16, 19:10, 86:10
**war** [3] - 10:17, 70:15
**War** [2] - 10:17, 80:16
**warrant** [2] - 37:14, 53:20
**wash** [1] - 73:17
**washed** [1] - 84:6
**washing** [1] - 37:10
**washington** [2] - 1:21, 1:25
**weapon** [4] - 23:20, 25:21, 55:2, 55:21
**weeks** [1] - 80:6
**weighing** [1] - 38:15
**weighs** [1] - 9:1
**weight** [1] - 76:5
**weighty** [1] - 27:18
**Wendell** [1] - 15:18
**Westlaw** [1] - 88:20
**whatsoever** [1] - 25:24
**whereas** [1] - 89:20
**white** [3] - 37:10, 73:17, 84:6
**white-wash** [1] - 73:17
**white-washed** [1] - 84:6
**white-washing** [1] - 37:10
**whole** [4] - 34:1,

53:11, 58:18, 61:23
**widespread** [1] - 88:17
**Wigen** [3] - 14:22, 49:18, 50:17
**Wilkes** [1] - 13:24
**wish** [2] - 4:1, 4:20
**wishes** [1] - 6:1
**witness** [12] - 13:9, 31:21, 37:16, 39:25, 40:1, 40:8, 40:18, 46:21, 46:23, 52:20, 52:22, 66:21
**witness'** [1] - 40:4
**witnesses** [21] - 4:1, 4:20, 4:22, 4:24, 5:17, 6:1, 26:4, 26:22, 27:2, 30:17, 30:24, 31:5, 31:23, 32:9, 38:7, 48:1, 51:14, 58:15, 60:24, 65:22
**witnesses'** [2] - 5:7, 24:19
**woke** [1] - 7:22
**wolf** [1] - 36:20
**wondering** [1] - 67:5
**word** [1] - 60:19
**words** [29] - 7:22, 11:17, 13:4, 17:8, 18:11, 25:8, 26:17, 28:10, 35:14, 39:8, 41:22, 45:1, 46:21, 47:25, 59:22, 60:16, 61:9, 61:12, 62:5, 67:14, 70:2, 74:17, 74:20, 78:17, 82:1, 84:1, 88:5, 90:8, 91:6
**World** [1] - 10:17
**worrying** [1] - 76:12
**worth** [1] - 7:20
**wounded** [1] - 24:9
**wounds** [4] - 20:17, 45:11, 52:23, 53:19
**writing** [1] - 77:5
**written** [1] - 32:8
**wrote** [1] - 85:14
**Wu** [10] - 3:12, 51:23, 54:4, 57:16, 58:8, 58:21, 59:2, 59:7, 60:11, 67:10
**WU** [93] - 1:17, 3:11, 4:3, 4:6, 4:13, 4:16, 5:3, 6:4, 11:17, 11:20, 14:8, 14:10, 16:2, 18:17, 19:8, 19:24, 21:2, 21:12, 21:18, 21:21, 22:19, 23:8, 23:10, 24:25,

25:2, 27:25, 28:11,
28:14, 28:25, 30:15,
30:19, 31:9, 31:13,
31:17, 31:23, 32:6,
33:5, 34:3, 34:6,
35:10, 35:19, 35:21,
35:25, 36:8, 36:10,
36:15, 39:6, 39:17,
40:25, 42:5, 42:23,
43:15, 43:24, 44:6,
44:15, 44:17, 44:21,
45:15, 45:18, 46:1,
46:14, 46:24, 47:4,
48:15, 48:19, 50:2,
50:8, 50:12, 50:16,
50:23, 51:1, 51:6,
51:13, 69:20, 76:15,
76:22, 82:5, 82:25,
84:10, 84:15, 84:20,
86:6, 87:11, 87:13,
87:21, 88:15, 89:9,
89:19, 89:22, 89:24,
90:23, 92:1, 92:18
**Wu's** [1] - 54:10

## Y

**years** [13] - 19:23,
20:25, 57:9, 58:2,
67:16, 70:19, 71:15,
72:8, 72:12, 73:18,
73:22, 83:20
**York** [3] - 1:21, 1:24,
14:23
**yourself** [1] - 8:19

## Z

**Zar** [1] - 6:25