**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-23851-MC-EGT**

IN THE MATTER OF
THE EXTRADITION OF
ROBERT GUILLERMO BRAVO.

_____/

## POST-HEARING MEMORANDUM IN SUPPORT OF EXTRADITION

Argentina's extradition request has established probable cause to believe that Roberto Guillermo Bravo and other Argentine military officers murdered or attempted to murder nineteen unarmed prisoners.   Indeed, Bravo does not even address the existence of probable cause in his post-hearing submission.   Bravo's insistence that the political offense exception applies depends on this Court finding that a very different version of the facts is true—that the prisoners executed a violent escape attempt, and that Bravo acted in self-defense.   This limited extradition proceeding is not the appropriate forum to resolve this factual dispute.   Rather, that task belongs to a trial court in Argentina.   Because Bravo has neither obliterated Argentina's probable cause showing nor demonstrated that the political offense exception applies, this Court should certify Argentina's request for extradition.

I.     **Bravo Has Failed To Establish that Killing Unarmed Prisoners Was "Incidental to" Any Political Uprising in Argentina.**

Bravo's argument for applying the political offense exception suffers from several fatal legal and factual missteps.   As an initial matter, Bravo reiterates that he needs only present evidence that "tends to show" the political character of his offense (DE38:6).   To the extent that he believes this burden is less than a preponderance of the evidence, that view is incompatible with the notion that the political offense exception is an affirmative defense that must be proven by its proponent.   *See Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063.

But in any event, as discussed in more detail below, Bravo cannot avail himself of the political offense exception under any burden standard.   Argentina has presented ample evidence that Bravo engaged in the extrajudicial killing of unarmed prisoners, and such actions cannot constitute a political offense.[1]

Bravo persists in another fundamental legal error.   He contends that the murder of unarmed and defenseless prisoners falls within the political offense exception if the victims at one time were enemy combatants or committed violent acts prior to their capture.   *See* (Hr'g Tr.:60 (asserting that, even if he prisoners were unarmed and not attempting to escape, "I don't think it would require a different result . . . [b]ecause there's still an uprising, the Monteneros are still a terrorist group"); DE38:4 (the violent "history of these terrorists" satisfies the political offense exception's requirement that Bravo's offenses be "incidental to" the larger civil conflict)).

As Bravo conceded, no contemporary or controlling case law supports this view:

Q: Do you have any authority that so long as an act arises in an environment of political uprising, that completely insulates any type of conduct like that?

[Bravo]: No.

Q: In other words, do you have any law that supports that?

[Bravo]: No, I don't.

(Hr'g Tr.:60).

Bravo's post-hearing memorandum does not identify a single decision supporting his view. On the contrary, a fugitive "cannot avail himself of the [political offense] defense merely because the alleged crimes occurred at the same time as a political disturbance."   *Extradition of Artukovic*,

---

[1] In light of that evidence, Bravo's claim that the government has failed to show the inapplicability of the political offense exception falls flat, even under the burden shifting framework he proposes.

628 F. Supp. 1370, 1376 (C.D. Cal. 1986), *overruled on other grounds by Lopez–Smith v. Hood*, 121 F.3d 1322 (9th Cir. 1997).   Particularly instructive are recent cases arising out of ethnic and sectarian conflicts in the Balkans.   In those decisions, fugitives sought refuge in the political offense exception and contended that the prisoners that they killed were once hostile armed combatants.   In other words, although disarmed and imprisoned, their victims had the capacity for violence and even may have committed heinous acts of violence themselves.   Notwithstanding those facts, federal courts reaffirmed that killing unarmed prisoners is not a political offense.   *See In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 227 (N.D.N.Y. 2013) (the killing of disarmed combatants fell outside the scope of the political offense exception); *In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420, at \*18 (W.D. Va. Sept. 16, 2013) (rejecting a similar argument for applying the political offense exception "[e]ven if the prisoners . . . were unarmed soldiers, as Nezirovic claims"), *aff'd* 779 F.3d 233; *Arambasic v. Ashcroft*, 403 F. Supp. 2d 951, 963 (D.S.D. 2005) (same); *Artukovic*, 628 F. Supp. at 1376 (same).

