**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 19-23851-MC-TORRES

IN THE MATTER OF THE
EXTRADITION OF
ROBERTO GUILLERMO BRAVO
_____/

**ORDER ON THE GOVERNMENT'S MOTION**
**TO EXTRADITE ROBERTO GUILLERMO BRAVO TO ARGENTINA**

This matter is before the Court on the United States of America's (the "Government") motion [D.E. 27] for an order certifying the extradition of Roberto Guillermo Bravo ("Mr. Bravo") on behalf of Argentina for sixteen counts of homicide and three counts of attempted aggravated homicide committed during a turbulent period in Argentine history in 1972. Mr. Bravo timely responded to the Government's motion [D.E. 34] to which the parties filed their supplemental memoranda. [D.E. 38, 40]. The Government's motion is thus ripe for disposition.

The record in this extradition proceeding is extensive. The Court has carefully reviewed the entire record and studied the many authorities cited by the parties as well as those identified by the Court. The record includes evidence presented at multiple extradition hearings, along with multiple supplemental filings from the parties. Based on that review, the Government's motion is once again **DENIED.** Mr. Bravo is deemed non-extraditable for the alleged offenses, pursuant to the treaty (the "Treaty") between the United States of America and

1

Argentina.  The original Petition in this case was Denied by Judge Robert Dubé after extensive proceedings were conducted before him in 2010.  The Government had the right to present this second petition based on additional evidence presented in this new record, which entitles Argentina to another review of the entire record. Having conducted that review and given this tragic case a great deal of thought, we find that there is now probable cause in this record to sustain a petition for extradition, contrary to the finding Judge Dubé made in his 2010 Order.  But, regrettably, the Court must still Deny the Petition based on the political offense exception in the Treaty with Argentina that confers Mr. Bravo with a very unique defense to extradition.  Judge Dubé reached that same conclusion in 2010 and we are not convinced that this finding was wrong.  The issue is a very close and difficult one.  But putting aside our sympathy for the victims of the tragedy and the strong case made for extradition given the circumstances, Mr. Bravo has shown that his defense to extradition under the terms of the treaty can be satisfied in this case.

Whether the victims' allegations against him are valid or not will have to be assessed in a different forum, where Mr. Bravo's conscience will be called to account.  Indeed, even before that he has been successfully sued in our district for violations of human rights.  And nothing technically stops the government from also prosecuting him criminally for those same offenses if it could prove them with admissible evidence under our rules of evidence and due process.  But extradition is not viable under the political offense exception to the treaty with Argentina.

## I.   BACKGROUND

### A.   *The Alleged Crimes*

In the 1970s, there were at least seventeen armed insurgent groups operating in Argentina with the purpose of overthrowing the military government in power. On August 15, 1972, twenty-five prisoners affiliated with groups opposed to Argentina's military government escaped from the Rawson Penitentiary ("Rawson") located in Chubut, Argentina. Nineteen of those prisoners were recaptured and taken to the Almirante Zar Naval Air Base in Trelew, Argentina (the "Base"). The Argentine Navy controlled the Base where the prisoners were held. Mr. Bravo, who was also present at the Base, was a lieutenant in Argentina's Naval Infantry.

The Government alleges that Mr. Bravo subjected the prisoners to harsh punishments during their detention. One survivor, Ricardo Rene, claimed that Mr. Bravo was the officer who treated the prisoners the worst. Mr. Bravo purportedly made prisoners lie on the floor completely naked for long periods of time and even ordered at least one prisoner to sweep a corridor with no clothes. A second survivor, Maria Antonia Berger ("Ms. Berger"), recalled Mr. Bravo holding a loaded pistol to the head of one of the prisoners while threatening to kill another prisoner if she refused to lie with her back on the floor. A third survivor, Alberto Camps ("Mr. Camps"), once overheard Mr. Bravo telling a subordinate that instead of feeding the prisoners, the officers should kill them.

On August 22, 1972, at approximately 3:30 a.m. and when all nineteen prisoners were asleep in their cells, the Government claims that Mr. Bravo and four other naval officers massacred almost all of the prisoners at the Base. The officers arrived at the prisoners' cells carrying machine guns and .45 caliber pistols. The officers then purportedly ordered the prisoners to stand in a line outside their cells with their heads down and, moments later, shot the prisoners at close range. Many of the prisoners were killed instantly from this initial round of gunfire and the naval officers proceeded to execute all remaining prisoners, except for three survivors.

Mr. Bravo's version of these events is drastically different. He claims that the prisoners attempted to escape the prison during an inspection and that one of the prisoners attacked a military officer, took his weapon, and fired at the guards. Other prisoners then began making advances and the naval officers opened fire to defend themselves, to repel the attack, and to prevent an escape. Mr. Bravo admits that thirteen prisoners died on the scene (three more died later in the hospital). Three prisoners survived. In sum, but he insists that the officers acted in self-defense and based on the exigencies of the situation they were facing.

Following these events, a military investigation took place and a court found that there was no convincing evidence to justify any charges against the naval officers because they prevented the escape of several prisoners. The military's report stated that the survivors' allegations were disproved and that the officers

4

had acted accordingly.  The report specifically addressed the role of Mr. Bravo and his participation in the uprising:

> As far as Lieutenant [Bravo], I agree with what was stated in pgs. 406/407 by the Chairman of the Joint Chiefs of Staff who had determined that the previously named officer should not be sanctioned. I should add that in my opinion [Bravo] acted appropriately when faced with a very difficult circumstance in which he had to fulfill his task, as the leader of the guard responsible for guarding the fanatically dangerous detainees.  It is evident that through his actions he not only saved the life of an officer, but also prevented the escape and the almost certain occurrence of other events with unforeseeable consequences. Simple routine compliance with the instructions he had received, to open fire immediately, would without a doubt have caused the death of Captain [Sosa], given the way in which the events took place.

*See* Report of the General Auditor of the Armed Forces, at 5.  The report then concluded that "[g]iven everything that was stated, and based on the facts and laws . . . I believe it is appropriate to resolve this case with a definitive acquittal[.]"  *Id.*

The military's acquittal was later transmitted to the President of Argentina for his review.  He dismissed the charges under the Code of Military Justice.  On May 27, 1973, Argentina passed Amnesty law 20.508, which immunized what transpired before May 25, 1973.  Mr. Bravo takes the position that this law has never been formally repealed or abrogated and that, even if the Government could overcome the other hurdles in seeking his extradition, this law gives him immunity against the alleged crimes.

### B.    *The Survivors' Allegations*

The three survivors of the alleged massacre, who are now all deceased, have recounted the events of that fateful day.  Mr. Camps recalled Mr. Bravo and Lieutenant Commander Luis Emilio Sosa ("Mr. Sosa") waking him around 3:00 a.m. and shouting insults at the prisoners.  Mr. Camps stated that, contrary to prior practice, all the cell doors were opened at the same time rather than each prisoner being taken out one at a time.  The prisoners were then ordered to line up in the hallway and, moments later, Mr. Camps recalled a burst of gunfire.  His initial thought was that this was a mock shooting with the officers using blank cartridges.  But when Mr. Camps saw a fellow prisoner fall to the ground, he realized that the officers were using live ammunition.   Mr. Camps hurled himself back into his cell, as did his cellmate, Alberto Delfino ("Mr. Delfino").  Mr. Camps then heard more gunfire and, a few moments later, Mr. Bravo approached the cell door.  Mr. Bravo held a pistol in his right hand and ordered Mr. Delfino to stand up.  Mr. Bravo demanded to know whether Mr. Camps was going to answer certain questions that were posed to him in an earlier interrogation.  When Mr. Camps refused to do so, Mr. Bravo shot him in the stomach.  Mr. Bravo subsequently trained his gun on Mr. Delfino and fatally shot him at close range.

Another prisoner, Ricardo Rene Haidar ("Mr. Haidar"), recalled similar events.  Mr. Haidar stated that Mr. Bravo and Mr. Sosa woke him at approximately 3:30 a.m. on the morning of the massacre.  Mr. Haider recalled that the officers

ordered the prisoners to fold their mattresses and blankets, to line up in the hallway, and to look down.  At the end of the corridor, Mr. Haidar could see two or three other officers with machine guns.  Mr. Bravo and Mr. Sosa walked up and down the line of prisoners with threatening comments and the prisoners remained silent with no movements.  Then, suddenly, Mr. Haidar recalled a burst of machine fire.  Mr. Haidar retreated into his cell with another prisoner, Alfredo Kohon ("Mr. Kohon"), and crouched below a slab of concrete that functioned as a bed.  After the initial round of gunfire, he heard Mr. Bravo state that "this one is still alive," and then there was an isolated shot.  This repeated several times.  Mr. Bravo then entered Mr. Haidar's cell with a gun in his hand and demanded to know whether Mr. Haidar and Mr. Kohn were going to give him certain information.  When both prisoners answered affirmatively, Mr. Bravo left.  Another officer later appeared and shot Mr. Haidar before proceeding to fatally shoot Mr. Kohon.  The shooting was followed with a period of silence and a statement from Mr. Bravo that the prisoners "tried to escape," and that they "tried to grab the Captain's gun."  [D.E. 27 at 5].  Mr. Haidar testified that Mr. Bravo's statement was completely false, and that the prisoners neither attacked the officers nor attempted to escape.

Likewise, Ms. Berger recalled waking up at 3:30 a.m. with the shouting of Mr. Bravo and the other naval officers.  She claimed that the officers threated the prisoners, warned them that they "were going to be taught a lesson about meddling with the Navy," and that the prisoners would "provide information that night

whether [they] liked it or not." *Id*. The prisoners were ordered to form a line outside their cells and look down at the floor. Similar to Mr. Camps, Ms. Berger reported that this was the first time that the prisoners were given such an order. Suddenly, the officers began firing their weapons at the prisoners and Ms. Berger was struck several times. Ms. Berger then looked around and saw another female prisoner, Maria Angelica Sabelli ("Ms. Sabelli"), and her breathing became more labored before she stopped moving entirely. Ms. Berger also saw a second female prisoner, Ana Maria Villareal de Santucho, lying motionless. Ms. Berger heard Mr. Bravo scream at Mr. Camps and Mr. Delfino to convey certain information and, when they refused, she heard more gunfire. Later, Ms. Berger overheard the officers beginning to fabricate a story to justify the murders.

The testimony of Navy corporal Carlos Amadeo Marandino ("Mr. Marandino") is also consistent with testimony of the survivors. Mr. Marandino was an officer on guard duty on the morning of the massacre and he testified that everything was normal during the first three hours and fifteen minutes of his midnight shift. The prisoners were asleep and there was no trouble at the Base. However, at 3:15 a.m., Mr. Bravo and other officers arrived at the prison cells smelling of alcohol and carrying firearms. They ordered Mr. Marandino to open the cell doors. After Mr. Marandino complied, the officers instructed him to leave. Mr. Marandino testified that he retreated behind a screen that separated the guard area from the cells. From behind the screen, Mr. Marandino recalled a lot of shouting, the singing of the

national anthem, someone shouting "they are trying to escape," a burst of gunfire, a pause, and then more shooting. *Id*. at 6. When Mr. Marandino went to see what was unfolding, the naval officers gave him a pistol and told him to check the bodies. Mr. Marandino subsequently entered the corridor and saw lots of blood with bodies piled on top of each other.

Mr. Marandino further testified that, on the day of the massacre, the prisoners were not attempting to escape and that a ranking officer instructed him to corroborate the fabricated version of the events that took place. This included the false allegation that the prisoners attempted to escape. The Argentine courts later found that the military investigation that followed the massacre was fatally flawed and that Mr. Marandino minimized his culpability as a participant in the shooting.

### C.   *Argentina's Original Investigation*

This version of events is starkly different from the investigation originally conducted by the Argentine government after the shooting occurred. The results of that investigation are addressed in more detail in the analysis section of this Order with respect to the political offense exception to extradition. But, in short, an investigative judge conducted a review of the evidence surrounding the shooting shortly after it occurred in 1972 and concluded that rebel insurgents, who had been arrested after trying to escape a different prison and hijacking a plane in the process, were being held at the Naval base where Mr. Bravo commanded his unit. The investigation confirmed Mr. Bravo's and other officers' account that the

prisoners tried once again to escape in the middle of the night, seizing an officer's weapon, and trying to shoot that officer.  Mr. Bravo and his men then returned fire at which point most of the insurgents were killed.  Some were only injured, and they were provided medical care.  Indeed, it is undisputed that some of the prisoners survived the shooting (as their version of what transpired is summarized above).  The investigation discounted the survivors' account at the time and concluded that the officers' actions were justifiable, or at least not criminal, based upon the actions initiated by the prisoners.  The Argentine government of the day adopted that investigative report and declined to prosecute Mr. Bravo or his men because of their lawful use of force.