Argentina has furnished ample evidence that Bravo and his fellow soldiers killed unarmed detainees.   Regardless of what those detainees did before coming into Bravo's custody, the political offense exception does not immunize him for their murder.

Next, Bravo maintains that the account presented in Argentina's extradition request is "factually and historically wrong" because one of his prisoners "had taken a weapon from a guard" and initiated an escape attempt (DE38:4-5).

To begin with, this story contradicts but does not obliterate the facts found by Argentina's courts and presented in its present extradition request.   This Court should not consider contradictory evidence, which would require this Court to make credibility findings and draw

3

definitive factual conclusions about Bravo's guilt or innocence—matters that lie outside the scope of any extradition hearing. *See* (Hr'g Tr.:62-63 (observing that there is "a factual dispute" and, to find in Bravo's favor, the Court effectively would be finding that "you can't call this murder")). Bravo cannot use the political offense exception as an end run around the rule of non-contradiction. "While an extraditee is allowed to present evidence to clarify or explain the explanatory evidence, contradictory evidence against the requesting country's case is inadmissible." *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at \*9 (S.D. Fla. Aug. 31, 2017).

This rule applies with equal force when evaluating the political offense exception. A fugitive may present explanatory evidence—for instance, historical information about the sociopolitical context of the alleged offenses—but he cannot dispute that his offenses occurred in the manner described in the request. *See Eain v. Wilkes*, 641 F.2d 504, 516 (7th Cir. 1981) ("In considering the presence of a political offense, the court determines whether the crime charged stemmed from political violence. To make that determination, *the magistrate need look only to the facts supporting the extradition request . . . .*" (emphasis added)); *Karadzole v. Artukovic*, 247 F.2d 198, 202 (9th Cir. 1957) ("The sole question therefore before the District Court was whether on the face of the Complaint and the attached Indictment, together with the facts of which the court could take judicial notice, it could clearly be said that the offenses charged were of a political character."); *Ahmad v. Wigen*, 726 F. Supp. 389, 409 (E.D.N.Y. 1989) ("Petitioner's alleged attack, if it took place in the manner charged, must be characterized as a random act of murderous terrorism, rather than a protected political offense."); *Mujagic*, 990 F. Supp. 2d at 227 (same).

When it comes to the shootings that took place on August 22, 1972, Bravo may not simply present an alternative version of events, requiring this Court to choose between competing factual

4

narratives.    Rather, Bravo's only recourse would be to present evidence that completely obliterates Argentina's probable cause showing.    Far from obliterating the Argentinian courts' factual findings, however, Bravo's experts disclaimed any knowledge of whether the prisoners' purported escape attempt occurred.    *See* (DE30:38 (Perdue testimony: "It depends on whether you believe that somebody tried to disarm one of the guards or not. . . . The only difference that I can discern is whether there was a . . . fusilado . . . [o]r a response to a disarming one of the guards and trying to foster another escape. . . . *I have no way to know whether that's the truth or not, whatsoever.*" (emphasis added)); DE30:65 (Solari testimony: "To say whether or not they were murdered, that's a fact-finding investigation.   I cannot say.")). [2]    Bravo also relies upon his military acquittal to establish the existence of an escape attempt, but that proceeding was so partial and deficient that the judge who conducted it, Jorge Enrique Bautista, was charged for his actions covering up the massacre.    *See* DE 1-2, at EX-BRAVO-0189 (concluding that Bautista's investigation was "merely formal" and "based on the premise that an attempted escape was actually made and failed to perform a serious and comprehensive analysis of the events"); EX-BRAVO-0211 to EX-BRAVO-0214 (detailing Bautista's omissions including his "failure to seize the clothes of the deceased and to have them examined by experts . . . as well as the failure to seize the weapons used"); EX-BRAVO-0232 (order vacating Bautista's acquittal).    The only remaining evidence is his experts' generalized testimony that Monteneros were trained to escape and had escaped from Rawson prison before being recaptured, which misses the mark.    Testimony about training cannot establish that the prisoners actually were trying to escape when Bravo and his co-