Years later, however, after the government of Argentina was no longer in the military's control, renewed investigations and court proceedings reached very different conclusions that lie at the heart of the original and present extradition petition.

### D.    *Argentina's First Extradition Petition*

On February 1, 2008, Argentina obtained a warrant for Mr. Bravo's arrest and several of his alleged accomplices.  Mr. Bravo had moved to the United States by that time so the Argentine government submitted to the State Department a request for Mr. Bravo's extradition.   The Government, acting on behalf of Argentina, filed a petition and Mr. Bravo filed a response indicating his opposition. On November 2, 2010, Judge Dubé denied the Government's petition and declined

to certify to the Secretary of State that Mr. Bravo was extraditable.  [D.E. 27-1]. Since that unfavorable decision, the Government claims that there have been significant new developments that now require Mr. Bravo's extradition.

On October 15, 2010, the Federal Oral Criminal Court of Comodoro Rivadavia (the "Trial Court") issued a written decision finding three of Mr. Bravo's alleged accomplices – Luis Emilio Sosa ("Mr. Sosa"), Emilio Jorge Del Real ("Mr. Del Real"), and Mr. Marandino – guilty of sixteen counts of aggravated murder and three counts of aggravated attempted murder.  The Trial Court sentenced all three men to life imprisonment and made several key findings with respect to Mr. Bravo: (1) that Mr. Bravo was among the naval officers who arrived at the prisoners' cells on the morning of August 22, 1972, (2) that Mr. Bravo participated in the massacre, (3) that Mr. Bravo shot two prisoners, wounding one and killing another, and (4) that the naval officers at the Base did not act in self-defense to repel a prison escape.

On March 19, 2014, the Federal Court of Cassation in Criminal Matters (the "Appellate Court") affirmed the convictions of all three accomplices.  The Appellate Court also \reversed the Trial Court's decision to acquit two other defendants.  The Appellate Court considered many of the same arguments that Mr. Bravo presents here, including the defense of statutory amnesty, his acquittal in a prior military investigation, and the credibility of the survivors' statements.  First, the court found that the defense of statutory amnesty did not apply because the officers committed

11

crimes against humanity. Second, the court determined that a prior military proceeding did not comport with basic requirements of impartiality and due process, and therefore failed to vitiate the legal and factual basis for the defendants' convictions. Third, the court determined that the evidence established that the defendants carried out the massacre and that the testimony of the survivors was credible. And finally, the court concluded that the physical evidence at the Base was consistent with the survivors' recollections, including the fact that one of the bodies bore "tattooing" from gun powder that could only be the product of shots fired at close range (approximately 14 inches away). This was found to be consistent with execution-style killings.

### E.    *Argentina's Second Extradition Petition*

After the Argentine government prosecuted Mr. Bravo's accomplices and their convictions were affirmed on appeal, the courts sentenced them to life in prison. Argentina then submitted a second request for Mr. Bravo's extradition. On September 17, 2019, the Government – in accordance with its Treaty obligations and pursuant to 18 U.S.C. § 3184 – filed a complaint in this district seeking a warrant for Mr. Bravo's arrest. The Court issued the arrest warrant and law enforcement arrested Mr. Bravo on October 25, 2019. Mr. Bravo is currently on bond awaiting the disposition of the Government's petition, which has been relitigated before the undersigned. The record on this Petition includes the original record and transcript of proceedings as well as supplemental briefing and filings.

## II.   ANALYSIS

The Government seeks the extradition of Mr. Bravo because Argentina's request satisfies the four requirements for certification pursuant to 18 U.S.C. § 3184: (1) that the judicial officer is authorized to conduct the extradition proceedings, and that the court has jurisdiction over the fugitive, (2) that the applicable extradition treaty is in full force and effect, (3) that the treaty covers the alleged crimes, and (4) that there is sufficient evidence to support a finding of probable cause as to the charges.   Mr. Bravo argues, on the other hand, that the petition should be denied because there is no probable cause for the alleged crimes, the political offense doctrine applies, and any extradition back to Argentina would violate his constitutional and due process rights.   Before we address each argument, we must consider the general principles of extradition to inform the analysis that follows.

### A.   *General Principles of Extradition*

"An extradition treaty creates in a foreign government the right to demand and obtain extradition of an accused criminal . . . [a]bsent a treaty, the federal government lacks the authority to turn the accused over to the foreign government." *United States v. Fernandez–Morris,* 99 F. Supp. 2d 1358, 1360 (S.D. Fla. 1999) (citation omitted).   When there is a treaty of extradition between the United States and any foreign government, international extradition requests are governed by 18 U.S.C. §§ 3184, *et seq.*   The statute provides in relevant part:

13

Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, ... issue his warrant for the apprehension of the person so charged, that he may be brought before such . . . magistrate judge, to the end that the evidence of criminality may be heard and considered . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184.

The extradition process "is a function of the Executive," allowing the courts to conduct only limited inquiry.[1]  *Kastnerova v. United States*, 365 F.3d 980, 984 n.5 (11th Cir. 2004) (citation omitted).  Although our inquiry is a limited one, it is critical to the extradition process because "[t]he executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process."  *Ahmad v. Wigen,* 726 F. Supp. 389, 412 (E.D.N.Y.1989) ("A court must

---

[1]    The Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to international extradition proceedings.  *See* Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *Afanesjev v. Hurlburt,* 418 F.3d 1159, 1164–65 (11th Cir. 2005); *Bovio v. United States,* 989 F.2d 255, 259 n.3 (7th Cir. 1993); *Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981).   Thus, hearsay and excludable evidence is admissible.  *See United States v. Peterka,* 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003).

ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness."), *aff'd,* 910 F.2d 1063 (2d Cir. 1990).  A court in an extradition proceeding "conducts a hearing simply to determine whether there is evidence sufficient to sustain the charge against the defendant under the provisions of the proper treaty or convention."   *Kastnerova,* 365 F.3d at 984 n.5 (citation and internal quotation marks omitted).  In other words, "[a]n extradition hearing is not a trial on the merits and does not require proof sufficient to satisfy the factfinder in a criminal trial."  *Cheng Na–Yuet v. Hueston,* 734 F. Supp. 988, 995 (S.D. Fla. 1990).

An extradition hearing is therefore akin to a preliminary hearing, where the primary purpose is to decide if there is sufficient evidence of the charge under the applicable treaty – not guilt or innocence.  *See Neely v. Henkel,* 180 U.S. 109, 123 (1901); *see also Afanasjev,* 418 F.3d at 1164 (finding that courts do "not inquire into the guilt or innocence of the accused.") (quoting *Kastnerova,* 365 F.3d at 987); *In re Extradition of Mohammad Safdar Gohir,* 2014 WL 2123402, at *6 (D. Nev. 2014) ("Foreign extraditions are *sui generis* in nature, neither civil nor criminal in nature and set forth their own law.").  In determining whether there is sufficient evidence to sustain the charge, section 3184 requires a finding of probable cause.  *See Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006) (interpreting the "sufficient" evidence standard set forth in 18 U.S.C. 3184 as requiring probable cause); *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir. 1969) (during a section 3184 extradition hearing, a

15

magistrate determines the sufficiency of evidence establishing reasonable ground for the accused's guilt).

A certification of extradition is generally based entirely on the authenticated documentary evidence provided by the requesting government. *See, e.g., Castro Bobadilla v. Reno,* 826 F. Supp. 1428, 1433–1434 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd* 28 F.3d 116 (11th Cir. 1994). In fact, "[i]t is exceedingly rare for the Government to submit anything other than documents in support of an extradition request." *In re Extradition of Nunez–Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011). As such, "one of the principal objectives of the extradition statute is 'to obviate the necessity of confronting the accused with the witnesses against him' by enabling the requesting country to meet its burden of proof through documents subject only to requirements necessary to guarantee their authenticity." *Id*. (quoting *Bingham v. Bradley,* 241 U.S. 511, 517 (1916)).

While an extraditee is allowed to present evidence to clarify or explain the explanatory evidence, contradictory evidence against the requesting country's case is inadmissible under the probable cause analysis. *See Cheng Na–Yuet,* 734 F. Supp. at 995. The reason for this rule is "[b]ecause of the circumscribed nature of an extradition proceeding, the importance of international obligations and the inherent practical difficulties in international proceedings," meaning a defendant's right to challenge evidence against him at an extradition hearing is limited. *Nunez-*

*Garrido*, 829 F. Supp. 2d at 1281.   "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Barapind v. Enomoto,* 400 F.3d 744, 749 (9th Cir. 2005) (quoting *Mainero v. Gregg,* 164 F.3d 1199, 1207 n.7 (9th Cir. 1999)); *see also Ordinola v. Hackman,* 478 F.3d 588, 608–09 (4th Cir. 2007); *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir. 2006).   That is, "[t]estimony that merely gives the opposite version of the facts does not destroy the probably of guilt" and is therefore inadmissible.   *See Fernandez–Morris*, 99 F. Supp. 2d at 1360 (citation omitted).   Affirmative defenses are, for the most part, not considered during extradition proceedings.   *See Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Collins v. Loisel,* 259 U.S. 309, 316–17 (1922); *Hooker v. Klein,* 573 F.2d 1360, 1368 (9th Cir. 1978); *DeSilva v. DiLeonardi,* 125 F.3d 1110, 1112 (7th Cir. 1997).   And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses.   *See Bovio,* 989 F.2d at 259.

Once the evidence is determined to be sufficient, a court "makes a finding of extraditability and certifies the case to the Secretary of State."   *Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 828 (11th Cir. 1993).   The Secretary of State then makes the final decision to determine whether to surrender the accused.   *See* 18 U.S.C. § 3186; *Martin*, 993 F.2d at 829 ("The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as

foreign relations which an extradition magistrate may not.  The Secretary of State's decision is not generally reviewable by the courts.") (citation omitted).  The Eleventh Circuit has reinforced this principle in recent years with repeated statements that the Executive – not the courts – is responsible for the final decision on whether to extradite a fugitive:

> Extradition ultimately remains an Executive function.  After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender.  The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not.

*Martin,* 993 F.2d at 829.

To make a finding of extraditability, courts generally consider four factors: (1) that the judicial officer has authority to conduct extradition proceedings and that that the court has jurisdiction over the extraditee; (2) that a valid extradition treaty exists, (3) that the crime with which the accused is charged is extraditable under the extradition treaty, and (4) that probable cause exists to believe that the accused is guilty of the charge pending against him in the requesting state.  *See Martin*, 993 F.2d at 828; *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003).  In making this determination, courts do not weigh conflicting evidence, "but rather, determine[] only whether there is competent evidence to support the belief that the accused has committed the charged offense."  *Quinn v. Robinson*, 783 F.2d 776, 787 (9th Cir. 1986).  If an extradition treaty requires that the doctrine of dual

18

criminality be satisfied – meaning that the conduct charged is a crime under the law of the respective states (i.e. Argentina and the United States in this case) – courts must also consider if this requirement is met. *See Gallo–Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *see also United States v. Cardoso*, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel,* 190 U.S. 40, 61 (1903). Considering these well-settled principles, we will discuss the four enumerated factors, in turn, to determine if a certification for the extradition of Mr. Bravo should be issued.

## B.   *First Factor: The authority to conduct extradition proceedings*

There is no dispute between the parties that the Court has jurisdiction over Mr. Bravo to conduct his extradition proceedings. Title 18, Section 3184 explicitly authorizes any magistrate judge authorized by a court of the United States to conduct extradition proceedings. *See id.* ("[A]ny justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any States."). Local Magistrate Rule 1(a)(3) also empowers United States Magistrate Judges of this District to conduct extradition proceedings. In addition, Mr. Bravo was arrested in South Florida, which confers jurisdiction upon this Court. *See* 18 U.S.C. § 3184 (stating that a judge "may, upon complaint made under oath, charging any person

19

found within his jurisdiction . . . issue [its] warrant for the apprehension of the person so charged."). Therefore, the first factor has been met because the Court has jurisdiction over Mr. Bravo and possesses the authority to conduct his extradition proceedings. *Id.*

### C.  *Second Factor: Whether a valid extradition treaty exists*

The second factor considers whether there is a treaty in force between the requesting state and the United States. The Government claims that the treaty between Argentina and the United States is in full force and effect. It directs the Court's attention to the declaration of Katherine Fennell, an attorney-adviser in the Office of the Legal Adviser for the U.S. Department of Statement. Every Circuit Court, including our own, has deferred to the executive branch on this factor. *See Kastnerova*, 365 F.3d at 986 ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination.") (citing *United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 171 (3d Cir. 1997); *Then v. Melendez,* 92 F.3d 851, 854 (9th Cir. 1996); *New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.,* 954 F.2d 847, 852 (2d Cir. 1992); *Sabatier v. Dabrowski,* 586 F.2d 866, 868 (1st Cir. 1978)); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is

20

entitled to great deference.") (citations omitted).  We therefore find based on the unrebutted evidence and the lack of any opposition that the Treaty between Argentina and the United States remains in full force and effect.