---

[2] These page numbers refer to the pagination of DE30, which differs by one from the internal pagination of the 2010 extradition hearing transcript.

conspirators began shooting them on August 22, 1972.[3]

Finally, Bravo invokes the experts' statements that these events were "incidental to" the hostilities in Argentina, but their colloquial use of the words "incident" or "incidental" is irrelevant.   Whether killing unarmed prisoners satisfied the second prong of the political offense exception—i.e., whether his actions meet the threshold established by case law—is a legal question outside of the province of experts.   *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (allowing experts to "testify as to . . . an ultimate issue of fact" but observing that a "witness . . . may not testify to the legal implications of conduct"); *United States v. Long*, 300 F. App'x 804, 814 (11th Cir. 2008) ("An expert witness may not testify as to his opinion regarding ultimate legal conclusions.").   To the extent that his experts opined that killing unarmed prisoners was "incidental to" the larger conflict regardless of whether an escape attempt or armed hostilities were occurring, this Court should reject that unqualified legal opinion because it is incompatible with the relevant case law.

In sum, the extradition request presents substantial evidence that Bravo and a group of military officers roused their defenseless prisoners in the middle of the night to massacre them. Under that account of the facts, his actions could not be incidental to any hostilities occurring in the country, and they do not qualify as political offenses.

---

[3] Nor can it establish which, if any, prisoners participated in the alleged attempt.   As the government pointed out during the hearing, numerous victims were shot either execution-style (Bonet, Sabelli, Santucho, Ulla) or in their cells after the initial burst of machine-gun fire (Camps, Haidar, Kohon, and Delfino).   *See* (Hr'g Tr.:12-13, 44-45).   Even if one prisoner (Pujadas) attempted to escape, his actions could not justify killing numerous other unarmed prisoners after the fact.   Thus, even if the Court were to engage in factfinding (which it should not), and then further decide to override the Argentinian courts and determine the killing of Pujadas was an act of justifiable self-defense (which again it should not), this Court should still extradite Bravo for the murders and attempted murders of every other prisoner.

II.     **This Court Should Make Its Own Certification Decision Based on the Information Presented in Argentina's Current Request.**

Bravo next contends that Judge Dubé would have decided this case the same way in 2010 even if he had known that Argentina's courts would convict Bravo's co-conspirators in 2012. Bravo also faults Argentina for not informing Judge Dubé of information that it knew or could have included in the earlier extradition request.

Put simply, that is not the proper inquiry for this Court to undertake. This Court should conduct its own assessment of all of the information presented in this extradition request. Thanks to the Argentinian trial and appellate court opinions, this Court has more comprehensive and detailed summaries of the evidence than were available to Judge Dubé in 2010. They provide extensive support for the factual conclusion that Bravo and his fellow officers massacred the Trelew prisoners, and that there was no escape attempt afoot that could justify their atrocities.

Because res judicata and Double Jeopardy do not bar subsequent extradition requests, there is no limitation on the types or age of evidence that the requesting state may present in a second extradition request. No legal principle or case law implies that the requesting state is barred from submitting a request with additional information that it could have (but did not) include the first time around. This proceeding is not akin to a Fed. R. Crim. P. 33 or a Fed. R. Civ. P. 60(b) motion for a new trial, nor is it an appeal from Judge Dubé's original ruling that calls upon this Court to apply a deferential standard of review. Information that may have been available in the 2010 proceeding, but which Argentina chose not to present, is still valuable evidence that can inform this Court as it makes its own probable cause determination.