> **D.    _Third Factor: Whether the crimes are covered by the treaty_**

The third factor, on whether the alleged crimes are covered under the treaty, is an inquiry that depends on the language of the treaty itself.  Extradition treaties "either list the offenses for which extradition shall be granted or designate a formula by which to determine extraditable offenses."  _United States v. Herbage_, 850 F.2d 1463, 1465 (11th Cir. 1988) (internal quotation marks and citation omitted).

Article 1 of the Treaty in this case provides for the return of fugitives charged with, or convicted of an "extraditable offense."  Treaty, Art. 1.  Under Article 2, an "extraditable offense" includes an offense that is "punishable under the laws in both the United States and Argentina] by deprivation of liberty for a maximum period of more than one year or by a more severe penalty."  Treaty, Art. 2.  This "dual criminality" requirement is met because the alleged criminal conduct provided in Argentina would be criminal under U.S. federal law or the law of the state in which the hearing is held.  _See, e.g._, _Gallo-Chamorro_, 233 F.3d at 1306 ("Dual criminality mandates that a prisoner be extradited only for conduct that constitutes a serious offense in both the requesting and surrendering country.").  The corresponding offenses need not be mirror images of one another as "the law does not require that

21

the name by which the crime is described in the two countries shall be the same; nor that the scope of liability shall be coextensive, or, in other respects the same in the two countries." *Collins,* 259 U.S. at 312. Dual criminality only requires that the "particular act charged is criminal in both jurisdictions," *id.,* and that "[t]he essential character of the transaction is the same . . . ." *Wright,* 190 U.S. at 58; *see also In re Extradition of Russell,* 789 F.2d 801, 803 (9th Cir. 1986) ("[E]ach element of the offense purportedly committed in a foreign country need not be identical to the elements of a similar offense in the United States. It is enough that the conduct involved is criminal in both countries."). The fact that "defenses may be available in the requested state that would not be available in the requesting state, or that different requirements of proof are applicable in the two states, does not defeat extradition under the dual criminality principle." *Gallo-Chamorro*, 233 F.3d at 1306 (citation and quotation marks omitted).

The third factor is therefore satisfied in this case because both murder and attended murder satisfy the dual criminal requirement. That is, both crimes are punishable by more than one year of imprisonment in both Argentina and the United States. And Mr. Bravo makes no contention that suggests either of the alleged crimes fail under this factor. Thus, this element is satisfied and the Treaty between Argentina and the United States covers the alleged crimes.

### E.    *Fourth Factor: Probable Cause*

The Court must now determine if the Government's evidence is sufficient to trigger extradition under the Treaty.  If there is insufficient evidence of probable cause, then the statutory requirements have not been met and Argentina's allegations "are nothing more than suspicions, and the request must be denied." *Fernandez-Morris*, 99 F. Supp. 2d at 1366.   "The purpose [of the extradition hearing] is to inquire into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country, that the alleged conduct, if committed in the United States, would have been a violation of our criminal law, and that the extradited individual is the one sought by the foreign nation for trial on the charge of violation of its criminal laws."  *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976).

The Government argues that there is now abundant evidence that establishes probable cause, contrary to Judge Dubé's 2010 finding.   First, the Government relies on the three survivors of the massacre (who are now deceased) who testified that Mr. Bravo was among the naval officers who woke them on the night of August 22, 1972, ordered them to line up in a hallway, and opened fire on them.   Mr. Camps testified, for instance, that he and his cellmate, Mr. Delfino, managed to survive the initial burst of gunfire and hurled themselves back into their cell.   When Mr. Bravo entered the cell, he shot them at close range and Mr. Delfino did not survive.   The Government then points to Ms. Berger's testimony,

which reflects that she heard Mr. Bravo screaming at Mr. Camps and Mr. Delfino when he requested that they provide him with information. When they refused, she heard gunfire. Mr. Haidar also testified that – after an initial round of gunfire – he retreated into his cell with another prisoner, Mr. Kohon, and crouched below a slab of concrete that functioned as a bed. After the initial gunfire subsided, Mr. Bravo called out that "this one is still alive," and then there was an isolated shot.

Second, the Government relies on the statements of Mr. Marandino, the naval officer on guard duty at the time of the massacre, who testified that Mr. Bravo and four other naval officers arrived at the prison cells smelling of alcohol and carrying pistols and machine guns. Those officers directed Mr. Marandino to leave the area. Mr. Marandino retreated to an area behind a screen and recalled hearing a lot of shouting, the singing of the national anthem, someone shouting "they're trying to escape," a burst of gunfire, a pause, and then more shooting. When Mr. Marandino went to see the aftermath of the shooting, the naval officers gave him a pistol and told him to check the bodies. After entering the corridor, Mr. Marandino saw blood and bodies piled on top of each other.

Third, the Government points to more recent developments where an Argentine Trial Court has now issued a written decision finding Mr. Bravo's accomplices guilty of sixteen counts of aggravated murder and three counts of aggravated attempted murder. The court imposed a sentence of life imprisonment. The decision contains a detailed summary of the testimony of numerous witnesses

and documentary evidence.  The Government argues that much, if not all, of this evidence implicates Mr. Bravo in the massacre because the Trial Court rendered specific findings as to Mr. Bravo's role and participation.

Fourth, the Government states that the Appellate Court's decision on March 19, 2014 adds even more weight to a finding of probable cause because it affirmed the convictions of Mr. Bravo's accomplices and even reversed the Trial Court's acquittal of two other defendants.  Given this decision, the Government concludes that there is more than enough evidence that probable cause exists and that Mr. Bravo must be extradited to Argentina.

Mr. Bravo's response is that the Government's petition is misguided because the same evidence was submitted more than thirteen years ago and Judge Dubé found that Mr. Bravo had "obliterated" probable cause[2]:

> This Court concludes that the evidence of the full military investigation and acquittal, Presidential Decree No. 425, and the evidence and testimony regarding the application of Amnesty Law 20.508 are all relevant and admissible on the issue of probable cause. Furthermore, the Court finds that the relevant evidence does obliterate the showing of probable cause in this case. Therefore, based on that finding, the Government of Argentina has failed to carry its burden of showing probable cause to justify extradition.

---

[2]   Mr. Bravo does not take the position that this Court is *per se* bound to the decision in 2010 or that principles of *res judicata* apply in extradition proceedings. *See, e.g.*, *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("[I]t is wholly inappropriate to apply *res judicata* concepts to the findings resulting from extradition proceedings."). He does argue, however, that the Court should consider the prior decision and give it considerable weight.

[D.E. 27-1 at 17].

Although the Government has presented new facts and other evidence in support of its second extradition petition, Mr. Bravo argues that there are few differences between the two cases.   Mr. Bravo reasons that he has obliterated probable cause for the same reasons previously mentioned and that the extradition petition should be denied on this basis alone.

Probable cause is a standard defined by federal law, *Sindona v. Grant,* 619 F.2d 167 (2d Cir. 1980), and is established when a "prudent man" believes that the suspect has committed or was committing an offense.   *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.") (citations omitted); *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict.").

The probable cause determination is not a finding of fact "in the sense that the court has weighed the evidence and resolved disputed factual issues," *Caplan v. Vokes*, 649 F.2d 1336, 1342 (9th Cir. 1981) (citing *Heiniger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir. 1980)).   Instead, probable cause "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based."  *Caplan*, 649 F.2d at 1342 n.10.  Thus, it requires "only

26

a probability or substantial chance of criminal activity," *Illinois v. Gates,* 462 U.S. 213, 243 n.13 (1983), or, in other words, "the existence of a reasonable ground to believe the accused guilty" of the crime charged. *Escobedo v. United States,* 623 F.2d 1098, 1102 (5th Cir. 1980) (quoting *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir. 1971)).  Although probable cause is not necessarily a difficult standard to meet, "[c]onclusory statements do not satisfy the probable cause standard." *In re Lehming,* 951 F. Supp. 505, 517 (D. Del. 1996) (failing to find probable cause where the report relied upon by the government did not personally implicate the relator in the transaction thus leaving that court to speculate as to the nature of his involvement).

In making a probable cause determination, an extraditee cannot merely allege that the evidence submitted contains inconsistencies.  *See, e.g.*, *In re Extradition of Shaw*, 2015 WL 3442022, at *7 (S.D. Fla. May 28, 2015) (finding probable cause despite extradite arguing that the evidence presented was "unreliable, contradictory, inconsistent, unbelievable, and inadmissible"); *In re Extradition of Figueroa*, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) ("In sum, although we agree with [the extraditee] that the evidence that Mexico has provided is by no means perfect, the issue before us is not whether [he] should be convicted of the crime. . . .  Although there may be some inconsistencies in the record, we do not believe that these are so compelling as to negate a finding of probable cause."); *Castro Bobadilla*, 826 F. Supp. at 1433-34 (upholding probable cause finding despite

27

"contradictions in the evidence [that] may create a reasonable doubt as to [the fugitive's] guilt").

The reason inconsistencies do not regularly defeat an extradition petition is because courts "must accept as true all of the statements and offers of proof by the demanding state," reserving the weighing of evidence and making of credibility determinations for the courts in the requesting country—which is where the determination of guilt will be made. *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014) (citation and internal quotation marks omitted); *see also, e.g.*, *Collins*, 259 U.S. at 316; *Quinn*, 783 F.2d at 791.

Rather, an extraditee must negate or completely obliterate the requesting country's showing of probable cause. As Judge Hoeveler stated long ago, an extraditee cannot avoid extradition simply by contradicting the requesting country's case or its witnesses:

> In order to 'negate' Hong Kong's showing of probable cause, Petitioner must discredit the testimony relied upon by Hong Kong to the extent that this Court can find that there is not 'any evidence warranting the finding that there was reasonable ground to believe the accused guilty.' Although some doubt as to the credibility of Chan Kam Chuen's version of what actually transpired is cast by the fact that his testimony was provided while he was in prison awaiting sentencing for the very crime in which he was implicating Petitioner, the appropriate acid test for his testimony must take place at a trial on the merits, not on motion for writ of habeas corpus.

*Cheng Na-Yuet*, 734 F. Supp. at 996 (internal citation omitted). As one might expect, "[t]his is a very difficult standard to meet," *In re Extradition of Shaw*, 2015 WL 3442022 at *9, especially where "[t]he primary source of evidence for the

28

probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination." *Matter of Extradition of Atta*, 706 F. Supp. 1032, 1051 (E.D.N.Y. 1989) (citing *Collins,* 259 U.S. at 315-16).

Hence, an extradition hearing is only preliminary in nature and not a determination of guilt or innocence. The resolution of any inconsistencies in the record is therefore of no consequence so long as sufficient evidence remains for a finding of probable cause. *See In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 891-93 (N.D. Ill. 2006) (resolution of inconsistencies in witness statements are "properly reserved for the eventual trial in Mexico").

We must now exercise our independent judgment, as required under federal law, to determine the propriety of Mr. Bravo's extradition. In considering whether Mr. Bravo has met this standard, we should first take a close look into the denial of the Government's first petition. Judge Dubé found that the statements of three surviving witnesses – specifically Ms. Berger, Mr. Haidar, and Mr. Camps – were not credible. Mr. Haidar stated, for example, that after he suffered injuries, the naval officers arranged for him to be taken to a hospital. Judge Dubé found that Mr. Haidar's hospitalization was inconsistent with the theory that this was a cold-blooded execution since mass murderers would, in theory, not want to leave any survivors alive.

Judge Dubé then turned to Mr. Marandino and found this his statements were unpersuasive because he admitted that he was in state of shock at the time of the massacre and that other officers never ordered him to shoot anyone.  While the Government argued that Mr. Marandino smelled alcohol on the other naval officers, Mr. Marandino also stated that the officers were not drunk, walked properly, looked fine, and expressed themselves appropriately.  When coupled with the fact that Mr. Marandino was not present when the shooting began, Judge Dubé determined that Mr. Marandino's recollection had little to no probative value.