This Court has information that Judge Dubé either did not have or which he overlooked. The government's extradition memorandum lays out the present request's additional information

and why this Court should not adopt Judge Dubé's conclusions, some of which he based on incomplete information (DE27:18-40).  To offer one example, Judge Dubé examined only one statement from each of the surviving victims Haidar, Camps, and Berger and expressed skepticism about their credibility because of the possibility that they coordinated those statements.  Judge Dubé believed that the victims provided their statements several weeks after the shooting "in concert with one another and with their defense counsels" for purposes of a press conference (DE27-1:12).  Argentina's request now reveals that Judge Dubé had an incomplete and inaccurate view of the context of the survivors' statements.  Far from having just one statement from each witness, the Argentinian courts had access to and considered numerous statements from each individual and found them credible.  Notably, Camps and Haidar gave separate, consistent statements within one or two days of the shooting, while in a naval hospital isolated from one another and "held incommunicado."  *See* DE 1-2, at EX-BRAVO-0900.  The Argentine court opinions also summarize favorable forensic evidence, including specific accounts of how some victims' fatal shots came from an extremely close range.  *Id.* at EX-BRAVO-0197 to EX-BRAVO-0198; EX-BRAVO-0828 to EX-BRAVO-0830; EX-BRAVO-0840; EX-BRAVO-0880.  In contrast, the much briefer 2008 charging document refers to the evidence without any elaboration or detail.  *See id.* at EX-BRAVO-0645 (alluding to observations of "the lifeless bodies" of the victims without further elaboration).

Based on all of the information presented in Argentina's current request, this Court has ample basis to conclude that there was probable cause and to certify the request for extradition.

### III.    The Governing Treaty Does Not Permit Denial of Certification Based on Bravo's Allegations of Politically Motivated Prosecution.

Finally, Bravo reiterates his contention that "vengeance rather than justice" prompted his

prosecution in Argentina (DE38:8).

Claims of political motivation or unfairness in the requesting state's courts are not cognizable at this stage of extradition. The Treaty provides for a different mechanism to protect individuals from that possibility: discretionary determinations by the Secretary of State. The Treaty specifies that "extradition shall not be granted if the competent authority of the Requested State [i.e., the United States in this case] determines that the request was politically motivated." Treaty, Art. 4, ¶ 3. The term "competent authority" refers to "the appropriate authorities of [the United States] executive branch." Treaty, Art. 20.

Furthermore, the rule of non-inquiry precludes this Court from "assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request." *Leiva v. Warden*, 928 F.3d 1281, 1295 (11th Cir. 2019) ("We have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch."). This Court is "bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911).

## Conclusion

The United States respectfully requests that this Court certify Argentina's request for Bravo's extradition.

9

Respectfully submitted,

Ariana Fajardo Orshan
United States Attorney


By:    /s *Jason Wu*            
         JASON WU
         Assistant United States Attorney
         Court ID No. A5502299
         99 N.E. 4th Street
         Miami, FL 33132
         (305) 961-9226
         Jason.Wu@usdoj.gov


         */s/ Christopher J. Smith*       
         CHRISTOPHER J. SMITH
         Associate Director
         Office of International Affairs
         Criminal Division
         U.S. Department of Justice
         Court ID No. A5502264
         1301 New York Avenue NW
         Washington, D.C. 20530
         Tel: (202) 532-4254
         Fax: (202) 514-0080


         */s/ Philip A. Mirrer-Singer*     
         PHILIP A. MIRRER-SINGER
         Trial Attorney
         Office of International Affairs
         Criminal Division
         U.S. Department of Justice
         Court ID No. A5502625
         1301 New York Avenue NW
         Washington, D.C. 20530
         Tel: (202) 514-3891
         Fax: (202) 514-0080

## **Certificate of Service**

I hereby certify that on April 24, 2020, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF.

/s *Jason Wu*
Jason Wu
Assistant United States Attorney