Judge Dubé was also concerned that Ms. Berger, Mr. Haidar, and Mr. Camps disappeared or died during the 1970s and that there was no way to test the strength of their allegations or to subject them to cross-examination.  He noted that the documents submitted in support of Mr. Bravo's extradition did not reveal any other independent evidence to support the Government's narrative and that it was unclear whether there was an attempted prison escape or a cold-blooded massacre.

Judge Dubé also relied on the testimony of Professor Alfredo Solari ("Professor Solari") who testified that Article 29 of the Argentine Constitution – which was later incorporated into the Military Code of Justice – gave the military the exclusive jurisdiction to investigate and prosecute military officers.  The court found that a military judge had conducted a thorough investigation of Mr. Bravo and his accomplices, summarized the evidence presented, and recommended an

30

acquittal.  The president of Argentina subsequently reviewed that recommendation and signed a decree to dismiss the charges against the naval officers.

Finally, Judge Dubé relied on Amnesty Law 20.508 enacted by the Argentine Congress enacted in 1973 to immunize all events that took place before May 25, 1973, including the alleged massacre at the Base that is at issue here.  Professor Solari testified that that this provision has never been repealed or found to be unconstitutional, which buttresses that probable cause cannot exist.  Judge Dubé highlighted this statute given that, in 2005, the President of Argentina invoked this same law to restore military rank and back pay to a navy shipman who had been convicted in 1972, which amounts to further evidence that this provision remains good law.  As a result, Mr. Bravo had a statutory immunity defense to further undermine probable cause to support extradition.

In response to this second extradition request, Mr. Bravo urges the Court to reach the same conclusions and find that probable cause is lacking.  We address each argument in turn.

### 1.    *Credibility Determinations*

Mr. Bravo's initial argument is that the statements of the surviving witnesses are so incredible as to be legally untrustworthy.  We need not dwell on this argument for very long because we "must accept as true all of the statements and offers of proof by the demanding state," reserving the weighing of evidence and making of credibility determinations for the courts in the requesting country (i.e.,

Argentina) — which is where a determination of guilt will be made.  *See Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014) (citation and internal quotation marks omitted); *see also, e.g.*, *Noeller v. Wojdylo*, 922 F.3d 797, 807 (7th Cir. 2019) ("Evidence that contradicts the demanding country's proof or poses questions of credibility—*i.e.*, contradictory evidence—is off-limits."); *Man–Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008) ("[A witness-accomplice's] lack of credibility is merely a weakness in Korea's case; it does not completely obliterate the evidence of probable cause") (internal quotation marks and alteration omitted).

While Mr. Bravo has raised legitimate concerns with the statements of the surviving witnesses (such as possible inconsistencies in their versions and their present inability to testify against him), these amount to defenses that can and should be raised in Argentina.  It is not the role of this Court on an extradition petition to weigh the ultimate credibility of the evidence or to determine how any potential inconsistencies might affect the proceedings under the laws of a foreign nation.  *See, e.g.*, *Grin v. Shine*, 187 U.S. 181, 190 (1902) ("[I]t can hardly be expected of us that we should become conversant with the criminal laws of Russia, or with the forms of warrants of arrest used for the apprehension of criminals."); *In re Mathison*, 974 F. Supp. 2d 1296, 1310 (D. Or. 2013) ("An American extradition court is neither equipped nor empowered to interpret and apply the Mexican constitution or to determine was rights it bestows upon the individuals charged

with violating Mexican laws"); *Skaftouros v. United States*, 667 F.3d 144, 156  (2d Cir. 2011) ("Any arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country.").

Courts defer to a foreign nation on these questions because a foreign government should not be required to prove to a U.S. judge that it is properly construing its own laws.  *See, e.g.*, *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty"); *Koskotas*, 931 F.2d at 174 ("Extradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts."); *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006) ("American courts should treat foreign law the way American courts want foreign courts to treat American law: avoid determining foreign law whenever possible.").

There is also the unnecessary risk that a U.S. Court could erroneously interpret the laws of a foreign country.  *See Sainez*, 588 F.3d at 717 ("[W]e recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (internal quotation marks and citation omitted); *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring

States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own.   The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."). Therefore, with respect to the credibility of the witnesses, this challenge is not a reason to find that probable cause does not exist because even if the evidence contains inconsistencies this is "of no consequence if there exists in those documents 'any' other sufficient competent evidence" to establish probable cause. *United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726, 728 (9th Cir. 1975).

Putting aside our reluctance to weigh the credibility of the witnesses in the probable cause analysis, there are several other aspects of the present record that distinguish this record from the one addressed by Judge Dubé.  Since the denial of the Government's first petition, an Argentine Trial Court has now found that the survivors' statements were credible and it made this determination after an evaluation of a voluminous record – much of which was never submitted to Judge Dubé.  The Trial Court incorporated, for example, the statements that Mr. Camps and Mr. Haidar made after being treated for their injuries in the days following the massacre, as well as statements they made a few months later in connection with a demand for civil damages. Judge Dubé does not appear to have had the benefit of this evidence in the earlier proceeding. The Trial Court also noted how the survivors' statements matched each other despite the witnesses being separated

after the massacre. The Appellate Court made a similar finding in that, notwithstanding the naval officers placing the survivors in solitary confinement, the witnesses consistently described the events on the morning of the massacre.[3]

Understandably, Mr. Bravo argues that the evidence presented shows otherwise and that the Trial Court's findings ignore the fact there was a violent escape attempt that preceded the deaths of the prisoners. This contention is initially unconvincing for our purposes as it merely presents a different narrative than the surviving victims. In other words, it does not obliterate probable cause; it only presents a different version of the events that took place in 1973, which version has been rejected twice by Argentine courts. [D.E. 1-2 at EX-BRAVO-0957 ("[T]here is no doubt that the alleged attempt to escape never existed and it can be anticipated that it was a vile excuse to try to hide the unexplainable and unfair death of 16 people and the attack to the 3 people who survived."); *id.* at EX-BRAVO-0197 ("[T]he evidence produced contradicts the account of the events given by the *de facto* government in office at the time, and rules out the flight attempt attributed to the detainees at the Almirante Zar Base.")]. Indeed, the Argentine courts have found that the statements of Mr. Camps, Mr. Haidar, and Ms. Berger are all compatible with the evidence presented. [*Id.* at EX-BRAVO-0666 (Haidar: "There

---

[3] Other evidence that the Government did not have available at the time of the first extradition request is expert analysis of Mr. Bravo's weapon. Three experts opined that the bullet taken from a survivor matched a casing from Mr. Bravo's firearm.

was no attempt to escape, and it is totally false that Pujadas had tried to grab an officer's gun."); EX-BRAVO-0670 (Berger: After the shootings, "I heard only the voices of our guards, who with great excitement began to invent a story to justify the cruel assassinations")].

In addition, the physical evidence left at the scene of the massacre further supports the Government's position because one of the victim's bodies bore "tattooing" from gunpowder – meaning that the shots that were fired at a close range of approximately 35 centimeters or 14 inches.  An autopsy report of another victim, Ruben Pedro Bonet, revealed that he received a shot in his left occipital region while he was on the ground – a fact that undermines the contention that the naval officers acted in self-defense. [D.E. 1-2 at EX-BRAVO-0197].  The evidence does not stop there, as the naval officers are accused of shooting a pregnant woman multiple times in the abdomen followed by a kill shot to another victim a mere ten centimeters from the back of her neck. [*Id*. at EX-BRAVO-0829; EX-BRAVO-0880 (finding that a "coroner reported the kill shot was made 10 cm from [Sabelli's] back neck.")].  This evidence calls into doubt the accuracy of Mr. Bravo's version of the events because it is unclear as to how some victims might have been shot execution style if the reason for the killings was to only quell a violent uprising. [*Id*. at EX-BRAVO-0840 (testimony of Julio Cesar Ulla, a trained surgeon, that his brother— one of the victims—bore "a non-fatal shot on his thigh" and a "close range" fatal shot bearing "a black halo surrounding the shot on the left nipple")].

So, a very different and compelling case can be made from this evidence that, even assuming the violence began because of fear of an escape, the ultimate use of force and the killing of all thirteen prisoners was intentional, malicious, and inexcusable. Either way, it is not for us to decide what the ultimate outcome should be as there is more than enough evidence to establish probable cause for the alleged crimes. And our record is clearly more extensive on the matter of probable cause than that available to Judge Dubé in 2010.

### 2. *Argentina's Military Proceedings*

The next issue is whether probable cause exists after a military court exonerated Mr. Bravo. This is certainly an important factor that is relevant to the political offense exception (which we address below). For probable cause purposes, however, it is not dispositive. Mr. Bravo relies on the military's findings as conclusively determining that the naval officers acted within their lawful authority and in self-defense. But, for the initial probable cause analysis, Mr. Bravo's argument is not persuasive because the military investigation merely contradicts the charges presented. It is well established that "extradition courts do not weigh conflicting evidence in making their probable cause determinations." *Barapind*, 400 F.3d at 750 (internal quotation marks omitted); *see also, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16 ("[T]he fugitive's right to introduce evidence is limited to testimony which explains rather than contradicts the demanding country's proof") (internal quotation marks and alteration omitted); *DeSilva,* 125 F.3d at 1112 (7th Cir. 1997)

("We cannot resolve factual disputes"); *Nunez-Garrido*, 829 F. Supp. 2d at 1294 ("[T]he type of conclusion which Nunez asks this Court to make here would require a weighing of evidence and a selection of one version over another version. This type of evidence evaluation is precisely what this Court cannot do in an extradition hearing."); *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) ("[C]ontradictory evidence against the requesting country's case is inadmissible.").

Alternatively, even if we were tasked with determining the impact of the military proceedings under Argentine law (a task that we are ill-equipped to do), the Trial Court and the Appellate Court both considered the military investigation that took place and concluded that it deserved no weight.  The Trial Court found, for example, that the "investigation conducted at the military court was merely formal in nature, was not independent or impartial, because it was conducted by officers of the Army subordinate to their commander, and acquittal[4] was decided by the then *de facto* president, who was also a superior officer of the above-mentioned Army." [D.E. 1-2 at EX-BRAVO-0984].    The Trial Court also determined that the

---

[4]       Indeed the judge who conducted the investigation, Jorge Enrique Bautista, was later charged for malfeasance. [D.E. 1-2 at EX-BRAVO-0189] (concluding that Bautista's investigation was "merely formal" and "based on the premise that an attempted escape was actually made and failed to perform a serious and comprehensive analysis of the events"); *id.* at EX-BRAVO-0211 to EX-BRAVO-0214 (detailing Bautista's omissions including his "failure to seize the clothes of the deceased and to have them examined by experts . . . as well as the failure to seize the weapons used"); EX-BRAVO-0232 (order vacating Bautista's acquittal)].

investigation did not pose double jeopardy concerns because it was administrative – as opposed to criminal – and did "not constitute judicial proceedings with a final and irremovable judgment." [*Id.* at EX-BRAVO-0905].

The Appellate Court reached a similar conclusion in that the military proceedings were flawed and that the "authorities involved only reproduced the official version of events which was spread by the *de facto* government authorities." [*Id.* at EX-BRAVO-0189; *see also, e.g.*, *id.* at EX-BRAVO-0190 ("All this leads to the conclusion that the decision adopted by virtue of Executive Order No. 425/73 was just the channel through which the alleged perpetrators were made to escape justice and leave the crime committed against the inmates at the Almirante Zar Base unpunished.")].   Therefore, to the extent we could consider the military investigation, it would still weigh in favor of Mr. Bravo's extradition from a probable cause perspective.   Again, however, the significance of the military tribunal with respect to Mr. Bravo's political offense defense is another matter altogether, as we discuss in  Section F below.

### 3.    *Argentina's Amnesty Laws*

The third issue relevant to the probable cause analysis focuses on Argentina's amnesty laws.   Mr. Bravo maintains that he cannot be prosecuted in Argentina because of an amnesty law that gives him blanket immunity for the alleged crimes. Again, Judge Dubé appears to have relied in part on this theory in denying the first petition.   We conclude otherwise, however, because "an immunity defense – which is

undeniably an affirmative defense – is not a proper consideration in an extradition proceeding." *Martinelli*, 2017 WL 3776953, at *27 (citing *DeSilva*, 125 F.3d at 1112 ("Affirmative defenses not specified in the treaty may not be considered."); *In re Extradition of Shaw*, 2015 WL 3442022, at *4 ("Courts have determined that affirmative defenses to the merits of the charge(s) are not to be considered at extradition hearings.") (citing *Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Collins,* 259 U.S. at 316–17; *Hooker,* 573 F.2d at 1368; *DeSilva,* 125 F.3d at 1112)).  Because Mr. Bravo's immunity defense is not an issue that this Court can opine on in an extradition proceeding, we find that his argument lacks merit for probable cause purposes.  *See In re Extradition of Harusha*, 2008 WL 1701428, at *5 (E.D. Mich. Apr. 9, 2008) ("[A]ffirmative defenses, including self-defense, are not relevant in extradition hearings and should not be considered.") (citations omitted).

We note, in the alternative, that even if we considered Mr. Bravo's immunity defense, it would likely not be enough to deny extradition because the Argentine courts considered and rejected the applicability of the amnesty laws to Mr. Bravo's accomplices.  The reason the amnesty laws did not apply was because the massacre constituted a human rights violation for which amnesty cannot be granted, according to these tribunals.  [D.E. 1-2 at EX-BRAVO-0938] ("[A]ny administrative rule or act aimed at deviating, mitigating or removing liability under International human rights law should be immediately set aside, including the amnesty stated as regards criminal defendants Sosa, Del Real, and Marandino."); *id*. at EX-BRAVO-

0187 ("[T]here is a clear incompatibility between the amnesty law and the American Convention on Human Rights, which means that such incompatibility may not be deemed—as sought by the appellants—as a formal impediment to the investigation of acts that constitute serious human rights violations in order to identify those responsible for such attacks and to impose the applicable penalties."); *id.* at EX-BRAVO-0928 to EX-BRAVO-0938].

We need not, of course, decide this question because as we stated earlier, American extradition courts have consistently recognized we are not well-suited to evaluate a defendant based on a requesting country's laws. Instead, an extradition court should defer to the country seeking extradition on matters involving foreign law. *See Noeller*, 922 F.3d at 805 ("[E]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law."); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second guess" foreign government's determination of what constituted the arrest warrant under its law); *Skaftouros*, 667 F.3d at 156 (observing that "it has long been recognized that an extradition judge should avoid making determinations regarding foreign law," and that "[a]ny arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country"); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (adhering to "established approach of giving credence to foreign proceedings"). Thus, Argentina's amnesty laws, even if potentially applicable, are not blanket impediments to this extradition as the Government has presented

sufficient prima facie evidence in support of Mr. Bravo's extradition.  Again, their significance in the political offense question will become apparent, as discussed below.

For now, limited to the probable cause determination, we have fully considered and given due weight to Judge Dubé's original findings as we are permitted by our standard of review.  So, we have not treated those findings as *res judicata* in this second petition because the law is settled that extradition orders are not final decisions of a district court.  They are instead non-appealable findings that may be the subject to a renewed petition when additional facts or evidence come to light.  *See, e.g., Hooker,* 573 F.2d at 1365; *In re Macklin,* 668 F.2d 122, 128 (2d Cir. 1981) (the recourse of the requesting party whose extradition request has been denied is to refile the request).  The Supreme Court indeed has approved the grant of extradition on a *third* request, while rejecting due process or double jeopardy challenges to such efforts, because the "[p]rotection against unjustifiable vexation and harassment incident to repeated arrests for the same alleged crime must be sought, not in constitutional limitations or treaty provisions, but in a high sense of responsibility on the part of public officials charged with duties in this connection." *Collins v. Loisel,* 262 U.S. 426, 430 (1923).

On the other hand, we have fully considered our colleague's analysis and given it due weight as a persuasive finding by a respected judge in an unrelated case.  *See, e.g., United States v. Doherty,* 786 F.2d 491, 501 (2d Cir. 1986) (relying on

government's right to file successive petition in this manner as reason enough to reject any appeal of a denial of extradition under a declaratory judgment act umbrella). In doing so, we need not find that his earlier conclusions were wrong, because the premise of the government's right to seek a renewed petition is that the second attempt may present additional facts or evidence that were found wanting in the first instance. Here, the government has buttressed the record and its case with sufficient new evidence that gives us reason to reach a different conclusion on a de novo review of the case. And, given that the standard for probable cause in an extradition context is so limited, we only find that on this record there is now "the existence of a reasonable ground to believe the accused guilty" of the crime charged. *Escobedo,* 623 F.2d at 1102.

But, in this unique and tragic case, probable cause is not the only matter we must address in this record. We turn to Mr. Bravo's immunity defense that will have to be considered before certifying extraditability: the political offense doctrine.

### F.     *The Political Offense Doctrine*

In what involves the most difficult issue presented in this second extradition petition, Mr. Bravo argues that, even if probable cause is satisfied, the Government's petition should be denied based on the "political offense doctrine." Like many other extradition treaties, the Treaty between the United States and Argentina contains a political offense exception that provides that "[e]xtradition shall not be granted if the offense for which extradition is requested is for a political

43

offense." Treaty, Art. 4(1). The Treaty does not define the term "political offense," but, over time, federal courts have defined the scope of how to meet this exception.

The doctrine arose in the aftermath of the American and French Revolutions. Countries first incorporated it into treaties in the early nineteenth century. Today, it is "almost universally accepted in extradition law." *Quinn,* 783 F.2d at 792. The purpose of the doctrine is to protect the rights of citizens to rebel against unjust or oppressive governments:

> First, its historical development suggests that it is grounded in a belief that individuals have a "right to resort to political activism to foster political change." This justification is consistent with the modern consensus that political crimes have greater legitimacy than common crimes. Second, the exception reflects a concern that individuals— particularly unsuccessful rebels—should not be returned to countries where they may be subjected to unfair trials and punishments because of their political opinions. Third, the exception comports with the notion that governments—and certainly their nonpolitical branches— should not intervene in the internal political struggles of other nations.

*Id.* at 793 (citations omitted).

The only United States Supreme Court decision that has ever squarely addressed the political offense doctrine is *Ornelas v. Ruiz,* 161 U.S. 502, 509–12 (1896). There, Mexico sought the extradition of armed bandits who attacked a group of Mexican soldiers and civilians, burned their barracks, and committed robbery among other crimes. The fugitives argued that their actions were "part of a political movement, having for its purpose the overthrow of the existing government in Mexico." *Id.* (internal quotation marks omitted). To determine if their actions were part of "a movement in aid of a political revolt, an insurrection, or a civil war,"

44

the Court listed several factors pertinent to the political offense inquiry, including "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed." *Id.* at 511. And after taking those factors into consideration, the Court concluded that the political exception did not apply because "acts which contained all the characteristics of crimes under the ordinary law" are not "exempt from extradition because of the political intentions of those who committed them." *Id.* at 511-12.

Since *Ornelas*, circuit courts have added some further clarity to the political offense doctrine. The former Fifth Circuit (and now our Circuit) has adopted the view that "a political offense under extradition treaties is an offense committed in the course of and incidental to a violent political disturbance, such as war, revolution and rebellion. An offense is not of a political character simply because it was politically motivated." *Escobedo,* 623 F.2d at 1104 (5th Cir. 1980) (citation and footnote omitted).[5] So in our circuit a political offense "must involve an 'uprising' or some other violent political disturbance," "must have been incidental to the occurrence in order to justify the exclusion," and must "be determined by the circumstances attending the alleged crime at the time of its commission and not by the motives of those who subsequently handle the prosecution." *Garcia–Guillern,* 450 F.2d at 1192.

---

[5]     Under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981), we are bound by cases decided by the former Fifth Circuit before October 1, 1981.

In more recent cases, the Eleventh Circuit has acknowledged that there are two forms of political offenses: pure political offenses and relative political offenses. Pure political offenses include treason, sedition, and espionage. *See Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1358 (11th Cir. 2012); *see also Vo v. Benov*, 447 F.3d 1235, 1241 (9th Cir. 2006). By contrast, relative political offenses include "common crimes that are so intertwined with a political act that the offense itself becomes a political one." *Ordinola*, 478 F.3d at 596. The crimes alleged against Mr. Bravo undoubtedly do not fall within the scope of a pure political offense. The problem, however, is that they also do not fit neatly into the relative political offense because there is nothing common about the crime alleged in this case. Nevertheless, our task must still focus on whether Mr. Bravo's actions constitute a relative political offense.

To qualify as a relative political offense, courts use what is commonly referred to as the "incidence test". "The incidence test has two components—the 'uprising' requirement and the 'incidental to' requirement." *Quinn,* 783 F.2d at 806. That is, criminal conduct will be subject to the political offense exception only if the criminal conduct (1) occurs during a violent uprising, (*e.g.,* "a revolt by indigenous people against their own government or an occupying power,") and (2) is "causally or ideologically related to the uprising." *Id.* at 807–809. Examples of an uprising or a violent political disturbance include "war, revolution and rebellion." *Escobedo*, 623 F.2d at 1104 (internal citations omitted). The second prong requires that

46

crimes be "causally or ideologically related to [an] uprising," as opposed to all common crimes connected to a political disturbance. *See Meza*, 693 F.3d at 1359 (citation and quotation marks omitted).

Judge Dubé persuasively concluded that the allegations in this case fit within this limited scope based on the record at that time. Unlike the probable cause factor, however, we simply do not look at the government's evidence in a vacuum and must acknowledge, as Judge Dubé did, that Mr. Bravo presented a strong showing that his actions were entirely within the realm of revolution and rebellion. In other words, to determine if the political exception fits, we do have to consider the record from the perspective of the accused and analyze the evidence in greater depth.

Having done so, the government's case for rejecting Judge Dubé's analysis remains strong. The political offense doctrine does not apply if a crime was not committed in furtherance of or in quelling an uprising. *See Ordinola*, 478 F.3d at 599 ("To have been considered political offenses, Ordinola's actions would had to have been in some way proportional to or in furtherance of quelling the Shining Path's rebellion.") (citing *Eain v. Wilkes*, 641 F.2d 504, 521 (7th Cir. 1981) (noting that the "legitimacy of a cause does not in itself legitimize the use of certain forms of violence especially against the innocent")). If the rule was any different, "isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of political upheaval, a result . . . the political

47

offense exception was not meant to produce." *Eain*, 641 F.2d at 521.  Therefore, "[t]o avoid a slippery slope, United States courts have confined the exception for relative political offenses to exceptional circumstances[.]" *Venckiene v. United States*, 929 F.3d 843, 857 (7th Cir. 2019).

To fall within the confines of the political offense doctrine, an extraditee must show more than a political motivation.  *See Escobedo*, 623 F.2d at 1104 ("An offense is not of a political character simply because it was politically motivated."); *see also Ordinola*, 478 F.3d at 600 ("[A] political motivation does not turn every illegal action into a political offense.").  Rather, an extraditee must show that there is a "rational nexus between the homicides and any uprising which may have been occurring." *Matter of Extradition of Suarez-Mason*, 694 F. Supp. 676, 707 (N.D. Cal. 1988).  In making this showing, an extraditee "cannot avail himself of the defense merely because the alleged crimes occurred at the same time as a political disturbance." *Extradition of Artukovic*, 628 F. Supp. 1370, 1376 (C.D. Cal. 1986), *overruled on other grounds by Lopez–Smith v. Hood*, 121 F.3d 1322 (9th Cir. 1997).

Given these stringent requirements, "[f]or decades federal courts have applied the incidence test, usually resulting in decisions finding that the political offense exception did not apply." *Venckiene*, 929 F.3d 843, 856–57 (citing *Eain*, 641 F.2d at 518, 520–23 ("The definition of 'political disturbance,' with its focus on organized forms of aggression such as war, rebellion and revolution, is aimed at acts that disrupt the political structure of a State[;]" political offense exception did not

apply under incidence test where petitioner's bombing was not incidental to political upheaval in Israel)); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir. 1980) (fraudulent bankruptcy is not subject to exception even where "it resulted from political maneuverings and [was] pursued for political reasons"); *Escobedo*, 623 F.2d at 1101, 1104 (under the incidence test, a petitioner's offenses, attempting to kidnap the Cuban Consul in Mexico and killing another man in the process, did not qualify him for political offense exception because "[a]n offense is not of a political character simply because it was politically motivated"); *Koskotas v. Roche*, 931 F.2d 169, 172 (1st Cir. 1991) (political offense exception did not apply where petitioner "characterize[es] as a violent uprising what plainly is an electoral conflict tainted by allegations of political corruption"); *Ordinola*, 478 F.3d at 599 (political offense exception did not apply where offenses "occurred during the course of a violent political uprising" but "were not in furtherance of quelling the uprising").

The Government argues, with much resonance, that the alleged massacre was not a political offense, in large part because Mr. Bravo allegedly killed unarmed and defenseless prisoners outside a theatre of conflict. *See, e.g.*, *Ordinola*, 478 F.3d at 604 ("[T]hat Ordinola's alleged offenses were carried out against innocent civilians largely dooms Ordinola's argument."); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 227 (N.D.N.Y. 2013) (concluding that the killing of disarmed prisoners of a conflict violated "international laws of armed conflict" and fell outside the scope of the political offense exception). The Government claims that there is

simply no rational nexus between killing helpless prisoners – even ones alleged to have been in an armed uprising – and the suppression of the larger political movement at the time.  These actions, in the Government's view, equate to cold-blooded murder and violate even the most basic standards of human decency.

The Government further contends that, even putting that aside, the factors that the Supreme Court considered in *Ornelas* confirm that the massacre in this case was not a political offense for several other reasons.  First, the Government states that the massacre was the culmination of days of horrific and degrading treatment.  Mr. Bravo ordered prisoners to assume humiliating positions, to sweep floors while naked, and he threatened to kill prisoners if they did not lie with their backs on the floor.  The Government also claims that there is an abundance of evidence that, in the early morning of August 22, 1972, Mr. Bravo and his accomplices arrived at the cells smelling of alcohol, carrying firearms, and murdering prisoners.  When considered together, the Government states that these are depraved acts of violence and that the political offense doctrine cannot apply.

Second, the Government argues that the political offense doctrine cannot apply because Mr. Bravo and his accomplices carried out their extrajudicial killings when all nineteen prisoners were asleep in their cells.  The officers purportedly ordered the prisoners to stand in a line outside their cells with their heads down and then the officers shot at them at close range.  The Government states that many of the prisoners were killed instantly from the initial gunfire and that the

officers proceeded to execute all the remaining prisoners, except for three survivors. After the shootings, the Government claims that there is no evidence that Mr. Bravo attempted to justify the crimes with an alleged prison break or that one of the prisoners grabbed one of the guard's guns.  As such, the Government maintains that none of these facts suggest that the massacre was a political act.

Third, the Government contends that Mr. Bravo cannot avail himself of the political offense doctrine because the persons killed or wounded were all unarmed and defenseless prisoners.  One of the victims, for example, was a pregnant woman whom officers shot multiple times in the abdomen.  Another female prisoner had been shot in the back of her neck, while a third was shot ten or eleven times.  While Mr. Bravo claims that the prisoners were associated with violent political groups, the Government argues that both the people killed and the manner in which they were killed all point to a drunken massacre – not an effort to quell an uprising.  *See, e.g.*, *Ordinola*, 478 F.3d at 601 (political offense exception did not apply where "[n]one of the victims . . . were armed at the time of attack or engaging in any overt hostility toward the Peruvian government").

Although Judge Dubé reached a different conclusion when Argentina first sought Mr. Bravo's extradition, the court's view rested on the premise that the prisoners were engaged in a violent escape attempt in the middle of a rebellion against the country's government.  The Government now argues that this view is entirely untenable because, since that time, the Argentine courts have made factual

findings that there was no attempt to escape prison.  The Government also points out that that the Appellate Court has confirmed the validity of these findings and that Mr. Bravo's version of these events has been repeatedly discounted.  In light of this new evidence the Government asserts that the political offense doctrine is of no help to Mr. Bravo because there is nothing political about shooting prisoners for the purpose of preventing their escape.  For these reasons, the Government concludes that the families of the massacre have waited half a lifetime for justice and that Mr. Bravo must be extradited back to Argentina.

Mr. Bravo's response is that the record is replete with evidence that satisfies the political offense doctrine. Mr. Bravo directs the Court to the testimony of two experts – Professor Solari and Jon Perdue ("Mr. Perdue") – to establish that the killings occurred during a period of uprisings and other political disturbances. Professor Solari testified, for example, that during the early 1970s, "viciousness . . . increased exponentially during that period of time."  [D.E. 30 at 60].  Professor Solari also stated that "[t]he terrorist organizations were carrying out in this particular case a revolution in order to go ahead and take over politically."  *Id*. at 84.

Mr. Bravo also relies on the expert testimony of Jon Perdue[6] who previously testified as to the level of violence during the time of the alleged massacre:

---

[6]    Jon Perdue was an expert when Argentina submitted its first extradition petition.  He was previously the Director of Latin American Programs for American Studies and now works for a governmental agency.

> Q. Tell us a little bit about the level of violence and the purpose of these terrorist organizations. First of all, were they terrorist organizations?
>
> A. Yes, they would certainly classify themselves, I think, as that as well at the time.
>
> Q. Was their purpose to overthrow the government of Argentina?
>
> A. They overtly stated so at that time, yes.
>
> Q. Were they involved in consistent uprisings and violence?
>
> A. This was a sustained and continuous revolution that took place from the mid, I say late '50s through -- I think at least to the Mingrets [phonetic] in Argentina after the Dirty War started in 1976, within about a year, a year-and-a-half.

[D.E. 30 at 13].

Mr. Perdue testified that there were seventeen violent insurgent groups operating in Argentina, *id*. at 16, and that there was a systemic revolution to overthrow the government in power:

> A. They had started in the late '60s and one in 1970. And this was a sustained and systematic revolution, overtly stated, and they -- in August, one year following the escape from Rawson prison, they formed, they even expanded and formed a --what was called the JCR, which was a Revolutionary Coordinating Committee in English, and that included what I mentioned from the southern cones, so they had -- they were just getting started about 1972, I would say.

*Id*. at p. 20.  Given this evidence, Mr. Bravo maintains that the first prong of the political offense doctrine is satisfied because there is undeniable evidence that the alleged massacre took place during a time of political upheaval:

> Q. Based on your expertise and having lived through it, are you of the opinion that in 1970, 1971 and 1972 there was a violent political disturbance such as war, revolution or rebellion?

> A. The terrorist organizations were carrying out in this particular case a revolution in order to go ahead and take over politically.

*Id*. at 84.

Mr. Bravo then turns to the second prong of the political offense doctrine and relies on the testimony of Professor Solari who stated that the shootings were incidental to and in the course of suppressing a violent terrorist revolution:

> Q. In your expert opinion, then, Rawson was incident to these ongoing hostilities?
>
> A. Absolutely.
>
> Q. And as a continuation from Rawson to Trelew, Trelew was also during the course of and incident to the hostilities?
>
> A. Absolutely.

*Id*. at 86.

Likewise, Mr. Perdue highlighted a direct connection between the prison break at Trelew and the armed revolutions:

> Q. Let me then just ask you, Mr. Perdue, for a couple of conclusions based on your research and based on the work that you've done in this area. You've already stated that the terrorism activities were not limited to civilians but were primarily aimed at the government. Do you consider this to be an attempt, a sustained attempt of revolutionary overthrow of the government?
>
> A. It was purely that.

[D.E. 30 at 27].

Mr. Perdue also testified that, based on his experience, he believed that the events that took place at Trelew were incident to the larger political disturbances at

the time:

> Q. And based upon your expertise, do you believe that the events that took place at Trelew were incident to that course of disturbance?
>
> A. It is part of the process, I would say.
>
> Q. I'm sorry?
>
> A. It was part of the process, I would say yes. The answer is certainly so.
>
> Q. Right. So in your expert opinion you believe that it was incident to the violence that was taking place in the 1970s leading up to the escape at Rawson and the incident at Trelew?
>
> A. And is doctrined as well to if incarcerated, escape, and escape and evasion is a part of their indoctrination as well.
>
> Q. Is that based on your research of the Montoneros and the ERP?
>
> A. As well as others.

[D.E. 30 at 27].

In sum, Mr. Bravo presented compelling evidence that the shootings at Trelew were a direct result of, and indeed "incident to," a violent uprising – first at Rawson and then at Trelew.  So the use of deadly force by the military officers guarding the prisoners was a consequence of sustained and continuous armed revolution to overthrow the government.  [D.E. 30 at 86 (Professor Solari testifying that "the prisoners were obligated to break out of any prison they were held."); *id*. at 28 (Jon Perdue stating that "escape and escape and evasion is a part of their indoctrination")].  Mr. Bravo concludes, as did Judge Dubé, that the political offense doctrine applies and that the Government's petition must be denied.

### 1.    *Burden of Proof*

Before we go any further, we must clarify the burden of proof needed for the political offense doctrine to apply.   The doctrine is "an affirmative defense to extradition," and the extraditee bears "[t]he initial burden of proof . . . to establish the essential elements of the political exception."   *Vo*, 447 F.3d at 1242 n.7 (quoting *United States v. Pitawanakwat*, 120 F. Supp. 2d 921, 928 (D. Or. 2000)).   "Once established, the burden shifts to the demanding government 'to prove that the crime charged in the Complaint was not of a political character.'"   *Pitawanakwat*, 120 F. Supp. 2d 921, 928 (D. Or. 2000) (citation and quotation marks omitted)

Mr. Bravo suggests that, to avail himself of the political offense doctrine, he needs to only present evidence that "tends to show" the political character of the alleged offense.   This is the same standard that Judge Dubé used in 2010, but it is unclear whether Judge Dubé considered this burden to be lower than a preponderance of the evidence.   The "tends to show" language originates from *Ramos v. Diaz*, yet that decision also does not make clear the minimum quantum of proof that is necessary for the political offense doctrine to apply.   179 F. Supp. 459, 463 (S.D. Fla. 1959) ("American authority indicates clearly that when evidence offered before the Court tends to show that the offenses charged against the accused are of a political character, the burden rests upon the demanding government to prove to the contrary.").

These cases are not outliers, as many decisions over the last several decades have tended to gloss over the required burden of proof.  Yet, more recent cases have confirmed that the burden should, at the very least, be a preponderance of the evidence and that an extraditee cannot merely suggest the *possibility* that his or her actions were political.  *See, e.g., Ahmad*, 726 F. Supp. at 408 (applying a preponderance standard to the political offense doctrine but noting that "[d]eference to the State Department might justify a higher standard such as 'clear and convincing'"); *see also Mujagic*, 990 F. Supp. 2d at 225 (applying a preponderance standard); *In re Extradition of Singh*, 2005 WL 3030819, at *21 (E.D. Cal. Nov. 9, 2005) (same).

Given the cases referenced above and the absence of any other authority that allows for an affirmative defense under federal law that allows for anything less than a preponderance of the evidence, the Court will use this standard to apply the political offense doctrine.  Importantly, however, the application of this standard highlights an important difference between the political offense exception and the prima facie probable cause analysis.  This defense invites the Court to review the evidence affirmatively presented by the defendant and requires the Court to view that analysis from his perspective, not just from the perspective of the requesting party.  The fact that, in isolation, we find the requesting country's proof sufficient to trigger extradition under the treaty does not dispose of this narrower issue that requires the Court to consider whether prima facie evidence of the political offense

defense is also present in the record.  With that understanding we proceed with the analysis of the incidence test that applies in this case.

### 2.        *The Incidence Test*

To reiterate, the incidence test requires that (1) an act involve an uprising or some other violent political disturbance (i.e. war, revolution, or rebellion), and (2) evidence that the act was incidental to that uprising or disturbance. *See Garcia–Guillern*, 450 F.2d at 1192 ("To qualify as a relative political offense, the murder of Valenzuela 'must [have] involve[d] an 'uprising' or some other violent political disturbance' and the murder 'must have been incidental to the' alleged uprising or disturbance.") (citing *Escobedo*, 623 F.2d at 1104).   The Eleventh Circuit has adopted and followed the incidence test when questions over the political offense exception are raised.   *See also Meza,* 693 F.3d at 1359 ("Yacaman's alleged crime does not qualify as a relative political offense because Valenzuela was not murdered in the course of any uprising or violent political disturbance.").

Mr. Bravo's case for applying the political offense exception hinges on the finding that the prisoners at Trelew belonged to a violent terrorist group that was militantly opposing the then military government.  After their arrest and detention, they engaged in an attempted escape from the facility where they were housed, which led Mr. Bravo and the military officers in his command to use lethal force to stop them.  He further claims that these prisoners were trained in escaping from prison and that Trelew was a continuation of other events at the time in how

extremists waged war against the government.  He even went so far as to argue that, even if the prisoners were unarmed and not attempting to escape, their killings would still be justified because there was an uprising at the time and the prisoners belonged to a terrorist group.

As to that latter point, there is not much support for such a broad proposition.  Federal courts have rejected the argument that an extraditee "cannot avail himself of the [political offense] defense merely because the alleged crimes occurred at the same time as a political disturbance." *Matter of Extradition of Artukovic*, 628 F. Supp. at 1376; *see also Eain,* 641 F.2d at 520–21 ("The [political offense] exception does not make a random bombing intended to result in the cold-blooded murder of civilians incidental to a purpose of toppling a government, absent a direct link between the perpetrator, a political organization's political goals, and the specific act."); *Mujagic*, 990 F. Supp. 2d at 227 (N.D.N.Y. 2013) (the killing of disarmed combatants fell outside the scope of the political offense exception); *In re Extradition of Nezirovic*, 2013 WL 5202420, at *18 (W.D. Va. Sept. 16, 2013) (rejecting a similar argument for applying the political offense exception "[e]ven if the prisoners . . . were unarmed soldiers, as Nezirovic claims").  *But see Quinn,* 783 F.2d at 806 (Reinhardt, J., with one judge concurring) (finding that even an atrocity, if undertaken for "purely political purposes," qualifies as a non-extraditable political act).

Instead, the required inquiry must be focused on the circumstances of each case, the status of those harmed, and not simply on whether the acts were merely committed during a political uprising. *See Ornelas,* 161 U.S. 502 at 511-512 (stating that extradition courts should consider "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed[.]"). If the analysis was as simple as Mr. Bravo contends, any rogue military or law enforcement official could avoid extradition with the killing of defenseless civilians merely because he claimed that the victims were political opponents of the government. That cannot be the case. *See Ordinola*, 478 F.3d at 600 (finding that the political offense exception cannot be read to protect any act – no matter how unjustifiable and no matter the victim – "simply because the suspect can proffer a political rationale for the action."). Therefore, even if the prisoners were members of a political opposition group before being taken into custody, that fact alone would not immunize Mr. Bravo under the political offense doctrine. *See, e.g., Eain,* 641 F.2d at 521 ("the political offense exception was not meant to protect "the indiscriminate bombing of a civilian populace . . . even when the larger 'political' objective of the person who sets off the bomb may be to eliminate the civilian population of a country."); *Ahmad,* 726 F. Supp. at 405 ("An army should not be held guiltless if it vindictively slaughters civilians."), *aff'd,* 910 F.2d at 1066 (following *Eain* and holding that an attack on a commercial bus carrying civilians is not a political offense despite political motivation"); *see also Barapind,* 400 F.3d at

756 (en banc dissent) (disagreeing with majority and arguing that circuit law should dictate that attacks on non-combatant civilian targets should be excluded from political offense exception); *Nezirovic v. Holt*, 779 F.3d 233, 241 (4th Cir. 2015) (affirming extradition on habeas review where "the acts of torture allegedly perpetrated by Nezirovic against civilians preclude application of the political offense exception.").

With that understanding, the narrow question presented is whether Mr. Bravo has shown that the killings were incident to a political rebellion in Argentina. The Government contends that Mr. Bravo woke the prisoners from their cells, ordered them to stand in a line, and then killed them in cold blood, independent of any rebellion.  Mr. Bravo argues, on the other hand, that the Government's version ignores the fact that one of the prisoners had taken a weapon from a guard, initiated an escape attempt, and that the killing of some of the prisoners was incident to the lawful execution of the guard's duties and necessary for their self-defense.

This presents a highly factual dispute that would ordinarily require the Court to make preliminary credibility findings and factual conclusions, which even in the political offense context would be very hard to do.  Ordinarily an extraditee cannot merely dispute that his offenses occurred in the manner described in the petition, because that would leave the Court with little record basis to reject the petition on this score. *See, e.g., Karadzole v. Artukovic*, 247 F.2d 198, 202 (9th Cir.

1957) ("The sole question therefore before the District Court was whether on the face of the Complaint and the attached Indictment, together with the facts of which the court could take judicial notice, it could clearly be said that the offenses charged were of a political character.").

But the Court can consider the facts in the Petition and then "look . . . for evidence as to whether or not violent political activity was unfolding at the time to which the facts relate, and of the individual's recognizable connection to that violence." *Eain*, 641 F.2d at 516. After all, because the burden of showing application of the exception rests on the extraditee, the Court would not be honoring the treaty language if it simply looked to the face of the petition and ignored the evidence proffered by the extraditee in this respect.

Here, Judge Dubé agreed with Mr. Bravo that a compelling case was made that the political offense exception applied. That finding was based on the record presented, including expert testimony, that revealed to him the extent of the political rebellion that was underway at the time these individuals were taken into custody. And that expert testimony was buttressed by the record evidence showing that a full investigation was conducted immediately following the tragedy. That investigation yielded the following findings of fact:

> From the analysis of the evidence on record, it appears that the attempted escape, previously mentioned, took place under the following circumstances: on August 22 of this year, at approximately 0300 hours, Lieutenant ROBERTO GUILLERMO BRAVO assumed guard duty over the extremists housed in the cells on the Naval Airbase, which contained members of that group, with Marine Corps

Corporal Second Class M.R. 333.046 CARLOS AMADEO MARANDINO and M.R. 327.189 JUAN HIPOLITO MARCHAN, both armed with P.A.M. machine guns. Said officer, explained, that he had heard whispering and suspicious noises coming from the cells, and for that reason he decided to order the detainees to come out of the cells where they were housed. Moreover, he ordered them to place their blankets and mats in the hall in front of the cells and to line up against the wall, facing the entrance, as shown in the photographs exhibited on pgs. 320/321.

Before the detainees finished forming a line, Marine Corps Corvette Captain, LUIS EMILIO SOSA Second Commander of the Marine Corps Battalion No. 4, officer in charge of guarding the prisoners, had entered the premises, followed by Navy Lieutenant EMILIO JORGE DEL REAL, and a few moments later by Corvette Captain JUAN CARLOS ANTONIO HERRERA.

Under these circumstances, Lieutenant BRAVO gave permission for corporal MARCHAN to go to the bathroom, leaving corporal MARANDINO as the only auxiliary personnel. For greater security, BRAVO states that he took one of the P.A.M. machine gun and he gave his 11.25 mm handgun to MARANDINO, and the other machine gun to Lieutenant DEL REAL. Captain HERRERA was unarmed.

These were the circumstance, as it is recorded in the legal proceeding, that at that time Captain SOSA, who was carrying a 11.25 mm handgun in his holster, entered between the two lines of detainees, walking the back and forth down the hallway, while at the same time addressing the detainees, exhorting them to strictly respect the orders that were given and not to speak. It was at that moment, when he walked back and stopped at the side of the terrorist standing first in line - MARIO PUJADAS - that he was attacked by him from behind, using a "Karate" move, and his weapon was taken from him.

An immediate struggle ensued between the extremist PUJADAS and Captain SOSA, who was able to free himself and started to walk "crawl" to the place where the other officers and the corporal were. At the same time PUJADAS fired the weapon at the guard - the bullet hit the bathroom door - and the other extremist began to advance together on the other three officers and corporal MARANDINO.

63

The photographs on pgs. 322 to 325 illustrate the way in which the previously stated events took place, and the floor plan appearing on pg. 29 shows the positions occupied by all the protagonists. Faced with this emergency, Lieutenant BRAVO started to fire his P.A.M. machine gun, followed by Lieutenant DEL REAL with a similar weapon, and Corporal MARANDINO with a 11.25 caliber handgun.

As a result of the attempted escape and the consequent shoot-out, sixteen extremists died: HUMBERTO ADRIAN TOSCHI, JOSE RICARDO MENA, ALEJANDRO JORGE ULLA, CLARISA ROSA LEA PLACE, MARIANO PUJADAS, MARIA ANGELICA SABELLI, HUMBERTO SEGUNDO SUAREZ, EDUARDO ADOLFO CAPELLO, ALBERTO CARLOS DEL REY, SUSANA LESGART, CARLOS HERIBERTO ASTUDILLO, MARIO EMILIO DELFINO, ANA MARIA VILLARREAL, MIGUEL ANGEL POL TI, RUBEN PEDRO BONET and ALFREDO ELIAS KOHON. RICARDO RENE HAIDAR, ALBERTO MIGUEL CAMPS and MARIA ANTONIA BERGER survived, and were subsequently transferred to the Naval Hospital in Puerto Belgrano. It should be stated here that a few minutes after the events took place the entire Health Care staff at the Naval base went into action in order to treat all those who had been shot.

As far as analyzing the conduct of the military personnel that intervened in the events, I should stress that, after a thorough analysis of the exhaustive investigation that was carried out, the sworn witness statements, . . . medical reports, . . . expert testimony on ballistics, . . . expert testimony on the wounds . . . etc., I draw the conclusion that there is no convincing evidence, not even circumstantial evidence, which would allow criminal charges to be brought against the personnel who intervened in the suppression in order to prevent the escape and PUJADAS' rash behavior. In this sense, I agree with the opinion of the Investigative Judge, that the grounds for exemption from responsibility set out in Art. 34, paragraphs 4, 5, and 6 of the Criminal Code come into play here in relation to the military personnel's conduct.

Aside from this, as far as HAIDAR's and CAMP's affirmations are concerned . . . the charges that they made in their statements against the military personnel - that they had tried to kill them after the shootout had ended - the medical and ballistics expert testimonies completely disprove them and demonstrate their falseness.

64

[D.E. 31, Exh. 12, at 86-88].

As for the context in which all this occurred, the record contains the following recitation of the events that immediately preceded the killings at the Naval Base, in which the same detained individuals committed a violent prison break from Rawson prison, killing one guard and wounding another, followed by them taking over an airport and hijacking an airplane:

> After the detainees had been counted, the routine relieving of the prison guards took place — except that on that occasion the relief men were the detainees dressed in uniforms. They took over all the guard posts, booths, doors and dormitories of the reserve guards, stealthily, while the only reaction they encountered came from the exclamations of surprise by the prison guards.
>
> As they advanced, the members of the group, who had been determined beforehand as everything had been planned in advance, removed the uniforms from the members of the force they were subduing and put them on themselves.
>
> When he approached one of the outside posts of the prison, prison guard Juan Gregorio Valenzuela became suspicious of the group of detainees wearing uniforms; he allegedly informed his colleague Gallarraga of this, and fired his gun. Those who made up the first group that intended to escape allegedly returned fire with machine guns, shooting Gallarraga, who fell to the ground, and also shooting Valenzuela. As a result, Valenzuela was killed and Gallarraga was injured. After making signs to the group of vehicles that was meant to enter and pick them up, at first there was no response, but in the end only one of the vehicles called upon entered and, in accordance with the plan, the six men who made up the first group and had spearheaded the taking over of the prison, climbed into the vehicle.
>
> Those six men were able to commandeer an airplane and leave the airport, but the remaining nineteen terrorists left behind at Rawson had to find transportation and they arrived at the airport after the plane had left.

65

* * *

> Next they took over the Airport of Trelew, holding several people hostage, and faced with the impossibility of boarding a plane decided to surrender to the civilian and military authorities that arrived there.

[D.E. 1-2, EX-BRAVO-0638-0639].

So, this record presents a highly unique set of circumstances. Ordinarily, a person who engages in terrorist or murderous acts has not been adjudicated in any proceeding in the extraditing country, and thus the record on extradition is limited to the facts amassed in the requesting country's petition. And that petition would more likely than not dispel any notion that the acts in question were incident to any political rebellion. Here, by contrast, Judge Dubé was presented with a case where a government military official was the subject of an official proceeding at the time of the events, which amassed a record of a violent uprising by people who could have been treated as terrorists, and who later engaged in a confrontation with the military officials in furtherance of that uprising. The natural consequence of this is that one can then reasonably draw the conclusion that, regardless of the precise details of who did what to whom, the entire tragedy took place "incident to" a violent political uprising.

In other words, what the government glosses over here is that we need not find that, in fact, the original government investigation was accurate or not. The fact that it was conducted in the first place, that it amassed evidence in the course of that investigation that supported the connection between the act and an ongoing

rebellion, and the fact that years later a very different government is *discounting* that entire investigation, all evidence a politically fraught and turbulent period of time in the history of Argentina.  And while that political rebellion was front and center, the government responded (rightly or wrongly) with the use of force to arrest what it considered to be rebels and terrorists.  Mr. Bravo found himself in the middle of that uprising.  So, whether he and his officers engaged in legitimate use of force, or whether they ultimately engaged in illegitimate use of force, is not dispositive for our purposes.  What is dispositive is that the record in this very unusual case gives rise to a strong inference that the entire set of tragic circumstances presented here took place during a violent political rebellion.  As the Seventh Circuit put it in *Eain*, which involved extradition of an alleged Palestinean terrorist, "the formulation of the political offense exception does not require any such 'recognition' [that the PLO was a legitimate political group].  It requires only the recognition that there occurred violent acts and political tensions that resulted in the charged criminal acts." 641 F.2d at 515.

Our review of the record shows that Judge Dubé's analysis may be entirely correct.  Was there a violent political disturbance underway in the requesting country at the time alleged acts were committed?  The record on that score yields only one possible conclusion: yes.  The government has not challenged, for instance, the expert testimony or the findings of the 1973 investigation that documented the prisoners' overt involvement with the rebellious group trying to undermine the

military government, through the use of violence and terrorist acts.   Morally justified or not, this record evidence fully supports Judge Dubé and his finding that the events that transpired in 1973 occurred in the midst of a violent political rebellion.

Given that this is the case, were the acts charged against the person whose extradition is sought "recognizably incidental," as *Eain* put it, to the disturbance? (*Id*.).   A dispassionate review of this record shows that indeed it is more likely than not that the answer is also yes.   In other words, "[i]n considering the presence of a political offense, the court determines whether the crime charged *stemmed from political violence.*" *Id*. (emphasis added).   Judge Dubé found that it did.   Having reviewed the entire record exhaustively once again, it is hard to argue with that conclusion.   Unlike a case where a terrorist blows up a bus full of civilians and seeks refuge under the political offense doctrine, which rightly fails to meet the second prong of the political offense test, Mr. Bravo's actions in defense of his military command and the Argentine government of the day (rightly or wrongly) were directly related to his assigned role during the rebellion.   As *Eain* put it, this finding cannot be tied to his motivation to fire his weapon or convey orders that night. *See also Escobedo,* 623 F.3d at 1104 ("An offense is not of a political character simply because it was politically motivated."). Rather, the focus is whether he committed acts that, within the context of a political rebellion, disrupted (in the case of a rebel)

or sought to uphold (in the case of a military or law enforcement official)[7] "the political structure of a State" as opposed to the social structure that established the government.  *Id.* at 520-21.  That yields a very different result in Mr. Bravo's case, as opposed to the Palestinean terrorist in *Eain*:

> The exception does not make a random bombing intended to result in the cold-blooded murder of civilians incidental to a purpose of toppling a government, absent a direct link between the perpetrator, a political organization's political goals, and the specific act. Rather, the indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger "political" objective of the person who sets off the bomb may be to eliminate the civilian population of a country. Otherwise, isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of political upheaval, a result we think the political offense exception was not meant to produce.

*Id.* at 521.

By contrast, most cases (like some of the ones discussed above) that have reviewed the political offense exception rejected, rightly so, an extraditee's attempt to use this very limited defense to immunize criminal acts motivated in part by

---

[7]      The government has not argued to the contrary.  In other words, there is no argument here that Mr. Bravo, as a defender of the then government in his military capacity, is not entitled to benefit from the political offense exception, unlike a political opponent of that government.  Such an argument would be foreclosed by long standing precedent that supports precisely such an application of the exception.  *See, e.g., In re Gonzalez,* 217 F. Supp. 717, 721 (S.D.N.Y. 1963) ("A leading American case in this area establishes that the political offense exception is applicable to acts of government agents seeking to suppress an uprising, as well as to the acts of those participating in the uprising." (citing *In re Ezeta,* 62 F. 972, 1002 (N.D.Cal.1894); *Karadzole v. Artukovic,* 247 F.2d 198, 202-04 (affirming application of exception to former Minister of Interior who ordered execution of thousands of rebels during political revolt), *rev'd on other grounds,* 355 U.S. 393 (1958) (remanding on procedural grounds)).

political activity or disagreement, or even occurring during political unrest.  *See also Ordinola,* 478 F.3d at 600 (although crime occurred during a period of political rebellion in Peru, political offense exception did not apply where extraditee charged with murdering and kidnapping non-combatant civilians); *Barapind,* 400 F.3d at 750 (although murders occurred during a period of violent political disturbance in India, murders of passerby civilians who had no role in the government targeted in the disturbance could not give rise to a political offense exception); *Escobedo,* 623 F.2d at 1101-02 (murder committed during course of kidnapping Cuban Consulate official by Mexican nationals were not incidental to any political uprising or rebellion taking place in Mexico at the time) (affirming denial of habeas review from Magistrate order granting motion to extradite from the Southern District of Florida).

Mr. Bravo's case, however, can be distinguished from this long line of cases precisely because it involves a government agent combatant (a military officer) alleged to have committed crimes during a political uprising against rebels/combatants revolting against his government.   That is a much rarer circumstance, but one that has been recognized as triggering the political offense exception.

In one of the earliest cases to do so, *In re Ezeta,* the extraditees included the vice-president and commander-in-chief of the army of Salvador, together with other military officers, who were charged with multiple offenses, including murder in the

hanging death of a young man accused of being a spy during the revolution against his government. 62 F. at 976. The court ruled that the offense occurred during a state of siege and that Ezeta and other defendants were seeking to maintain the authority of the government against a revolutionary uprising. Under the political incidence test that it espoused, Ezeta was not extradited. *Id.* at 976, 1002. Notably, a separate defendant was extradited because the attempted murder he was charged with occurred before the uprising occurred. So, in his case, the political offense exception could not apply. *Id.* at 985-86.

More recent cases involving political rebellion in Northern Ireland underscore how the exception could apply in a case like this one. In a non-published case, *In Re McMullen,* a former member of the Irish Republican Army (IRA) sought by the United Kingdom on charges related to an IRA bombing of a military barracks was not extradited. No. 3-78-1099-MG (N.D. Cal. May 11, 1979), *cited in* Note, *American Courts & Modern Terrorism: the Politics of Extradition,* 13 N.Y.U. J. Int'l L. & Pol. 617, 637-38 (1980). This offense was deemed political under the political incidence test. The Magistrate Judge found that the conflict in Northern Ireland was a political uprising and that an attack on such a military target was incidental to and part of that uprising.

Similarly, the Second Circuit in *In re Mackin* affirmed the findings of a Magistrate Judge who refused to extradite a member of the IRA charged by the United Kingdom with the attempted murder of a British soldier in Belfast. 668 F.2d

122 (2d Cir. 1981).  The presiding judge found that at the time of the murder a political uprising was underway, that the extraditee was an active member of the IRA, and that the offense was incidental to his role in the political uprising. So it was an offense of a "political character" within the meaning of the treaty.  Though the holding of the case really is that the Magistrate Judge's conclusion was not subject to review on appeal, Judge Friendly's opinion emphasized that the reviewing judge has an independent duty to determine whether the offense falls within the political exception provision of the treaty notwithstanding the strong policy preferences espoused by the government in the exercise of its broad foreign relations power. *Id.* at 137.

And, applying that judicial power, a Magistrate Judge in *United States v. Doherty* reached the same conclusion. 599 F. Supp. 270 (S.D.N.Y. 1984).  That case also involved an IRA rebel who was charged with murder of a British army officer on patrol in Northern Ireland.  The officers encountered Doherty and his cohorts, who were lying in wait, and they exchanged gun fire when officers approached. This then led to an officer's death and to Doherty's arrest.  While on trial, Doherty escaped and landed in the United States.  *Id.* at 272-73.  After the United Kingdom requested his extradition, the reviewing Judge concluded that the political offense exception barred extradition.  The Judge recounted the history of violence between Irish republicans and the British government that led to a period of violent rebellion in the early 1970s (similar to the period of time at issue in our case).  And

because the murder at issue occurred in combat that flowed directly from that rebellion, the political offense exception was triggered. *Id.* at 274-76.

In particular, the Court's analysis of the proper application of the exception is quite persuasive and apt for our purposes:

> Considering the offenses for which extradition is sought in the light of these precepts, the Court is constrained to conclude that the political offense exception clearly encompasses those offenses. . . . [T]he facts of this case present the assertion of the political offense exception in its most classic form. The death of Captain Westmacott, while a most tragic event, occurred in the context of an attempted ambush of a British army patrol. It was the British Army's response to that action that gave rise to Captain Westmacott's death. . . . The Court further concludes that his escape from Crumlin Road prison, organized and planned as the evidence established that it was, under the direction of the PIRA and to effect its purposes rather than those of Doherty himself, was also political.

*Id.* at 275, 276, 277.

Similarly, the Judge distinguished this set of facts from more traditional cases that do not justify the exception:

> We are not faced here with a situation in which a bomb was detonated in a department store, public tavern, or a resort hotel, causing indiscriminate personal injury, death, and property damage. Such conduct would clearly be well beyond the parameters of what and should properly be regarded as encompassed by the political offense exception to the Treaty. . . . Nor is this a case where violence was directed against civilian representatives of the government, where defining the limits of the political offense exception would be far less clear. Similarly, this is not a case where the alleged political conduct was committed in a place other than the territory where political change was to be effected, a circumstance that would in all probability render the political offense exception inapplicable.

*Id.* at 275-76.

Accordingly, the Court deemed itself constrained to enforce the political offense exception based on the nature of the offense as well as "the nature of an organization, its structure, and its mode of internal discipline, in deciding whether the act of its members can constitute political conduct under an appropriate interpretation of the Treaty." *Id.* at 276.[8]

What if another very similar case came along, which instead involved a government military officer who shot and killed a rebel in his custody?  And what if that official was investigated and cleared of wrongdoing by the then presiding government?  And after that officer retires and moves to the United States, a very different government in effect tries him in abstentia and seeks extradition?  Should the political offense exception also equally apply?   Obviously, the case we are envisioning is *this* case, where the military official is alleged to have wrongfully used deadly force on rebel prisoners in his custody.  That scenario still gives rise to the political offense exception just as in *Ezeta* and *Doherty*.  The murderous acts took place in defense of the existing government structure against undisputed

---

[8]    The government again was dissatisfied with the Judge's finding and sought to undermine it through a declaratory judgment action filed with a District Judge. That effort was rebuffed, with Judge Friendly again reasserting that the political offense question, with all appropriate deference to the government's foreign policy interests, was left for the Magistrate Judge. *United States v. Doherty,* 615 F. Supp. 755 (S.D.N.Y. 1985), *aff'd,* 786 F.2d 491, 503 (2d Cir. 1986).  Also note that after *Doherty* and this line of cases, the United Kingdom and United States amended their extradition treaties to narrow the scope of the political offense exception and remove violent "relative" political offenses from consideration. See, e.g., James T. Kelly, *The Empire Strikes Back: The Taking of Joe Doherty,* 61 Fordham L. Rev. 317, 349 (1992).

rebels of the government, as in *Ezeta*, and the analysis adopted by this line of cases applies equally to that circumstance to preclude the extradition of that military officer because the alleged crime occurred in the midst of violent political rebellion. That rebellion resulted in casualties on both sides under very conflicting and disputed circumstances.

Undoubtedly, and fortunately, circumstances such as these are exceedingly rare. For good reason. The State Department would not ordinarily seek extradition of a bona fide political prisoner who escaped incarceration from a totalitarian state that charged him with committing crimes against that state's officials. In reality, of course, those clear cut easy cases are out-numbered by much harder, messy ones that implicate a whole host of political and legal considerations. *See, e.g., United States v. Posada Carriles,* 541 F.3d 344 (5th Cir. 2008) (recounting history of alleged Cuban dissident who was charged with bombing civilian airliner, killing 73 people, and escaping custody in Venezuela, who later illegally entered the United States but not extradited to Venezuela notwithstanding extradition treaty) (defendant was charged only with illegal entry through false statements, which indictment was initially dismissed but reversed on appeal for trial; defendant ultimately tried and acquitted and released from custody).

Here, we have a very hard case. In exercising its important role in the process, this government has given much thought to, and expertly developed a record to support, this second extradition request. We are bound as much as

possible to defer to the government's views on the wisdom and necessity of complying with Argentina's request from a foreign affairs point of view. *See, e.g., United States v. Fernandez-Pertierra*, 523 F. Supp. 1135, 1141-42 (S.D. Fla. 1981) (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Haig v. Agee*, 453 U.S. 280 (1981) (noting that a "long judicial tradition" supports a "general judicial policy of deference to the executive in the area of foreign relations")).

But we have an equal obligation to engage in limited judicial review of a narrower legal issue: whether the terms of the treaty preclude extradition notwithstanding the government's rightful discretion. In this case, Judge Dubé found, and I concur, that a case has been sufficiently made for application of the political offense exception.

### III.   *CONCLUSION*

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that the Government's motion [D.E. 27] for an order certifying the extradition of Mr. Bravo is **DENIED**. The Court does not find there to be compelling and persuasive reasons to upset the Judgment entered by Judge Dubé in 2010, at least with respect to the application of the political offense exception. Accordingly, extradition is barred under the terms of the existing treaty with Argentina and the United States. The Court's Order setting bond for the Defendant is also **VACATED**. The case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of

October, 2023.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

77